No. 17-16161

# IN THE

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

**Facebook, Inc**.,

*Plaintiff-Appellee*,

*v.*

**Power Ventures, Inc. and Steven Vachani**,

*Defendants-Appellants*,

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, Honorable Lucy Koh

## APPELLANTS' JOINT OPENING BRIEF

Amy Sommer Anderson, SBN 282634
Aroplex Law
156 2ⁿᵈ Street
San Francisco, California 94105
Telephone: 415-529-5148
Facsimile: 415-970-5016

Counsel for Defendant-Appellant,
POWER VENTURES, INC.

STEVEN VACHANI
2425B Channing, #216
Berkeley, CA 94704
Telephone: (917) 267-8823

*Pro se* Defendant-Appellant

## CORPORATE DISCLOSURE STATEMENT

There is no parent corporation and no publicly held corporation that owns 10% or more of Power Ventures, Inc.'s stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES CITED ........................................................iv

JURISDICTIONAL STATEMENT ..........................................................1

INTRODUCTION ....................................................................................1

STATEMENT OF ISSUES .......................................................................3

PERTINENT LEGAL PROVISIONS .......................................................3

STATEMENT OF THE CASE ...................................................................4

   I.   THE PARTIES AND THEIR BUSINESS DISPUTE. ....................................4

   II.   PROCEDURAL POSTURE AND CURRENT ISSUES..............................8

   III.   RECENT EVOLUTIONS IN RELEVANT LEGAL STANDARDS. ..........12

       A. *The Ninth Circuit Overruled the District Court's Standard Applied in the Instant Matter to Determine When Access Is 'Without Authorization.'* .12

       B. *The Implications of hiQ v. LinkedIn in Protecting Appellants' Equitable and Constitutional Rights Under CFAA*...............................................15

ARGUMENT...........................................................................................18

   I.   THE DISTRICT COURT'S NONCOMPLIANCE WITH THE NINTH CIRCUIT'S MANDATE AND ITS REFUSAL TO REQUIRE EVIDENTIARY SUPPORT FOR ITS ORDER AND JUDGMENT DEPRIVED APPELLANTS THE BENEFITS OF THEIR SUCCESSFUL APPEAL AND SUBSTANTIVE RIGHTS TO DUE PROCESS. ...............22

       A. *The District Court's Orders on Summary Judgment, Judgment Following Remand From the Ninth Circuit, and Findings of Law Under CFAA and § 502 Are Reviewed De Novo*.................................................................24

         1. Review of the District Court's Compliance With a Directive on Remand From This Court Is De Novo. .............................................24

         2. The District Court's Conclusions of Law Are Reviewed De Novo, Including a Decision to Award Attorney Fees.....................................25

         3. A District Court's Ruling on Motion for Summary Judgment is Reviewed De Novo. ..........................................................................25

4. A Determination of 'Loss' Under CFAA and § 502 is a Specific Jurisdictional Requirement and Is Reviewed De Novo. ....................26

    a. The Question of a Plaintiff's Jurisdictional Statutory Standing Can Be Raised at Any Time. .......................................................26

    b. Facebook Must Prove at Least $5,000 in Qualifying Losses. .....26

5. Civil Violation of Cal. Pen. Code § 502 ...............................................29

B. *Significant Ninth Circuit Findings Overruled the District Court's Basis for Determining Facebook's Standing and/or Determining Damages Under CFAA and § 502.* ...........................................................................29

1. The Ninth Circuit Reversed and Dismissed the Primary Claim Under the CAN-SPAM Act, on Which Facebook's 'Loss' Was Based and Summary Judgment Was Entered. ......................................................29

2. The District Court's Standard for Determining When Appellants' Access Was 'Without Authorization' Was Overruled by the Ninth Circuit, Which Substantially Negated the Factual Findings on Which Summary Judgment and Damages Were Decided. .............................31

C. *Facebook's Post-Remand Admissions Undermine the Credibility and Characterization of the Evidence on Which the District Court Determined Summary Liability and Compensatory Damages* ...............32

D. *Taken at Face Value, Facebook's Evidence Is Not Sufficient to Support an Award of Compensatory Damages and Wholly Inadequate to Establish Standing to Bring this Civil Action.* .......................................37

1. The Whole of Facebook's Evidence Lacks Credibility on Its Face and Is Insufficient to Support Facebook's Claim for Damages or 'Loss' on Summary Judgment ...............................................................................38

2. The Alleged Costs for McGeehan's Time Were Awarded Absent Evidence of What McGeehan Actually Did or When He Did It. ........41

3. Facebook's Attorney Fees Are Not Qualified 'Losses' or Sufficiently Proven Compensable Damages ...........................................................42

4. The District Court Erred in Refusing to Consider the Merits of Appellants' Challenges to Facebook's Evidence Following Changes of Law and Consequential Facts. ..........................................................43

E. *The Ninth Circuit's Findings Substantially Narrowed the Scope of Liability on Which the District Court Based Its Over-Broad Permanent Injunction.* ................................................................................45

   1. Standard of Ninth Circuit Review & Substantive Questions of Law..45

   2. The District Court Exceeded Its Power by Awarding Injunctive Relief Under CFAA Because Facebook's Case Under § 1030(g) Is Categorically Excluded From Providing Any Non-Economic Relief.46

   3. The District Court Erred in Permanently Enjoining Appellants from Activities Relevant Under Only the CAN-SPAM Act and CFAA......47

   4. The District Court Erred in Issuing Its Revised Permanent Injunction Against Appellants Because the Scope Is Over-Broad and Permits Arbitrary Discrimination Regarding a Service, the Use of Which Is Critical to Appellants' Legitimate Business Interests.........................48

II. THE DISTRICT COURT'S FAILURE TO COMPLY WITH THE MANDATE RESULTS IN VIOLATION OF THE RULE OF LENITY AND DEPRIVES WOULD-BE LITIGANTS DUE PROCESS. ..........................49

III. REQUESTED RELIEF .................................................................54

  A. *Reversal of Summary Judgment and Dismissal of Facebook's CFAA and § 502 Claims Is Warranted and Necessary.* ..............................................54

  B. *Short of Dismissal, Summary Judgment on CFAA and § 502 Claims Should Be Reversed and Remanded for Jury Trial.* ..............................54

  C. *At the Very Least, the Judgment Should Be Vacated and Remanded With Specific Instructions to the District Court.* ..............................................55

CONCLUSION & SUMMARY OF REQUESTED RELIEF ................................56

CERTIFICATE OF COMPLIANCE ........................................................58

STATEMENT OF RELATED CASES ......................................................59

CERTIFICATE OF SERVICE ...............................................................60

ADDENDUM TO THE BRIEFS ...........................................................61

# TABLE OF AUTHORITIES CITED

| Constitution, Statutes, Regulations, and Rules | Page No. |
|---|---|
| 15 U.S.C. §7701 - Controlling the Assault of Non-Solicited Pornography And Marketing Act of 2003 ("CAN-SPAM Act") | 6-11 18, 24, 29-31, 46-48 |
| 18 U.S.C. § 1030 - Computer Fraud and Abuse Act ("CFAA") | 2-4, 6-13, 15-20, 22-24, 26-29, 31, 38, 42-45, 46-47, 50-56, 61 |
| 28 U.S.C. § 1291 | 1 |
| 28 U.S.C. § 1331 | 1 |
| 28 U.S.C. § 1367 | 1 |
| Cal. Pen. Code § 502 | 2-4, 6-13, 15, 18-24, 26, 29, 38, 44, 46-56, 69 |
| Fed. R. Civ. Proc. § 12 | 26 |
| Fed. R. Civ. Proc. § 56 | 25, 38 |

| Cases | Page No. |
|---|---|
| *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242 | 39, 55 |
| *City of Chicago v. Morales* (1999) 527 U.S. 41 | 50 |
| *eBay Inc. v. MercExchange, L.L.C.* (2006) 547 U.S. 388 | 46 |
| *Lujan v. National Wildlife Federation* (1990) 497 U.S. 871 | 55 |
| *Adler v. Federal Republic of Nigeria* (9th Cir. 2000) 219 F.3d 869 | 44 |
| *Facebook, Inc. v. Power Ventures, Inc.* (9th Cir. 2016) 828 F.3d 1068 | 10 |
| *Hall v. City of Los Angeles* (9th Cir. 2012) 697 F.3d 1059 | 24 |
| *K.V. Mart Co. v. United Food & Comm'l Workers Int'l Union, Local 324* (9th Cir. 1999) 173 F.3d 1221 | 25 |
| *Karen Kane, Inc. v. Reliance Ins. Co.* (9th Cir. 2000) 202 F.3d 1180 | 22 |
| *LVRC Holdings LLC v. Brekka* (9th Cir. 2009) 581 F.3d 1127 | 53 |
| *San Luis & Delta-Mendota Water Auth. v. United States (9th Cir. 2012)* 672 F.3d 676 | 26 |
| *Sitrick v. Dreamworks, LLC* (Fed. Cir. 2008) 516 F.3d 993 | 43 |

| | |
|---|---|
| *Snow-Erlin v. United States* (9th Cir. 2006) 470 F.3d 804 | 24 |
| *Suzuki Motor Corp. v. Consumers Union, Inc.* (9th Cir. 2003) 330 F.3d 1110 | 25 |
| *Szajer v. City of Los Angeles* (9th Cir. 2011) 632 F.3d 607 | 25 |
| *TrafficSchool.com, Inc. v. Edriver, Inc.* (9th Cir. 2011) 653 F.3d 820 | 45 |
| *United States v. Christensen* (9th Cir. 2015) 828 F.3d 763 | 26, 45 |
| *United States v. Kellington* (9th Cir. 2000) 217 F.3d 1084 | 24 |
| *United States v. Nosal* (*Nosal I*) (9th Cir. 2012) 676 F.3d 854 | 18, 21 |
| *United States v. Nosal* (*Nosal II*) (9th Cir. 2016) 844 F.3d 1024 | 13, 18 |
| *United States v. Pend Oreille County Pub. Util. Dist. No. 1* (9th Cir. 1998) 135 F.3d 602 | 25 |
| *Zivkovic v. Southern Calif. Edison Co.* (9th Cir. 2002) 302 F.3d 1080 | 25 |
| *Animators at Law, Inc. v. Capital Legal Solutions, LLC* (2011, ED Va) 786 F. Supp.2d 1114 | 55 |
| *Brooks v. AM Resorts, LLC* (2013, ED Pa) 954 F. Supp.2d 331 | 29 |
| *Cont'l Group, Inc. v. Kw Prop. Mgmt., LLC* (2009, SD Fla) 622 F. Supp.2d 1357 | 42 |
| *Hayes v. Packard Bell NEC, Inc.* (2001, ED Tex) 193 F. Supp.2d 910 | 54 |
| *In re Google Inc. Cookie Placement Consumer Privacy Litig.* (2013, DC Del) 988 F. Supp.2d 434 | 27 |
| *Pecarovich v. Allstate Ins. Co.* (CD Cal 2003) 272 F. Supp.2d 981 | 26 |
| *Ticketmaster L.L.C. v. RMG Techs., Inc.* (2007, CD Cal) 507 F. Supp.2d 1096 | 53 |
| *Wilborn v. Ashcroft* (SD Cal 2002) 222 F. Supp.2d 1192 | 38 |
| *Wilson v. Moreau* (2006, DC RI) 440 F. Supp.2d 81 | 28, 43 |
| *Horwitz v. Southwest Forest Indus., Inc.* (D.Nev. 1985) 604 F.Supp. 1130 | 49 |
| *Chas. S. Winner, Inc. v. Polistina* (D.N.J. June 4, 2007) 2007 WL 1652292, No. 06-4865 | 28 |
| *Farmers Insurance Exchange v. Steele Insurance Agency, Inc.* (E.D. Cal. July 25, 2013) No. 2:13-cv-00784-MCE-DAD, 2013 WL 3872950 | 28 |

| | |
|---|---|
| *hiQ Labs, Inc. v. LinkedIn Corp.* (N.D.Cal. Aug. 14, 2017, No. 17-cv-03301-EMC) 2017 U.S.Dist.LEXIS 129088 | 12, 15-16, 51-52 |
| *Lockheed Martin Corp. v. Speed* (M.D. Fl. Aug. 1, 2006) U.S. Dist. LEXIS 53108, 2006 WL 2683058 | 50 |
| *Southwest Airlines Co. v. Boardfirst, L.L.C.* (N.D. Texas 2007) U.S. Dist. LEXIS 96230 | 42 |

| **Texts, Treatises, and Law Reviews** | **Page No.** |
|---|---|
| Ladd, Expert Testimony, 5 Vand.L.Rev. 414 (1952) | 40 |
| Notes of Advisory Committee on Proposed Rules, FRCP 702 | 40 |

## JURISDICTIONAL STATEMENT

District Court Jurisdiction: The United State District Court for the Northern District of California (the "District Court") had subject matter jurisdiction over this action brought by Plaintiff-Appellee Facebook, Inc. against Defendants-Appellants Power Ventures, Inc. and Mr. Steven Vachani pursuant to 28 U.S.C. §§ 1331 and 1367.

Ninth Circuit Appellate Jurisdiction and Appealability of Judgment: This Court has jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291. In particular, jurisdiction under this statute is proper because this appeal is from a final judgment rendered and entered in the United States District Court for the Northern District of California, which disposed of all claims of all parties to this action.

Timeliness of Appeal: On May 2, 2017, the District Court entered judgment. 1-ER-1. Appellants filed their notice of appeal on June 2, 2017, requesting review of the District Court's compliance with the Ninth Circuit's mandate, including the various implications thereof. 2-ER-118.

## INTRODUCTION

This nearly nine-year-old saga between Facebook, Inc., the most widely used social network service in the world, and Appellants Power Ventures, Inc., a long defunct Facebook competitor, and Mr. Steven Vachani, an individual who was Power's President and Chief Executive Officer at the time of the activity

underlying this case, has been substantially pared down to two nearly identical and highly disputed hacking claims—the federal Computer Fraud and Abuse Act and California Penal Code § 502(c)—summarily adjudged in Facebook's favor despite material insufficiencies in Facebook's evidence and Appellants' staunch opposition thereto. Following Appellants' prior appeal in this matter, the Ninth Circuit substantially reversed the District Court's summary judgement order and made significant findings regarding the applicable standard for determining Appellants' liability under the remaining claims. On remand, the District Court reverted to its prior, overruled standard when reconsidering appropriate remedies, which not only violated the Ninth Circuit's Order and Mandate but also created a further degree of inconsistency and vagueness with regard to how courts decide summary liability in civil actions under these two remaining criminal statutes.

Here, again, Appellants appeal to the Ninth Circuit to challenge the District Court's new and renewed findings as to the existence of genuine issues of material fact as to each of Facebook's remaining claims. Appellants further dispute the District Court's remedies order on the bases that it (1) exceeds the District Court's power and violates the Ninth Circuit's directive on remand, and (2) perpetuates use of a standard already deemed void for uncertainty by the Ninth Circuit and which has the effect of sanctioning discretionary discrimination by Facebook for the purposes of enforcing its website Terms of Use and stifling competition.

2

## STATEMENT OF ISSUES

1. The District Court erred in refusing to consider the merits of Appellants' arguments challenging Facebook's statutory standing in light of a substantive change in relevant law and changes in Facebook's evidentiary proof underlying the District Court's order of summary judgment because Facebook has not proven standing under CFAA or § 502 as a matter of law.

2. The District Court erred in selectively complying with the Ninth Circuit's Order and Mandate following reversal and remand by deferring to the District Court's prior, overruled legal standard, thereby depriving Appellants their Constitutional rights to substantive and procedural due process under two criminal statutes.

## PERTINENT LEGAL PROVISIONS

### 18 U.S.C. §1030[1]. Computer Fraud and Abuse Act; "CFAA"

(a) Whoever— … (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains— … (C) information from any protected computer;

…

(c)(4)(A)(i)(I) loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value

…

(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be

---

[1] Full recitation of this legal authority is set forth verbatim in the Addendum to the Briefs appended to this document.

brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

**California Penal Code §§ 502(c)(2)(3) & (7)**[2]

(c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:

    (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

    (3) Knowingly and without permission uses or causes to be used computer services.

    (7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

## STATEMENT OF THE CASE

## I. THE PARTIES AND THEIR BUSINESS DISPUTE.

Appellee Facebook, Inc. ("Facebook") is the universally known social media giant operating the website facebook.com, which serves as a platform for users to communicate with each other and share their own data and information online. Appellant Power Ventures, Inc. ("Power") was a software company that enabled users to access their various social media accounts (e.g., myspace.com and friendster.com) from a single user interface at power.com, and Appellant Steven Vachani ("Mr. Vachani") was Power's President and CEO during all times relevant to this matter. In late 2008, Power launched its integration with facebook.com to

---

[2] Full recitation of this legal authority is set forth verbatim in the Addendum to the Briefs appended to this document.

enable users to access their Facebook user accounts from within its users' private accounts on power.com.

This particular means of accessing one's account is a technical violation of Facebook's Terms. Naturally, Facebook desires control over all facets of the user experience while their members are utilizing facebook.com, including and especially exposure to paid advertisements, news stories, political spots, and the like. Instead of restricting the users' access, however, Facebook sent a cease-and-desist notice to Power demanding that Power comply with Facebook's Terms.

After Facebook initially sent its notice to an unassociated third-party, Power and Facebook's counsel first communicated on December 4, 2008, at which time Facebook made its cease-and-desist demand directly to Power for the first time. 2-ER-251 at ¶ 11. Facebook engaged in ongoing negotiations with Power concerning Facebook's requirements for Power's use of facebook.com, and Facebook expressly extended its cease-and-desist deadline to December 26, 2008. 2-ER-251 at ¶ 11 ( "On December 15, I sent an email to Mr. Vachani responding to his December 12, 2008 email. In that message, I reconfirmed that Facebook expected the Power website to delete all user data and to fully comply with the Facebook Connect policies and all other applicable Facebook Terms and guidelines within two weeks, or by December 26, 2008").

During this time, Power was actively working with Facebook to develop its Facebook Connect infrastructure as Facebook had requested. 2-ER-237 at ¶ 5.

Email correspondence exchanged between Vachani—as Power's CEO and on Power's behalf—and Facebook' counsel on various dates in December 2008 unequivocally shows Facebook's focus was solely on getting Power to agree to operate within Facebook's Terms. 2-ER-237 at ¶ 11.



**Diagram 1:** Whether with (right) or without (left) use of Power's service, Facebook users accessed only their own www.facebook.com user accounts, and the same user data was viewed/accessed *by those Facebook users*.

Without further extension, Facebook's cease-and-desist notice was effective following the December 26, 2008 deadline. Negotiations between Power and Facebook over the implementation of Facebook Connect broke down on December 26, 2008, and Power discontinued allowing its users to connect to their facebook.com accounts on December 30, 2008.

On December 30, 2008, approximately one month after learning that some Facebook users were using Power's service to access their private Facebook accounts through the power.com interface, Facebook initiated the underlying action

against Power and Mr. Vachani alleging, *inter alia,* violations of the Controlling

the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-

SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18

U.S.C. § 1030, and California Penal Code § 502 ("Cal. Pen. Code § 502(c)" or "§

502"). Facebook's claims disproportionately focused on the CAN-SPAM claim, for

which Facebook sought more than $18M in statutory damages based on intra-

system messages sent to Facebook users by other Facebook users who were

accessing facebook.com through Power's service. Facebook's secondary claims

under CFAA and § 502 were based on the fact that Power technically accessed

facebook.com in violation of Facebook's Terms when the users accessed their

facebook.com accounts via power.com.

Power continued working to develop software in compliance with

Facebook's Terms, and Power attempted to release its Facebook Connect-

compliant service in early January 2009. 2-ER-238. Presumably based on the

parties' history, Facebook imposed additional terms on Power's implementation of

Facebook Connect—including payment of Facebook's litigation fees—which were

prejudicial and unable to be met by Power at that time. 2-ER-238. Therefore,

Power voluntarily shut down its Facebook Connect integration completely in

January 2009 and never made any further attempt to connect to Facebook in any

way. 2-ER-238 at ¶¶ 9-10.

Unable to absorb the costs of doing business while incurring legal fees to defend against Facebook in this matter, Power went out of business in April, 2011. 2-ER-238 at ¶ 11.

## II.  PROCEDURAL POSTURE AND CURRENT ISSUES.

On February 16, 2012, the District Court responded to the parties' cross-motions for summary judgment, thereon issuing an order denying Defendants' motion for summary judgment and granting summary judgment in Facebook's favor as to Facebook's CAN-SPAM, CFAA, and § 502 claims. 1-ER-98—117, (the "Summary Judgment"). In the Summary Judgment, the court ruled only on the issue of Power's liability and requested additional briefing regarding remedies and Mr. Vachani's individual liability. 1-ER-117. The parties thereafter filed supplemental briefs on these issues.

Before the court issued a final ruling, proceedings in the District Court case were halted due to activities resulting from a change in counsel for the Appellants and the Appellants' contemporaneously filed bankruptcy cases, which stayed the matter until April 2013. Upon lifting the stay, the court ordered a second round of supplemental briefing on the lingering issues of remedies and Mr. Vachani's liability. 1-ER-96–97.

On September 25, 2013, the court issued an order finding Mr. Vachani liable as a matter of law, and granting damages and permanent injunctive relief based on its finding of Appellants' liability under CAN-SPAM, CFAA, and § 502. 1-ER-62

—95, ("Remedies Order 1"). The District Court contemporaneously entered final Judgment in the action. 1-ER-61. In Remedies Order 1, the court addressed the issue of damages for the first time[3] and entered an award of statutory damages of $3,031,350 under Facebook's CAN-SPAM claim and compensatory damages of $80,543 under Facebook's CFAA claim[4]. The court further entered a permanent injunction against Appellants under all three statutes—CAN-SPAM, CFAA, and § 502.

Remedies Order 1 held that Facebook was entitled to compensatory damages under CFAA and summarily concluded that "Facebook has established through undisputed testimony that it expended $80,543 to investigate Defendants' actions and for outside legal services in connection with the Defendants' actions."[5] 1-ER-88. In fact, Facebook's proffered evidence, particularly including the referenced testimony, was heavily disputed by Appellants[6], but the court expressly declined to consider Appellants' objections and refused to perform an independent assessment of the credibility and sufficiency of Facebook's evidence prior to

---

3  Court admits the issue was before the court for the first time. 1-ER-96:26–27.

4  The District Court did not assess damages under § 502: "As the Court decides to grant Facebook compensatory damages under CFAA, the Court need not and does not analyze Facebook's alternative argument that Facebook deserves compensatory damages under Cal. Pen. Code § 502(e)(1)." 1-ER-88 fn. 14.

5  The CAN-SPAM claim has been later dismissed, and the issue of Vachani's personal liability, while still disputed by Mr. Vachani, was previously affirmed by the Ninth Circuit and not specifically here on appeal. 1-ER-39.

6  Examples at: 2-ER-252:14–16, 2-ER-253:8-10, 2-ER-253:21-23, 2-ER-241:9–10, 2-ER-243–244, 2-ER-122—140.

awarding damages despite acknowledging the issue was before the court for the first time.

Appellants timely appealed the Summary Judgment, specifically challenging, *inter alia*, sufficiency of evidence supporting the District Court's findings of 'loss' adequate to confer standing to Facebook under CAN-SPAM, CFAA, and § 502. On December 9, 2016, a modified order issued from the Ninth Circuit reversing the CAN-SPAM claim, vacating all remedies, and remanding the matter for reconsideration of appropriate remedies in light of the Ninth Circuit's ruling, including dismissal of the CAN-SPAM claim, and limited the period of damages under CFAA and § 502 to Power's unauthorized access of facebook.com.

> "Because we reverse in significant part, we also vacate the injunction and the award of damages. We remand the case to the district court to reconsider appropriate remedies under CFAA and section 502, including any injunctive relief. With respect to damages, the district court shall calculate damages only for the period after Power received the cease and desist letter, when Power continued to access data contained in Facebook's servers and memory banks." *Facebook, Inc. v. Power Ventures, Inc.* (9th Cir. Cal. 2016) 828 F.3d 1068, 1080.

Following remand from this Court, the District Court held a case management conference and set a supplemental briefing schedule on the issue of appropriate remedies. Against Appellants' objections to Facebook's new allegations regarding damages, the court narrowed the scope of briefing and ordered the parties to refrain from "relitigating" certain matters the court has repeatedly avoided despite the fact that they were made relevant and unresolved in

light of the Ninth Circuit's findings, such as whether Facebook's evidence sufficiently proves its new claim for compensatory damages and injunctive relief. 2-ER-187-191.

On May 2, 2017, the Court issued an order granting Facebook the whole of its new remedies demand, including $79,640.50 in compensatory damages for alleged violation of CFAA and § 502, which simply deducted Facebook's newly alleged expenses from December 1, 2008, and a permanent injunction that includes restrictions related to all three of the initial claims—CAN-SPAM, CFAA, and § 502. 1-ER-4–34.

The undisputed facts in this matter do not warrant a nine-year legal battle over the nuances of these criminal statues, especially when Facebook's own evidence from December 2008 shows in no uncertain terms that Facebook's true grievance was with Power enabling users to access facebook.com without having to interact with the website—including its advertisements—which admittedly violated the site's Terms but in actuality caused no harm to Facebook, its computers, its network, or its data[7].

---

[7] 2-ER-255 ("counsel for Facebook rejects power.com's offer, explains that Facebook does not trust Mr. Vachani to abide by Facebook's Terms without a permanent injunction in place, and that Facebook will not settle its case for less than what it spent enforcing its Terms in the first place"), 2-ER-252 ("The 2-week extension results in a new deadline of EOD December 26, 2008 for power.com compliance with Facebook's Terms and applicable Connect policies").

Without demonstrating one shred of actual harm caused by Appellants, Facebook has relied on alternative evidence in the form of speaking louder and waving a bigger stick to distract from the truth of the matter, which is simply that Facebook wanted Power to comply with its Terms. While Appellants' activities might support a civil action for breach of contract, they do not support a civil action under two primarily criminal "hacking" statutes, the consequences of which were recently brought to light by this Court's previous findings in Appellants' first appeal, as well as in the matter of *hiQ v. LinkedIn* as further described herein.

## III. RECENT EVOLUTIONS IN RELEVANT LEGAL STANDARDS.

### A. *The Ninth Circuit Overruled the District Court's Standard Applied in the Instant Matter to Determine When Access Is 'Without Authorization.'*

The Ninth Circuit's narrowed definition of 'without authorization' as applied to 'access' of a computer under CFAA and § 502 effectively supplanted the definition of 'without authorization' originally applied by the District Court to the facts in this matter. Under the District Court's definition of 'without authorization,' a defendant is considered to be acting in violation of the statutes when a plaintiff attempts to block the defendant's access and the defendant takes any step to bypass that block[8]. On Appellants' first appeal, the Ninth Circuit found that bypassing an

---

[8] "Where, however, a party accesses the network in a manner that circumvents technical or code-based barriers in place to restrict or bar a user's access, then the access does qualify as being 'without permission.'" 1-ER-112:3-7. "[F]or the reasons discussed above regarding Plaintiff's Section 502 claim, the Court finds that Defendants accessed Plaintiff's website without authorization and obtained information" and has "standing as a result of such access." 1-ER-115:20–116:1.

IP block is *not* sufficient to render access 'without authorization' under CFAA and § 502[9]. Indeed, because the Ninth Circuit has specifically rejected the argument that "CFAA only criminalizes access where the party circumvents a technological access barrier," merely *viewing* a website in contravention of a unilateral directive from a private entity would be a crime. *United States v. Nosal* (*Nosal II*) (9th Cir. 2016) 844 F.3d 1024, 1038. Instead, the Ninth Circuit found that where a party's initial access is authorized, such as by the facebook.com users in the instant case, a website owner's revocation of that authorization is not effective unless it is actually communicated to the offending party.

On that finding, the Ninth Circuit ruled that Power did not act in violation of CFAA or § 502 before Facebook effectively revoked its authorization, and before that time, Power's access of facebook.com was done with the valid authorization of the facebook.com account users. 1-ER-56.

Notably, the Ninth Circuit made no mention of the parties' negotiations throughout the month of December or the critical fact that Facebook expressly permitted (or extended its revocation of permission to) Power to continue its access of facebook.com until December 26, 2008, by which time Power's service would have to fully comply with Facebook's "Terms and applicable Connect policies" in order to be permitted continued connection with facebook.com. 2-ER-252.

---

9  "Simply bypassing an IP address, without more, would not constitute unauthorized use." 1-ER-57 fn. 5.

Presumably, the Ninth Circuit left this matter to the District Court since the issue was previously avoided by applying IP-block standard.

Facebook does not deny extending its deadline for compliance to December 26, 2008 but argues that since Facebook simultaneously expressed discontent with Power's access and also allegedly tried to block Power on the network's backend, Facebook's extension had no legal effect. Inherent in setting a deadline for compliance with Facebook's Rules, however, is Facebook's knowledge and acceptance that Power's access before that date would likely not comply with Facebook's Rules.

These facts are not disputed, and Facebook's own evidence of 'loss' proves Power did not act 'without authorization' until after December 26, 2008. 2-ER-252. On remand, however, the court deferred back to its original definition of 'without authorization' and found that because Facebook made attempts to block Power's access to facebook.com throughout the month of December, Facebook's actual, verbal extension of authorization to December 26th had no legal effect, making Appellants liable for all of Facebook's attorney fees and technician costs dating back to the original cease-and-desist notice. 1-ER-17:12—23.

Power believed it could rely on Facebook's actual authorization, which is reasonable in light of the fact that the statement "we will continue to block you" is, it turns out, not the legal equivalent of Facebook crossing its fingers behind its back. Unless the court intended to sanction Facebook's fraudulent inducement of

Power to continue accessing facebook.com for the purpose of racking up costs, it cannot hold Appellants liable for Facebook's alleged expenses prior to December 26, 2008, lest Appellants obtain a right of action against Facebook for the costs induced by such fraudulent conduct. Yet there is no need to speculate about the fact that the District Court did not require Facebook to prove its claimed expenses or provide evidence of actual damages to Facebook's property due to Power's unauthorized access of facebook.com.

Notwithstanding the myriad issues with Facebook's evidence, this selective application of the Ninth Circuit's ruling deprives Appellants the substantial benefit of their hard-fought appeal with respect to the remaining claims and deprives future would-be litigants the benefit of reliable application of the Ninth Circuit's narrowed definition of liability under these two criminal statutes. After this Court ruled that the mere attempted blocking and/or circumvention of access to a plaintiff's computer does not render said access to be 'without authorization' under CFAA and § 502, it was beyond the District Court's power to reenter judgment for remedies based precisely on that standard.

## B. The Implications of hiQ v. LinkedIn in Protecting Appellants' Equitable and Constitutional Rights Under CFAA.

On August 14, 2017, the District Court in the Northern District of California issued a preliminary injunction in favor of hiQ, the accused hacker, and against LinkedIn, the website owner, in a strikingly similar case involving a civil claim

under CFAA. *See, hiQ Labs, Inc. v. LinkedIn Corp.* (N.D.Cal. Aug. 14, 2017, No. 17-cv-03301-EMC) 2017 U.S.Dist.LEXIS 129088 ("*hiQ*"); 18 U.S.C. § 1030. Like Power, hiQ is a small technology company that performs analytics using online data. After several years of accessing and scraping linkedin.com user profile data made publicly accessible by LinkedIn and its members, hiQ received a cease-and-desist notice from LinkedIn alleging hiQ's violation of LinkedIn's Terms of Service and threatening, *inter alia*, civil litigation under CFAA. Like Facebook, LinkedIn took measures to block hiQ's access of their website, which effectively stalled hiQ's business and inspired hiQ's lawsuit for, *inter alia*, bad business practices.

LinkedIn countersued alleging hiQ's unauthorized access of linkedin.com under CFAA. On hiQ's motion for a preliminary injunction, the court considered LinkedIn's arguments, which substantially relied on this Court's December 9, 2016 decision in the instant matter. In weighing the four factors for preliminary injunction, it was significant that LinkedIn had known hiQ was scraping data from linkedin.com for years without objection.

Because the factors weighed sharply in hiQ's favor, including finding no showing of actual harm to LinkedIn but a real threat to the public interest in free access to publicly available data, the court issued a preliminary injunction against LinkedIn, thereby prohibiting any further blocking of hiQ and requiring withdrawal of its cease-and-desist notice. As in the instant matter, LinkedIn's

16

alleged CFAA violations lacked any proof of harm and were obviously made in furtherance of forcing hiQ's compliance with LinkedIn's Terms of Service as opposed to a remedial action in response to criminal activity. As such, *hiQ* lends useful guidance in this actively evolving area of cyber law toward understanding and fairly considering the matters now before this Court.

The recent *hiQ* decision is highly instructive of the true nature of these types of cases as glorified business disputes that are about little, if anything, more than social and professional networking powerhouses using the technicalities of civil carve-outs in near-antiquated criminal statutes to force competitors into compliance with their Terms and/or to purchase their services. Indeed, without actual harm caused to these companies' property, all that remains is the website owners' demands for compliance with their terms and discretionary self-inflicted loss, including pre-litigation expenses.

LinkedIn's attempted discriminatory enforcement of CFAA illustrates precisely why Applicants were deprived due process when the District Court determined both Applicants' liability and damages based on alleged loss entirely under Facebook's control during a period when Applicants access was authorized. As this and other courts have cautioned, there is great risk in permitting businesses to compel competitor compliance with the businesses' Terms or control competing services by leveraging criminal hacking statutes and exploiting the technicalities of what is, at least in this instant case, plaintiff-directed liability. *See, for example,*

17

*Nosal I and Nosal II.* The court's analyses in *hiQ* and the implications described heretofore reveal the inherent ambiguity and risk of discrimination in applying these criminal hacking statutes to modern disputes between business competitors. Fortunately, there are standing requirements written into the statutes, and the means available to satisfy the requirements have been well defined by courts previously tasked with guarding against these risks. This is precisely why it is no small oversight for the court to enter an unduly deferential, conclusory ruling on fact determinations and matters of law directly affecting Facebook's ability to meet the statutes' jurisdictional thresholds.

## ARGUMENT

As this Court expressly recognized in its directive on remand to the District Court, the reversal and effective dismissal of Facebook's claim under the CAN-SPAM Act was a significant occurrence in this case. Not only was >97% of the total damages award tied solely to the CAN-SPAM claim, the face of the pleadings and language of the lower court's orders plainly prioritized CAN-SPAM such that very little CFAA- or § 502-specific evidence was provided and assessment performed for the purpose of determining Facebook's standing and remedies. In addition to this Court's substantial reversal under Facebook's CAN-SPAM claim, the Ninth Circuit clarified certain conditions under which access of a 'protected computer,' such as Facebook's online server, would be deemed 'without authorization,' which both overruled the standard used by the District Court in

awarding summary judgment and provided a new, clearly defined standard for the District Court to apply in determining under CFAA and/or § 502. The combined significance of these rulings by the Ninth Circuit did far more to affect the District Court's compensatory damages award under CFAA and § 502 than simply reduce Facebook's compensable damages by a single day, as decided by the District Court. Most significantly, the District Court refused to acknowledge Facebook's own evidence of its express authorization of Appellants' continued use of facebook.com, after sending the initial cease-and-desist letter.

The District Court originally determined that Appellants were liable for damages at all times after Facebook initiated its attempts to block Power. In overruling that standard, the Ninth Circuit specifically found that a party's actions cannot be deemed 'without authorization' under CFAA and § 502 for the purpose of determining liability based solely on a computer owner's attempts to block that party or that party's attempts to circumvent the block. Instead, the Ninth Circuit ruled that a party cannot be liable under CFAA and § 502 where the actions amounting to a party's liability can occur without that party being explicitly notified that the computer owner—or website owner—does not authorize the party's access to its computer or website, such as through a cease-and-desist letter. On remand to the District Court for reconsideration of remedies in light of the Ninth Circuit's findings, the District Court reverted to its prior standard when determining the window of Appellants' liability, finding Appellants liable for

damages during the period of time when Facebook expressly extended its effective revocation of authorization but continued to leave its attempted 'IP blocks' in place.

Since the Ninth Circuit ruled the 'IP block' standard is unconstitutional for vagueness when determining liability under CFAA and § 502, it is beyond the District Court's power to impose compensatory damages based on that standard since damages are tied to Appellants' liability. To that end, the District Court improperly refused to account for Facebook's subsequent authorized access and erred in not requiring Facebook to provide evidence of its compensable damages allegedly incurred during the period when Power's access of facebook.com actually violated CFAA and/or § 502. Of further significance is the fact that CFAA has a jurisdictional threshold whereby Facebook must prove it incurred at least $5,000 in qualified 'loss' to have standing to bring a civil action under CFAA. Since the District Court's calculation of 'loss' occurred under its prior, overruled standard, the fact that Facebook has not proven 'loss' or any type of compensatory damages incurred as a result of Appellants' actions during the applicable period of liability undercuts the court's basis for entering summary judgment.

Irrespective of the applicable period of liability, the District Court erred in making conclusions of law based on what it concluded to be "Facebook's undisputed evidence" when determining Facebook's standing under CFAA and § 502 in light of the facts that (1) the record is rife with Appellants' objections to the

referenced evidence, and (2) conclusions of law cannot be entered summarily based on a party's agreement or lack of objection. The District Court erred in not requiring Facebook to produce sufficient, credible evidence to support its finding of 'loss' with respect to its determination of standing or compensable damages with respect to its remedies order on remand from this Court.

Furthermore, Facebook has not shown that Power accessed Facebook's data or any part of its website other than what is either publicly available or within each authorizing user's possession and control. Likewise, Power's access was limited to the authorizing users' accounts and did not extend into Facebook's private network. As such, Power gained nothing from Facebook, including any information as to how to access facebook.com, since it is universally known that a user accesses an online account via username and password. *See, United States v. Nosal* (*Nosal I*) (9th Cir. 2012) 676 F.3d 854, 858.

Further still, more recent decisions highlight the threats to public interest and illustrate how far the courts have come in just the last five to six years toward adopting a functional understanding of how the internet works, the means by which technology is connected, and why sinister-sounding terms of art, such as 'scraping' and 'crawling,' with respect to online data are integral tools of the trade and do not imply underhanded conduct. The threatening character in which Facebook painted Power's objectively harmless use of facebook.com, which on its face constitutes no more than perhaps a breach of Facebook's Terms, in light of the courts' evolved

application of criminal hacking statutes to what appear to be straightforward business disputes is sufficient to raise questions regarding whether summary judgment in Facebook's favor was appropriate in this matter.

## I. THE DISTRICT COURT'S NONCOMPLIANCE WITH THE NINTH CIRCUIT'S MANDATE AND ITS REFUSAL TO REQUIRE EVIDENTIARY SUPPORT FOR ITS ORDER AND JUDGMENT DEPRIVED APPELLANTS THE BENEFITS OF THEIR SUCCESSFUL APPEAL AND SUBSTANTIVE RIGHTS TO DUE PROCESS.

Appellants appeal to this Court following the District Court's second final judgment entered without affording Appellants basic due process. After nearly nine years of litigation between the parties, Appellants wearily make their appeal for consideration of their right to a judgment on the merits, supported by legally sufficient evidence that has actually been reviewed by the court for its credibility and admissibility. Irrespective of the absence of specific guidance in the December 2016 decision, it was incumbent on the District Court to consider the time periods when Appellants actually acted without authorization and to excluded Facebook's claimed 'loss' incurred during periods when Appellants were most certainly not liable under CFAA and § 502—i.e., dates when Appellants acted with Facebook's express and assured authorization. A statements of an appellate court "cannot be dismissed as mere dicta" where the appellate court's disposition requires the district court to follow those statements on remand. *Karen Kane, Inc. v. Reliance Ins. Co.* (9th Cir. 2000) 202 F.3d 1180, 1186 (case "remanded to the trial court for further proceedings *consistent with the views expressed in our opinion*"). Where, as in the

case of CFAA and § 502, there exists a jurisdictional threshold for the minimum amount and/or type of 'loss' Facebook must establish as a matter of law to maintain each cause of action, the District Court deprived Appellants of basic due process rights by conclusively entering judgment of liability, damages, and permanent injunctive relief without assessing the proffered evidence and making a qualitative determination of the types of loss claimed, as well as a quantitative determination of the amount of loss incurred during the specific period(s) of unauthorized access. The District Court's failure to make an educated, independent determination of this element, as well as its scathing rejections of Appellants' repeated pleas for a judgment fairly composed thereon, amounts to denial of due process because the court's unsupported conclusions of liability are being made under Federal and state criminal statutes.

Following remand from the Ninth Circuit, Facebook made illusory evidentiary concessions and introduced new evidence directly undercutting any plausible integrity previously read into the 'loss' determination on which the District Court relied in making both the recent remedies award and the original summary judgement. Still, the District Court refused to make any evidentiary findings on facebook's questionable new 'evidence' when reconsidering its compensatory damages award under the ninth circuit's directive.

The court's compensatory damages award rested on its prior February 16, 2012 Summary Judgment and findings of liability against Power. 1-ER-17–20. In

the Summary Judgment, the court acknowledged Facebook's claimed expenses in assessing Facebook's standing under CAN-SPAM, which has since been reversed and dismissed. In response to Appellants' repeated pleas for a proper assessment of 'loss' under CFAA and § 502 for the purpose of making evidentiary findings on which to base standing and compensatory damages, the court consistently deferred to the prior order in which the court specifically declined to determine damages. 1-ER-17–20.

### A. The District Court's Orders on Summary Judgment, Judgment Following Remand From the Ninth Circuit, and Findings of Law Under CFAA and § 502 Are Reviewed *De Novo*.

#### 1. Review of the District Court's Compliance With a Directive on Remand From This Court Is *De Novo*.

The Ninth Circuit reviews *de novo* whether the court complied with the mandate in a remanded case. *Hall v. City of Los Angeles* (9th Cir. 2012) 697 F.3d 1059, 1066. The rule of mandate provides that appellate decisions on legal issues must be followed in all subsequent proceedings in the same case but also recognizes that district courts are often confronted with issues that were not considered by the remanding court. *United States v. Kellington* (9th Cir. 2000) 217 F.3d 1084, 1093; *Snow-Erlin v. United States* (9th Cir. 2006) 470 F.3d 804, 807. Irrespective of how the decision came before the District Court, selection of the correct legal standard for measuring damages—a prime issue permeating the

matters here on appeal—is reviewed *de novo*. *United States v. Pend Oreille County Pub. Util. Dist. No. 1* (9th Cir. 1998) 135 F.3d 602, 608.

2. <u>The District Court's Conclusions of Law Are Reviewed *De Novo*, Including a Decision to Award Attorney Fees.</u>

The district court's conclusions of law are reviewed *de novo*. *Zivkovic v. Southern Calif. Edison Co.* (9th Cir. 2002) 302 F.3d 1080, 1088. Any element of legal analysis and any issue of whether the District Court applied the correct legal standard in determining whether to award attorney fees is a question of law reviewed *de novo* by this Court on appeal. *K.V. Mart Co. v. United Food & Comm'l Workers Int'l Union, Local 324* (9th Cir. 1999) 173 F.3d 1221, 1223.

3. <u>A District Court's Ruling on Motion for Summary Judgment is Reviewed *De Novo*.</u>

A district court's decision to grant or deny summary judgment is reviewed *de novo*. *See, e.g., Szajer v. City of Los Angeles* (9th Cir. 2011) 632 F.3d 607, 610. The appellate court's review is governed by the same standard used by the trial court under Fed. R. Civ. P. 56(c). *See, Suzuki Motor Corp. v. Consumers Union, Inc.* (9th Cir. 2003) 330 F.3d 1110, 1131. On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.

Summary Judgment cannot be entered on a party's consent or concession regarding the existence of proffered evidence, and any award of summary

judgment must be adequately supported by evidence *irrespective of whether any party opposes the motion*. It is well established that the moving party must establish all essential elements of the claim or defense to warrant judgment as a matter of law in that party's favor irrespective of whether an opposition is filed—i.e., summary judgment cannot be entered on the parties' consent, nor on an opposing party's concession regarding the mere existence of proffered evidence. *Pecarovich v. Allstate Ins. Co.* (CD Cal 2003) 272 F. Supp.2d 981, 985.

   4. A Determination of 'Loss' Under CFAA and § 502 is a Specific
      Jurisdictional Requirement and Is Reviewed *De Novo.*

   **a.    The Question of a Plaintiff's Jurisdictional Statutory
           Standing Can Be Raised at Any Time.**

The trial court's determination of whether a party has standing is reviewed *de novo*. *See, San Luis & Delta-Mendota Water Auth. v. United States (9th Cir. 2012)* 672 F.3d 676, 699. Because standing is an element of the case or controversy requirement, it cannot be waived. Thus, the standing issue may be raised at any point in the proceedings. Fed. R. Civ. Proc. § 12(h)(3). A district court's decision to consider only certain admissible evidence or arguments regarding a party's alleged 'loss' under CFAA and/or § 502 is reviewed *de novo* in the Ninth Circuit. *United States v. Christensen* (9th Cir. 2015) 828 F.3d 763, 815.

   **b.    Facebook Must Prove at Least $5,000 in Qualifying Losses.**

Although primarily a criminal statute, CFAA provides civil remedy in limited circumstances. *See,* 18 U.S.C. § 1030(g). To recover, Facebook must prove

that Power (1) intentionally 'accessed' a protected Facebook computer, (2) lacked authorization or exceeded its authorized access to the computer, (3) obtained information from the computer, and (4) caused a 'loss' of at least $5,000 to Facebook resulting from these actions. 18 U.S.C. §§ 1030(a)(2), (g). The fourth element is a statutory jurisdictional threshold requiring Facebook to plead and prove at least $5,000 in qualified 'loss' to maintain and prevail on a claim under CFAA. *See,* 18 U.S.C. § 1030(c)(4)(A)(i)(I).

CFAA defines 'loss' to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Significantly, not every form of injury qualifies as 'loss' under CFAA. Remedial expenses within the scope of CFAA must be related to impairment of Facebook's data or computer. *In re Google Inc. Cookie Placement Consumer Privacy Litig.* (2013, DC Del) 988 F. Supp. 2d 434, affd in part and vacated in part (2015, CA3 Del) 806 F.3d 125 (party had not sufficiently alleged threshold loss of $5,000 required by CFAA because they had not identified any impairment of performance or functioning of their computers). Injury solely related to the loss or misuse of information acquired from a plaintiff's computer do not constitute 'loss' as contemplated by CFAA. *See, Id.* at 475–478. For computer-related expenses,

27

Facebook must plead facts explaining the type of investigation performed or the type of damages remedied, as well as the actually time spent and expense incurred. General claims of expenses meeting or exceeding the $5,000, including expenses for hiring a computer expert to conduct an investigation, is insufficient to meet the statutory threshold without evidence of what was actually done[10]. "Costs *not related* to computer impairment or computer damages are not compensable under CFAA." *Farmers Insurance Exchange v. Steele Insurance Agency, Inc.* (E.D. Cal. July 25, 2013) No. 2:13-cv-00784-MCE-DAD*, 2013 WL 3872950, at *21 (*emphasis added*).

Most significant to the instant matter, attorney's fees have explicitly been held not to qualify as CFAA 'loss' where a plaintiff fails to show that lawyers helped to repair an interruption of service or impairment of data. *In re Mud King Prods.* (2014, BC SD Tex) 514 BR 496. In any event, costs of litigation cannot be counted toward the $5,000 statutory threshold under 18 U.S.C. § 1030(g). *Wilson v. Moreau* (2006, DC RI) 440 F. Supp. 2d 81, affd (2007, CA1 RI) 492 F.3d 50. Summary judgment in a defendant's favor is appropriate under CFAA absent evidence of any significant loss resulting from alleged 'access' other than litigation expenses, which do not constitute 'loss' as defined in CFAA. *Brooks v. AM Resorts, LLC* (2013, ED Pa) 954 F. Supp.2d 331.

---

[10] *Chas. S. Winner, Inc. v. Polistina* (D.N.J. June 4, 2007) 2007 WL 1652292, No. 06-4865, at *4.

5.  Civil Violation of Cal. Pen. Code § 502.

Section 502(e) provides that "the owner or lessee of the computer, computer system, computer network, computer program, or data *who suffers damage or loss* by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." *See,* Cal. Pen. Code § 502(e) (emphasis added).

**B.  *Significant Ninth Circuit Findings Overruled the District Court's Basis for Determining Facebook's Standing and/or Determining Damages Under CFAA and § 502.***

1.  The Ninth Circuit Reversed and Dismissed the Primary Claim Under the CAN-SPAM Act, on Which Facebook's 'Loss' Was Based and Summary Judgment Was Entered.

Following this Court's reversal of the CAN-SPAM claim, Facebook reasserted its claim for compensatory damages for the time employee McGeehan allegedly spent on efforts related to CAN-SPAM, stating in his own declaration, "My investigation included analyzing the complexity of the attack was,[sic] and involved a substantial amount of my time being spent determining how much effort was needed to contain the spamming." 2-ER-131:15-24. Facebook made no attempt to exclude or even define the "substantial amount" of Mr. McGeehan's time specifically related to spamming, which was only at issue under Facebook's

CAN-SPAM claim[11], and the District Court refused to exclude that cost when reconsidering damages on remand.

Instead, the District Court found its original compensatory damages award should be reinstated, less the costs Facebook claims were incurred on December 1, 2008. 2-ER-145:9–12. Since Facebook's hopelessly inadequate evidence compensatory damages is based in substantial part on the alleged CAN-SPAM violations, as well as during a period time after Facebook initiated litigation and Power ceased all interactions with facebook.com, the prior award cannot simply be reinstated since Facebook bears the burden of demonstrating its damages by a preponderance of the evidence.

Facebook's failure to provide minimal evidentiary support of its compensable damages pursuant to the Ninth Circuit's remand is not a minor deficiency and cannot be overlooked at the remedies stage, nor is it too much to expect a party to produce a schedule of hours or other evidence supporting the dates on which efforts were made and for what activities costs were incurred. Likewise, Facebook's continued assertion of costs incurred in relation to the overturned CAN-SPAM claim is not inconsequential to the defendants, one of which has long since been put out of business due to this litigation, and the other of whom has been forced into bankruptcy because of it. Appellants simply ask this

_____

[11] 1-ER-115:15-20 ("as discussed above with regard to Plaintiff's CAN-SPAM claim, Plaintiff has provided uncontradicted evidence of the costs of attempting to thwart Defendants' unauthorized access").

Court to hold Facebook to its burden of proving damages by a preponderance of evidence and not merely based on statements that certain sums were incurred for generalized activities over broad periods of time, which is utterly insufficient as a matter of law under CFAA.

2. The District Court's Standard for Determining When Appellants' Access Was 'Without Authorization' Was Overruled by the Ninth Circuit, Which Substantially Negated the Factual Findings on Which Summary Judgment and Damages Were Decided.

The Ninth Circuit's complete reversal of the District Court's CAN-SPAM judgment, including its associated $3,031,350 award, was a meaningful win for Appellants. Its narrowing and clarifying the applicable standard for determining the point at which a party might become liable under CFAA for 'unauthorized' conduct, however, is arguably the most significant finding from the first appeal. When the Ninth Circuit ruled that Power's initial access to facebook.com was 'authorized' in the context of CFAA by the Facebook users specifically permitting said access and only became 'unauthorized' when Power received Facebook's revocation of that permission, it necessarily follows that Power's actions were not inherently unlawful under CFAA and that satisfaction of an essential element of the statute—'unauthorized access'—turned entirely on Facebook's discretion in whether and when to send Power a cease-and-desist letter. Since the Ninth Circuit ruled that Power's access to facebook.com was not 'unauthorized' under CFAA during the period of time when Facebook was silent on the matter and its users

were employing power.com to access their facebook.com accounts, it likewise follows that Power's access during a time period when Facebook expressly delayed revocation of previously authorized access cannot be considered 'unauthorized' simply because Facebook took unilateral actions or expressed desires appearing contrary to the overtly assured extension of its cease-and-desist deadline. The District Court, however, imposed an erroneous judgment on Appellants during a time period when Power was expressly authorized to continuing providing its service on the basis that Facebook attempted to block Power's IP addresses and simultaneously told Power to comply with Facebook's Terms. Nothing in the statute, its legislative history, or any applicable case law limits the aggrieved party's ability to delay revocation of authorization or renew its authorization after sending an initial cease-and-desist notice. Longstanding principals of due process, however, require that criminal statutes be unambiguous and capable of faithfully consistent enforcement. As such, there was no intervening act, including Facebook's attempted IP blocks, depriving Power of the legal benefits of Facebook's expressly extended deadline of December 26, 2008.

## C.    *Facebook's Post-Remand Admissions Undermine the Credibility and Characterization of the Evidence on Which the District Court Determined Summary Liability and Compensatory Damages.*

To establish standing under its claims, Facebook initially offered two sources of alleged 'loss': (1) $75,543 in legal fees paid to Facebook's outside counsel at Perkins Coie LLP for the initial response to Power and litigation through

March 2009; and (2) $5,000 in estimated salary paid to employee Ryan McGeehan who allegedly spent approximately 50 hours, including 3-4 days of his own time, looking into Power's activities from December 1, 2008 through March 23, 2009. 2-ER 52:16-17.

| FACEBOOK PAYMENTS ATTRIBUTABLE TO ENFORCEMENT AGAINST POWER.COM | | | Internal Remediation | |
|---|---|---|---|---|
| MONTHS | HOURS | VALUE | | |
| December 2008 | ███ | $38,719 | | 50 |
| January-March 2009 | ███ | $36,824 | $ | 100 |
| Total | ███ | $75,543 | $ | 5,000 |

2-ER-174, 2-ER-167.

Following remand from this Court, Facebook eventually deducted $902.50 from its original total 'loss,' which Facebook claimed it incurred on the date of December 1, 2008. As depicted in Diagram 2, below, Facebook's alleges 'loss' and compensable damages for the period spanning December 2, 2008 through December 26, 2008 began 24 days before Facebook actually revoked authorized access after granting Power an extension until December 26, 2008 to comply with Facebook's Terms or cease offering access to facebook.com as part of Power's service.

Facebook's alleged damages further cover the period December 30, 2008 through March 2009, which began the date Facebook filed its complaint in this action, which is also the date when Power disconnected its service from

facebook.com. as Facebook demanded. The remaining period in which Facebook might reasonably have incurred costs associated with Power's 'unauthorized access' of facebook.com spanned a four-day period beginning December 27, 2008, following the missed deadline for full compliance with Facebook's Terms, and ending on December 30, 2008 when Power ceased its connection with facebook.com. Since Facebook never provided evidence in support of its attorney and "expert" affidavits summarizing the estimated expenses incurred by outside counsel and employee McGeehan, neither the court nor Appellants had any way of knowing what expenses Facebook claims were actually incurred during the very brief period when facebook.com users continued connecting to their personal facebook.com accounts through Power's service. In fact, Facebook never provided evidence of any of its claimed damages, irrespective of when or how they were incurred.



**Diagram 2.** Timeline of Power's activities versus alleged compensable damages.

At the January 15, 2017 Case Management Conference following remand from the Ninth Circuit, Facebook admitted to the court that the expert report and attorney's declaration, on which the Court based its determinations of Facebook's standing and prior order of damages, was wrong. Specifically, Facebook admitted that its $75,543 sworn claim for attorney fee "costs" for the period December 1, 2008 through March 2009 was wrong and that after deducting the amount of attorney fees paid *prior* to December 1, 2008, the alleged total incurred attorneys fees reduced to $46,883. *See,* 2-ER-185. Facebook confirmed it was now claiming 'loss' of $46,883 for outside counsel fees for the period December 1, 2008 — March 2009. *Id.* Since Facebook has never provided so much as a log of attorney names, time billed, billing rates, or the service actually performed, neither Appellants nor the court had any way to verify that the claimed costs were actually incurred or the true basis for its revised costs after Facebook used the admittedly inaccurate expert report for the purpose of establishing standing and damages under each of its claims during the previous nine years of litigation.

| | ◀··· | Dec 1 2008 | Dec 2-31 2008 | Jan-Mar 2009 | |
|---|---|---|---|---|---|
| **March 8, 2017** (2-ER-176, Cutler Decl) | | $50.00 | | $4,950.00 | |
| | | $852.50 | | $74,690.50 | |
| **Feb 15, 2017** (2-ER-184, CMC) | | | | $46,883.00 | |
| **Jan 4, 2017** (2-ER-226, CMS) | $33,660.00 | $5,000.00 $5,059.00 | | $36,824.00 | |
| **Dec 19, 2011** (2-ER-166, 174, Ostiller Rpt) | | $38,719.00 | | $5,000.00 $36,824.00 | |

McGeehan's Cost | Attorney's Fees | Undefined | **Lawsuit filed** | No further access

**Diagram 3.** Facebook's varying 'loss' allegations.

35

Appellants repeated their renewed concerns about not having *any* evidence proving either of Facebook's original or corrected loss value, the disparity between which was never explained and made no logical sense given Facebook's allegation that no action was taken prior to December 1, 2008. The court refused to consider the implications of Facebook's admission that the entire Summary Judgment and subsequent appeal were based on an unexplained fiction (2-ER-193—196), even when Facebook informed the court that their new number, for which no evidence was provided, would most likely change again if Facebook were made to engage in another round of briefing regarding appropriate remedies after remand (2-ER-207).

As promised, Facebook inexplicably returned to its original claim in the post-remand supplemental remedies briefing, alleging Appellants are responsible for $75,543 of Facebook's attorney fees from December 1, 2008 through March 2009. 2-ER-146:9–10. This time, however, Facebook conceded its claimed expenses incurred on December 1, 2008, for which Facebook produced a new declaration summarily stating that $852.50 of the alleged December 2008 attorney's fees were incurred by Joseph Cutler for his time initially investigating power.com and drafting the cease-and-desist notice. 2-ER-176, 2-ER-144. Facebook also voluntarily reduced the time claimed for employee Ryan McGeehan by 0.5 hour for December 1, 2008, reducing the total estimated time expended by McGeehan responding to Power-related matters to 49.5 and thus reducing Facebook's alleged estimated expense for McGeehan from $5,000 to $4,950. 2-

ER-146. Facebook provided no evidence or explanation for its revolving damages claims.

Despite Appellants' objections to Facebook's new "evidence," including the fact that Facebook yet again failed to provide evidence of the time or activities attributed to McGeehan and that Facebook's "proof" of damages changed at least three times, the court took Facebook's allegations as fact when ordering compensatory damages and entering final judgment. 1-ER-20—21.

### D. *Taken at Face Value, Facebook's Evidence Is Not Sufficient to Support an Award of Compensatory Damages and Wholly Inadequate to Establish Standing to Bring this Civil Action.*

Where the moving party bears the burden of persuasion at trial, that party must support its motion with credible evidence showing there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See,* Fed. R. Civ. Proc. 56(a); *Wilborn v. Ashcroft* (SD Cal 2002) 222 F. Supp. 2d 1192, 1197, aff'd mem. Because Facebook was responsible for establishing all the essential elements of its claims, summary judgment cannot be awarded in Facebook's favor on its CFAA claim where the trial court neglected to assess the evidence and make a specific determination regarding the jurisdictional threshold element of 'loss.' This element provides a very specific requirement that the complainant suffered "loss to 1 or more persons during any 1-year period" "aggregating at least $5,000 in value" resulting from the accused party's actions. 18 U.S.C. § 1030(c)(4)(A)(i)(I). While there undoubtedly remain chasms in

reconciling the legislative intent behind CFAA and § 502 with the whirlwind

evolution of connected technology in the modern internet era, courts have

confidently established guidelines for determining a complainant's 'qualified'

losses for the purpose of determining standing under 18 U.S.C. § 1030(c)(4)(A)(i)

(I).

1. <u>The Whole of Facebook's Evidence Lacks Credibility on Its Face and Is Insufficient to Support Facebook's Claim for Damages or 'Loss' on Summary Judgment.</u>

In determining whether a given factual dispute requires submission to a jury

such that summary judgment would be improper, the court must be guided by

applicable substantive evidentiary standards. *Anderson v. Liberty Lobby, Inc.*

(1986) 477 U.S. 242, 255. The inquiry involved in ruling on a motion for summary

judgment necessarily implicates the substantive evidentiary standard of proof that

would apply at the trial on the merits. *Id.* at 252. Accordingly, the judge must

decide whether a reasonable jury, measuring the evidence presented on the motion

against the substantive evidentiary standard applicable at trial, could find for the

nonmoving party. *See, Id*. at 254.

In the instant case, Facebook's claimed damages are limited to the time of

McGeehan and outside counsel. Since compensatory damages are based on actual

losses, there is no better evidence of the amount of time expended on an activity

and the value of that time than the records and testimony of those making such

claims. Instead of submitting the best evidence supporting its two sources of

alleged damages, Facebook hides the ball by offering "expert" third-party interpretation and estimation of the hours spent by McGeehan and outside attorneys at Perkins Coie on activities necessitated under the remaining claims. The court's gatekeeper function is intended to prevent the existence (or non-existence) of facts readily understandable to the lay factfinder from being buried under an unnecessary "expert opinion" and to prevent the factfinder from being deprived the opportunity to determine the significance of lay facts and apply its determination to its particular findings, even when the factfinder is the court itself. Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). Notes of Advisory Committee on Proposed Rules, FRCP 702. The trial court is surely capable of comprehending the numbers on a timesheet and the values of stated salary and hourly rates. There is no conceivable justification for permitting and relying on the summary conclusions of a financial "expert" regarding Facebook's alleged expenditures in relation to the Appellant's activities during December 2008 or in the three months after litigation was initiated, particularly given the absence of evidence on which the expert supposedly relied.

Likewise, instead of requiring evidence of attorney hours with sufficient descriptions to identify the activities on which time was spent, the court admitted and relied on the "expert" Ostiller Report, which merely repeats the summary estimates provided in the Cutler Declaration, as well as on the Cutler Declaration which merely provides two time periods in which Joseph Cutler and unnamed

attorneys at Perkins Coie performed legal services for Facebook. 2-ER-250. Cutler admitted that his summarized attorney fees were, in substantial part, an estimation of the time actually spent responding to Power based on an overall fixed fee arrangement and not based on actual legal costs incurred by Facebook on this matter, which the District Court declined to acknowledge and prohibited Appellants from addressing in their supplemental damages brief following remand. 2-ER-189.

On remand, Facebook revealed that it has records proving the compensable time spent by Facebook's outside attorneys on or before December 1, 2008, though it has inexplicably declined to provide this evidence at every appropriate opportunity, including in its supplemental brief on remedies submitted on remand from this Court. 2-ER-176, 2-ER-144. The record shows Facebook's evidence is insufficient to establish compensatory damages, and Facebook does not have the legal right to claim specific damages based on easily provable business records and simultaneously deprive the factfinder the opportunity to review that evidence. There is no "just take our word for it" exception to evidentiary requirements, and it is beyond the District Court's jurisdiction to render conclusions of law on evidence not actually before the court.

2.  <u>The Alleged Costs for McGeehan's Time Were Awarded Absent Evidence of What McGeehan Actually Did or When He Did It.</u>

Facebook failed to prove its alleged expenses related to responding to Power are 'qualified' losses under 18 U.S.C. § 1030(c)(4)(A)(i)(I). Facebook has not alleged or proven any impairment to a computer or interruption of service, which is inconsistent with Facebook's "expert report" implying McGeehan's work was responsive to Power's unauthorized actions and is compensable on that basis. Short of proving any actual harm to its property, Facebook's claimed expenses are insufficient to prove statutory minimal 'loss.' *Cont'l Group, Inc. v. Kw Prop. Mgmt., LLC* (2009, SD Fla) 622 F. Supp. 2d 1357 (because all loss had to be as result of "interruption of service" and data had to be impaired and not merely copied, evidence that company paid over $5,000 to its computer forensic consultant to investigate integrity of its computers following employee's alleged unauthorized access was insufficient to meet jurisdictional threshold under CFAA).

Absent identification of the precise steps taken by Facebook's employees or contractors in "investigating and responding to Power's alleged 'unauthorized access,' there is simply no basis upon which the court may determine whether Facebook's responsive efforts constitute 'reasonable' losses due to Power's purported unauthorized access of Facebook's computer system. *Southwest Airlines Co. v. Boardfirst, L.L.C.* (N.D. Texas 2007) 2007 U.S. Dist. LEXIS 96230. While investigative and responsive costs fit within the concept of 'loss' as used in CFAA,

conclusory testimony, taken alone, is insufficient to prove as a matter of law that Facebook has proven 'loss' to establish standing under CFAA. *See, Id.*

Notwithstanding Appellants's repeated objections to the sufficiency of Facebook's evidence of 'loss' and setting aside the plain basis for finding that Facebook's qualifying losses fell *at least* $50.00 short of the $5,000 threshold, even by Facebook's calculation, the court had no just cause for awarding summary judgment in favor of the moving party without assessing whether the claimed losses were "qualifying" losses sufficient to establish standing under each individual statute. 1-ER-98—117.

3. Facebook's Attorney Fees Are Not Qualified 'Losses' or Sufficiently Proven Compensable Damages.

Facebook's only other claimed source of 'loss' is a summary declarations of undocumented attorney's fees, which is not a qualified 'loss' under CFAA. In general, declarations containing nothing but conclusory allegations on the ultimate legal issues are not sufficient to defeat summary judgment. *See, for example, Sitrick v. Dreamworks, LLC* (Fed. Cir. 2008) 516 F.3d 993, 1001. Facebook has not denied that the vast majority of its claim for attorney fees as costs were incurred for litigation activities. Indeed, Facebook provides no evidence that *any* of its claimed attorney fees as of December 26, 2008 are for any activities *other than* initiating and prosecuting this lawsuit, nor does Facebook allege that it is entitled to attorneys as a matter of law as a 'prevailing party,' which it is not. Likewise,

litigation fees are not qualified 'losses' for establishing standing and cannot be recovered as an item of compensable costs. *Wilson v. Moreau* (2006, DC RI) 440 F. Supp. 2d 81, affd (2007, CA1 RI) 492 F.3d 50 (costs of litigation cannot be counted towards $5,000 statutory threshold under CFAA).

4. <u>The District Court Erred in Refusing to Consider the Merits of Appellants' Challenges to Facebook's Evidence Following Changes of Law and Consequential Facts.</u>

Appellants' pleas have been heretofore mired in a fiction perpetrated by the appellee and propagated by the District Court in a self-imposed catch-22 whereby the court based its judgment on a non-existent ruling invented by Facebook and refuses Appellants' due process challenges on the basis that the existence of its own judgment precludes review of the underlying fiction, thereby guaranteeing Facebook the benefit of its fraud. Despite the court's three separate requests for briefing on the issue of remedies, including damages and injunctive relief, it refused to actually consider arguments challenging the quality and sufficiency of Facebook's evidence as a matter of law under CFAA and § 502 and deferred each time to the illusory CFAA and § 502 damages ruling in the Summary Judgment. 1-ER-20—24. Despite its curious, conclusory deference to the prior order, the record shows that the court understood, at least when she first inherited the case, that no damages order whatsoever had been made. 1-ER-35:24-26 (the order "did not decide Defendant Vachani's liability or damages, and no subsequent decision has decided these issues").

Even if the court had in fact made a prior ruling on the issue of damages, it would not be so bound in light of changes in the facts and law supporting the ruling. A court need not follow a prior judicial determination that was based on substantially different evidence. *Adler v. Federal Republic of Nigeria* (9th Cir. 2000) 219 F.3d 869, 874, fn. 4. Not only is the District Court *not* prohibited from reconsidering its own flawed rulings in an active case, the District Court has a duty to reconsider its prior determinations of 'loss' when the bases for those determinations are implicated on remand. *United States v. Christensen* (9th Cir. 2015) 828 F.3d 763.

Likewise, neither Facebook nor the District Court can reasonably determine that Appellants waived objections to evidence that Facebook never actually presented, though that is precisely what the court decided in declining to consider Appellants' challenges to the credibility and sufficiency Facebook's evidence. 1-ER-14, 18, 21.

**E.    The Ninth Circuit's Findings Substantially Narrowed the Scope of Liability on Which the District Court Based Its Over-Broad Permanent Injunction.**

On May 2, 2017, the District Court issued a Facebook-drafted permanent injunction against Appellants. 1-ER-31:16–33:6. While the language of the new injunction was revised following remand, it remains overly broad. It is also apparent from the court's award of injunctive relief under CFAA, which precludes non-economic relief for the relevant alleged violation, that the District Court did not consider the merits of Facebook's demand or of Appellants' arguments thereon.

1.  Standard of Ninth Circuit Review & Substantive Questions of Law.

The basis for awarding injunctive relief, however, is reviewed *de novo* where the underlying determination of liability was found by summary judgment. *See, TrafficSchool.com, Inc. v. Edriver, Inc.* (9th Cir. 2011) 653 F.3d 820, 829. In the Ninth Circuit, a court weighs the following four factors when determining whether and to what extent it may issue a permanent injunction: (1) whether the plaintiff has suffered irreparable injury; (2) monetary damages are inadequate and unavoidable; 3) the balance of hardships among the parties; and 4) the manner and extent of public interest in the requested injunction. *See, e.g., eBay Inc. v. MercExchange, L.L.C.* (2006) 547 U.S. 388, 390.

2. <u>The District Court Exceeded Its Power by Awarding Injunctive Relief Under CFAA Because Facebook's Case Under § 1030(g) Is Categorically Excluded From Providing Any Non-Economic Relief.</u>

The revised permanent injunction expressly covers activities related to CAN-SPAM and CFAA, in addition to § 502. Significantly, CFAA expressly denies plaintiffs any kind of non-economic remedy in actions meeting the civil statutory requirements under only subclause (I) of § 1030(c)(4)(A)(i) and *not* under subclause (II), (III), (IV), or (V)[12], as in this case. There should be no question that Facebook is not entitled to injunctive relief, including the permanent injunction awarded by the District Court, under its CFAA claim even if this Court determines that Facebook has otherwise met its burden proving Appellants' liability under the statute. The District Court referenced CFAA throughout its four-factor analysis—in some instances in conjunction with § 502 but often on its own. Since CFAA does not provide Facebook an opportunity for non-economic relief, the court's ubiquitous reliance on CFAA-based case law is inherently suspect and, at the least, is exemplary of the District Court's indifference to Appellants' right to a fair and reasoned judgment.

---

12 "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclause (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages." 18 U.S.C. § 1030(g).

3.  The District Court Erred in Permanently Enjoining Appellants from Activities Relevant Under Only the CAN-SPAM Act and CFAA.

In light of the Ninth Circuit's reversal of Facebook's CAN-SPAM claim, and given CFAA's disallowance of non-economic damages under Facebook's civil cause of action as provided herein, any proper award for injunctive relief must result directly from a well-founded civil violation of Cal. Pen. Code §502. While it is clear from the court's analysis that the permanent injunction was based at least in part on Appellants' alleged violation of CFAA, the court's continued consideration of the dismissed CAN-SPAM claim in its remedies assessment is apparent from certain provisions in the order that speak only to CAN-SPAM-regulated activities.

For example, Subpart A of Section 1 of the permanent injunction prohibits Appellants and a broad group of third parties from "Accessing or using, or directing, aiding, facilitating, causing, or conspiring with others to use or access the Facebook website or servers for any *commercial purpose*, without Facebook's prior permission…" 1-ER-31:25 – 32:4 (*emphasis added*). Subpart A of Section 1 of the permanent injunction specifies that an example of the enjoined activities includes "sending or assisting others in sending, or procuring the sending, of unsolicited commercial electronic text messages via the Facebook website or service." 1-ER-32:2-4. Section 502 notably does not regulate commercial activity or the sending of email or other electronic messages. CAN-SPAM, however, does both.

4. <u>The District Court Erred in Issuing Its Revised Permanent Injunction Against Appellants Because the Scope Is Over-Broad and Permits Arbitrary Discrimination Regarding a Service, the Use of Which Is Critical to Appellants' Legitimate Business Interests.</u>

Subpart A of Section 1, as written, specifically and detrimentally affects Mr. Vachani's ability to earn a living conducting perfectly lawful business in his area of experience and expertise since access to—and use of—facebook.com is essential to operating in any kind of online or technology-centered business, which describes Mr. Vachani's area of employment nearly exclusively. 1-ER-31:25–32:4. Likewise, Power's former business activities were entirely software- and internet-related, and it stands to reason that Power will resume operating in that area of industry if and when it is able to return to active business. The harm to Appellants was immediate upon entry of the permanent injunction, yet Facebook did not demonstrate any countervailing risk of harm if Appellants were not enjoined pursuant to this provision.

Section 1, subpart C specifically covers activities associated with software development, sales, and use, none of which falls within the scope of § 502. A permanent judgment enjoining Appellants from conducting business in their specific area of commerce irrespective of whether that business relates to facebook.com or activities regulated by § 502 is grossly outside the scope of the court's authority to award injunctive relief. Furthermore, injunctive relief may be refused where it would adversely affect the rights of persons who are not parties to

the litigation. *Horwitz v. Southwest Forest Indus., Inc.* (D NV 1985) 604 F. Supp. 1130, 1136. The permanent injunction enjoins persons and entities unrelated to the activities at issue in this litigation against use of Facebook.com for any commercial purpose, without Facebook's prior consent. 1-ER-31:16–33:6.

Without any limit on Facebook's power to refuse permission, the language reaches far beyond the scope of this litigation. For the foregoing reasons, the permanent injunction is impermissibly over-broad because it prohibits lawful commercial activity not within the scope of Cal. Pen. Code § 502, prejudicially restricts unrelated activities, and unreasonably imposes restrictions on unrelated, unnamed third parties.

## II. THE DISTRICT COURT'S FAILURE TO COMPLY WITH THE MANDATE RESULTS IN VIOLATION OF THE RULE OF LENITY AND DEPRIVES WOULD-BE LITIGANTS DUE PROCESS.

The "rule of lenity" counsels courts to construe ambiguities in a criminal statute narrowly, even when applied in a civil setting. It is well established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits, as no one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. *City of Chicago v. Morales* (1999) 527 U.S. 41, 56-58. Courts have found that provisions of CFAA must be narrowly construed to avoid imposing criminal or civil liability on unsuspecting individuals engaged in otherwise lawful activities. *See e.g. Lockheed Martin Corp. v. Speed,* 2006 U.S.

Dist. LEXIS 53108, 2006 WL 2683058, at *7 (M.D. Fl. Aug. 1, 2006) (to the extent 'without authorization' can be considered ambiguous, the rule of lenity requires a restrained, narrow interpretation). The District Court's selective application of the Ninth Circuit's previous findings results in court-sanctioned arbitrary discrimination against Appellants, as well as future unsuspecting litigants, which is precisely the type of harm courts strive to protect against when applying legal standards under primarily criminal statutes to narrow civil rights of action.

Given the parties' negotiations and Facebook's expressly extended authorization of Power's continued access of facebook.com while Power worked to get its software in compliance with Facebook's requirements, the effective date of Facebook's revocation of authorization under CFAA and § 502 must be December 26, 2008. To find otherwise is to make it lawful for would-be plaintiffs to deceive ignorant would-be defendants by giving a deadline by which to cease their previously unauthorized access yet continuing to rack up 'loss' for the purpose of achieving the CFAA's standing threshold while the defendants have no reason to believe they are acting in violation of a criminal statute. Since the Ninth Circuit's CFAA and § 502-specific findings make it clear that legal authorization to access facebook.com was granted by Facebook users until the time when Facebook actively revoked that authorization, it is incumbent upon the District Court to consider the time period when Facebook gave their express authorization for

Appellants to access their site and, likewise, to clearly define those periods when Appellants were acting without authorization.

In reaching its conclusion regarding the effect of Facebook's cease-and-desist letter as to revoke the users' initial authorization, this Court did not address certain critical elements no longer unambiguous under this new application. For example: If the only difference between findings that Appellants' did or did not act in violation of the CFAA or §502 is a unilateral letter from a website owner asserting revocation of authorized access to a public website and threatening to sue for, *inter alia*, millions of dollars in statutory damages, liability requires no further act by Appellants and does not inherently alter the nature of means of 'access' or the information being accessed, protection of which is the express goal of enacting the CFAA. *See, for example, hiQ Labs, Inc. v. LinkedIn Corp.*, 201 U.S. Dist. LEXIS 129088, at *20. To find otherwise has the effect of empowering website owners to use the legal system against its competitors by sending the competitors cease-and-desist letters and alleging that they paid their attorneys at least $5,000 to prepare and file a lawsuit.

The problem is obvious—Appellants' were not engaged in any kind of harmful or inherently criminal activity. In fact, Facebook does not and cannot allege any actual harm to its service, network, or data, as Power's service enabled Facebook users to access their own accounts and did not access any portion of facebook.com or any data not publicly available or owned by the users themselves.

51

Under the District Court's interpretation of the Ninth Circuit's findings, there is no requirement that actual harm or any objectively improper activity be proven as long the website owner takes the specified unilateral actions to raise its alleged damage to the statutory threshold, irrespective of any contrary guarantees it makes to an unsuspecting defendant.

The recent decision in *hiQ v. LinkedIn* exemplifies precisely this concern, as the court's findings differ wildly despite the comparable fact patterns and relevant actions by the social media hosts. The *hiQ* court protected the rights of the alleged hacker to continue its legitimate business activities absent proof of actual harm to the website owner, finding that the contrary would mean "a website would be free to revoke 'authorization' with respect to any person, at any time, for any reason, and invoke CFAA for enforcement, potentially subjecting an Internet user to criminal, as well as civil, liability." *hiQ Labs, Inc. v. LinkedIn Corp.,* 2017 U.S.Dist.LEXIS 129088, at *20.

The jurisdictional statutory requirements under CFAA and § 502 are substantive provisions of law for which Appellants are presumed innocent absent fair judgment based on evidentiary proof and reasoned conclusions of law. The Ninth Circuit has taken the firm position that CFAA and § 502 are first and foremost criminal statutes that must have limited reach and clear parameters under the rule of lenity and to comply with the void for vagueness doctrine. *LVRC Holdings LLC v. Brekka* (9th Cir. 2009) 581 F.3d 1127, 1134.

52

The initial summary judgment order adjudging liability did not determine compensatory damages or make a ruling thereon, nor did it adequately report any related findings sufficient to impose liability under CFAA or § 502 on summary judgment. Under CFAA, the expenses a party claims as "loss" absolutely must be specifically qualified under 18 U.S.C. § 1030(g). This is an uncompromisable exercise during both liability and damages determinations because, as pleaded herein, CFAA requires a threshold showing of compensable damages permitted under CFAA to establish standing sufficient to maintain an action under CFAA.

Even if the District Court validly determined that Facebook most likely incurred at least $5,000 based on the court's general acknowledgment that Facebook's claimed ample expenses, Facebook must still prove its 'qualified' damages under CFAA to maintain that claim, let alone be entitle to summary judgment on it. There is simply no statutory or common law exception to the District Court's obligation to consider this critical element of this criminal statute. *Ticketmaster L.L.C. v. RMG Techs., Inc.* (2007, CD Cal) 507 F. Supp. 2d 1096, 85 USPQ2d 1018 (because plaintiff had not qualified its harm as required by CFAA, court could not find plaintiff had affirmatively shown that its harm caused by defendant exceeded $5,000).

## III.  REQUESTED RELIEF

### A.  *Reversal of Summary Judgment and Dismissal of Facebook's CFAA and § 502 Claims Is Warranted and Necessary.*

Based on the foregoing, it is not only in Appellants' rightful interest that the District Court's judgment be reversed and entered wholly in Appellants' favor, there is also compelling public interest in the outcome of this case such that any questionable finding is subject to future litigation abuse by Facebook and similarly situated internet-based businesses seeking to squelch competitors' undesirable but otherwise lawful activities.

Reversal and dismissal of Facebook's CFAA and § 502 claims is proper when, as in the instant matter, it is clear the statutory threshold has not and cannot be met. *Hayes v. Packard Bell NEC, Inc.* (2001, ED Tex) 193 F. Supp. 2d 910 (where consumer could not plead or meet the $5,000 threshold requirement, the manufacturer's motion to dismiss was proper as to the claims based on CFAA). Since the provisions of § 502 are subsumed by those of CFAA, and since liability under one was the District Court's basis for liability under the other[13], it follows that reversal of the § 502 claim is necessitated by reversal of CFAA claim.

### B.  *Short of Dismissal, Summary Judgment on CFAA and § 502 Claims Should Be Reversed and Remanded for Jury Trial.*

Should this Court decline to make a clear finding in Appellants' favor warranting the above-requested relief, Appellants submit that the disputed issues of

---

[13] See, for example, 1-ER-115:20–22.

fact necessitate remand for jury determination as to the ultimate issue of liability and/or appropriate damages. The issue of plaintiff's standing to sue, a legal issue, may involve disputed facts (e.g., adequacy of representation), precluding summary judgment. *See, Lujan v. National Wildlife Federation* (1990) 497 U.S. 871, 885–889. Indeed, full reversal and remand for jury trial is necessary if there exist questions of material fact going to any of the elements of Facebook's CFAA and Cal. Pen. Code § 502 claims. *Animators at Law, Inc. v. Capital Legal Solutions, LLC* (2011, ED Va) 786 F. Supp. 2d 1114 (defendant's summary judgment motion was improper where the record established genuine issue of material fact as to whether corporation incurred at least $5,000 of qualified losses under 18 U.S.C. § 1030 based on claim that forensic analysis firm provided at least $19,501.41 worth of services). Disputes over facts that may affect the outcome of the suit under applicable substantive law properly preclude entry of summary judgment, and there is ample recorded history demonstrating the parties' longstanding disputes. *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 248.

> ### C.   *At the Very Least, the Judgment Should Be Vacated and Remanded With Specific Instructions to the District Court.*

In the event this Court determines summary liability under CFAA and/or Cal. Pen. Code § 502(c) is warranted, Appellants request the remedies award be vacated and the case remanded to the District Court with specific instructions for reconsideration of appropriate compensable damages and entry of judgment

consistent with the Ninth Circuit's prior findings, specifically determining and taking into consideration Facebook's evidence of qualifying losses during only the time Appellants accessed facebook.com without express or implied authorization. At the very least, Facebook's evidence does not support an order of summary judgment on either remaining claim. Alternatively, Defendants request this Court remand the issue for entry of judgement with specific instructions to the District Court.

## CONCLUSION & SUMMARY OF REQUESTED RELIEF

Defendants respectfully ask this Court to end this litigation finally and fairly by (1) reversing the lower court's findings on which summary judgment and vacating the order for remedies awarded thereon, (2) finding Plaintiff Facebook has not met its burden of proving 'loss' under CFAA or damages sufficient to prove standing under CFAA or Cal. Pen. Code § 502, and (3) remanding the matter to the District Court with direction to enter judgment in Appellants' favor and dismiss Facebook's action as to all causes and counts.

|  | AROPLEX LAW |
|---|---|
| Dated: January 1, 2018 | By  *s/* Amy Sommer Anderson |
|  | Attorney for Appellant-Defendant, Power Ventures, Inc. |
|  |  |
| Dated: January 1, 2018 | By  *s/* Steven Vachani |
|  | Appellant-Defendant, *In Pro Per* |

FILER'S ATTESTATION: Pursuant to Circuit Rule 25-5(f), I attest under penalty of perjury that all other parties on whose behalf the filing is submitted concur in the filing's content.

Dated: January 1, 2018                                  Respectfully submitted,

                                                        By   *s/* Amy Sommer Anderson

# CERTIFICATE OF COMPLIANCE

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** <u>17-16161</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [12,920] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☒ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [        ]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

| Signature of Attorney or Unrepresented Litigant | s/ Amy Sommer Anderson | Date | 01/01/2018 |

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants certify that they are not aware of any related appeal pending in this court.


Dated: January 1, 2018                                    s/ Amy Sommer Anderson

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on January 1, 2018, I electronically filed the foregoing Appellants' Amended Joint Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service on all participants will be accomplished by notification from the CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 1, 2018, at Alameda, California.

s/ Amy Sommer Anderson

## ADDENDUM TO THE BRIEFS

### 18 U.S.C. §1030. Computer Fraud and Abuse Act; "CFAA"

(a)  Whoever--

(1)  having knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y.[(y)] of section 11 of the Atomic Energy Act of 1954 [42 U.S.C. § 2014(y)], with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it;

(2)  intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--

(A)  information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

(B)  information from any department or agency of the United States; or

(C)  information from any protected computer;

(3)  intentionally, without authorization to access any nonpublic computer of a department or agency of the United States, accesses such a computer of that department or agency that is exclusively for the use of the Government of the United States or, in the case of a computer not exclusively for such use, is used by or for the Government of the United States and such conduct affects that use by or for the Government of the United States;

(4)  knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained

consists only of the use of the computer and the value of such use is not more than $ 5,000 in any 1-year period;

(5)  (A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B)  intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C)  intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[;]

(6)  knowingly and with intent to defraud traffics (as defined in section 1029 [18 U.S.C. § 1029]) in any password or similar information through which a computer may be accessed without authorization, if--

(A)  such trafficking affects interstate or foreign commerce; or

(B)  such computer is used by or for the Government of the United States; [or]

(7)  with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any--

(A)  threat to cause damage to a protected computer;

(B)  threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or

(C)  demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;shall be punished as provided in subsection (c) of this section.

(b)  Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

(c)  The punishment for an offense under subsection (a) or (b) of this section is--

(1)  (A) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(1) of this section which does not occur after a conviction for another offense

under this section, or an attempt to commit an offense punishable under this subparagraph; and

    (B)  a fine under this title or imprisonment for not more than twenty years, or both, in the case of an offense under subsection (a)(1) of this section which occurs after a conviction for another offense under this section; or an attempt to commit an offense punishable under this subparagraph;

(2)  (A) except as provided in subparagraph (B), a fine under this title or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2), (a)(3), or (a)(6) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

    (B)  a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if--

        (i)  the offense was committed for purposes of commercial advantage or private financial gain;

        (ii)  the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

        (iii)  the value of the information obtained exceeds $ 5,000; and

    (C)  a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(2), (a)(3) or (a)(6) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(3)  (A) a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a) (7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

    (B)  a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4) [,] or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this section;

(4)  (A) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of--

(i)  an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)--

(I)  loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $ 5,000 in value;

(II)  the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(III)  physical injury to any person;

(IV)  a threat to public health or safety;

(V)  damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

(VI)  damage affecting 10 or more protected computers during any 1-year period; or

(ii)  an attempt to commit an offense punishable under this subparagraph;

(B)  except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 10 years, or both, in the case of--

(i)  an offense under subsection (a)(5)(A), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused) a harm provided in subclauses (I) through (VI) of subparagraph (A)(i); or

(ii)  an attempt to commit an offense punishable under this subparagraph;

(C)  except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 20 years, or both, in the case of--

(i)  an offense or an attempt to commit an offense under subparagraphs (A) or (B) of subsection (a)(5) that occurs after a conviction for another offense under this section; or

(ii)  an attempt to commit an offense punishable under this subparagraph;

(D)  a fine under this title, imprisonment for not more than 10 years, or both, in the case of--

(i)  an offense or an attempt to commit an offense under subsection (a)(5)(C) that occurs after a conviction for another offense under this section; or

(ii)  an attempt to commit an offense punishable under this subparagraph;

(E)  if the offender attempts to cause or knowingly or recklessly causes serious bodily injury from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for not more than 20 years, or both;

(F)  if the offender attempts to cause or knowingly or recklessly causes death from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for any term of years or for life, or both; or

(G)  a fine under this title, imprisonment for not more than 1 year, or both, for--

(i)  any other offense under subsection (a)(5); or

(ii)  an attempt to commit an offense punishable under this subparagraph.

(5)  [Deleted]

(d)

(1)  The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

(2)  The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of

the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title [18 U.S.C. § 3056(a)].

(3)  Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.

(e)  As used in this section--

(1)  the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

(2)  the term "protected computer" means a computer--

(A)  exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government; or

(B)  which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;

(3)  the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession or territory of the United States;

(4)  the term "financial institution" means--

(A)  an institution, with deposits insured by the Federal Deposit Insurance Corporation;

(B)  the Federal Reserve or a member of the Federal Reserve including any Federal Reserve Bank;

(C)  a credit union with accounts insured by the National Credit Union Administration;

(D)  a member of the Federal home loan bank system and any home loan bank;

(E)  any institution of the Farm Credit System under the Farm Credit Act of 1971;

(F) a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934 [15 U.S.C. § 78o];

(G) the Securities Investor Protection Corporation;

(H) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978 [12 U.S.C. § 3101(1) and (3)]); and

(I) an organization operating under section 25 or section 25(a) of the Federal Reserve Act;

(5) the term "financial record" means information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution;

(6) the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

(7) the term "department of the United States" means the legislative or judicial branch of the Government or one of the executive department enumerated in section 101 of title 5;

(8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

(9) the term "government entity" includes the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province, municipality, or other political subdivision of a foreign country;

(10) the term "conviction" shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

(11) the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and

(12) the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity.

(f)  This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

(g)  Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [subclause] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

(h)  The Attorney General and the Secretary of the Treasury shall report to the Congress annually, during the first 3 years following the date of the enactment of this subsection [enacted Sept. 13, 1994], concerning investigations and prosecutions under subsection (a)(5).

(i)  (1) The court, in imposing sentence on any person convicted of a violation of this section, or convicted of conspiracy to violate this section, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person forfeit to the United States--

(A)  such person's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation; and

(B)  any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

(2)  The criminal forfeiture of property under this subsection, any seizure and disposition thereof, and any judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except subsection (d) of that section.

(j)  For purposes of subsection (i), the following shall be subject to forfeiture to the United States and no property right shall exist in them:

(1) Any personal property used or intended to be used to commit or to facilitate the commission of any violation of this section, or a conspiracy to violate this section.

(2) Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this section, or a conspiracy to violate this section[.]

## California Penal Code § 502; "Cal. Pen. Code § 502"

(a) It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data. The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

(1) "Access" means to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2) "Computer network" means any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities.

(3) "Computer program or software" means a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions.

(4) "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, Internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network.

69

(5) "Computer system" means a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control.

(6) "Government computer system" means any computer system, or part thereof, that is owned, operated, or used by any federal, state, or local governmental entity.

(7) "Public safety infrastructure computer system" means any computer system, or part thereof, that is necessary for the health and safety of the public including computer systems owned, operated, or used by drinking water and wastewater treatment facilities, hospitals, emergency service providers, telecommunication companies, and gas and electric utility companies.

(8) "Data" means a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

(9) "Supporting documentation" includes, but is not limited to, all information, in any form, pertaining to the design, construction, classification, implementation, use, or modification of a computer, computer system, computer network, computer program, or computer software, which information is not generally available to the public and is necessary for the operation of a computer, computer system, computer network, computer program, or computer software.

(10) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program.

(11) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

(12) "Computer contaminant" means any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify,

destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network.

(13) "Internet domain name" means a globally unique, hierarchical reference to an Internet host or service, assigned through centralized Internet naming authorities, comprising a series of character strings separated by periods, with the rightmost character string specifying the top of the hierarchy.

(14) "Electronic mail" means an electronic message or computer file that is transmitted between two or more telecommunications devices; computers; computer networks, regardless of whether the network is a local, regional, or global network; or electronic devices capable of receiving electronic messages, regardless of whether the message is converted to hard copy format after receipt, viewed upon transmission, or stored for later retrieval.

(15) "Profile" means either of the following:

    (A) A configuration of user data required by a computer so that the user may access programs or services and have the desired functionality on that computer.

    (B) An Internet Web site user's personal page or section of a page that is made up of data, in text or graphical form, that displays significant, unique, or identifying information, including, but not limited to, listing acquaintances, interests, associations, activities, or personal statements.

(c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

(9) Knowingly and without permission uses the Internet domain name or profile of another individual, corporation, or entity in connection with the sending of one or more electronic mail messages or posts and thereby damages or causes damage to a computer, computer data, computer system, or computer network.

(10) Knowingly and without permission disrupts or causes the disruption of government computer services or denies or causes the denial of government computer services to an authorized user of a government computer, computer system, or computer network.

(11) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a public safety infrastructure computer system computer, computer system, or computer network.

(12) Knowingly and without permission disrupts or causes the disruption of public safety infrastructure computer system computer services or denies or causes the denial of computer services to an authorized user of a public safety infrastructure computer system computer, computer system, or computer network.

(13) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or public safety infrastructure computer system computer, computer system, or computer network in violation of this section.

(14) Knowingly introduces any computer contaminant into any public safety infrastructure computer system computer, computer system, or computer network.

(d) (1) Any person who violates any of the provisions of paragraph (1), (2), (4), (5), (10), (11), or (12) of subdivision (c) is guilty of a felony, punishable by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years and a fine not exceeding ten thousand dollars ($10,000), or a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, by a fine not exceeding five thousand dollars ($5,000), or by both that fine and imprisonment.

(2) Any person who violates paragraph (3) of subdivision (c) is punishable as follows:

    (A) For the first violation that does not result in injury, and where the value of the computer services used does not exceed nine hundred fifty dollars ($950), by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

    (B) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000) or in an injury, or if the value of the computer services used exceeds nine hundred fifty dollars ($950), or for any second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(3) Any person who violates paragraph (6), (7), or (13) of subdivision (c) is punishable as follows:

    (A) For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

    (B) For any violation that results in a victim expenditure in an amount not greater than five thousand dollars ($5,000), or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

    (C) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000), by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(4) Any person who violates paragraph (8) or (14) of subdivision (c) is punishable as follows:

    (A) For a first violation that does not result in injury, a misdemeanor punishable by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

    (B) For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by

imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

(5) Any person who violates paragraph (9) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(B) For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(e) (1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

(2) In any action brought pursuant to this subdivision the court may award reasonable attorney's fees.

(3) A community college, state university, or academic institution accredited in this state is required to include computer-related crimes as a specific violation of college or university student conduct policies and regulations that may subject a student to disciplinary sanctions up to and including dismissal from the academic institution. This paragraph shall not apply to the University of California unless the Board of Regents adopts a resolution to that effect.

(4) In any action brought pursuant to this subdivision for a willful violation of the provisions of subdivision (c), where it is proved by clear and convincing evidence that a defendant has been guilty of oppression, fraud, or malice as defined in subdivision (c) of Section 3294 of the Civil Code, the court may additionally award punitive or exemplary damages.

(5) No action may be brought pursuant to this subdivision unless it is initiated within three years of the date of the act complained of, or the date of the discovery of the damage, whichever is later.

(f) This section shall not be construed to preclude the applicability of any other provision of the criminal law of this state which applies or may apply to any transaction, nor shall it make illegal any employee labor relations activities that are within the scope and protection of state or federal labor laws.

(g) Any computer, computer system, computer network, or any software or data, owned by the defendant, that is used during the commission of any public offense described in subdivision (c) or any computer, owned by the defendant, which is used as a repository for the storage of software or data illegally obtained in violation of subdivision (c) shall be subject to forfeiture, as specified in Section 502.01.

(h) (1) Subdivision (c) does not apply to punish any acts which are committed by a person within the scope of his or her lawful employment. For purposes of this section, a person acts within the scope of his or her employment when he or she performs acts which are reasonably necessary to the performance of his or her work assignment.

(2) Paragraph (3) of subdivision (c) does not apply to penalize any acts committed by a person acting outside of his or her lawful employment, provided that the employee's activities do not cause an injury, to the employer or another, or provided that the value of supplies or computer services which are used does not exceed an accumulated total of two hundred fifty dollars ($250).

(i) No activity exempted from prosecution under paragraph (2) of subdivision (h) which incidentally violates paragraph (2), (4), or (7) of subdivision (c) shall be prosecuted under those paragraphs.

(j) For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.

(k) In determining the terms and conditions applicable to a person convicted of a violation of this section the court shall consider the following:

(1) The court shall consider prohibitions on access to and use of computers.

(2) Except as otherwise required by law, the court shall consider alternate sentencing, including community service, if the defendant shows remorse and recognition of the wrongdoing, and an inclination not to repeat the offense.