No. 17-16161

# IN THE

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

**Facebook, Inc**.,

*Plaintiff-Appellee*,

*v.*

**Power Ventures, Inc. and Steven Vachani**,

*Defendants-Appellants*,

_____

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, Honorable Lucy Koh

## INDEX — EXCERPTS OF RECORD
## VOLUME 1 OF 2
## (PAGES 1 - 117)

Amy Sommer Anderson, SBN 282634
Aroplex Law
156 2nd Street
San Francisco, California 94105
Telephone: 415-529-5148
Facsimile: 415-970-5016

Counsel for Defendant-Appellant,
POWER VENTURES, INC.

STEVEN VACHANI
2425B Channing, #216
Berkeley, CA 94704
Telephone: (917) 267-8823

*Pro se* Defendant-Appellant

Court of Appeals No. 17-16161

*Facebook, Inc v. Power Ventrues, Inc, et al.*

INDEX
EXCERPTS OF RECORD
VOLUME 1 OF 2

## VOLUME 1

| Date | Dkt. No. | Page No. | Document Name |
|---|---|---|---|
| 05/02/2017 | 435 | 1-3 | Order Regarding Remedies and Denying Motion to Stay |
| 05/02/2017 | 437 | 4-34 | Judgment |
| 02/15/2017 | 410 | 35-36 | Case Management Order |
| 12/19/2016 | 95 (9th Cir.) | 37-38 | Ninth Circuit Mandate |
| 12/09/2016 | 94 (9th Cir.) | 39-60 | Ninth Circuit Order and Amended Opinion |
| 09/25/2013 | 374 | 61 | Judgment |
| 09/25/2013 | 373 | 62-95 | Order denying Motion for Leave to File; granting Motion for Permanent Injunction; granting motion for summary judgment regarding liability of Vachani and motion for damages (unsealed version only; no reference to sealed portion(s)) |
| 05/02/2013 | 340 | 96-97 | Minute and Case Management Order |
| 02/16/2012 | 275 | 98-117 | Order Granting Plaintiff's Motion for Summary Judgment |

## VOLUME 2

| Date | Dkt. No. | Page No. | Document Name |
|---|---|---|---|
| 06/02/2017 | 451 | 118-119 | Defendants-Appellants' Notice of Appeal to the United States Court of Appeals for the Ninth Circuit |
| 03/30/2017 | 423 | 120-138 | Defendants' Opposition to Facebook's Supplemental Remedies Brief |

| Date | Dkt. No. | Page No. | Document Name |
|------|----------|----------|---------------|
| 03/08/2017 | 416 | 139-152 | Facebook's Supplemental Remedies Brief |
| 03/08/2017 | 416-8 | 153-174 | Expert Report of Richard J. Ostiller |
| 03/08/2017 | 416-2 | 175-177 | Declaration of Joseph Cutler in Support of Facebook's Supplemental Brief on Remedies Following Remand (REDACTED as filed in the District Court) |
| 02/15/2017 | N/A | 178-208 | Transcript of Proceedings—Case Management Conference |
| 02/09/2017 | 409 | 209-222 | Defendants' Joint Case Management Statement |
| 01/11/2017 | 404 | 223-235 | Plaintiff's Case Management Statement |
| 08/15/2013 | 357-1 | 236-240 | Declaration Of Steven Vachani In Support Of Defendants' Opposition To Facebook, Inc.'S Request For Injunctive Relief |
| 08/01/2013 | 353 | 241-244 | Notice Of Motion And Motion For Leave To File Motion For Reconsideration Of Court's Order For Summary Judgment (Dkt. No. 275) [pgs. 1, 3, 5, 6] |
| 01/19/2012 | 235 | 245-247 | Defendants' Memorandum Of Points And Authorities In Opposition To Facebook's Motion For Partial Summary Judgment Under California Penal Code § 502 And The Computer Fraud And Abuse Act, 18 U.S.C. § 1030 [pgs. 10, 11] |
| 01/19/2012 | 225-1,2 | 248-258 | Declaration of Joseph Cutler in Support of Facebook's Motion for Partial Summary Judgment Under the CAN-SPAM Act, Including Exhibit C (REDACTED as filed in the District Court) |
| N/A | N/A | 259-311 | District Court Docket |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., | Case No. 08-CV-05780-LHK |
| Plaintiff, | **JUDGMENT** |
| v. | |
| POWER VENTURES, INC., and STEVEN VACHANI, | |
| Defendants. | |

On May 2, 2017, the Court issued an order granting Plaintiff Facebook Inc. ("Plaintiff"): $79,640.50 in compensatory damages for the violation of the Computer Fraud and Abuse Act and California Penal Code § 502 by Defendants Power Ventures, Inc. and Steven Vachani (collectively, "Defendants"); $39,796.73 in discovery sanctions against Defendants for Defendants' misconduct during a Federal Rule of Civil Procedure 30(b)(6) deposition; and the following permanent injunction:

    1. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-interest, and those in active concert or participation with them, are permanently enjoined from:

1

United States District Court
Northern District of California

A. Accessing or using, or directing, aiding, facilitating, causing, or conspiring with others to use or access the Facebook website or servers for any commercial purpose, without Facebook's prior permission, including by way of example and not limitation for the purpose of sending or assisting others in sending, or procuring the sending, of unsolicited commercial electronic text messages via the Facebook website or service.

B. Using any data, including without limitation Facebook-user data and data regarding Facebook's website or computer networks, obtained as a result of the unlawful conduct for which Defendants' have been found liable.

C. Developing, using, selling, offering for sale, or distributing, or directing, aiding, or conspiring with others to develop, sell, offer for sale, or distribute, any software that allows the user to engage in the conduct found to be unlawful.

2. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-interest, and those in active concert or participation with them shall destroy any software, script(s) or code designed to access or interact with the Facebook website, Facebook users, or the Facebook service. They shall also destroy Facebook data and/or information obtained from Facebook or Facebook's users, or anything derived from such data and/or information.

3. Within three calendar days of entry of this permanent injunction and order, Defendants shall affirm that they already have notified, or shall notify, their current and former officers, agents, servants, employees, successors, and assigns, and any persons acting in concert or participation

United States District Court
Northern District of California

1  with them of this permanent injunction.

2  4. Within seven calendar days of entry of this injunction and order,

3  Defendants shall certify in writing, under penalty of perjury, that they

4  have complied with the provision of this order, and state how notification

5  of this permanent injunction in accordance with paragraph 3 above was

6  accomplished, including the identities of all email accounts (if any) used

7  for notification purposes.

8  5. The Court shall continue to retain jurisdiction over the parties for the

9  purpose of enforcing this injunction and order.

10  Pursuant to Federal Rule of Civil Procedure 54, the Court finds no just reason for delay and directs

11  the Clerk to enter judgment in favor of Plaintiff on Plaintiff's causes of action under the Computer

12  Fraud and Abuse Act and California Penal Code § 502 and to enter judgment in favor of

13  Defendants on Plaintiff's cause of action under the Controlling the Assault of Non-Solicited

14  Pornography and Marketing Act.  Defendants shall pay to Plaintiff $79,640.50 in compensatory

15  damages and $39,796.73 for discovery sanctions. Defendants shall also abide by the permanent

16  injunction described above. The Clerk shall close the file.

17  **IT IS SO ORDERED.**

18

19  Dated: May 2, 2017

20  _Lucy H. Koh_

21  LUCY H. KOH
    United States District Judge

22

23

24

25

26

27

28
    Case No. 08-CV-05780-LHK
    JUDGMENT

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., | Case No. 08-CV-05780-LHK |
| Plaintiff, | |
| | **ORDER REGARDING REMEDIES AND DENYING MOTION FOR STAY** |
| v. | |
| POWER VENTURES, INC., et al., | |
| Defendants. | |

On December 9, 2016, the Ninth Circuit issued an order affirming in part and reversing in part the Court's grant of summary judgment. ECF No. 401. The Ninth Circuit remanded for this Court to reconsider the issue of remedies in light of the Ninth Circuit's order. *Id.* at 22. The Court held a case a management conference on February 15, 2017, ECF No. 412, and set a briefing schedule on the remanded issue of remedies, ECF No. 410. Facebook filed its initial brief on March 8, 2017. ECF No. 416. Defendants filed their responsive brief on March 30, 2017. ECF No. 423. Facebook filed a reply on April 7, 2017. ECF No. 424.

On April 24, 2017, Defendant Steven Vachani ("Vachani") filed a motion to stay all proceedings in the case pending resolution of his petition for certiorari in the United States Supreme Court. ECF No. 428. Facebook filed an opposition to this motion on April 24, 2017. ECF

No. 429. On April 26, 2017, Vachani filed a letter stating that Facebook had not filed a brief in opposition to the petition for certiorari. ECF No. 431. On May 1, 2017, Vachani filed a reply to Facebook's opposition to the motion for a stay. ECF No. 434.

Having considered the briefing of the parties, the record in the case, and the relevant law, the Court finds that Facebook is entitled to $79,640.50 in compensatory damages and a permanent injunction as described below. The Court also DENIES Vachani's motion for a stay.

## I.    BACKGROUND

### A.  Factual Background

Facebook owns and operates the social networking website located at facebook.com. First Amended Complaint ("FAC") ¶ 2. Power Ventures ("Power") is a corporation incorporated in the Cayman Islands and doing business in California. Answer ¶ 10. At the times relevant to the instant case, Power has operated the website www.power.com, which offers to integrate users' various social media accounts into a single experience. FAC ¶ 5; Answer ¶ 5. Vachani is the Chief Executive Officer of power.com. Answer ¶ 11.

In December 2008, Facebook brought against Defendants this action, which alleges violations of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CANSPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; California Penal Code § 502; and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201; copyright infringement under 17 U.S.C. § 101; trademark infringement under 15 U.S.C. §§ 1114 and 1125(a) and under California law; and violations of California Business and Professions Code Section 17200. ECF Nos. 1, 9. Facebook complains that Defendants employ Facebook's proprietary data without its permission by inducing Facebook users to provide their login information and then using that information to "scrape" Facebook's proprietary material. FAC ¶¶ 49, 50, 52. Defendants then display Facebook's material on power.com. FAC ¶ 52. Facebook asserts that it never gave Defendants permission to use its material in this way. FAC ¶ 54.

Facebook also accuses Defendants of sending unsolicited and deceptive email messages to

Facebook users. FAC ¶¶ 65-69. To launch their site, Defendants promised power.com users a chance to win $100 if they invited and signed up the most new users to Defendants' site. FAC ¶ 65. Defendants provided to their users a list of the users' Facebook friends from which the users could choose people to whom to send the invitation. FAC ¶ 66. Power.com sent commercial emails to those friends that included on the "from" line a "@facebookmail.com" address. FAC ¶¶ 66, 68. The content of the message included a line that the message was from "The Facebook Team." FAC ¶ 69, 70. Facebook contends that it never gave permission to send these messages and that the emails were deceptive because they "do not properly identify the initiators of the messages, nor do they provide clear or conspicuous notice that the messages are advertisements for" power.com. FAC ¶ 71.

**B. Procedural History**

On February 18, 2011, Judge Ware granted the parties' stipulation to dismiss Facebook's DMCA claim, copyright and trademark infringement claims, and claims for violations of California Business and Professions Code Section 17200. ECF No. 97. On May 9, 2011, Defendants moved for summary judgment on Facebook's CFAA, Section 502, and CAN-SPAM Act claims. ECF No. 98. On November 17, 2011, Facebook moved for summary judgment on Facebook's § 502 and CFAA claims. ECF No. 214 ("§ 502/CFAA Motion"). On November 18, 2011, Facebook moved for summary judgment on Facebook's CAN-SPAM Act claim. ECF No. 215. On February 16, 2012, Judge Ware issued an order denying Defendants' motion for summary judgment and granting summary judgment in Facebook's favor as to Facebook's § 502, CFAA, and CAN-SPAM Act claims. ECF No. 275 ("February 16, 2012 order").

In the February 16, 2012 order, Judge Ware requested additional briefing regarding Vachani's individual liability and the amount of damages Facebook should receive in light of the February 16, 2012 order. *Id.* at 19. On March 30, 2012, Facebook filed its supplemental brief regarding damages and the liability of Vachani. ECF No. 299 ("Facebook Damages/Liability Brief"). The same day, Defendants lodged with the court a brief regarding damages and the liability of Vachani. ECF No. 288 ("Defendants' Damages/Liability Brief"). On August 15, 2012,

United States District Court
Northern District of California

1    Vachani also submitted a supplemental brief regarding damages and his personal liability. ECF

2    No. 317 ("Vachani Damages/Liability Brief").

3        On June 4, 2012, the attorneys representing Vachani and Power moved to withdraw as

4    counsel. ECF Nos. 302, 303. On July 2, 2012, Judge Ware granted the motions to withdraw. ECF

5    No. 306. In the order granting the withdrawal requests, Judge Ware required Vachani and Power

6    to file Notices of Identification of Substitute Counsel no later than July 17, 2012. *Id.* Judge Ware

7    noted that although Vachani could proceed pro se, Power had to be represented by a member of

8    the bar pursuant to Civil Local Rule 3-9(b). Civil L.R. 3-9(b) ("A corporation, unincorporated

9    association, partnership or other such entity may appear only through a member of the bar of this

10   Court."). Judge Ware cautioned Defendants that a failure to file timely Notices of Identification of

11   Substitute Counsel may result in default of the case. *Id.*

12       On July 19, 2012, after neither Vachani nor Power had filed a Notice of Identification of

13   Substitute Counsel, Judge Ware ordered both parties to appear on August 6, 2012 to respond to an

14   Order to Show Cause regarding Defendants' failure to obtain counsel. ECF No. 308. On August 6,

15   2012, the parties appeared for the hearing, and on August 8, 2012, Judge Ware issued an order

16   regarding Defendants' failure to obtain counsel ("August 8, 2012 order"). ECF No. 313. Because

17   Power had failed to identify replacement counsel, Judge Ware found good cause to strike Power's

18   answer to Facebook's complaint and enter default against Power. *Id.* Judge Ware permitted

19   Vachani a short extension to find new counsel, which was conditioned on Vachani's immediate

20   filing of a Notice of Self-Representation. *Id.* The Clerk entered default against Power on August 9,

21   2012. ECF No. 314.

22       On August 15, 2012, new counsel filed a Notice of Appearance on behalf of Power. ECF

23   No. 316. That same day, Power moved for leave to file a motion for reconsideration of Judge

24   Ware's August 8 order requiring entry of default against Power. ECF No. 318. Judge Ware gave

25   Power leave to file a motion for reconsideration on August 21, 2012. ECF No. 320. On August 23,

26   2012, Power filed its motion for reconsideration. ECF No. 321.

27       On August 27, 2012, Facebook filed its response and simultaneously requested entry of

28

United States District Court
Northern District of California

1   default judgment against Power. ECF No. 322. On August 27, 2012, Defendants provided notice

2   that both Power and Vachani had filed for bankruptcy. ECF Nos. 323, 324. Noting that pursuant to

3   11 U.S.C. § 362(a)(1), a voluntary petition for bankruptcy operates as an automatic stay of any

4   judicial actions involving the petitioners, Judge Ware stayed the proceedings and administratively

5   closed the case on August 29, 2012. ECF No. 325. In the same order, Judge Ware denied as

6   premature Power's motion for reconsideration of the August 8 order requiring entry of default. *Id.*

7          On March 20, 2013, Facebook notified the Court that the Bankruptcy Court had dismissed

8   Power's bankruptcy case and had granted Facebook's request for relief from the automatic stay in

9   Vachani's bankruptcy case. ECF No. 327. Facebook sought to reopen the case. *Id.* Facebook also

10  sought reassignment to a new judge because on August 31, 2012, while the automatic stay was in

11  effect, Judge Ware resigned from the bench. *Id.* On April 8, 2013, the undersigned judge, as the

12  Duty Judge at the time Facebook filed its motion, granted Facebook's request. ECF No. 328. The

13  undersigned judge ordered that the stay be lifted, the case be reopened, and the case be reassigned.

14  *Id.* The case then was reassigned to the undersigned judge. ECF No. 329.

15         On April 25, 2013, Vachani moved for clarification of Judge Ware's February 16, 2012

16  order regarding whether Vachani's liability had been determined in the February 16, 2012 order.

17  ECF No. 332. On April 29, 2013, Facebook filed a case management statement in which Facebook

18  again requested that default judgment be entered against Power. ECF No. 333. On the same day,

19  Defendants filed a consolidated case management statement in which Power again sought to set

20  aside default. ECF No. 334. Defendants also stated their intent to request leave to file a motion for

21  reconsideration of the February 16, 2012 order. *Id.* In Facebook's and Defendants' respective case

22  management statements, the parties acknowledged that Vachani's liability and the issues of

23  damages and injunctive relief still needed to be addressed. ECF No. 333, 334.

24         On May 2, 2013, following a case management conference, the Court issued a case

25  management order. ECF No. 340. In that order, the Court clarified that the February 16, 2012

26  order did not decide Vachani's liability. *Id.* The Court granted Power's request to set aside default

27  and denied Facebook's request for entry of default judgment against Power. *Id.* The Court also set

28  

United States District Court
Northern District of California

5

1    a briefing schedule for the damages and injunctive relief issues. *Id.* The Court set a hearing date of

2    September 26, 2013 to consider Vachani's liability and the issue of remedies. *Id.*

3         On August 1, 2013, Power filed its request for leave to file a motion to reconsider Judge

4    Ware's February 16, 2012 order. ECF No. 353. On August 1, 2013, Facebook filed its

5    supplemental memorandum in support of its request for injunctive relief. ECF No. 354 ("Facebook

6    Injunction Brief"). On September 25, 2013, Facebook filed a supplemental motion for a

7    permanent injunction. ECF No. 369.

8         On August 7, 2013, Magistrate Judge Spero issued an order requiring Vachani to pay

9    Facebook $39,796.73 as a discovery sanction because of Vachani's noncompliance during a Rule

10   30(b)(6) deposition. ECF No. 356. Following Judge Spero's order, Vachani immediately appealed

11   the discovery sanction to the Ninth Circuit on September 6, 2013. ECF No. 360. Despite the

12   appeal, this Court retained jurisdiction over aspects of the case unrelated to the discovery

13   sanctions.

14        On September 25, 2013, the Court filed an Order Denying Leave to File Motion for

15   Reconsideration, Finding Defendant Steven Vachani Liable as a Matter of Law, and Granting

16   Damages and Permanent Injunctive Relief. ECF No. 373. In the order, the Court first found that

17   Defendants had not identified any new material facts, changes in law, or issues that Judge Ware

18   manifestly failed to consider in his February 16, 2012 order. The Court therefore denied leave to

19   file a motion for reconsideration of the February 16, 2012 order. *Id.* at 15. The Court also found

20   that because Vachani directed and authorized the activities at issue, Vachani was personally liable

21   for violations of the CAN-SPAM Act, CFAA, and California Penal Code § 502 along with Power.

22   *Id.* at 17.

23        The Court then addressed the issue of damages for the first time. The Court noted that

24   under the CAN-SPAM Act, Facebook was entitled to elect between monetary damages in the

25   amount of actual losses and statutory damages. *Id.* at 22. Facebook elected to recover statutory

26   damages, and the Court ordered Defendants to pay $50 for each of 60,627 spam messages sent, for

27   a total of $3,031,350. *Id.* at 25–26. The Court then held that Facebook was entitled to

28

United States District Court
Northern District of California

compensatory damages under the CFAA. The Court held that "Facebook has established through undisputed testimony that it expended $80,543 to investigate Defendants' actions and for outside legal services in connection with the Defendants' actions." *Id.* at 26.

Finally, the Court issued a permanent injunction against Defendants. The Court found that each of the applicable four factors – (1) irreparable injury, (2) no adequate remedy at law, (3) balance of hardships, and (4) the public interest – favored granting a permanent injunction. *Id.* at 27 (citing *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006)). In doing so, the Court considered Defendants' CAN-SPAM Act violations as well as Defendants' violations of the CFAA and § 502. The Court granted a permanent injunction that enjoined Defendants from (1) making any misleading statement in advertising, including statements that Facebook had authorized a particular communication; (2) accessing Facebook's website or servers "for any purpose" without Facebook's prior permission; (3) using any data obtained from the unlawful conduct; and (4) developing or using any software to commit the illegal acts alleged in the complaint. *Id.* at 33–34. The injunction also required Defendants to destroy all the software at issue, destroy all data obtained from Facebook with the illegal software, and take measures to ensure that the injunction was obeyed. *Id.* at 34. The Court entered judgment against Defendants the same day, September 25, 2013. ECF No. 374.

On October 23, 2013, Defendants appealed the Court's grant of summary judgment. ECF No. 379. On November 21, 2013, the Ninth Circuit dismissed Vachani's appeal of Magistrate Judge Spero's August 7, 2013 order granting discovery sanctions because the August 7, 2013 order was not final or appealable. ECF No. 386.

On December 9, 2016, the Ninth Circuit affirmed in part and reversed in part the Court's grant of summary judgment. ECF No. 401. The Ninth Circuit reversed the Court's finding that Defendants had violated the CAN-SPAM Act because the Ninth Circuit found that Facebook initiated the email messages at issue and that the sender of the messages was not materially misleading within the meaning of the CAN-SPAM Act. *Id.* at 9–13. The Ninth Circuit then held that Defendants had violated CFAA, but only for the period "after receiving written notification

United States District Court
Northern District of California

1    from Facebook on December 1, 2008." *Id.* at 19. The Ninth Circuit held that by sending the

2    December 1, 2008 notification, Facebook revoked Defendants' permission to use Facebook's

3    computers. *Id.*

4    　　　With respect to damages, the Ninth Circuit held that "[i]t is undisputed that Facebook

5    employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and

6    responding to Power's actions." *Id.* at 14. However, in light of the Ninth Circuit's finding that the

7    violation began only after Facebook sent its cease and desist letter, the Ninth Circuit remanded to

8    "calculate damages only for the period after Power received the cease and desist letter . . . ." *Id.* at

9    22.

10   　　　After remand, the Court initially scheduled a case management conference for January 11,

11   2017. However, Defendants filed a motion requesting a continuance of the case management due

12   to "ongoing personal considerations." ECF No. 405. The Court granted this motion and continued

13   the case management conference to January 25, 2017. Facebook then filed a motion requesting a

14   continuance due to scheduling problems with the January 25, 2017 date. ECF No. 407. The Court

15   therefore continued the case management to February 15, 2017. ECF No. 408.

16   　　　The Court held a case management conference on February 15, 2017. At the case

17   management conference, the Court set a briefing schedule for the remanded issue of remedies.

18   ECF No. 410. In doing so, the Court warned that "the parties shall limit their arguments to the

19   issues that the Ninth Circuit remanded for consideration. The parties shall not present arguments

20   regarding aspects of the Court's decision which the Ninth Circuit did not reverse on appeal. . . .

21   The parties shall carefully review the Ninth Circuit's opinion and the record in this case to ensure

22   that the parties argue only those issues that the Ninth Circuit ordered the district court to address

23   on remand." ECF No. 410, at 1–2. The Court also ordered Defendants to pay by March 15, 2017

24   the $39,796.73 discovery sanction that the Ninth Circuit affirmed.[1]

25

26   _____

27   [1] Although the Ninth Circuit dismissed Vachani's earlier appeal of Magistrate Judge Spero's
     August 7, 2013 order granting discovery sanctions, ECF No. 386, the Ninth Circuit later
     considered the issue of discovery sanctions in its December 9, 2016 order, ECF No. 401.

28
     Case No. 08-CV-05780-LHK
     ORDER REGARDING REMEDIES AND DENYING MOTION FOR STAY

United States District Court
Northern District of California

Pursuant to the briefing schedule, Facebook filed its supplemental remedies brief on March 8, 2017. ECF No. 416. On March 9, 2017, Defendants filed a petition for certiorari with the United States Supreme Court. ECF No. 418. Defendants failed to pay the $39,796.73 discovery sanction by the March 15, 2017 deadline and still have not done so. Subsequently, on March 28, 2017, Vachani filed an "urgent motion" requesting that the Court stay all district court proceedings for 90 days or grant a 45–60 day extension because Vachani had been unable to contact Power's attorney for over a month. ECF No. 420. The same day, Vachani filed a letter with the Court stating that although he has not paid the $39,796.73 discovery sanction, Vachani is "in compliance with this court's order" because he is "in an active bankruptcy proceeding." ECF No. 421.

On March 29, 2017, the Court denied Vachani's motion for a stay and for an extension of time. ECF No. 422. On March 30, 2017, Power's attorney filed Defendants' supplemental brief regarding remedies. ECF No. 423. On April 17, 2017, Facebook filed a reply brief. ECF No. 424.

## II.   LEGAL STANDARD

### A.  Damages Under the CFAA

Under the CFAA, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g) (emphasis added). The CFAA defines "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11); *see also* ECF No. 401, at 13–14. Thus, pursuant to the Ninth Circuit's order, the Court's task is to calculate the amount of Facebook's "loss" under the statute after Facebook sent a cease and desist letter on December 1, 2008 and thus revoked Power's authorization to access Facebook's computer.

### B.  Injunctive Relief

The CFAA provides that "[a]ny person who suffers damage or loss by reason of a violation of [§1030] may maintain a civil action against the violator to obtain compensatory damages and

1    injunctive relief or other equitable relief." 18 U.S.C.A. § 1030(g). California Penal Code § 502

2    also allows a plaintiff to obtain injunctive relief. California Penal Code § 502(e)(1).

3        A party seeking a permanent injunction must make a four-part showing: (1) that it has

4    suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

5    inadequate to compensate for that injury; (3) that, considering the balance of hardships between

6    the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would

7    not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388,

8    390 (2006). The Court has discretion to grant or deny permanent injunctive relief. *Id.* at 391.

9    **III.    DISCUSSION**

10       The Ninth Circuit ordered the Court to address two narrow issues on remand. First, the

11   Ninth Circuit ordered the Court to recalculate damages "only for the period after Power received

12   the cease and desist letter, when Power continued to access data contained in Facebook's servers

13   and memory banks." ECF No. 401, at 22. Second, the Ninth Circuit ordered the Court to consider

14   "appropriate remedies under the CFAA and section 502, including any injunctive relief." *Id.* The

15   Court therefore considers the issue of damages and the issue of injunctive relief in turn. The Court

16   then considers issues that Defendants raise regarding taxable costs and the $39,796.73 discovery

17   sanction. Finally, the Court considers Vachani's motion for a stay.

18       **A.  Damages**

19       The Ninth Circuit ordered the Court to calculate damages for the period after Power

20   received Facebook's cease and desist letter on December 1, 2008. Specifically, the Ninth Circuit

21   emphasized that although violation of a website's terms of use is not sufficient to sustain a CFAA

22   violation, "after receiving written notification from Facebook on December 1, 2008, Power

23   accessed Facebook's computers 'without authorization' within the meaning of the CFAA and is

24   liable under that statute." ECF No. 401, at 19. The Ninth Circuit also noted that "Facebook

25   expressly rescinded [its] permission when Facebook issued its written cease and desist letter to

26   Power on December 1, 2008." *Id.* at 16.

27       Facebook argues that because the Ninth Circuit's order requires this Court to calculate

28
10

United States District Court
Northern District of California

damages for the period after Power received Facebook's cease and desist letter on December 1, 2008, this Court should simply subtract the amount of Facebook's loss that occurred on December 1, 2008 or earlier and reinstate the remaining damages award. ECF No. 416, at 4–5. Thus, Facebook asks for all damages incurred on or after December 2, 2008. Defendants argue that this method is improper for several reasons. First, Defendants claim that the "allowable period" for damages began on December 26, 2008 rather than December 2, 2008. Second, Defendants claim that the "allowable period" ended on December 30, 2008, the date that the instant lawsuit was filed and the date "on which defendants ceased all unauthorized interaction with Facebook's website." ECF No. 423, at 8. Third, Defendants argue that an unknown amount of Facebook's claimed damages are not compensable because those damages were caused by the reversed CAN-SPAM Act violation rather than the CFAA or § 502 violations. Fourth, Defendants argue that Facebook has not adequately documented the work of McGeehan for which Facebook requests compensatory damages.

Before addressing Defendants' objections in detail, the Court notes that Defendants failed to comply with the Court's instructions. At the February 15, 2017 case management conference, Defendants raised many issues that went beyond the scope of the Ninth Circuit's remand. Therefore, at the case management conference, the Court informed Defendants that "a lot of your damages arguments are not related to the date issue" on which the Ninth Circuit remanded and warned Defendants against "retreading and reopening issues that have now been decided." ECF No. 414, at 12–13. Additionally, in the Court's February 15, 2017 case management order, the Court ordered that "[i]n briefing the remanded issue of damages, the parties shall limit their arguments to the issues that the Ninth Circuit remanded for consideration. The parties shall not present arguments regarding aspects of the Court's decision which the Ninth Circuit did not reverse on appeal. For example, the Court will not consider arguments regarding whether attorney's fees constitute compensable damages under the CFAA." ECF No. 410, at 1. The Court also ordered that "[t]he parties shall carefully review the Ninth Circuit's opinion and the record in this case to ensure that the parties argue only those issues that the Ninth Circuit ordered the district

11

1   court to address on remand." *Id.* at 1–2.

2          However, despite the Court's explicit instructions, Defendants' briefing contains many

3   arguments that essentially re-raise issues that the Court has already resolved or raise issues that

4   Defendants never raised before either this Court or the Ninth Circuit. For example, Defendants

5   repeatedly argue that Facebook has not met its burden to justify compensatory damages by a

6   preponderance of the evidence. *See* ECF No. 423, at 9. However, although Facebook does bear the

7   burden of justifying its damages by a preponderance of the evidence, the Court has already found

8   that Facebook met this burden. In the Court's September 25, 2013 order, the Court found that

9   Facebook's damages calculations were fully justified by "undisputed testimony," and the Ninth

10  Circuit did not disturb this finding on appeal. ECF No. 373, at 26.

11         Defendants also raise many other issues that have already been decided, and the Court will

12  discuss these issues in detail below. However, as a general matter, the Court notes that issues that

13  were previously resolved and were not raised on appeal are the law of the case and are not subject

14  to relitigation absent a motion for leave to file a motion for reconsideration. *Securities Investor*

15  *Protection Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996) (finding that an issue was

16  "subsumed within [the Court's] summary judgment" order was therefore "law of the case.").

17  Additionally, "an issue or factual argument waived at the trial level before a particular order is

18  appealed, or subsequently waived on appeal, cannot be revived on remand." *Magnesystems v.*

19  *Nikken, Inc.*, 933 F. Supp. 944, 949–950 (C.D. Cal. 1996); *see also Vigman*, 74 F.3d at 937

20  (holding that an argument not raised on appeal was waived).

21         Thus, on remand, the Court's task is not to relitigate issues that the Court has already

22  decided and which the Ninth Circuit did not disturb on appeal. Instead, the Court's task is to

23  determine which of the CFAA damages that the Court granted in its September 25, 2013 order

24  were incurred after Facebook revoked its permission by sending a cease and desist letter to Power

25  on December 1, 2008. With the narrow scope of the Ninth Circuit's remand in mind, the Court

26  now considers Defendants' arguments in turn.

27         **1.   Defendants' Arguments about the "Start Date of the Applicable Period"**

28

United States District Court
Northern District of California

1    Defendants first argue that contrary to the Ninth Circuit's order, Facebook did not revoke

2    authorization when Facebook sent its December 1, 2008 cease and desist letter. Instead,

3    Defendants argue that Facebook did not revoke authorization until December 26, 2008.

4    Before addressing Defendants' arguments, the Court first outlines the relevant sequence of

5    events. Power launched its website on December 1, 2008. ECF No. 299, Ex. 8. The same day,

6    Facebook's Security Incident Response team determined that the website was running an

7    automated script to download Facebook data. Specifically, Facebook employee Ryan McGeehan

8    spent 31 minutes or $50 worth of time investigating the incident. ECF No. 214, at Ex. 9 & Ex. 4.

9    In response to this finding, Joseph Cutler ("Cutler"), Facebook's outside counsel at Perkins Coie,

10   spent ███████ on December 1, 2008 drafting a cease and desist letter.

11   The same day, Facebook sent the cease and desist letter to Power no later than 7:54 p.m.

12   on December 1, 2008. ECF No. 299, Ex. 3. At 8:01 p.m., Vachani forwarded the letter to other

13   Power employees and stated that employees should "be prepared for Facebook to try and block us

14   and turn this into a national battle that gets us huge attention." *Id.* Soon afterward, Vachani

15   contacted Cutler. Cutler states that in December 2008 and early 2009, Cutler had many

16   discussions with Vachani and "[i]n nearly all of [the] discussions, [Cutler] continued to demand

17   that Defendants cease their unlawful activities." ECF No. 213-2. In one such conversation, on

18   December 15, 2008, Cutler emailed Vachani and informed him that he expected Power to delete

19   all user data and conform to Facebook policies within two weeks, or by December 26, 2008. *Id.*

20   However, despite these warnings and despite Vachani's repeated assurances that the Power

21   website would be changed to comply with Facebook policies, Vachani failed to make the

22   requested changes to the Power website. *Id.* Facebook therefore filed the instant suit on December

23   30, 2008. Defendants ceased interaction with Facebook's website the same day. However,

24   Defendants again accessed Facebook through the Facebook Connect program on February 5,

25   2009. ECF No. 213-3. To date, it is not clear whether Defendants have deleted the data acquired

26   from Facebook. After considering this sequence of events, the Ninth Circuit ruled as follows:

27

28

United States District Court
Northern District of California

13

1
2
3
4
5
6
7

> Facebook expressly rescinded that permission when Facebook issued its written cease and desist letter to Power on December 1, 2008. Facebook's cease and desist letter informed Power that it had violated Facebook's terms of use and demanded that Power stop soliciting Facebook users' information, using Facebook content, or otherwise interacting with Facebook through automated scripts. . . . We therefore hold that, after receiving written notification from Facebook on December 1, 2008, Power accessed Facebook's computers "without authorization" within the meaning of the CFAA and is liable under that statute. . . . . [A]fter receiving the cease and desist letter from Facebook, Power intentionally accessed Facebook's computers knowing that it was not authorized to do so, making Power liable under the CFAA. ECF No. 401, at 17–20.

With this background in mind, the Court addresses Defendants' argument. Defendants argue that

Facebook did not actually deny Defendants permission to use Facebook's website until December

26, 2008, because Cutler "gave Power an extension of time, ending December 26, 2008, by which

Power would need to have its software in full compliance with Facebook's requirements." ECF

No. 423, at 7. This argument fails for two reasons.

First, and most importantly, the argument is flatly contradicted by the Ninth Circuit's

order, which held that "Facebook expressly rescinded [its] permission when Facebook issued its

written cease and desist letter to Power on December 1, 2008." ECF No. 401, at 15. Second, the

notion that Facebook gave Power permission to use its website until December 26, 2008 is

incorrect. As Facebook points out, between December 2, 2008 and December 26, 2008, Power

was actively evading Facebook's attempts to block IP addresses associated with Power from

accessing Facebook's servers. ECF No. 424, at 8. Additionally, during this period Cutler

repeatedly demanded that Power cease its activities. The mere fact that Cutler gave Power a two-

week deadline before Facebook took further action does not indicate that Facebook gave Power

permission to access Facebook. Therefore, the Court rejects Defendants' argument that the

"allowable period" for damages began on December 26, 2008.

As an alternative, Defendants argue that the "allowable period" began at the earliest on

December 4, 2008, when "Facebook made its cease and desist demand directly to Power for the

first time." ECF No 423, at 6. However, this again is inconsistent with the Ninth Circuit's order,

which held that Facebook revoked authorization on December 1, 2008. Defendants never argued

United States District Court
Northern District of California

before the Ninth Circuit or this Court that the allowable period began on December 4, 2008, and thus, this argument is waived. *See Magnesystems*, 933 F. Supp. at 949–950 ("[A]n issue . . . waived on appeal[] cannot be revived on remand."). This argument is also inconsistent with the undisputed facts, which show that Vachani received Cutler's cease and desist letter and forwarded it to Power employees at 8:01 p.m. on December 1, 2008. ECF No. 299, Ex. 3. Therefore, the Court finds that for the purposes of damages calculations, Facebook revoked Power's authorization on December 1, 2008.

### 2. Defendants' Arguments about the "End Date of the Applicable Period"

Defendants also argue that the damages calculation should end on December 30, 2008. Specifically, Defendants argue that December 30, 2008 was the "last date of 'unauthorized access'" because "December 30, 2008 is the date this lawsuit was filed and the date on which the defendants ceased all unauthorized interaction with Facebook's website." ECF No. 423 at 8. In short, Defendants argue that Facebook is entitled to recover for losses sustained only while Power was interacting with Facebook's website.

At the outset, the Court notes that Defendants' claim that "December 30, 2008 is the date . . . on which the defendants ceased all unauthorized interaction with Facebook's website" is incorrect. ECF No. 423 at 8. As the Ninth Circuit held, "Power's campaign lasted less than two months. On December 20, 2008, Facebook filed this action. Toward the end of January 2009, Power ended its campaign." ECF No. 401, at 8. Additionally, despite the cease and desist letter, Defendants accessed Facebook's computers again through the Facebook Connect program on February 5, 2009. ECF No. 213-3. Furthermore, the full extent of Defendants' activities after December 2008 is unknown because Vachani testified at his deposition that in April 2011, Vachani destroyed a logging database that contained evidence about the scope of Defendants' activities after December 2008. Dkt. 300 at 2-5; Dkt. 299-14 at 83:23-84:10.

However, even if Defendants were correct that they ceased actively interacting with Facebook computers on December 30, 2008, nothing in the Ninth Circuit's order indicated that the Court should consider this issue on remand. This Court already decided that Facebook's attorney's

United States District Court
Northern District of California

15

1    fees and investigation and enforcement costs through March 2009 are compensable even though

2    Power was not actively interacting with Facebook's website for significant portions of that time.

3    ECF No. 373, at 26. The Ninth Circuit did not question this finding in its order, and indeed the

4    Ninth Circuit stated that Facebook had "suffered a loss" based on all time spent "analyzing,

5    investigating, and responding to Power's actions." ECF No. 401, at 14. Therefore, the Court's

6    ruling on this issue is law of the case and is not subject to relitigation at this stage.

7          Even if the Court were to reconsider the issue, however, the Court would find that

8    Facebook's attorneys' fees and investigation and enforcement costs are compensable even if

9    Power was not actively interacting with Facebook's website at the time the expenses were

10   incurred. Under the CFAA, a defendant can recover for "any reasonable cost to any victim,

11   including the cost of responding to an offense, conducting a damage assessment, and restoring the

12   data, program, system, or information to its condition prior to the offense, and any revenue lost,

13   cost incurred, or other consequential damages incurred because of interruption of service." *Id.* §

14   1030(e)(11). Nothing in this definition limits compensable damages to the precise time that the

15   unauthorized access is occurring.

16         Consistent with this understanding, there are many cases in which courts have granted

17   damages under the CFAA for actions taken after the offense itself. In *EF Cultural Travel BV v.*

18   *Explorica, Inc.*, 274 F.3d 577, 584 n.17 (1st Cir. 2001), for example, the First Circuit affirmed a

19   damages award for money plaintiffs paid "to assess whether their website had been

20   compromised." Similarly, in *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174-1175

21   (11th Cir. 2017), the Eleventh Circuit affirmed a damages award for "extensive forensic and

22   physical review of [the victim's] systems to determine the extent of . . . hacking activity" after a

23   hack occurred. *See also, e.g., A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th

24   Cir. 2009) ("the costs of responding to the offense are recoverable including costs to investigate

25   and take remedial steps" (internal quotations omitted)). Therefore, pursuant to the plain language

26   and consistent with persuasive caselaw, Facebook's attorney's fees and investigation and

27   enforcement costs through March 2009 are compensable as long as those costs were reasonably

28

United States District Court
Northern District of California

1   incurred responding to the offense.

2          Facebook has presented undisputed evidence that it incurred expenses both for technical

3   measures to block Power from accessing Facebook servers and expenses for negotiating with

4   Power to voluntarily stop its activities and destroy the data. Specifically, Facebook incurred

5   $4,950 in costs for technical measures after December 1, 2008 and $74,690.50 in legal fees to

6   negotiate with Defendants. This Court previously held that these costs were reasonably incurred to

7   respond to Defendants' CFAA violation. ECF No. 373, at 26 n.13 ("This Court previously

8   recognized that 'Defendants do not dispute the accuracy or veracity of [the] evidence of

9   [Facebook's] expenditures.' Indeed, Defendants never filed a rebuttal brief to Facebook's expert

10  report regarding the monetary damages Facebook incurred.").

11         For the foregoing reasons, the Court rejects Defendants' argument that Facebook can

12  recover only damages that were incurred on or before December 30, 2008. Facebook is entitled to

13  compensation for all costs incurred after December 1, 2008 in response to Defendants' CFAA

14  violations, and not merely for costs incurred while Defendants were actively interacting with

15  Facebook's website.

16     **3.  Defendants' Argument that Facebook's Claimed Damages Include CAN-SPAM
            Act Damages**
17
           Next, Defendants argue that Facebook's claimed damages of $79,640.50 includes damages
18
    that are attributable only to the CAN-SPAM Act violation, which the Ninth Circuit reversed,
19
    rather than to the CFAA or § 502 violations. For example, Defendants point out that Facebook
20
    employee Ryan McGeehan ("McGeehan"), who incurred $4,950.000 in enforcement costs, spent a
21
    "substantial amount of . . . time specifically related to spamming, which was solely an issue under
22
    the CAN-SPAM claim." ECF No. 423, at 12. Here again, however, Defendants raise an issue that
23
    was already resolved prior to appeal, that Defendants did not raise on appeal, and upon which the
24
    Ninth Circuit did not opine. Def.'s Appellate Br., *Facebook v. Power Ventures, et al.*, Case No.
25
    13-17102, Dkt Entry 18-1. The Court's previous decision on this issue is law of the case that is not
26
    subject to relitigation at this stage of the proceedings.
27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In the Court's September 25, 2013 order, the Court granted Facebook $80,543 in

2 compensatory damages under the CFAA. ECF No. 373, at 26–27. The September 25, 2013 order

3 also made clear that none of this $80,543 compensatory damages award included damages for

4 CAN-SPAM Act violations. Indeed, the Court did not grant any compensatory damages for the

5 CAN-SPAM Act violations because Facebook had elected to recover "statutory damages" rather

6 than "monetary damages" for "actual losses" as a remedy for the CAN-SPAM Act violation. ECF

7 No. 373, at 22 (citing 15 U.S.C. § 7706(g)(1)(B)). In other words, contrary to Defendants'

8 argument, the Court's earlier compensatory damages award did not include a portion of

9 compensatory damages attributable to Defendants' CAN-SPAM Act violation. This is because

10 Facebook elected to receive statutory damages rather than compensatory damages.

11    Additionally, Defendants never raised, either before this Court or before the Ninth Circuit

12 on appeal, the argument that the compensatory damages that Facebook requested under the CFAA

13 included damages attributable only to the CAN-SPAM Act violation. Def.'s Appellate Br.,

14 *Facebook v. Power Ventures, et al.*, Case No. 13-17102, Dkt Entry 18-1. Therefore, Defendants

15 have waived this argument. *See Magnesystems*, 933 F. Supp. at 949–950 ("[A]n issue or factual

16 argument waived at the trial level before a particular order is appealed, or subsequently waived on

17 appeal, cannot be revived on remand.").

18    Even if the Court were to consider Defendants' argument that Facebook's requested

19 damages included losses attributable only to the CAN-SPAM Act violation, the Court would reject

20 the argument. In granting Facebook's motion for summary judgment, the Court found that

21 Defendants violated the CFAA when Defendants accessed Facebook's computers without

22 authorization and thereby gained access to Facebook's data.[2] ECF No. 373, at 11; *see also* 18

23 U.S.C. § 1030(a)(2) (establishing penalties against anyone who "intentionally accesses a computer

24 without authorization or exceeds authorized access, and thereby obtains . . . information from any

25

26 _____

27 [2] The Ninth Circuit held that Facebook did not revoke authorization until Facebook sent the cease and desist letter on December 1, 2008, but otherwise the Ninth Circuit did not disturb the Court's grant of CFAA damages.

28

18

protected computer."). Defendants then used this data, obtained in violation of the CFAA, to send messages to Facebook's users. Even though under the Ninth Circuit's order these messages did not violate the CAN-SPAM Act, these messages were nevertheless sent using data acquired in violation of the CFAA. Therefore, all enforcement or investigation actions that Facebook took regarding the messages were a reasonable response to the CFAA violation. Therefore, the costs of these enforcement and investigation actions are compensable.

In short, all of Facebook's investigation and enforcement efforts were reasonable responses to the CFAA violation. Thus, all of Facebook's investigation and enforcement costs are compensable under the CFAA. The Court therefore rejects Defendants' argument that Facebook has not sufficiently separated CAN-SPAM Act damages from CFAA damages.

### 4.   Argument about Inadequate Documentation

Finally, Defendants argue that Facebook has not adequately documented or justified the salary and hours worked by McGeehan. Specifically, Defendants argue that "Facebook's claim that it incurred an estimated $5,000 in damages due to the time that Facebook employee Ryan McGeehan spent investigating and responding to Power's activities is utterly unsupported by evidence." ECF No. 423, at 12.

As discussed above, the Court already found in its September 25, 2013 order that Facebook's damages calculations were fully justified by "undisputed testimony." ECF No. 373, at 26. The Ninth Circuit did not reverse this finding on appeal, and indeed the Ninth Circuit affirmed the Court's finding that "[i]t is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions." ECF No. 401 at 14. Thus, the Court's earlier ruling on the adequacy of Facebook's proof of damages is the "law of the case" and is not subject to relitigation at this stage. *Vigman*, 74 F.3d at 937.

Nevertheless, even if the Court were to consider Defendants' arguments, the Court would find that Facebook has presented adequate evidence justifying its claim that McGeehan's work after December 1, 2008 was worth $4,950. On March 30, 2012, Facebook filed the expert report of Richard J. Ostiller. According to the Ostiller report, "McGeehan estimate[d] that he spent

19

United States District Court
Northern District of California

approximately 50 hours responding to Power's unauthorized activities . . . ." ECF No. 416-8, at ¶ 19. Additionally, the Ostiller report concluded that "a rate of $100 per hour for the fully burdened payroll costs of Mr. McGeehan" properly took into account "his estimated salary and fringe benefits. *Id.* ¶ 20. Defendants "never challenged the factual sufficiency of Facebook's evidence in opposing summary judgment or on appeal; Defendants offered only the legal argument that attorneys' fees are not compensable CFAA damages." ECF No. 424, at 12.

Defendants now claim that "it must be assumed" that Ostiller's report relies on impermissible hearsay. ECF No. 423, at 13. However, under the Federal Rules of Evidence, an expert may rely on hearsay testimony if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. It is unquestionable that an expert forming an opinion about the salary and the hours worked by an employee would rely on statements by the employee in an interview. Thus, Ostiller's decision to rely on an interview with McGeehan to determine McGeehan's salary, benefits, and hours worked was consistent with the Federal Rules of Evidence. *See* ECF No. 416-8, at 3 (stating that Ostiller calculated damages using information gained from an interview of McGeehan). Additionally, Defendants never challenged the reliability of Ostiller's report. Therefore, the Court finds that Ostiller's report is reliable and provides adequate justification for the damages attributable to work by McGeehan.

**5. Conclusion**

For the reasons discussed above, Defendants' objections to the $79,640.50 damages award are unpersuasive. The Ninth Circuit's order instructed this Court to calculate CFAA damages for the period after Facebook sent its cease and desist letter on December 1, 2008. In all other respects, the Ninth Circuit left the Court's CFAA damages award undisturbed, and therefore the Court's earlier rulings on these damages issues is law of the case that is not subject to relitigation at this stage of the proceedings.

Pursuant to the Ninth Circuit's order, the Court therefore determines what damages were incurred after Facebook sent its cease and desist letter on the evening of December 1, 2008.

United States District Court
Northern District of California

1   Facebook has established through undisputed evidence that of the $80,543 in damages that Court

2   granted prior to appeal, only $902.50 was incurred on or before December 1, 2008. Specifically,

3   on December 1, 2008, McGeehan spent .5 hours of time, valued at $50, investigating Power's

4   actions, and Cutler spent ███████ of time, valued at $852.50 drafting the cease and desist letter,

5   for a total of $902.50 in losses incurred on December 1, 2008. Subtracting this amount from the

6   $80,543 that the Court previously granted in damages, the Court determines that Facebook

7   incurred $79,640.50 in losses on December 2, 2008 or later.  Therefore, in accordance with the

8   Ninth Circuit's order, the Court GRANTS Facebook $79,640.50 in compensatory damages under

9   the CFAA.

10   **B. Permanent Injunction**

11         The Court next considers whether Facebook is entitled to a permanent injunction against

12   Defendants. In the Court's September 25, 2013 order, the Court granted a permanent injunction

13   meant to cure violations of the CAN-SPAM Act, the CFAA, and § 502. However, the Ninth

14   Circuit ordered that this Court "reconsider appropriate remedies under the CFAA and section 502,

15   including any injunctive relief." ECF No. 401, at 22.

16         In Facebook's supplemental briefing on the issue of remedies after the Ninth Circuit's

17   remand, Facebook requests a revised permanent injunction. The permanent injunction that

18   Facebook requests is narrower than the injunction that the Court granted in September 25, 2013

19   order in two important ways. First, Facebook no longer requests that the injunction include two

20   sections specific to the CAN-SPAM Act violation that prohibited Defendants from sending

21   unsolicited messages to Facebook users or making misleading statements about Defendants'

22   affiliation with Facebook in commercial messages. Second, whereas the previous injunction

23   forbade Defendants from accessing the Facebook website "for any purpose" without prior

24   permission, Facebook now requests that this language be narrowed to forbid Defendants from

25   accessing the Facebook website "for any *commercial* purpose" without prior permission. ECF No.

26   424, at 6–7. Thus, Facebook states that the revised permanent injunction is "narrowly tailored . . .

27   to prevent Defendants from repeating their unlawful access to, and misappropriation of,

28

United States District Court
Northern District of California

21

Case No. 08-CV-05780-LHK
ORDER REGARDING REMEDIES AND DENYING MOTION FOR STAY

1-ER-24

1   Facebook's protected computers in violation of the CFAA and California Penal Code § 502." ECF

2   No. 416, at 1.

3    The CFAA creates civil liability against anyone who "intentionally accesses a computer

4   without authorization or exceeds authorized access, and thereby obtains . . . information from

5   any protected computer." 18 U.S.C. § 1030(a)(2)(C). The CFAA provides that "[a]ny person

6   who suffers damage or loss by reason of a violation of [§1030] may maintain a civil action

7   against the violator to obtain compensatory damages and injunctive relief or other equitable

8   relief." 18 U.S.C.A. § 1030(g).

9    California Penal Code § 502 imposes liability on a person who "[k]nowingly accesses

10  and without permission takes, copies, or makes use of any data from a computer, computer

11  system, or computer network, or takes or copies any supporting documentation, whether existing

12  or residing internal or external to a computer, computer system, or computer network." Cal.

13  Penal Code § 502(c)(2). California Penal Code § 502 also allows a plaintiff to obtain injunctive

14  relief. *Id.* § 502(e)(1). Although § 502 is "different" than the CFAA, *United States v.*

15  *Christensen*, 828 F.3d 763, 789 (9th Cir. 2015), the Ninth Circuit held that "the analysis under

16  both statutes is similar in the present case," ECF No. 401, at 20.

17   A party seeking a permanent injunction must make a four-part showing: (1) that it has

18  suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

19  inadequate to compensate for that injury; (3) that, considering the balance of hardships between

20  the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

21  would not be disserved by a permanent injunction. *See eBay*, 547 U.S. at 390. The Court has

22  discretion to grant or deny permanent injunctive relief. *Id.* at 391. The Court will consider each

23  of these factors in turn and will then consider whether, on balance, the principles of equity

24  support the issuance of a permanent injunction in this case. Applying this standard, the Court

25  finds below that the revised injunction that Facebook seeks is narrowly tailored to Defendants'

26  violations of the CFAA and California Penal Code § 502.

27

28

Case No. 08-CV-05780-LHK
ORDER REGARDING REMEDIES AND DENYING MOTION FOR STAY

United States District Court
Northern District of California

### 1. Irreparable Harm

Facebook has suffered irreparable harm because of Defendants' violations of the CFAA and § 502. Specifically, in accessing Facebook's computers without authorization, Defendants have interfered with Facebook's right to control access to its own computers and have acquired data to which Defendants have no lawful right in violation of the CFAA and § 502. Numerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm. *See, e.g.*, *Enargy Power Co. v. Xiaolong Wang*, 2013 U.S. Dist. LEXIS 170193, *28-29 (D. Mass. Dec. 3, 2013) ("[P]revent[ing] Enargy from enjoying the uninterrupted use of its property . . . constitutes irreparable harm. Furthermore, Plaintiffs' inability to make use of the PH Project files has hampered Enargy . . . .") (internal citations omitted); *Reliable Prop. Servs., LLC v. Capital Growth Partners, LLC*, 1 F. Supp. 3d 961, 965 (D. Minn. 2014) (finding "substantial threat of irreparable harm" based on the public dissemination of information after the defendant "unlawfully took volumes of detailed data" in violation of the CFAA); *TracFone Wireless, Inc. v. Adams*, 98 F. Supp. 3d 1243, 1256 (S.D. Fla. 2015) ("TracFone would be irreparably harmed because Adams' actions, if allowed to persist, will continue to cause TracFone to suffer harm by impairing the integrity of TracFone's proprietary computer system and wireless telecommunications network.").

Additionally, unless the Court issues a permanent injunction, it is very likely that Facebook will suffer irreparable harm again because Defendants will again attempt to access Facebook's servers without authorization. Defendants have frequently exhibited bad faith conduct that indicates that they will not easily be deterred from attempting to access Facebook's servers without authorization in violation of the CFAA and § 502. When Vachani first received the cease and desist letter from Facebook, Vachani forwarded it to Power employees with the message to "be prepared for Facebook to try and block us and turn this into a national battle that gets us huge attention." ECF No. 299, Ex. 3. Consistent with that intent, Vachani then engaged in lengthy negotiations with Facebook. For example, Vachani initially promised to bring Power into compliance with Facebook's terms by December 26, 2008. ECF No. 225-1, at ¶ 11. However, on

December 26, 2008, Vachani informed Facebook that Power would not comply with Facebook's terms for at least another month, and that Power would not stop accessing Facebook's servers in the meantime because Power "made the business decision to not prevent the interruption of service to our millions of users." ECF No. 233-1, at 2. Additionally, while Vachani negotiated with Facebook in December 2008, Defendants acknowledged that they violated the law and yet nevertheless actively took steps to evade Facebook's IP-blocking measures. *See* ECF No. 275, at 16–17. As the Ninth Circuit stated,

> On December 4, 2008, a Power executive sent an e-mail agreeing that Power engaged in four "prohibited activities"; acknowledging that Power may have "intentionally and without authorization interfered with [Facebook's] possessory interest in the computer system," while arguing that the "unauthorized use" did not cause damage to Facebook; and noting additional federal and state statutes that Power "may also be accused of violating," beyond those listed in Facebook's cease and desist letter. Emails sent later in December 2008 discussed the IP blocks that Facebook had imposed and the measures that Power took to evade them. Nevertheless, Power continued to access Facebook's data and computers without Facebook's permission. ECF No. 401, at 17.

Thus, Defendants' actions suggest that Defendants may continue to access Facebook's servers unless they are strongly deterred. Thus, not only has Facebook suffered irreparable harm, it is very likely that in the absence of a permanent injunction, Facebook will suffer irreparable harm again in the future. *See Tagged, Inc. v. Does 1 through 10*, 2010 WL 370331 (N.D. Cal. Jan. 25. 2010) (approving permanent injunction in part because of the likelihood that the defendant might violated the CFAA and § 502 again in the future).

Furthermore, in their briefing, Defendants do not contest that Facebook has suffered irreparable harm. Therefore, the Court finds that Facebook has shown that it has suffered irreparable harm through Defendants' unauthorized access to its computer systems and Defendants' illegal possession of Facebook's data. Because Facebook has shown irreparable harm, this factor weighs in favor of a permanent injunction.

### 2. Inadequacy of Money Damages

Facebook has established that "remedies available at law, such as monetary damages, are

1    inadequate to compensate for [its] injury." *eBay*, 547 U.S. at 391. Most importantly, Defendants'

2    conduct indicates that there is a "reasonable likelihood of defendant's future violations." *Souza*,

3    861 F. Supp. 2d at 1092. Defendants may still possess the software at issue in this litigation and

4    the data illegally acquired from Facebook. ECF No. 373, at 29. Additionally, before Facebook

5    filed the instant suit, Defendants "deliberately implemented . . . tactics to circumvent plaintiff's

6    security measures," *Tagged*, 2010 WL 370331, at *12, and Defendants continued to illegally

7    access Facebook's computers even after Vachani "repeatedly assured [Facebook's counsel] that

8    the functionality of the Power website would be changed to comply with Facebook's requests . . .

9    ," ECF No. 213-2, at ¶ 9. As discussed above, this conduct indicates that unless the Court issues an

10   injunction, there is a high probability that Defendants will repeat their illegal conduct.

11           Additionally, the Ninth Circuit has held that a district court has authority to issue an

12   injunction "where the plaintiffs can establish that money damages will be an inadequate remedy

13   due to impending insolvency of the defendant . . . ." *In re Estate of Marcos*, 25 F.3d 1467, 1480

14   (9th Cir. 1994). In the instant case, Power has been out of business since April 2011 and filed for

15   Chapter 11 bankruptcy on August 27, 2012. ECF No. 401, at 8 ("In April 2011, Power ceased

16   doing business altogether."); ECF No. 323 ("Defendant Power Ventures, Inc.'s Suggestion of

17   Bankruptcy"). Power's bankruptcy petition was dismissed on November 27, 2012. ECF No. 327-

18   1. Additionally, Vachani petitioned for Chapter 13 bankruptcy on August 27, 2012. ECF No. 324.

19   Vachani's bankruptcy petition was dismissed because Vachani failed to make payments pursuant

20   to the Chapter 13 Plan. ECF No. 327, at 2. Therefore, it is very unlikely that Defendants will be

21   able to pay a $79,640.50 money judgment.

22           Indeed, despite being ordered three times to pay the $39,796.73 discovery sanction,

23   Defendants have not yet done so and the Court has even invited a motion to hold Defendants in

24   contempt of Court. ECF No. 356 (August 7, 2013 order requiring Defendants to pay discovery

25   sanction); ECF No. 401 (affirming discovery sanction); ECF No. 410 (ordering Defendants to pay

26   discovery sanction by March 15, 2017); ECF No. 422 (inviting motion to hold Defendants in

27   contempt of Court). Therefore, it is unlikely that Facebook will be able recover the monetary

28

United States District Court
Northern District of California

25

1    damages that the Court has awarded.

2        Furthermore, in their briefing, Defendants do not contest that Facebook has no adequate

3    remedy at law. For these reasons, Facebook has established that money damages are inadequate to

4    compensate for its injury. Therefore, this factor weighs in favor of a permanent injunction.

5        **3.  Balance of Hardships**

6        The balance of hardships also weighs in favor of granting a permanent injunction.

7    Facebook has suffered substantial harm because of Defendants' activities. Defendants' conduct

8    also makes clear that if the Court does not issue an injunction, there is a probability that

9    Defendants will engage in similar conduct in the future. Therefore, Facebook would suffer

10   significant hardship in the absence of an injunction.

11       Defendants, on the other hand, would not suffer substantial hardship if the Court issued an

12   injunction. As the Court held in its September 25, 2013 motion, an injunction would "simply serve

13   to force [Defendants'] compliance with the law." ECF No. 373, at 30. However, Defendants' raise

14   three specific objections to Facebook's proposed injunction, which appear to be most relevant to

15   the balance of hardships factors. First, Defendants argue that the proposed injunction prohibits

16   lawful activity such as the commercial use of Facebook without prior permission. Second,

17   Defendants argue that the proposed injunction relates to software production that is unconnected

18   to Facebook or to the instant litigation. Third, Defendants argue that the proposed injunction

19   applies to third parties unrelated to the litigation. The Court addresses these arguments in turn.

20       First, Defendants claim that using Facebook for commercial purposes is perfectly legal and

21   therefore should not be enjoined.[3] However, although Facebook's proposed injunction restricts

22   Defendants from using Facebook for commercial purposes without Facebook's prior permission,

23   this restriction is warranted to prevent future violations of the law. Additionally, Defendants'

24   Facebook for commercial purposes is not legal if, as in the instant case, Facebook has explicitly

25   ───────────────────

26   [3] As discussed above, the injunction that Facebook now seeks, which prohibits Defendants from
     using Facebook for any commercial purpose, is narrower than the injunction the Court granted in
27   its September 25, 2013 motion, which prohibited Defendants from using Facebook for any
     purpose. ECF No. 373, at 33.

28                                                    26
     Case No. 08-CV-05780-LHK
     ORDER REGARDING REMEDIES AND DENYING MOTION FOR STAY              1-ER-29

United States District Court
Northern District of California

1   revoked Defendants' authorization to do so. Furthermore, the proposed injunction does not

2   entirely prohibit Defendants from using Facebook for commercial purposes; it simply requires that

3   Defendants receive permission from Facebook before doing so.

4          Additionally, even if the proposed injunction did prohibit legal conduct, it is well

5   established that "federal courts have the equitable power to enjoin otherwise lawful activity if they

6   have jurisdiction over the general subject matter and if the injunction is necessary and appropriate

7   in the public interest to correct or dissipate the evil effects of past unlawful conduct" or to prevent

8   "continued violations" of the law. *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).

9   For the reasons discussed above, there is a probability that Defendants will attempt to access

10  Facebook's computers without authorization unless enjoined. Therefore, the Court finds that even

11  if Facebook's proposed injunction prohibits legal conduct, the injunction is not overbroad in light

12  of Defendants' conduct in the instant case.

13         Second, Defendants argue that the prohibition on software development that "allows the

14  user to engage in the conduct found to be unlawful" is overbroad. ECF No. 423, at 17. However,

15  Defendants will suffer no harm from being unable to develop software to engage in illegal

16  conduct. Therefore, the Court finds that this is provision is narrowly tailored to correct the legal

17  violations at issue and is not overbroad.

18         Finally, Defendants object to the fact that Facebook's proposed injunction applies to

19  "Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary

20  companies or entities, affiliated or related companies and entities, assignees, and successors-in-

21  interest, and those in active concert or participation with them." *Id.* However, this proposed

22  language closely tracks the terms of Federal Rule of Civil Procedure 65(d)(2) (providing that an

23  injunction binds "(A) the parties; (B) the parties' officers, agents, servants, employees, and

24  attorneys; and (C) other persons who are in active concert or participation with anyone described

25  in Rule 65(d)(2)(A) or (B)."). Additionally, Defendants raised this same argument in briefing

26  before the Court's September 25, 2013 order. Specifically, Defendants claimed that "the requested

27  injunction impermissibly threatens Vachani's employability and livehilood." ECF No. 373, at 31.

28

United States District Court
Northern District of California

1   The Court rejected this argument and held that "Defendants fail[ed] to provide a persuasive reason

2   why this is the case, and in any event, given that Vachani brought this risk upon himself by

3   violating the law, the balance would not shift in favor of Defendants even if there were evidence to

4   support this speculative claim." *Id.* Similarly, at this stage Defendants have provided no evidence

5   to support their argument that Vachani's livelihood would be threatened by the injunction.

6       For these reasons, the Court finds that the balance of hardships weighs in favor of

7   Facebook, and therefore this factor supports granting Facebook's requested injunction.

8       **4. Public Interest**

9       The Court also finds that the public interest weighs in favor of an injunction, as courts have

10   consistently held in CFAA cases. *See, e.g., Craigslist, Inc. v. Troopal Strategies, Inc.*, 2011 U.S.

11   Dist. LEXIS 156825, at *11 (N.D. Cal. 2011) (holding that public interest factor supported an

12   injunction where defendant violated CFAA). The public has an interest in ensuring that computers

13   are not accessed without authorization. Additionally, Defendants do not argue that the public

14   interest would be disserved by an injunction. Therefore, the Court finds that this factor weighs in

15   favor of granting Facebook's proposed injunction

16       **5. Injunction**

17       For the reasons discussed above, each of the four factors strongly supports granting an

18   injunction in the instant case. The Court therefore grants Facebook's request for permanent

19   injunctive relief against both Power and against Vachani in his personal capacity. Specifically, the

20   Court grants the following injunction:

21       1. Defendants, their agents, officers, contractors, directors, shareholders,

22       employees, subsidiary companies or entities, affiliated or related

23       companies and entities, assignees, and successors-in-interest, and those in

24       active concert or participation with them, are permanently enjoined from:

25           A. Accessing or using, or directing, aiding, facilitating,

26           causing, or conspiring with others to use or access the Facebook

27           website or servers for any commercial purpose, without

28

United States District Court
Northern District of California

28

Case No. 08-CV-05780-LHK
ORDER REGARDING REMEDIES AND DENYING MOTION FOR STAY

Facebook's prior permission, including by way of example and not limitation for the purpose of sending or assisting others in sending, or procuring the sending, of unsolicited commercial electronic text messages via the Facebook website or service.

B. Using any data, including without limitation Facebook-user data and data regarding Facebook's website or computer networks, obtained as a result of the unlawful conduct for which Defendants' have been found liable.

C. Developing, using, selling, offering for sale, or distributing, or directing, aiding, or conspiring with others to develop, sell, offer for sale, or distribute, any software that allows the user to engage in the conduct found to be unlawful.

2. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-interest, and those in active concert or participation with them shall destroy any software, script(s) or code designed to access or interact with the Facebook website, Facebook users, or the Facebook service. They shall also destroy Facebook data and/or information obtained from Facebook or Facebook's users, or anything derived from such data and/or information.

3. Within three calendar days of entry of this permanent injunction and order, Defendants shall affirm that they already have notified, or shall notify, their current and former officers, agents, servants, employees, successors, and assigns, and any persons acting in concert or participation with them of this permanent injunction.

4. Within seven calendar days of entry of this injunction and order, Defendants shall certify in writing, under penalty of perjury, that they

1    have complied with the provision of this order, and state how notification

2    of this permanent injunction in accordance with paragraph 3 above was

3    accomplished, including the identities of all email accounts (if any) used

4    for notification purposes.

5    5. The Court shall continue to retain jurisdiction over the parties for the

6    purpose of enforcing this injunction and order.

7    **C. Costs and Discovery Sanctions**

8    In addition to their arguments about damages and injunctive relief, Defendants raise two

9    other issues. First, Defendants argue that Facebook is not entitled to costs because Facebook has

10   not been deemed the prevailing party. Second, Defendants argue that Facebook is not entitled to

11   judgment for the discovery sanctions award that the Ninth Circuit affirmed. The Court addresses

12   these issues in turn.

13   First, the Court addresses the issue of costs. At the February 15, 2017 case management

14   conference, Facebook agreed that it would wait until after a new judgment was entered under

15   Federal Rule of Civil Procedure 54 before requesting costs. ECF No. 414, at 6. Thus, it is not

16   surprising that, as Defendants state, Facebook's brief on damages "makes no mention of the costs

17   of suit previously claimed by Facebook following the Court's original judgment." ECF No. 423, at

18   14–15. Therefore, because Facebook has not yet requested costs, the Court does not consider

19   Defendants' arguments regarding costs at this time.

20   Second, the Court addresses the issue of discovery sanctions. The Court has already

21   ordered Defendants to pay the $39,796.73 discovery sanction by March 15, 2017, ECF No. 410,

22   and has even invited Facebook to file a motion for contempt based on Defendants' ongoing failure

23   to pay the discovery sanction, ECF No. 422, at 3. Additionally, Defendants give no explanation or

24   authority for their position that the discovery sanction should not be included in the judgment. The

25   Court's prior orders requiring Defendants to pay the discovery sanction are "effective on [their]

26   own." ECF No. 423, at 15. However, in order to ensure that the record is clear and in light of

27   Defendants' ongoing failure to pay the discovery sanction, the Court will include the $39,796.73

28

United States District Court
Northern District of California

discovery sanction in the judgment.

**D. Motion for Stay**

Vachani has also filed a motion for a stay pending resolution of his petition for certiorari to the United States Supreme Court. ECF No. 434. However, the Ninth Circuit has held that "once a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority." *Yong v. INS*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000). Therefore, the Court DENIES Vachani's motion for a stay.

**IV.    CONCLUSION**

For the foregoing reasons, the Court finds that Facebook is entitled to $79,640.50 in compensatory damages and permanent injunctive relief as described above. The Court also again orders Defendants to pay the $39,796.73 discovery sanction. Finally, the Court DENIES Vachani's motion for a stay.

**IT IS SO ORDERED.**

Dated: May 2, 2017

*Lucy H. Koh*
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California

Case No. 08-CV-05780-LHK
ORDER REGARDING REMEDIES AND DENYING MOTION FOR STAY

1-ER-34

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10                                SAN JOSE DIVISION

11

12   FACEBOOK, INC.,                          Case No. 08-CV-05780-LHK

13                Plaintiff,                   **CASE MANAGEMENT ORDER**

14        v.

15   POWER VENTURES, INC., et al.,

16                Defendants.

17

18   Plaintiff's Attorney: Neel Chatterjee and Robert Uriarte
     Defendant Power Venture's Attorney: Amy Anderson
19   Defendant Steve Vachani: Pro Se

20        A case management conference was held on February 15, 2017.

21        The Court set the following briefing schedule on the remanded issue of remedies. Plaintiff
22   shall file an opening brief by March 8, 2017. Defendants shall file a joint response brief by March
     29, 2017. Plaintiff shall file a reply brief by April 12, 2017. A hearing is set for the remanded issue
23   of remedies on April 25, 2017 at 2:00 p.m.

24        In briefing the remanded issue of damages, the parties shall limit their arguments to the
25   issues that the Ninth Circuit remanded for consideration. The parties shall not present arguments
     regarding aspects of the Court's decision which the Ninth Circuit did not reverse on appeal. For
26   example, the Court will not consider arguments regarding whether attorney's fees constitute
     compensable damages under the CFAA. *See, e.g.*, ECF No. 373, at 15 (finding "no clear error in
27   Judge Ware's determination that Facebook's costs meet the definition of 'loss' provided by the

28                                                  1
     Case No. 08-CV-05780-LHK
     CASE MANAGEMENT ORDER                                                         1-ER-35

United States District Court
Northern District of California

CFAA" or California Penal Code § 502). Similarly, the Court will not reconsider its previous holdings on the issue of Defendant Vachani's personal liability for the actions of Defendant Power Ventures. *See* ECF No. 401 ("[W]e affirm the district court's holding on Vachani's personal liability for Power's actions."). The parties shall carefully review the Ninth Circuit's opinion and the record in this case to ensure that the parties argue only those issues that the Ninth Circuit ordered the district court to address on remand.

The Court also orders that Defendants shall pay the $39,796.73 discovery sanction affirmed by the Ninth Circuit by March 15, 2017.

**IT IS SO ORDERED.**

Dated: February 15, 2017

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

DEC 19 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>        Plaintiff - Appellee,<br><br>  v.<br><br>POWER VENTURES, INC., dba Power.com, a California corporation and POWER VENTURES, INC., a Cayman Island corporation,<br><br>        Defendants,<br><br> and<br><br>STEVEN SURAJ VACHANI, an individual,<br><br>        Defendant - Appellant. | No. 13-17102<br><br>D.C. No. 5:08-cv-05780-LHK<br>U.S. District Court for Northern California, San Jose<br><br>**MANDATE** |
| FACEBOOK, INC., a Delaware corporation,<br><br>        Plaintiff - Appellee,<br><br>  v.<br><br>POWER VENTURES, INC., dba Power.com, a California corporation, | No. 13-17154<br><br>D.C. No. 5:08-cv-05780-LHK<br>U.S. District Court for Northern California, San Jose |

Defendant,

and

POWER VENTURES, INC., a Cayman
Island corporation and STEVEN SURAJ
VACHANI, an indvidual,

Defendants - Appellants.

The judgment of this Court, entered July 12, 2016, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Craig Westbrooke
Deputy Clerk
Ninth Circuit Rule 27-7

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | No. 13-17102 |
| *Plaintiff-Appellee*, | D.C. No. 5:08-cv-05780-LHK |
| v. | |
| POWER VENTURES, INC., DBA Power.com, a California corporation; POWER VENTURES, INC., a Cayman Island corporation, | |
| *Defendants*, | |
| and | |
| STEVEN SURAJ VACHANI, an individual, | |
| *Defendant-Appellant.* | |

2                    FACEBOOK V. VACHANI

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | No. 13-17154 |
| *Plaintiff-Appellee*, | |
| | D.C. No. |
| v. | 5:08-cv-05780-LHK |
| POWER VENTURES, INC., DBA Power.com, a California corporation, | ORDER AND AMENDED OPINION |
| *Defendant*, | |
| and | |
| POWER VENTURES, INC., a Cayman Island corporation; and Steven Suraj Vachani, an individual, | |
| *Defendants Appellants*. | |

Appeals from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted December 9, 2015
San Francisco, California

Filed July 12, 2016
Amended December 9, 2016

Before:  Susan P. Graber, Kim McLane Wardlaw,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Graber

FACEBOOK V. VACHANI                    3

# SUMMARY[*]

## CAN-SPAM Act / Computer Fraud

The panel filed an order denying a petition for panel rehearing and rehearing en banc and amending its opinion affirming in part and reversing and vacating in part the district court's summary judgment in favor of Facebook, Inc., on Facebook's claims against Power Ventures, Inc., a social networking company that accessed Facebook users' data and initiated form e-mails and other electronic messages promoting its website.

Reversing in part, the panel held that Power's actions did not violate the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, or CAN-SPAM Act, which grants a private right of action for a provider of Internet access service adversely affected by the transmission, to a protected computer, of a message that contains, or is accompanied by, header information that is materially false or materially misleading. The panel held that here, the transmitted messages were not materially misleading.

Reversing in part and affirming in part, the panel held that Power violated the Computer Fraud and Abuse Act of 1986, or CFAA, which prohibits acts of computer trespass by those who are not authorized users or who exceed authorized use, and California Penal Code § 502, but only after it received a cease and desist letter from Facebook and nonetheless continued to access Facebook's computers without

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4                    FACEBOOK V. VACHANI

permission. With regard to authorization, the panel stated
that a defendant can run afoul of the CFAA when he or she
has no permission to access a computer or when such
permission has been revoked explicitly. Once permission has
been revoked, technological gamesmanship or the enlisting of
a third party to aid in access will not excuse liability. The
panel also stated that a violation of the terms of use of a
website, without more, cannot be the basis for liability under
the CFAA.

The panel vacated the district court's awards of injunctive
relief and damages and remanded for consideration of
appropriate remedies under the CFAA and § 502.

---

## COUNSEL

Amy Sommer Anderson (argued), Aroplex Law, San
Francisco, California; Steven Vachani (argued pro se),
Berkeley, California, for Defendants-Appellants.

Eric A. Shumsky (argued), Orrick, Herrington & Sutcliffe
LLP, Washington, D.C.; I. Neel Chatterjee, Monte Cooper,
Brian P. Goldman, and Robert L. Uriarte, Orrick, Herrington
& Sutcliffe LLP, Menlo Park, California, for Plaintiff-
Appellee.

Jamie L. Williams (argued), Hanni M. Fakhoury, and Cindy
A. Cohn, Electronic Frontier Foundation, San Francisco,
California, as and for Amicus Curiae.

---

FACEBOOK V. VACHANI                    5

## ORDER

The opinion filed July 12, 2016, and published at 828 F.3d 1068, is amended by the opinion filed concurrently with this order.

With these amendments, the panel has voted to deny the petition for panel rehearing and rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it.

The petition for panel rehearing and rehearing en banc is **DENIED**. No further petitions for panel rehearing or rehearing en banc shall be entertained.

## OPINION

GRABER, Circuit Judge:

One social networking company, Facebook, Inc., has sued another, Power Ventures, Inc., over a promotional campaign. Power accessed Facebook users' data and initiated form e-mails and other electronic messages promoting its website. Initially, Power had implied permission from Facebook. But Facebook sent Power a cease and desist letter and blocked Power's IP address; nevertheless Power continued its campaign. Facebook alleges that Power's actions violated the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), the Computer Fraud and Abuse Act of 1986 ("CFAA"), and California Penal Code

6 FACEBOOK V. VACHANI

section 502. We hold that Power did not violate the CAN-SPAM Act because the transmitted messages were not materially misleading. We also hold that Power violated the CFAA and California Penal Code section 502 only after it received Facebook's cease and desist letter and nonetheless continued to access Facebook's computers without permission. Accordingly, we affirm in part, reverse in part, and remand to the district court.

## BACKGROUND

Defendant Power Ventures, a corporation founded and directed by CEO Steven Vachani, who also is a defendant here, operated a social networking website, Power.com. The concept was simple. Individuals who already used other social networking websites could log on to Power.com and create an account. Power.com would then aggregate the user's social networking information. The individual, a "Power user," could see all contacts from many social networking sites on a single page. The Power user thus could keep track of a variety of social networking friends through a single program and could click through the central Power website to individual social networking sites. By 2008, the website had attracted a growing following.

Plaintiff Facebook also operates a social networking website, Facebook.com. Facebook users, who numbered more than 130 million during Power's promotional campaign, can create a personal profile—a web page within the site—and can connect with other users. Facebook requires each user to register before accessing the website and requires that each user assent to its terms of use. Once registered, a Facebook user can create and customize her profile by adding personal information, photographs, or other content. A user

FACEBOOK V. VACHANI                    7

can establish connections with other Facebook users by "friending" them; the connected users are thus called "friends."

Facebook has tried to limit and control access to its website. A non-Facebook user generally may not use the website to send messages, post photographs, or otherwise contact Facebook users through their profiles. Instead, Facebook requires third-party developers or websites that wish to contact its users through its site to enroll in a program called Facebook Connect. It requires these third parties to register with Facebook and to agree to an additional Developer Terms of Use Agreement.

In December 2008, Power began a promotional campaign to attract more traffic to its website; it hoped that Facebook users would join its site. Power placed an icon on its website with a promotional message that read: "First 100 people who bring 100 new friends to Power.com win $100." The icon included various options for how a user could share Power with others. The user could "Share with friends through my photos," "Share with friends through events," or "Share with friends through status." A button on the icon included the words "Yes, I do!" If a user clicked the "Yes, I do!" button, Power would create an event, photo, or status on the user's Facebook profile.

In many instances, Power caused a message to be transmitted to the user's friends within the Facebook system. In other instances, depending on a Facebook user's settings, Facebook generated an e-mail message. If, for example, a Power user shared the promotion through an event, Facebook generated an e-mail message to an external e-mail account from the user to friends. The e-mail message gave the name

8                    FACEBOOK V. VACHANI

and time of the event, listed Power as the host, and stated that
the Power user was inviting the recipient to this event. The
external e-mails were form e-mails, generated each time that
a Facebook user invited others to an event. The "from" line
in the e-mail stated that the message came from Facebook;
the body was signed, "The Facebook Team."

On December 1, 2008, Facebook first became aware of
Power's promotional campaign and, on that same date,
Facebook sent a "cease and desist" letter to Power instructing
Power to terminate its activities. Facebook tried to get Power
to sign its Developer Terms of Use Agreement and enroll in
Facebook Connect; Power resisted. Facebook instituted an
Internet Protocol ("IP") block in an effort to prevent Power
from accessing the Facebook website from Power's IP
address. Power responded by switching IP addresses to
circumvent the Facebook block. Through this period, Power
continued its promotion even though it acknowledged that it
took, copied, or made use of data from Facebook.com without
Facebook's permission.

Power's campaign lasted less than two months. On
December 20, 2008, Facebook filed this action. Toward the
end of January 2009, Power ended its campaign. In April
2011, Power ceased doing business altogether. In total, more
than 60,000 external e-mails promoting Power were sent
through the Facebook system. An unknown number of
internal Facebook messages were also transmitted.

In this action, Facebook alleged violations of the CFAA,
the CAN-SPAM Act, and California Penal Code section 502
and moved for summary judgment. The district court granted
summary judgment to Facebook on all three claims. The
district court awarded statutory damages of $3,031,350,

compensatory damages, and permanent injunctive relief, and it held that Vachani was personally liable for Power's actions. Discovery disputes persisted after the judgment; a magistrate judge ordered Power to pay $39,796.73 in costs and fees for a renewed Federal Civil Procedure Rule 30(b)(6) deposition. Power filed a motion for reconsideration, which the district court denied. Defendants timely appeal both the judgment and the discovery sanctions.

## STANDARD OF REVIEW

We review de novo a grant of summary judgment. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011). We may affirm the judgment on any ground supported by the record and presented to the district court. *Venetian Casino Resort L.L.C. v. Local Joint Exec. Bd.*, 257 F.3d 937, 941 (9th Cir. 2001).

## DISCUSSION

### A. *CAN-SPAM Act*

The CAN-SPAM Act grants a private right of action for a "provider of Internet access service adversely affected by a violation of section 7704(a)(1) of this title." 15 U.S.C. § 7706(g)(1). In relevant part, § 7704(a)(1) makes it unlawful for "any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading."

The CAN-SPAM Act "does not ban spam outright, but rather provides a code of conduct to regulate commercial e-

10                FACEBOOK V. VACHANI

mail messaging practices." *Gordon v. Virtumundo, Inc.*,
575 F.3d 1040, 1047–48 (9th Cir. 2009). To prove a violation
of the statute, Facebook cannot simply identify excessive
electronic messages. Rather, assuming all facts in favor of
the non-moving party, the offending messages must be
"materially false" or "materially misleading." 15 U.S.C.
§ 7704(a)(1).

The statute provides that

> the term "materially," when used with respect
> to false or misleading header information,
> includes the alteration or concealment of
> header information in a manner that would
> impair the ability of an Internet access service
> processing the message on behalf of a
> recipient, a person alleging a violation of this
> section, or a law enforcement agency to
> identify, locate, or respond to a person who
> initiated the electronic mail message or to
> investigate the alleged violation, or the ability
> of a recipient of the message to respond to a
> person who initiated the electronic message.

*Id.* § 7704(a)(6). A "from" line "that accurately identifies any
person who initiated the message shall not be considered
materially false or materially misleading." *Id.*
§ 7704(a)(1)(B). And, further, "header information that is
technically accurate but includes an originating electronic
mail address, domain name, or Internet Protocol address the
access to which for purposes of initiating the message was
obtained by means of false or fraudulent pretenses or
representations shall be considered materially misleading."
*Id.* § 7704(a)(1)(A).

FACEBOOK V. VACHANI 11

Here, two types of messages might rise to the level of "materially misleading" under the CAN-SPAM Act: external e-mails sent when Power caused a Facebook event to be created and internal Facebook messages authored by Power that Power users transmitted to their Facebook friends.

We first consider the external e-mails. Facebook generated these e-mails whenever a Power user created a Facebook event, promoting Power. The "from" line of the e-mails identified "Facebook" as the sender. The body was signed "Thanks, The Facebook Team." The header stated that a friend of the recipient invited her to an event entitled "Bring 100 friends and win 100 bucks!"

Because the statute provides that a "from" line that accurately identifies a person who initiated the message is not misleading, it is relevant whether Facebook, identified in the from line, initiated the messages. The statute defines "initiate" as "to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message." *Id.* § 7702(9). It provides that "more than one person may be considered to have initiated a message." *Id.* A Power user gave Power permission to share a promotion, Power then accessed that user's Facebook data, and Facebook crafted and caused form e-mails to be sent to recipients. These actions all go beyond the routine conveyance of a message. All the actions require some affirmative consent (clicking the "Yes, I do!" button) or some creative license (designing the form e-mails). Because more than one person may be considered to have initiated the message, we hold that, within the meaning of the statute, Power's users, Power, *and* Facebook all initiated the messages at issue.

12          FACEBOOK V. VACHANI

Because Facebook (among others) initiated the messages, the "from" line accurately identified a person who initiated the messages. Accordingly, the "from" line is not misleading within the meaning of the statute. Similar reasoning also leads us to conclude that the header is technically accurate. Because a Power user consented to share Power's promotion through an event invitation, a header line that stated that a recipient's friend "invited" the recipient to the event does not conceal or misstate a creator of the e-mail.

It is true that the CAN-SPAM Act includes as materially misleading a technically accurate header that includes information accessed through false or fraudulent pretenses or representations. *Id.* § 7704(a)(1)(A). But Power users consented to Power's access to their Facebook data. In clicking "Yes, I do!," users gave Power permission to share its promotion through event invitations. On this record, Power did not use false pretenses or fraudulent representations to obtain users' consent. Therefore, the external messages were not materially misleading within the meaning of the CAN-SPAM Act.

We next consider internal messages sent within the Facebook system. We can find these messages misleading only if they impaired the ability of the recipient to "respond to a person who initiated the electronic mail message" or the ability of Facebook to locate the initiator of the messages. *Id.* § 7704(a)(6). Two factors convince us that the messages are not misleading under this standard. First, the body of the messages included both Power's name and a link to the Power website. A reasonable recipient could understand that Power had drafted the message or had some part in its construction. Second, Facebook users who were identified as the senders did authorize the sending of these messages. It

FACEBOOK V. VACHANI                    13

was not misleading for such users to be identified in internal messages sent through the Facebook system.

Because neither e-mails nor internal messages sent through Power's promotional campaign were materially misleading, Power did not violate the CAN-SPAM Act. We reverse the district court on this claim and remand for entry of judgment in favor of Defendants.

### B. *CFAA*

The CFAA prohibits acts of computer trespass by those who are not authorized users or who exceed authorized use. It creates criminal and civil liability for whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). "The statute thus provides two ways of committing the crime of improperly accessing a protected computer: (1) obtaining access without authorization; and (2) obtaining access with authorization but then using that access improperly." *Musacchio v. United States*, 136 S. Ct. 709, 713 (2016). The CFAA provides a private right of action for "[a]ny person who suffers damage or loss by reason of a violation of this section." 18 U.S.C. § 1030(g).

First, we hold that Facebook suffered a loss within the meaning of the CFAA. The statute permits a private right of action when a party has suffered a loss of at least $5,000 during a one-year period. *Id.* § 1030(c)(4)(A)(i)(I). The statute defines "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the

14            FACEBOOK V. VACHANI

offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11). It is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions. Accordingly, Facebook suffered a loss under the CFAA.

We next consider whether Power accessed Facebook's computers knowing that it was not authorized to do so. We have previously considered whether a defendant has accessed a computer "without authorization" or in a manner that "exceeds authorized access" under the CFAA.

In *LVRC Holdings LCC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009), an employee logged onto his employer's computer, accessed confidential information, and sent e-mails from the computer to himself and his wife with the intention of starting a competing business. We held that a person is "without authorization" under the CFAA "when the person has not received permission to use the computer for any purpose (such as when a hacker accesses someone's computer without any permission), or when the employer has rescinded permission to access the computer and the defendant uses the computer anyway." *Id.* at 1135. Because the employee had sent e-mails while he still had authorized access to the company's computers, his actions did not constitute unauthorized use and did not run afoul of the CFAA. *Id.* That fact was key; had the employee accessed company computers without express permission, he would have violated the CFAA. "[I]f [the employee had] accessed LVRC's information on the LOAD website after he left the company in September 2003, [the employee] would have

FACEBOOK V. VACHANI                    15

accessed a protected computer 'without authorization' for purposes of the CFAA." *Id.* at 1136.

In *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc) ("*Nosal I*"), a criminal case, we considered whether a group of employees who logged on to a work computer, downloaded information from a confidential database, and transferred it to a competing business "exceed[ed] authorized access." *Id.* at 856. Wary of creating a sweeping Internet-policy mandate, we applied the rule of lenity to the CFAA and reversed liability for the defendant. *Id.* at 863. The decision broadly described the application of the CFAA to websites' terms of service. "Not only are the terms of service vague and generally unknown . . . but website owners retain the right to change the terms at any time and without notice." *Id.* at 862. As a result, imposing criminal liability for violations of the terms of use of a website could criminalize many daily activities. Accordingly, "the phrase 'exceeds authorized access' in the CFAA does not extend to violations of use restrictions. If Congress wants to incorporate misappropriation liability into the CFAA, it must speak more clearly." *Id.* at 863.

From those cases, we distill two general rules in analyzing authorization under the CFAA. First, a defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly. Once permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability. Second, a violation of the terms of use of a website—without more—cannot establish liability

16                    FACEBOOK V. VACHANI

under the CFAA.[1]  Our analysis also is consistent with *United States v. Nosal*, 828 F.3d 865 (9th Cir. 2016) ("*Nosal II*").

Here, initially, Power users arguably gave Power permission to use Facebook's computers to disseminate messages.  Power reasonably could have thought that consent from *Facebook users* to share the promotion was permission for Power to access *Facebook's* computers.[2]  In clicking the "Yes, I do!" button, Power users took action akin to allowing a friend to use a computer or to log on to an e-mail account.  Because Power had at least arguable permission to access Facebook's computers, it did not initially access Facebook's computers "without authorization" within the meaning of the CFAA.

But Facebook expressly rescinded that permission when Facebook issued its written cease and desist letter to Power on December 1, 2008.  Facebook's cease and desist letter informed Power that it had violated Facebook's terms of use and demanded that Power stop soliciting Facebook users' information, using Facebook content, or otherwise interacting

---

[1] One can imagine situations in which those two principles might be in tension—situations in which, for example, an automatic boilerplate revocation follows a violation of a website's terms of use—but we need not address or resolve such questions on the stark facts before us.

[2] Because, initially, Power users gave Power permission to use Facebook's computers to disseminate messages, we need not decide whether websites such as Facebook are presumptively open to all comers, unless and until permission is revoked expressly.  *See* Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1163 (2016) (asserting that "websites are the cyber-equivalent of an open public square in the physical world").

FACEBOOK V. VACHANI                    17

with Facebook through automated scripts.[3]  Facebook then
imposed IP blocks in an effort to prevent Power's continued
access.

The record shows unequivocally that Power knew that it
no longer had authorization to access Facebook's computers,
but continued to do so anyway.  In requests for admission
propounded during the course of this litigation, Power
admitted that, after receiving notice that its use of or access
to Facebook was forbidden by Facebook, it "took, copied, or
made use of data from the Facebook website *without
Facebook's permission* to do so."   (Emphasis added;
capitalization omitted.)  Contemporaneously, too, soon after
receiving the cease and desist letter, Power's CEO sent an e-
mail stating:  "[W]e need to be prepared for Facebook to try
to block us and the [sic] turn this into a national battle that
gets us huge attention."   On December 4, 2008, a Power
executive sent an e-mail agreeing that Power engaged in four
"prohibited activities"[4]; acknowledging that Power may have
"intentionally and without authorization interfered with
[Facebook's] possessory interest in the computer system,"
while arguing that the "***unauthorized use***" did not cause

---

[3] The mention of the terms of use in the cease and desist letter is not
dispositive.  Violation of Facebook's terms of use, without more, would
not be sufficient to impose liability.  *Nosal I*, 676 F.3d at 862–63.  But, in
addition to asserting a violation of Facebook's terms of use, the cease and
desist letter warned Power that it may have violated federal and state law
and plainly put Power on notice that it was no longer authorized to access
Facebook's computers.

[4] The activities were:  "- Using a person's Facebook account without
Facebook's authorization; - Using automated scripts to collect information
from their site; - Incorporating Facebook's site in another database[; and] -
Using Facebook's site for commercial purposes[.]"

18          FACEBOOK V. VACHANI

damage to Facebook; and noting additional federal and state statutes that Power "may also be accused of violating," beyond those listed in Facebook's cease and desist letter. E-mails sent later in December 2008 discussed the IP blocks that Facebook had imposed and the measures that Power took to evade them. Nevertheless, Power continued to access Facebook's data and computers without Facebook's permission.

The consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computers after Facebook's express revocation of permission. An analogy from the physical world may help to illustrate why this is so. Suppose that a person wants to borrow a friend's jewelry that is held in a safe deposit box at a bank. The friend gives permission for the person to access the safe deposit box and lends him a key. Upon receiving the key, though, the person decides to visit the bank while carrying a shotgun. The bank ejects the person from its premises and bans his reentry. The gun-toting jewelry borrower could not then reenter the bank, claiming that access to the safe deposit box gave him authority to stride about the bank's property while armed. In other words, to access the safe deposit box, the person needs permission *both* from his friend (who controls access to the safe) *and* from the bank (which controls access to its premises). Similarly, for Power to continue its campaign using Facebook's computers, it needed authorization both from individual Facebook users (who controlled their data and personal pages) and from Facebook (which stored this data on its physical servers). Permission from the users alone was not sufficient to constitute authorization after Facebook issued the cease and desist letter.

FACEBOOK V. VACHANI 19

In sum, as it admitted, Power deliberately disregarded the cease and desist letter and accessed Facebook's computers without authorization to do so. It circumvented IP barriers that further demonstrated that Facebook had rescinded permission for Power to access Facebook's computers.[5] We therefore hold that, after receiving written notification from Facebook on December 1, 2008, Power accessed Facebook's computers "without authorization" within the meaning of the CFAA and is liable under that statute.

*Nosal I* is materially distinguishable. First, *Nosal I* involved employees of a company who arguably exceeded the limits of their authorization. 676 F.3d at 856. Here, by contrast, Facebook explicitly revoked authorization for *any* access, and this case does not present the more nuanced question of exceeding authorization. *Nosal I* involved a defendant who "exceeded authorization," while this case involves a defendant who accessed a computer "without authorization." Second, although *Nosal I* makes clear that violation of the terms of use of a website cannot itself constitute access without authorization, this case does *not* involve non-compliance with terms and conditions of service. Facebook and Power had no direct relationship, and it does not appear that Power was subject to any contractual terms that it could have breached. Finally, *Nosal I* was most concerned with transforming "otherwise innocuous behavior into federal crimes simply because a computer is involved."

---

[5] Simply bypassing an IP address, without more, would not constitute unauthorized use. Because a blocked user does not receive notice that he has been blocked, he may never realize that the block was imposed and that authorization was revoked. Or, even if he does discover the block, he could conclude that it was triggered by misconduct by someone else who shares the same IP address, such as the user's roommate or co-worker.

20          FACEBOOK V. VACHANI

*Id.* at 860.  It aimed to prevent criminal liability for computer users who might be unaware that they were committing a crime.  But, in this case, Facebook clearly notified Power of the revocation of access, and Power intentionally and admittedly refused to comply.  *Nosal I*'s concerns about overreaching or an absence of culpable intent simply do not apply here, where an individualized cease-and-desist letter is a far cry from the permission skirmishes that ordinary Internet users may face.

Accordingly, we hold that, after receiving the cease and desist letter from Facebook, Power intentionally accessed Facebook's computers knowing that it was not authorized to do so, making Power liable under the CFAA.  We therefore affirm in part the holding of the district court with respect to the CFAA.

C.  *Section 502*

California Penal Code section 502 imposes liability on a person who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network."  *Id.* § 502(c)(2).  This statute, we have held, is "different" than the CFAA.  *United States v. Christensen*, 801 F.3d 970, 994 (2015).  "[T]he California statute does not require *unauthorized* access.  It merely requires *knowing* access."  *Id.*

But despite differences in wording, the analysis under both statutes is similar in the present case.  Because Power had implied authorization to access Facebook's computers, it

FACEBOOK V. VACHANI                21

did not, at first, violate the statute. But when Facebook sent the cease and desist letter, Power, as it conceded, knew that it no longer had permission to access Facebook's computers at all. Power, therefore, knowingly accessed and without permission took, copied, and made use of Facebook's data. Accordingly, we affirm in part the district court's holding that Power violated section 502.

D. *Personal Liability*

We affirm the district court's holding that Vachani is personally liable for Power's actions. A "corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (internal quotation marks omitted). Cases finding "personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct, or the 'central figure' in the challenged corporate activity." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 523 n.10 (9th Cir. 1989) (internal quotation marks and ellipsis omitted).

Vachani was the central figure in Power's promotional scheme. First, Vachani admitted that, during the promotion, he controlled and directed Power's actions. Second, Vachani admitted that the promotion was his idea. It is undisputed, therefore, that Vachani was the guiding spirit and central figure in Power's challenged actions. Accordingly, we affirm the district court's holding on Vachani's personal liability for Power's actions.

22    FACEBOOK V. VACHANI

### E. *Discovery Sanctions*

We affirm the discovery sanctions imposed against Power for non-compliance during a Rule 30(b)(6) deposition. Defendants failed to object to discovery sanctions in the district court. Failure to object forfeits Defendants' right to raise the issue on appeal. *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996).

Even assuming the issue was not waived, we "review the district court's rulings concerning discovery, including the imposition of discovery sanctions, for abuse of discretion." *Goodman v. Staples Office Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011). The magistrate judge's findings that Vachani was unprepared, unresponsive, and argumentative and that Power Ventures had failed to produce many e-mails responsive to Facebook's requests prior to discovery are supported by the record. Accordingly, we hold that the discovery sanctions imposed were not an abuse of discretion.

### F. *Remedies*

Because we reverse in significant part, we also vacate the injunction and the award of damages. We remand the case to the district court to reconsider appropriate remedies under the CFAA and section 502, including any injunctive relief. With respect to damages, the district court shall calculate damages only for the period after Power received the cease and desist letter, when Power continued to access data contained in Facebook's servers and memory banks.

**REVERSED** in part, **VACATED** in part, **AFFIRMED** in part, and **REMANDED**. The parties shall bear their own costs on appeal.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| FACEBOOK, INC., | ) Case No.: 08-CV-5780 |
| Plaintiff, | ) JUDGMENT |
| v. | ) |
| POWER VENTURES, INC., a Cayman Island corporation, and STEVE VACHANI, an individual, | ) |
| Defendants. | ) |

In ECF No. 373, the Court denied Defendants' motion for leave to file a motion for reconsideration of this Court's order granting Plaintiff summary judgment against Power Ventures (ECF No. 275), granted Plaintiff's motion for permanent injunctive relief, granted Plaintiff's motion for summary judgment regarding the liability of Defendant Vachani, and granted Plaintiff's motion for damages. Accordingly, the Clerk of the Court shall enter judgment in favor of Plaintiff. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: September 25, 2013

_Lucy H. Koh_
_____
LUCY H. KOH
United States District Judge

1

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10

**SAN JOSE DIVISION**

11
12

FACEBOOK, INC.,             )

                )

Case No.: 08-CV-5780-LHK

13

      Plaintiff,     )

14

     v.             )

ORDER DENYING LEAVE TO FILE
MOTION FOR RECONSIDERATION,
FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF
LAW, AND GRANTING DAMAGES
AND PERMANENT INJUNCTIVE
RELIEF

15

POWER VENTURES, INC., a Cayman Island
corporation, and STEVE VACHANI, an
individual,

16
17

      Defendants.   )

18
19
20
21
22
23
24
25
26
27

     Defendant Power Ventures, Inc. ("Power Ventures") and Defendant Steve Vachani

("Vachani") (collectively, "Defendants") request leave to file a motion for reconsideration of the

February 16, 2012 summary judgment order issued by Judge James Ware.  Plaintiff, Facebook, Inc.

moves for statutory and compensatory damages, permanent injunctive relief, and a grant of

summary judgment holding that Vachani is personally liable for violations of the Controlling the

Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C

§ 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and California Penal

Code § 502.  Pursuant to Civil Local Rule 7-1(b), the Court finds a hearing unnecessary for

28

1

1    resolution of these matters and accordingly VACATES the hearing and case management

2    conference set for September 26, 2013.  Having considered Defendants' papers and the record in

3    this case, Defendants' request for leave to file a motion for reconsideration is DENIED.  Plaintiff's

4    motion for statutory and compensatory damages, motion for permanent injunctive relief, and

5    motion for summary judgment on the issue of Vachani's personal liability are GRANTED.  The

6    Court proceeds to discuss each issue in turn.

7    **I.    BACKGROUND**

8        **A.    Factual Background**

9        Facebook owns and operates the eponymous social networking website located at

10    facebook.com.  First Amended Complaint ("FAC") ¶ 2.  Power Ventures is a corporation

11    incorporated in the Cayman Islands and doing business in California.  Answer ¶ 10.  It operates the

12    website www.power.com, which offers to integrate users' various social media accounts into a

13    single experience.  FAC ¶ 5; Answer ¶ 5.  Vachani is the Chief Executive Officer of power.com.

14    Answer ¶ 11.

15        Facebook brought this action against Defendants in December 2008, alleging violations of

16    the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-

17    SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030;

18    California Penal Code § 502; and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §

19    1201; copyright infringement under 17 U.S.C. § 101; trademark infringement under 15 U.S.C. §§

20    1114 and 1125(a) and California law; and violations of California Business and Professions Code

21    Section 17200.  ECF Nos. 1, 9.  Facebook complains that Defendants employ Facebook's

22    proprietary data without its permission by inducing Facebook users to provide their login

23    information and then using that information to "scrape" Facebook's proprietary material.  FAC ¶¶

24    49, 50, 52.  Defendants then display Facebook's material on power.com.  FAC ¶ 52.  Facebook

25    asserts that it never gave Defendants permission to use its material in this way.  FAC ¶ 54.

26        Facebook also accuses Defendants of sending unsolicited and deceptive email messages to

27    Facebook users.  FAC ¶¶ 65-69.  To launch their site, Defendants promised power.com users a

28
2

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF                                                                                          1-ER-63

United States District Court
For the Northern District of California

1   chance to win $100 if they invited and signed up the most new users to Defendants' site.  FAC ¶

2   65.  Defendants provided to their users a list of the users' Facebook friends from which the users

3   could choose people to whom to send the invitation.  FAC ¶ 66.  Power.com sent unsolicited

4   commercial emails to those friends that included on the "from" line a "@facebookmail.com"

5   address.  FAC ¶¶ 66, 68.  The content of the message included a line that the message was from

6   "The Facebook Team."  FAC ¶ 69, 70.  Facebook contends that it never gave permission to send

7   these messages and that the emails were deceptive because they "do not properly identify the

8   initiators of the messages, nor do they provide clear or conspicuous notice that the messages are

9   advertisements for" power.com.  FAC ¶ 71.

10        **B.**    **Procedural Background**

11       On February 18, 2011, Judge Ware granted the parties' stipulation to dismiss Facebook's

12   DMCA claim, copyright and trademark infringement claims, and claims for violations of California

13   Business and Professions Code Section 17200.  ECF No. 97.  On May 9, 2011, Defendants moved

14   for summary judgment on Facebook's CFAA, Section 502, and CAN-SPAM Act claims.  ECF No.

15   98.  On November 17, 2011, Facebook moved for summary judgment on Facebook's § 502 and

16   CFAA claims.  ECF No. 214 ("§ 502/CFAA Motion").  On November 18, 2011, Facebook moved

17   for summary judgment on Facebook's CAN-SPAM Act claim.  ECF No. 215 ("CAN-SPAM

18   Motion").  On February 16, 2012, Judge Ware issued an order denying Defendants' motion for

19   summary judgment and granting summary judgment in Facebook's favor as to Facebook's § 502,

20   CFAA, and CAN-SPAM Act claims.  ECF No. 275 ("February 16 order").

21       In the February 16 order, Judge Ware requested additional briefing regarding Vachani's

22   individual liability and the amount of damages Facebook should receive in light of the February 16

23   order.  *Id.* at 19.  On March 30, 2012, Facebook filed its supplemental brief regarding damages and

24   the liability of Vachani.  ECF No. 299 ("Facebook Damages/Liability Brief").  The same day,

25   Defendants lodged with the court a brief regarding damages and the liability of Vachani.  ECF No.

26   288 ("Defendants' Damages/Liability Brief").  On August 15, 2012, Vachani also submitted a

27

28

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1    supplemental brief regarding damages and his personal liability.  ECF No. 317 ("Vachani

2    Damages/Liability Brief").

3        On June 4, 2012, the attorneys representing Vachani and Power Ventures moved to

4    withdraw as counsel.  ECF Nos. 302, 303.  On July 2, 2012, Judge Ware granted the motions to

5    withdraw.  ECF No. 306.  In the order granting the withdrawal requests, Judge Ware required

6    Vachani and Power Ventures to file Notices of Identification of Substitute Counsel no later than

7    July 17, 2012.  *Id.*  Judge Ware noted that although Vachani could proceed *pro se*, Power Ventures

8    had to be represented by a member of the bar pursuant to Civil L.R. 3-9(b).  *Id.*  Judge Ware

9    cautioned Defendants that a failure to file timely Notices of Identification of Substitute Counsel

10   may result in default of the case.  *Id.*

11       On July 19, 2012, after neither Vachani nor Power Ventures had filed a Notice of

12   Identification of Substitute Counsel, Judge Ware ordered both parties to appear on August 6, 2012

13   to respond to an Order to Show Cause regarding Defendants' failure to obtain counsel.  ECF No.

14   308.  On August 6, 2012, the parties appeared for the hearing, and on August 8, 2012, Judge Ware

15   issued an order regarding Defendants' failure to obtain counsel ("August 8 order").  ECF No. 313.

16   Because Power Ventures had failed to identify replacement counsel, Judge Ware found good cause

17   to strike Power Ventures' answer to Facebook's complaint and enter default against Power

18   Ventures.  *Id.*  Judge Ware permitted Vachani a short extension to find new counsel, which was

19   conditioned on Vachani's immediate filing of a Notice of Self-Representation.  *Id.*   The Clerk

20   entered default against Power Ventures on August 9, 2012.  ECF No. 314.

21       On August 15, 2012, new counsel filed a Notice of Appearance on behalf of Power

22   Ventures.  ECF No. 316.  That same day, Power Ventures moved for leave to file a motion for

23   reconsideration of Judge Ware's August 8 order requiring entry of default against Power Ventures.

24   ECF No. 318.  Judge Ware gave Power Ventures leave to file the motion for reconsideration on

25   August 21, 2012.  ECF No. 320.  On August 23, 2012, Power Ventures filed its motion for

26   reconsideration.  ECF No. 321.  On August 27, 2012, Facebook filed its response and

27   simultaneously requested entry of default judgment against Power Ventures.  ECF No. 322.

28

United States District Court
For the Northern District of California

4

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1    On August 27, 2012, Defendants provided notice that both Power Ventures and Vachani

2    had filed for bankruptcy.  ECF Nos. 323, 324.  Noting that pursuant to 11 U.S.C. § 362(a)(1), a

3    voluntary petition for bankruptcy operates as an automatic stay of any judicial actions involving the

4    petitioners, Judge Ware stayed the proceedings and administratively closed the case on August 29,

5    2012.  ECF No. 325.  In the same order, Judge Ware denied as premature Power Ventures' motion

6    for reconsideration of the August 8 order requiring entry of default.  *Id.*

7    On March 20, 2013, Facebook notified the Court that the Bankruptcy Court had dismissed

8    Power Ventures' bankruptcy case and had granted Facebook's request for relief from the automatic

9    stay in Vachani's bankruptcy case.  ECF No. 327.  Facebook sought to reopen the case.  *Id.*

10   Facebook also sought reassignment to a new judge because on August 31, 2012, while the

11   automatic stay was in effect, Judge Ware resigned from the bench.  *Id.*  On April 8, 2013, the

12   undersigned judge, as the Duty Judge at the time Facebook filed its motion, granted Facebook's

13   request.  ECF No. 328.  The undersigned judge ordered that the stay be lifted, the case be reopened,

14   and the case be reassigned.  *Id.*  The case then was reassigned to the undersigned judge.  ECF No.

15   329.

16   On April 25, 2013, Vachani moved for clarification of the February 16 order regarding

17   whether Vachani's liability had been determined in the February 16 order.  ECF No. 332.  On April

18   29, 2013, Facebook filed a case management statement in which Facebook again requested that

19   default judgment be entered against Power Ventures.  ECF No. 333.  On the same day, Defendants

20   filed a consolidated case management statement in which Power Ventures again sought to set aside

21   default.  ECF No. 334.  Defendants also stated their intent to request leave to file a motion for

22   reconsideration of the February 16 order.  *Id.*  In Facebook's and Defendants' respective case

23   management statements, the parties acknowledged that Vachani's liability and the issues of

24   damages and injunctive relief still need to be addressed.  ECF No. 333, 334.

25   On May 2, 2013, following a case management conference, the Court issued a case

26   management order.  ECF No. 340.  In that order, the Court clarified that the February 16 order did

27   not decide Vachani's liability.  *Id.*  The Court granted Power Ventures' request to set aside default

28

5

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1    and denied Facebook's request for entry of default judgment against Power Ventures.  *Id.*  The

2    Court also set a briefing schedule for the damages and injunctive relief issues.  *Id.* The Court set a

3    hearing date of September 26, 2013 to consider Vachani's liability, as well as the remedies issues.

4    *Id.*

5           On August 1, 2013, Power Ventures filed its request for leave to file a motion to reconsider

6    the February 16 order.  ECF No. 353.  On August 1, 2013, Facebook filed its supplemental

7    memorandum in support of its request for injunctive relief.   ECF No. 354 ("Facebook Injunction

8    Brief").  On August 15, 2013, Defendants filed a response to Facebook's request for injunctive

9    relief.  ECF No. 357 ("Defendants' Inj. Opp.")  On August 22, 2013, Facebook filed its reply.  ECF

10   No. 358 ("Facebook Injunction Reply").[1]

## II.    LEGAL STANDARDS

### A.    Motion for Reconsideration

13          Pursuant to Civil Local Rule 7–9, "[b]efore the entry of a judgment adjudicating all of the

14   claims and the rights and liabilities of all the parties in a case, any party may make a motion before

15   a Judge requesting that the Judge grant the party leave to file a motion for reconsideration of any

16   interlocutory order made by that Judge on any ground set forth in Civil L.R. 7–9(b).  No party may

17   notice a motion for reconsideration without first obtaining leave of Court to file the motion."  Civil

18   Local Rule 7-9(b) provides three grounds for reconsideration of an interlocutory order:

19          (1)    That at the time of the motion for leave, a material difference in fact or
20                 law exists from that which was presented to the Court before entry of the
                   interlocutory order for which reconsideration is sought. The party also
21                 must show that in the exercise of reasonable diligence the party applying
                   for reconsideration did not know such fact or law at the time of the
22                 interlocutory order; or

---

[1] Vachani has appealed Magistrate Judge Joseph Spero's order granting Facebook fees and costs for
Vachani's second Rule 30(b)(6) deposition, which Judge Spero granted because of Defendants'
misconduct during discovery.  ECF No. 356 (Order granting fees); ECF No. 360 (Notice of Appeal
by Vachani).  Vachani's appeal does not divest this Court of jurisdiction over the issues resolved in
this order because the filing of a notice of appeal divests the district court of jurisdiction only over
the matters appealed.  *Masalosalo by Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955, 956 (9th Cir.
1983) ("A notice of appeal only transfers jurisdiction to the appellate court over matters contained
in the appeal."); *Donovan v. Mazzola*, 761 F.2d 1411 (9th Cir. 1985) ("Appeal of one order does
not necessarily deprive the district court of jurisdiction over issues not raised in that order.").

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

**United States District Court**
For the Northern District of California

(2)   The emergence of new material facts or a change of law occurring after the time of such order; or

(3)   A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

Rule 7-9(c) further requires that "[n]o motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered." In general, motions for reconsideration should not be frequently made or freely granted. *See generally Twentieth Century–Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981).

**B.    Summary Judgment Regarding Liability of Vachani**

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative," the court may grant summary judgment. *Id.* at 249-50. (citation omitted). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006).

The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Celotex*, 477 U.S. at 323. It "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 310 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted).

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

1-ER-68

1   Once the moving party has satisfied its initial burden of production, the burden shifts to the

2   nonmoving party to show that there is a genuine issue of material fact. *Id.* at 1103.

3   **C.      Permanent Injunctive Relief**

4          A party seeking a permanent injunction must make a four-part showing: (1) that it has

5   suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

6   inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

7   plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not

8   be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388,

9   390 (2006).

10  **III.    ANALYSIS OF DEFENDANTS' MOTION FOR RECONSIDERATION**

11         Defendants proffer three grounds in support of their request for reconsideration, notably

12  none of which arise out of a material difference in fact or law either at the time the February 16

13  order was issued or in the intervening period.  Defendants instead assert that the February 16 order

14  represents a "manifest failure" to consider "material facts or dispositive legal arguments which

15  were presented" and that the order includes "conclusions of law counter to precedent controlling

16  authorities."  Mot. Recons. at 2.  In support of their position, Defendants argue that (1) the

17  February 16 order incorrectly applied the law by finding that the email messages were materially

18  misleading; (2) the order incorrectly considered the issue of data ownership under the CFAA and §

19  502 claims; and (3) the order incorrectly classified Facebook's damages in determining that

20  Facebook had standing to litigate its claims.  Mot. Recons. at 3.

21  **A.      Materially Misleading Emails**

22         Defendants argue that the February 16 order incorrectly applied the law by finding that the

23  email messages Defendants caused to be sent to Facebook users were materially misleading.

24  Defendants assert that the header information was not materially misleading because within the

25  body of the email, Defendants were identified and because no one complained about being misled.

26  Mot. Recons. at 3-4.

27

28

*Vertical left margin:* **United States District Court**  For the Northern District of California

8

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF                                                                    1-ER-69

United States District Court
For the Northern District of California

1      To establish liability under the CAN-SPAM Act, Facebook had to establish that

2 Defendants' emails were materially misleading. 15 U.S.C. § 7704(a)(1).  The Act provides that

3 "[i]t is unlawful for any person to initiate the transmission, to a protected computer of a

4 commercial electronic mail message . . . that contains, or is accompanied by, header information

5 that is materially false or materially misleading."  *Id.*  The Act defines "materially" "when used

6 with respect to false or misleading header information" to include:

7      the alteration or concealment of header information in a manner that would impair
8      the ability of an Internet access service processing the message on behalf of a
       recipient, a person alleging a violation of this section, or a law enforcement
9      agency to identify, locate, or respond to a person who initiated the electronic mail
       message or to investigate the alleged violation, or the ability of a recipient of the
10     message to respond to a person who initiated the electronic message.

11 15 U.S.C. § 7704(a)(6).

12      Defendants' arguments fail to meet the standard for reconsideration for three reasons.  First,

13 Defendants presented essentially the same arguments to Judge Ware in their opposition to

14 Facebook's CAN-SPAM Motion.  ECF No. 239.  In Defendants' opposition to the CAN-SPAM

15 Motion, Defendants asserted that the header information was not materially misleading because

16 Facebook in fact had generated the emails and because no one complained about being misled.

17 ECF No. 239 at 11-12.  The significant overlap in the arguments alone warrants denial of

18 Defendants' request.  Moreover, to the extent Defendants failed to present these arguments in

19 Defendants' opposition to Facebook's CAN-SPAM Motion, Defendants have provided no reason

20 why they could not have done so at that time.

21      Second, Judge Ware considered Defendants' arguments in his order.  In the February 16

22 order, Judge Ware addressed whether the "from" line in the emails rendered the emails materially

23 misleading as required under the CAN-SPAM Act.  ECF No. 275 at 13.  Judge Ware also

24 addressed Defendants' argument that the body of the email corrected any misrepresentation in the

25 header information.  *Id.*  Judge Ware therefore did not manifestly fail to consider Defendants' legal

26 theories or material facts.

27

28
Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF                                                                                    1-ER-70

United States District Court
For the Northern District of California

1    Third, Judge Ware's consideration of Defendants' argument was not clear error.  The

2   February 16 order correctly states that a false or misleading statement is considered material if "the

3   alteration or concealment of header information" would impair the ability of an Internet Service

4   Provider ("ISP") or the recipient of the email to "identify, locate, or respond to a person who

5   initiated the electronic mail message." 15 U.S.C. § 7704(a)(6).  The parties did not dispute that the

6   "from" line of the emails Defendants caused to be sent listed the address "@facebookmail.com."

7   ECF No. 375 at 13.  Judge Ware found that the "@facebookmail.com" failed to provide the

8   recipient with an ability to identify, locate, or respond to Defendants.  ECF No. 275 at 13.  As a

9   result, Judge Ware concluded that the headers were materially misleading as defined by the statute.

10   *Id.*  Judge Ware did not, as Defendants argue, hold that misleading header information is a per se

11   violation of the CAN-SPAM Act.

12    Defendants have failed to meet their burden for leave to request reconsideration of the

13   February 16 order on this issue.

14   **B.    Violations Under the CFAA and § 502**

15    Defendants next argue that reconsideration of the February 16 order is warranted because

16   Judge Ware failed to address whether the information Defendants took from Facebook had value.

17   Mot. Default J. at 4-5.  Defendants assert that a determination of value was necessary because

18   violations under the CFAA and § 502 require a showing that the taken information had value.  *Id.*

19   The Court first addresses Defendants' CFAA argument.

20    The CFAA prohibits several types of activities involving fraud and unauthorized access to

21   protected computers.  18 U.S.C. § 1030(a)(1)-(7).  The CFAA provides a civil cause of action for a

22   violation of any of its provisions.  Specifically, the CFAA provides that "[a]ny person who suffers

23   damage or loss by reason of a violation of this section [i.e. Section 1030] may maintain a civil

24   action against the violator to obtain compensatory damages and injunctive relief or other equitable

25   relief." 18 U.S.C. § 1030(g).

26    Notably, the CFAA defines "loss" and "damage" separately from the actions prohibited

27   under the CFAA.  *See* 18 U.S.C. § 1030(a)(1)-(7) (describing prohibited activities); § 1030(e)(8)

28
    10
    Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF                                                                              1-ER-71

1    (defining "damage"); § 1030(e)(11) (defining "loss").  The Court addresses in this section only the

2    violations of the CFAA that serve as the basis of Facebook's CFAA cause of action and addresses

3    the "damage or loss" requirement in Section C below.

4         In Facebook's § 502/CFAA Motion, Facebook alleged that Defendants had violated both

5    18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(4).  Either violation could serve as the basis for

6    Facebook's CFAA cause of action.  Section 1030(a)(2)(C) prohibits a person from "intentionally

7    access[ing] a computer without authorization or exceed[ing] authorized access, and thereby

8    obtain[ing] . . . information from any protected computer."  Section 1030(a)(4) meanwhile

9    prohibits a person from:

> knowingly and with intent to defraud, access[ing] a protected computer without
> authorization, or exceed[ing] authorized access, and by means of such conduct
> further[ing] the intended fraud and obtain[ing] anything of value, unless the object
> of the fraud and the thing obtained consists only of the use of the computer and
> the value of such use is not more than $5,000 in any 1-year period.

13   Notably, while Section 1030(a)(4) prohibits unauthorized access to a protected computer that

14   results in obtaining "anything of value," Section 1030(a)(2)(C) prohibits unauthorized access that

15   results in obtaining only "information."  Thus, Section 1030(a)(2)(C) does not require a showing

16   that the taken information had value.

17        In the February 16 order, Judge Ware determined that Defendants had violated Section

18   1030(a)(2)(C).  ECF No. 275 at 17-18.  In his analysis, Judge Ware found that an admission by

19   Defendants that Defendants had taken, copied, or used data from Facebook's site established that

20   Defendants had "obtain[ed] information" from Facebook, as required to establish a violation under

21   Section 1030(a)(2)(C).  ECF No. 275 at 18.  Because Judge Ware found a violation of the CFAA

22   under Section 1030(a)(2)(C), Judge Ware did not need to address Facebook's alternative argument

23   that Defendants had also violated Section 1030(a)(4), which would require a showing that the taken

24   information had value.  Accordingly, as Defendants correctly point out, Judge Ware in the

25   February 16 order did not explicitly analyze whether the taken information had value.  Thus,

26   Defendants' argument is meritless.  Defendants have not shown that Judge Ware manifestly failed

27   to consider a dispositive legal argument or that Judge Ware clearly erred.

28

11

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

**United States District Court**
For the Northern District of California

1   Defendants' arguments regarding § 502(c) likewise are unavailing.  Section 502(c)

2   prohibits, among other things, a person from "knowingly access[ing] and without permission

3   tak[ing], cop[ying] or ma[king] use of any data from a computer, computer system or computer

4   network."  Cal. Penal Code § 502(c)(2).  Section 502(e)(1) confers standing for a civil cause of

5   action on an "owner or lessee of the . . . data who suffers damage or loss by reason of a violation of

6   any of the provisions of subdivision (c)."  In Section C below, the Court addresses the "damage or

7   loss" requirement.

8       Judge Ware determined that Defendants' admission established that Defendants had

9   violated § 502(c), and Judge Ware further determined that Facebook had suffered a loss as a result

10  of that violation.  ECF No. 275 at 14-15; ECF No. 89 at 8.  As with Section 1030(a)(2)(C) of the

11  CFAA, the plain language of § 502(c) does not require that any data that was taken be valuable.

12  Defendants offered no case law in their opposition to Facebook's § 502/CFAA Motion and do not

13  offer any case law in this motion suggesting that § 502(c) requires that the data that was taken be

14  valuable.  *See* ECF No. 242 at 4-5; Mot. Default. J. at 5.  Thus, Defendants have not shown that

15  Judge Ware's finding that Defendants were liable under § 502(c) reflects a manifest failure to

16  consider a dispositive legal theory or clear error.

17      Defendants also include a new argument in the motion for leave to seek reconsideration that

18  because Defendants did not destroy any information or data Defendants are not liable under the

19  CFAA or § 502.[2]  Mot. Default J. at 5.  Nothing in the plain language of either Section

20  1030(a)(2)(C) or § 502 requires that taken information be destroyed, and Defendants do not point

21  to any case law suggesting otherwise.  Furthermore, Defendants do not explain why Defendants did

22  not or could not raise the new argument in their opposition to Facebook's § 502/CFAA Motion.

23  The Court thus finds Defendants' new argument is not grounds for leave to request reconsideration.

24  **C.   Standing**

25
    _____
26  [2] Defendants also assert that Facebook never had ownership over the information and that the
    information did not have proprietary value.  Mot. Recons. at 5.  The Court finds these arguments to
27  be duplicative of arguments that Defendants presented to Judge Ware in their opposition to
    Facebook's Section 502/CFAA Motion.  The Court thus finds these arguments do not constitute
    grounds for leave to seek reconsideration.

28  12
    Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF                                                                              1-ER-73

1     Defendants finally argue that Judge Ware erred in finding that Facebook had established

2     sufficient harm to have standing under the CAN-SPAM Act, § 502, and the CFAA.  Mot. Recons.

3     at 5-6.  Defendants have not made the requisite showing to justify reconsidering the February 16

4     order.

5         **1.     CAN-SPAM Act**

6         To recover under the CAN-SPAM Act, Facebook had to establish that it was "adversely

7     affected by a violation of . . . or a pattern or practice that violates" the Act.  15 U.S.C. § 7706(g)(1).

8     In *Gordon v. Virtumundo, Inc.*, the Ninth Circuit held that to be "adversely affected" under the

9     CAN-SPAM Act, an ISP must experience harm that is "both real and the type experienced by

10    ISPs."  575 F.3d 1040, 1053 (9th Cir. 2009).

11        In this motion, Defendants argue that Facebook's harm evidence fails to meet the standard

12    under *Gordon*.  Defendants' argument, however, is recycled from the argument Defendants made

13    before Judge Ware in opposition to Facebook's CAN-SPAM Motion.  In their opposition to the

14    CAN-SPAM Motion, Defendants argued that under *Gordon* Facebook's claimed injuries do not

15    give rise to standing under the statute.  ECF No. 239 at 14-15.  Defendants repeat that argument in

16    this motion.  Accordingly, Defendants have not established that leave for reconsideration is

17    warranted.

18        The Court further finds that Judge Ware considered Defendants' argument in the February

19    16 order.  In his order, Judge Ware addressed *Gordon* and concluded that Facebook's evidence of

20    costs incurred as a result of investigating Defendants' unauthorized access and the legal fees

21    incurred in trying to stop Defendants' unauthorized access sufficed to confer standing on Facebook

22    under the CAN-SPAM Act.  ECF No. 275 at 8-9.  The analysis of *Gordon* and Facebook's

23    evidence in the February 16 order precludes any claim by Defendants that Judge Ware manifestly

24    failed to address either material facts or legal arguments.  *See id.*

25        There is no clear error or manifest injustice in Judge Ware's analysis.  The February 16

26    order describes how Facebook's evidence of injury from having to address Defendants'

27    unauthorized access amounts to the type of specialized harm against which the CAN-SPAM Act

28
13
Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF                                                                                    1-ER-74

**United States District Court**
For the Northern District of California

1     protects.  ECF No. 275 at 7-8.  *Gordon* advises that "the threshold of standing should not pose a

2     high bar for the legitimate service operations contemplated by Congress" in instituting the CAN-

3     SPAM Act, and so for "well-recognized ISPs or plainly legitimate [ISPs] . . . adequate harm might

4     be presumed."  575 F.3d at 1055.  In light of that advice, the Court finds no clear error or manifest

5     injustice in Judge Ware's holding.

6         **2.     CFAA and § 502**

7         In this motion, Defendants argue that the costs Facebook incurred from investigating

8     Defendants' actions and having Facebook's attorneys respond to Defendants' activities are

9     insufficient to show harm under the CFAA and § 502.

10        The CFAA defines "loss" as:

11        any reasonable cost to any victim, including the cost of responding to an offense,
          conducting a damage assessment, and restoring the data, program, system, or
12        information to its condition prior to the offense, and any revenue lost, cost
          incurred, or other consequential damages incurred because of interruption of
13        service[.]

14    18 U.S.C. § 1030(e)(11).

15        § 502(e)(1) in turn provides that:

16        the owner or lessee of the computer, computer system, computer network,
          computer program, or data who suffers damage or loss by reason of a violation of
17        any of the provisions of subdivision (c) may bring a civil action against the
          violator for compensatory damages and injunctive relief or other equitable relief.
18        Compensatory damages shall include any expenditure reasonably and necessarily
          incurred by the owner or lessee to verify that a computer system, computer
19        network, computer program, or data was or was not altered, damaged, or deleted
          by the access.

20

21    § 502 does not further define "loss."

22        Defendants' argument in support of its request for leave to move for reconsideration is

23    unavailing.  First, Defendants raised this argument in the opposition to Facebook's § 502/CFAA

24    Motion.  ECF No. 242 at 11.  To the extent Defendants repeat arguments from their opposition to

25    the § 502/CFAA Motion, Defendants have not established grounds for seeking reconsideration.

26    Defendants add new case law in this motion, but Defendants offer no reasons why they did not or

27    could not present these decisions in Defendants' opposition to Facebook's § 502/CFAA Motion.

28
                                                                    14
      Case No.: 08-CV-5780-LHK
      ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
      VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
      RELIEF                                                                                    1-ER-75

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

Second, Judge Ware addressed Defendants' arguments regarding harm under the CFAA and § 502. Judge Ware specifically determined that the costs Facebook incurred to block Defendants from the site, to investigate Defendants' activities, and to have its attorneys attempt to stop Defendants from continuing the activities were sufficient to establish loss under the CFAA and § 502. ECF No. 275 at 18; ECF No. 89 at 8. Defendants therefore cannot assert that the order reflects a manifest failure to consider either material facts or dispositive legal arguments.

Third, the Court finds no manifest injustice or clear error in the February 16 order regarding Facebook's "loss" under the CFAA or § 502. Given that the CFAA explicitly identifies the "cost of responding to an offense" and "conducting a damage assessment" as types of losses for which the CFAA confers standing, the Court finds no clear error in Judge Ware's determination that Facebook's costs meet the definition of "loss" provided by the CFAA. *See Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("Costs associated with investigating intrusions into a computer network and taking subsequent remedial measures are losses within the meaning of the statute."). The Court also finds that Judge Ware's determination that Facebook's costs satisfy the "loss" requirement under § 502 is not clear error. *See Yee v. Lin*, No. C 12-02474 WHA, 2012 WL 4343778, at *3 (N.D. Cal. Sept. 20, 2012) (finding that plaintiff's expenses "associated with responding" to defendant's unauthorized access were sufficient to meet loss requirement under § 502).

The Court further finds no manifest injustice or clear error in the February 16 order based on Defendants' late-added case law. *See AtPac, Inc. v. Aptitude Solutions, Inc.*, 730 F. Supp. 2d 1174, 1184 (E.D. Cal. 2010) (noting that under the CFAA, "[c]ognizable costs also include the costs associated with assessing a hacked system for damage"); *Farmers Insurance Exchange v. Steele Insurance Agency, Inc.*, No. 2:13-cv-00784-MCE-DAD, 2013 WL 3872950, at *21 (E.D. Cal. July 25, 2013) (same).

Defendants have not established that leave to request reconsideration of the February 16 order is warranted.

15

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

### IV.    STEVEN VACHANI'S PERSONAL LIABILITY FOR VIOLATIONS OF THE CAN-SPAM ACT, CFAA, AND CALIFORNIA PENAL CODE § 502

The next issue before the Court is whether there is a genuine issue of material fact as to whether Defendant Steve Vachani, who was CEO of Power Ventures during the time period in question, is personally liable for statutory violations of the CAN-SPAM Act, CFAA, and California Penal Code § 502.  For the reasons explained below, the Court concludes Vachani is personally liable as a matter of law and is thus jointly and severally liable with Power Ventures for violations of these statutory provisions.

Before analyzing Vachani's personal liability, the Court first summarizes this Court's previous findings regarding the precise conduct by Power Ventures that led to Judge Ware's finding of Power Venture's liability under the CAN-SPAM Act, CFAA, and California Penal Code § 502.  *See* ECF No. 275.  The Court first held that Power Ventures, by creating the Launch Promotion and the software that caused Facebook's servers to send out the misleading emails with "@facebookmail.com" addresses to Facebook users, violated the provision of the CAN-SPAM Act which makes it unlawful "for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or misleading," 15 U.S.C. § 7704(a)(1).  ECF No. 275 at 9-14.  Second, the Court held that Power Ventures, by intentionally circumventing technical barriers to take, copy, or make use of data from the Facebook website without permission, violated California Penal Code § 502, which provides that a person is guilty of a public offense if he (1) knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network; (2) knowingly and without permission uses or causes to be used computer services; or (3) knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.  California Penal Code §§ 502(c)(2)(3) & (7).  ECF No. 275 at 14-17.  Third, the Court held that Power Ventures, by accessing Facebook without authorization, and obtaining information from the Facebook website, violated the provision of CFAA that imposes liability on any party that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby

16

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

1    obtains . . . information from any protected computer," 18 U.S.C. § 1030(a)(2)(C).  ECF No. 275 at

2    17-19.

3          The Court must decide whether Vachani should be held personally liable for violating these

4    statutory provisions.  The Ninth Circuit has held that "a corporate officer or director is, in general,

5    personally liable for all torts which he authorizes or directs or in which he participates,

6    notwithstanding that he acted as an agent of the corporation and not on his own behalf."  *Comm.*

7    *for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (quoting *Transgo, Inc. v.*

8    *Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)).  "Cases which have found

9    personal liability on the part of corporate officers have typically involved instances where the

10   defendant was the 'guiding spirit' behind the wrongful conduct, . . . or the 'central figure' in the

11   challenged corporate activity."  *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 523 n.10 (9th Cir.

12   1989).  Under such circumstances, both the corporation and the officers or directors who

13   participated in the tortious conduct may be held liable.  *See Moseley v. U.S. Appliance Corp.*, 155

14   F.2d 25, 27 (9th Cir. 1946).  Thus, where an officer authorized, directed, or participated in a

15   corporation's tort or statutory violation, the officer can be held personally liable.  *See United States*

16   *v. Reis*, 366 Fed. Appx. 781, 782 (9th Cir. 2010) (finding personal liability where corporate officer

17   was an active participant in the acts giving rise to corporate liability under the Resource

18   Conservation and Recovery Act); *Dish Network, LLC v. Sonicview USA, Inc.*, 2012 WL 1965279,

19   at *11 (S.D. Cal. May 31, 2012), *reconsideration denied*, 2012 WL 4339047 (finding personal

20   liability of several corporate officers who were the "guiding spirits" of the corporation's statutory

21   violations of the Digital Millennium Copyright Act and the Federal Communications Act).

22         In this case, the Court must assess whether there is a genuine issue of material fact as to

23   whether Vachani directed and authorized the specific activities giving rise to Power Ventures'

24   liability to a degree that reflects more than simply his supervisory role as CEO of the company.

25   More specifically, the Court assesses whether he was a "guiding spirit" or "central figure" in Power

26

27

28

17

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF                                                                                         1-ER-78

United States District Court
For the Northern District of California

1    Venture's unlawful access to and use of the Facebook website.[3]  *Davis*, 885 F.2d at 523 n.10.

2    Again, the unlawful activities that led to Power Venture's liability under the three relevant statutes

3    were 1) creating the Launch Promotion and the software that caused Facebook's servers to send out

4    the misleading emails to Facebook users; 2) circumventing technical barriers to take, copy, or make

5    use of data from the Facebook website without permission; 3) accessing Facebook without

6    authorization and obtaining information from the Facebook website without authorization.  ECF

7    No. 275 at 9-19.  Drawing all reasonable inferences in the light most favorable to Vachani, the

8    Court concludes that the undisputed facts prove that Vachani authorized and directed these

9    activities.

10        First, with respect to the creation of the Launch Promotion[4] and the software through which

11   Power Ventures caused Facebook's servers to send out the misleading emails to Facebook users,

12   Vachani admitted he was "controlling and directing [Power's] activities as it related to Facebook,"

13   including "controlling and directing the activities related to the use of the Power 100 campaign in

14   conjunction with Facebook users."  ECF No. 299-3 at 27.  Vachani also admitted that the Power

15   100 Campaign was his very own idea, ECF No. 229 at 7, and Defendants admit he managed the

16   campaign's implementation.  ECF No. 232-2 at 5-6 (Power Venture's Response to Interrogatories,

17   noting Vachani was the "director responsible for developing the technology to allow Power or

18   Power users to continue to access the Facebook website following Facebook's IP blocking" and for

19

20   [3] The Court notes that Facebook does not argue an alter ego theory; namely, it does not ask the
     Court to pierce the corporate veil in order to hold Vachani liable.  In any event, courts have held

21   that where officers direct, order, or participate in the company's tortious conduct, there is no need
     to pierce the corporate veil to establish the personal liability of the corporate officer. *Chase Inv.*

22   *Servs. Corp. v. Law Offices of Jon Divens & Assocs.*, No. 09–9152, 2010 WL 4056022, at *28
     (C.D .Cal. Oct. 14, 2010) ("This principle applies regardless of the piercing of the corporate veil.")

23   [4] Around December 2008, Power Ventures began integrating with Facebook by allowing users to
     enter their Facebook account information and access the Facebook site through Power.com.  FAC ¶

24   49-50; Answer ¶ 49-50.  Later, Power Ventures initiated a "Launch Promotion," or the Power 100
     Campaign, that promised Power Venture's users the chance to win a $100 award if they invited and

25   signed up new users. FAC ¶ 65; Answer ¶ 65.  Power Ventures gave existing users a list of their
     Facebook friends Power Ventures had obtained from Facebook, and users had to select the friends

26   who would receive a Power Ventures invitation, which would contain a "@facebookmail.com"
     sender address.  *Id.* ¶ 66-68; *Id.* ¶ 66-68.

27

28   Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

18

1-ER-79

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    "creating the email messages sent to Facebook users asking Facebook users to use the Power

2    website to access the Facebook website").[5]  Given these admissions, the Court finds there is no

3    genuine dispute regarding whether Vachani actually led the effort to create the Launch Promotion

4    and to develop the software behind Power Venture's illegal actions.

5          Second, with respect to Power Venture's circumvention of Facebook's technical barriers to

6    take, copy, or make use of data from the Facebook website without permission, the undisputed

7    facts show that Vachani anticipated Facebook's attempts to block Power Venture's access and

8    oversaw the implementation of a system that would be immune to such technical barriers so that

9    Power Ventures could access Facebook's network.  Vachani admitted that he directed the

10   company's decision to circumvent Facebook's blocks of Power Venture's IP addresses.  ECF No.

11   299-3 at 6-7 (Vachani deposition in which he admits he "was the person making the executive

12   decision . . . to ensure that Facebook could not block Power.com"); ECF No. 299-3 at 28-29

13   (Vachani deposition admitting he controlled and directed employees' activities related to ensuring

14   that Power Ventures continued to have access to Facebook); *see also* ECF No. 232-2 at 5-6 (Power

15   Venture's Response to Interrogatories noting that Vachani was the "director responsible for

16   developing the technology to allow Power or Power users to continue to access the Facebook

17   website following Facebook's IP blocking").  There is also other evidence that Vachani instructed

18   employees to circumvent the blocks he anticipated.  ECF No. 236-6 at 2 (Email from Vachani to

19   staff members stating that "we need to be prepared for Facebook to try and block us . . ."); ECF

20   No. 299-5 at 2 (Email from Vachani to employee noting, "please just make sure they cannot block

21   us").[6]

22         Third, with respect to *obtaining* information from the Facebook website without

23   authorization, Defendants admitted that they "took, copied, or made use of data from the Facebook

---

[5]  Defendants also admitted to the court in other papers that Vachani has "been personally involved
in all of Power's operations including the Facebook integration that occurred in December 2008
that gave rise to this litigation."  ECF No. 269 at 7 (response to Judge Joseph Spero regarding
discovery dispute in this litigation).
[6]  There is evidence that Vachani took other actions himself as well.  ECF No. 299-3 at 8-9
(Vachani admitting he sent Facebook an email informing Facebook that Power Ventures would
continue to try to access Facebook's services despite Facebook's request that the company stop).

19

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1    website without Facebook's permission to do so."  ECF No. 241-3 at 6 (Defendants' Reponses to

2    Interrogatories).  Vachani's admission that he controlled and directed "the activities related to the

3    use of the Power 100 campaign in conjunction with Facebook users," ECF No. 299-3 at 27,

4    suffices to show that there is no genuine dispute regarding whether he led the company's quest to

5    obtain proprietary Facebook information, as that information was a necessary ingredient to the

6    Power 100 Campaign.  Ultimately, the Court concludes that these uncontroverted facts demonstrate

7    Vachani was the "guiding spirit" behind Power Venture's efforts to send the misleading spam

8    emails to Facebook users, and thus should be held personally liable.

9            Defendants' arguments to the contrary are unpersuasive.  First, Defendants concede that

10   corporate officers may be held liable for torts they authorize or direct, *see* Defendants'

11   Damages/Liability Brief at 4-5, but claim that "corporate executives like Vachani cannot be held

12   liable merely by virtue of their office for the torts of the corporation."  *Id.* at 5.  This argument

13   neglects to take into consideration Vachani's specific acts with respect to the Power 100 Campaign

14   that went above and beyond his merely advisory role as CEO of the company.  Second, Defendants

15   note that "there is no precedent for holding a CEO liable in this type of computer fraud and tort

16   action where the CEO is not the exclusive owner or director . . ."  Defendants' Inj. Opp. at 6.

17   Vachani himself similarly argues he was never the sole owner, controlling shareholder, or

18   controlling board member of Power Ventures, which he claims had six other executive officers and

19   multiple board members who had significant influence in decision-making as well.  *See* Vachani

20   Damages/Liability Brief at 5-7, 15.  It is true that the cases holding corporate officers personally

21   liable for violations of CFAA, CAN-SPAM, or California Penal Code § 502 have involved factual

22   situations in which the officer was either the *sole* officer or a majority shareholder of the company

23   or some combination of both.  *F.T.C. v. Sili Neutraceauticals, L.L.C.*, No. 07-C-4541, 2008 WL

24   474116, at *3 (N.D. Ill. Jan. 23, 2008) (finding that sole officer of defendant corporation who

25   formulated, directed, and controlled the acts giving rise to CAN-SPAM liability by the corporation

26   was individually liable under CAN-SPAM); *Facebook v. Fisher*, No. C 09-05842, 2011 WL

27   250395 (N.D. Cal. Jan. 26, 2011) (finding that sole officer of defendant corporation who conducted

28                                                    20

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF                                                                            1-ER-81

United States District Court
For the Northern District of California

1  the acts giving rise to CAN-SPAM and CFAA liability by the corporation was individually liable

2  under CAN-SPAM and CFAA); *Hanger Prosthetics &Orthotics, Inc., v. Capstone Orthopedic Inc.*,

3  556 F.Supp.2d 1122, 1134035 (E.D. Cal. 2008) (denying motion for summary judgment on CFAA

4  and California Penal Code § 502 claims against CEO where CEO owned one third of the

5  corporation and a reasonable jury could infer that he authorized and directed the unlawful acts).

6  However, Defendants fail to argue why an officer's majority shareholder status or sole officer

7  position should make any difference to the liability outcome, especially given clear Ninth Circuit

8  law in various other statutory contexts that holds corporate officers liable regardless of whether

9  they are majority shareholders or sole officers.  *See, e.g.*, *Coastal Abstract Serv. Inc. v. First*

10  *American Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (holding officer of insurance company

11  personally liable for violations of the Lanham Act despite the fact that he was acting as a corporate

12  agent when committing the illegal conduct, without any discussion of his shareholder status).

13  Accordingly, given the overwhelming evidence of Vachani's personal involvement in the unlawful

14  acts leading to the statutory violations in this case, Defendants have failed to show that there is a

15  genuine disputed issue of material fact concerning Vachani's personal liability, and the Court finds

16  Vachani personally liable as a matter of law for violations of CAN-SPAM, CFAA, and California

17  Penal Code § 502.

18  **V.    DAMAGES**

19       In its memorandum in support of its request for injunctive relief, Facebook expressly

20  waives its entitlement to attorneys' fees under the CFAA and its right to exemplary damages under

21  California Penal Code § 502.  Facebook Inj. Brief at 2.[7]  However, Facebook seeks statutory

22  damages under CAN-SPAM, asks the Court to treble damages, and also seeks compensatory

23  damages under either CFAA or California Penal Code § 502.  *Id.* at 1-13.

24  **A.    Facebook is entitled to damages under the CAN-SPAM ACT**

25

26

27  ---
[7] Facebook had previously requested punitive damages under Penal Code § 502.  Facebook's
    Damages/Liability Brief at 10.

28
Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF                                                                                    1-ER-82

United States District Court
For the Northern District of California

1    Under the CAN–SPAM Act, a plaintiff may elect to recover monetary damages in an

2 amount equal to the greater of actual losses or statutory damages.  15 U.S.C. § 7706(g)(1)(B).

3 Facebook elects to recover statutory damages.  It is well established that "[a] plaintiff may elect

4 statutory damages regardless of the adequacy of the evidence offered as to his actual damages and

5 the amount of the defendant's profits . . . and if statutory damages are elected, the court has wide

6 discretion in determining the amount of statutory damages to be awarded, constrained only by the

7 specified maxima and minima."  *Facebook v. Wallace*, No. 09-798, 2009 WL 3617789, at *2 (N.D.

8 Cal. Oct. 29, 2009) (citation omitted) (internal quotations omitted).  However, a statutory damages

9 award may violate the due process rights of a defendant "where the penalty prescribed is so severe

10 and oppressive as to be wholly disproportioned to the offense and obviously unreasonable."

11 *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (citation omitted).

12    CAN–SPAM Act statutory damages are calculated as follows:

13 (3) Statutory damages.

14
15 (A) In general. For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is
the amount calculated by multiplying the number of violations (with each separately addressed
16 unlawful message that is transmitted or attempted to be transmitted over the facilities of the
provider of Internet access service, or that is transmitted or attempted to be transmitted to an
17 electronic mail address obtained from the provider of Internet access service in violation of section
5(b)(1)(A)(i) [15 USCS § 7704(b)(1)(A)(i) ], treated as a separate violation) by—

18
  (i) up to $ 100, in the case of a violation of section 5(a)(1) [15 USC § 7704(a)(1)]; or
19   (ii) up to $ 25, in the case of any other violation of section 5 [15 USC § 7704].

20 (B) Limitation. For any violation of section 5 [15 USCS §7704] (other than section 5(a)(1) [15
21 USC 7704(a)(1) ] ), the amount determined under subparagraph (A) may not exceed $ 1,000,000.

22 (C) Aggravated damages. The court may increase a damage award to an amount equal to not more
than three times the amount otherwise available under this paragraph if—
23
24   (i) the court determines that the defendant committed the violation willfully and knowingly;
or
25   (ii) the defendant's unlawful activity included one or more of the aggravated violations set
forth in section 5(b) [15 USC § 7704(b)].
26
27 15 U.S.C. § 7706(g)(3).

28
22

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1-ER-83

United States District Court
For the Northern District of California

1    In this case, Facebook seeks to recover statutory damages pursuant to 15 U.S.C. §

2  7706(g)(3)(A)(i), which are calculated by multiplying the number of Header violations by up to

3  $100.[8]  The Court has already determined Defendants are liable for violating 15 U.S.C. §

4  7704(a)(1) because they initiated "a minimum of 60,000 instances of spamming."  ECF No. 275 at

5  9.  Facebook thus argues it is entitled to the maximum statutory damages of 100 dollars for each of

6  the 60,627 spam messages Defendants sent to Facebook users.  Facebook Damages/Liability Brief

7  at 2.  In its briefing, Defendants do not appear to contest the fact that they sent 60,627 email

8  messages.  Defendants' Damages/Liability Brief at 2-4.  Facebook argues that the maximum is

9  warranted because Defendants committed "egregious" actions by "designing their spamming

10  campaign to ensure that it would continue notwithstanding any actions Facebook took to stop it"

11  and "us[ing] cash payments to induce third parties to send deceptive electronic messages."  *Id.* at 2-

12  3.  Indeed, Defendants undisputedly utilized the incentive of monetary payments as a means to

13  access Facebook users' accounts.  FAC ¶¶ 66-70; Answer ¶¶ 66-70 (noting how Power's "Launch

14  Promotion" offered site users 100 dollars if they successfully invited and signed up the most new

15  Power.com users").  Defendants also undisputedly designed a system that would circumvent

16  Facebook's blocking efforts.  ECF No. 232-2 at 5-6 (Power Venture's Response to Interrogatories

17  answering that they "develop[ed] the technology to allow Power or Power users to continue to

18  access the Facebook website following Facebook's IP blocking").[9]  Facebook also asks the Court

19  _____

20  [8]  Under the CAN-SPAM Act, each message is considered a separate violation.  15 U.S.C.
§ 7706(g)(3)(i).

21  [9]  Facebook also argues that Defendants' actions were "egregious" because they "destroyed
evidence necessary to establish exactly how many messages, above the 60,627, they initiated."
22  Facebook Damages/Liability Brief at 2-3.  There is some evidence that Defendants did in fact
delete evidence relevant to this lawsuit.  Facebook's source code expert testified that a database
23  called "Power_Logger" was one of two databases that should have recorded information about how
many emails were sent to Facebook users throughout the Power 100 campaign.  ECF No. 217 at ¶
24  31-34.  Defendants admitted that they deleted the Power_Logger database in April 2011.  ECF No.
299-15 at 4-5 (Vachani admitting he made the decision to delete the database).  *See also* ECF No.
25  220 at 12 (engineer's declaration in support of Facebook's opposition to Defendants' motion for
summary judgment noting that "by deleting the Power_Logger database, Defendants effectively
26  erased arguably the most relevant and useful information concerning the number of electronic mail
messages that Defendants initiated through execution of their PowerScript software associated with
27  the 100x100x100 campaign."); ECF No. 299-36 at 3 (Email from Defendants' counsel answering

28  23

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1   to treble the damages, contending that Defendants willfully and knowingly sent the deceptive spam

2   messages to Facebook users. *Id.* at 8-9.[10]  The record supports Facebook's contention that

3   Defendants acted knowingly and willfully, *see e.g.* ECF No. 232-2 at 5-6 (Power's Response to

4   Interrogatories answering that Vachani was "responsible for developing the technology to allow

5   Power or Power users to continue to access the Facebook website following Facebook's IP

6   blocking" and for "creating the email messages sent to Facebook users asking Facebook users to

7   use the Power website to access the Facebook website").

8          In light of this evidence, the Court finds that a statutory damages award is warranted in this

9   case.  While Defendants argue that the Court should not award any damages under the CAN-

10  SPAM Act because Facebook did not suffer "any specific harm" as a result of the email messages,

11  citing *Gordon v. Virtumundo Inc.*, 575 F.3d 1040 (9th Cir. 2009), *see* Defendants'

12  Damages/Liability Brief at 1-2, this argument fails for two reasons.  First, this Court has already

13  determined that under *Gordon*, Facebook has shown that it was "adversely affected" by

14  Defendants' actions within the meaning of the CAN-SPAM Act.  ECF No. 275 at 8-9.  Second,

15  *Gordon* is inapposite here because it deals with whether a plaintiff has standing to bring a claim

16  under the CAN-SPAM Act as opposed to whether the plaintiff deserves damages once liability

17  under the Act has been determined, as in this case.[11]  Nonetheless, exercising its broad discretion to

18  determine an appropriate damages award, the Court finds that the $18,000,000 award requested by

19  Facebook is unnecessary to address the deterrent and punitive purposes of a statutory damages

20  award.  Without deciding whether the requested $18,000,000 award would violate Defendants' due

21

22  ───────────────────────────────
    Plaintiff's counsel's request to identify the "missing databases related to the number of Launch

23  Promotion messages that were sent to Facebook users" and stating that the Power_Logger
    database, which logs the activities on Power Venture's servers, has "missing tables" because

24  Defendant chose not to back up those large files after it ceased operations and closed its server).
    [10]  A court may treble damages under the CAN-SPAM Act where (1) the court determines that the

25  defendant committed the violation willfully and knowingly; or (2) the defendant's unlawful activity
    included one or more of the aggravated violations in §7704(b).  15 U.S.C. § 7706(f)(3)(C).

26  [11] Defendant Vachani's own arguments against damages, namely that a damages decision could
    deter innovation and that "creating CAN-SPAM liability . . . would be unprecedented," are

27  similarly unavailing.  Vachani Damages/Liability Brief at 12-13.  This Court has already found that
    he is liable, *see supra*, Part IV, and more importantly, damages, not liability, are at issue here.

28                                          24
    Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF                                                                              1-ER-85

1  process rights, the Court declines to award that amount and finds it sufficient to award $50 per

2  email communication that was sent.  This decision is consistent with other cases where courts have

3  declined to award the maximum statutory damages of $100 per violation, instead granting awards

4  of either $50 or $25 per violation of the CAN-SPAM Act.  *See Fisher*, 2011 WL 250395 (awarding

5  plaintiffs $50 per violation of the CAN-SPAM Act); *Wallace*, 2009 WL 3617789 at *2 (same);

6  *Tagged, Inc. v. Does 1 through 10*, No. C 09–01713, 2010 WL 370331 (N.D. Cal. Jan. 25. 2010)

7  (awarding plaintiffs only $25 for each of 6,079 spam emails in violation of CAN-SPAM Act in

8  case where, unlike the instant case, *see supra* n.9, there was no evidence Defendants had actively

9  deleted relevant database information to conceal the number of spam messages sent).  Thus,

10  Facebook will be granted $50 per email communication that was sent.  It will be awarded

11  $ 3,031,350 ($50 for each of the estimated 60,627 spam messages sent) in CAN–SPAM damages.

12      The Court also finds trebling unnecessary given the large size of the primary award amount.

13  This finding is consistent with past cases where, despite defendants' willful and knowing violation

14  of the statutes in question, courts refused to treble damages.  *See Fisher*, 2011 WL 250395 (holding

15  that although defendants willfully and knowingly violated the statutes by engaging in the

16  circumvention of Facebook's security measures, the requested maximum statutory award was

17  disproportionate to the gravity of defendants' acts, and thus the court awarded plaintiffs $50 per

18  violation and declined to treble damages); *Wallace*, 2009 WL 3617789 at *2 (holding that although

19  defendant "willfully violated the statutes in question with blatant disregard for the rights of

20  Facebook and the thousands of Facebook users whose accounts were compromised by his

21  conduct," and even violated a temporary restraining order and preliminary injunction, the requested

22  maximum statutory award was not merited and the court awarded plaintiffs $50 per violation and

23  declined to treble damages); *Tagged*, 2010 WL 370331 (awarding $25 for each of 6,079 spam

24  emails for a total amount of $151,975 and declining to treble damages because although

25  defendant's violations were allegedly intentional and willful, a $2,000,000 award was not

26

27

28

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1-ER-86

*United States District Court*
For the Northern District of California

justified).[12]  Ultimately, a statutory damages award of $3,031,350 along with a permanent

injunction which this Court grants, *see infra* Part VI, will adequately serve the purpose of

punishment and deterrence in this case.

**B.    Facebook is entitled to compensatory damages under the CFAA**

Under the CFAA, "[a]ny person who suffers damage or loss by reason of a violation of this

section may maintain a civil action against the violator to obtain *compensatory* damages and

injunctive relief or other equitable relief." 18 U.S.C. § 1030(g) (emphasis added).  This Court

previously held that Facebook suffered "loss" as a result of Defendants' violation of CFAA.  ECF

No. 275 at 18.  Facebook is thus entitled to recover compensatory damages under the statute.

Facebook has established through undisputed testimony[13] that it expended          to investigate

Defendants' actions and for outside legal services in connection with the Defendants' actions.

Accordingly, this Court grants Facebook compensatory damages in the amount of $       .

Defendants' arguments against a grant of compensatory damages are unavailing.  Defendants argue

that Facebook "makes no effort to quantify any real harm it suffered" or "identify anything that

Power misappropriated from Facebook's network."  Defendants' Damages/Liability Brief at 3.

Again, these arguments are irrelevant as they address issues on the merits that have already been

---

[12] Facebook cites two default judgment orders in support of its request for $18,000,000.  Facebook Damages/Liability Brief at 2-3.  In *Facebook v. Guerbuez*, No. C 08–03889 (N.D. Cal. Nov. 21, 2008), Facebook was awarded $873 million against a defendant who sent four million spam emails to other Facebook users.  In *Myspace v. Wallace*, 2008 U.S. Dist. LEXIS 75752 (C.D. Cal. May 28, 2008), Myspace was awarded $223 million against a defendant who had sent nearly 400,000 messages and posted 890,000 comments from 320,000 Myspace.com user accounts which were "hijacked."  Here, in contrast, Defendants sent an estimated 60,627 individual emails.  Accordingly, the Court concludes that it is just to award $3,031,350.  Further, even if, as Facebook asserts, there are "tens of thousands of additional messages that Defendants littered through Facebook that cannot be accounted for in the damages calculation" due to Defendants' alleged destruction of the relevant database information, *see* Facebook Damages/Liability Brief at 6, the Court finds that a $3,031,350 award is sufficient, as courts in this district have granted awards proportionate to this award for similar violations.  *See Tagged*, 2010 WL 370331 (awarding plaintiff $151,975 for 6,079 emails that violated the CAN-SPAM Act where defendants' actions were intentional and willful and where defendant circumvented plaintiff's security measures like in this case).
[13] This Court previously recognized that "Defendants do not dispute the accuracy or veracity of [the] evidence of [Facebook's] expenditures."  ECF No. 275 at 8.  Indeed, Defendants never filed a rebuttal brief to Facebook's expert report regarding the monetary damages Facebook incurred. ECF No. 299-26 (Expert Report of Richard Ostiller).

26

1    decided; this Court previously found that Facebook *did* incur a "loss" under CFAA, and that Power

2    Ventures *did* obtain information from Facebook without permission.  ECF No. 275 at 18.[14]

3    ## VI.   PERMANENT INJUNCTIVE RELIEF

4            Facebook moves for permanent injunctive relief to prevent future statutory violations by

5    Defendants Vachani and Power Ventures.  The CAN–SPAM Act authorizes the Court to grant a

6    permanent injunction "to enjoin further violation by the defendant."  15 U.S.C. § 7706(g)(1)(A).

7    Likewise, the CFAA provides that "[a]ny person who suffers damage or loss by reason of a

8    violation of [§1030] may maintain a civil action against the violator to obtain compensatory

9    damages and injunctive relief or other equitable relief."  18 U.S.C.A. § 1030(g).  California Penal

10   Code § 502 also allows a plaintiff to obtain injunctive relief.  California Penal Code § 502(e)(1).

11           A party seeking a permanent injunction must make a four-part showing: (1) that it has

12   suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

13   inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

14   plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not

15   be disserved by a permanent injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388,

16   390 (2006).[15]  The Court has discretion to grant or deny permanent injunctive relief.  *Id.* at 391.

---

[14] As the Court decides to grant Facebook compensatory damages under CFAA, the Court need not and does not analyze Facebook's alternative argument that Facebook deserves compensatory damages under California Penal Code Section 502(e)(1).  Facebook's Damages/Liability Brief at 9.
[15] Defendants cite Ninth Circuit law holding that when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief, future violations are presumed once a statutory violation is shown and the standard requirements for equitable relief need not be satisfied before an injunction is granted.  Facebook Inj. Brief at 6 (citing *Silver Sage Partners, LTD v. City of Desert Hot Springs*, 251 F.3d 814, 826-27 (9th Cir. 2001) (Fair Housing Act context).  The Court notes that although some courts have granted statutory injunctions in similar contexts without analyzing the traditional four factor test, *see Tagged*, 2010 WL 370331(CFAA and California Penal Code §502); *Fisher*, 2011 WL 250395 (CAN-SPAM Act and CFAA context), this Court declines to do so in light of Supreme Court authority reemphasizing the traditional four factor test.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-93 (2006) ("According to well established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief" and noting that the Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.")

27

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF                                                                                    1-ER-88

17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

1     The Court will consider each of these factors in turn, and will then consider whether, on balance,

2     the principles of equity support the issuance of a permanent injunction in this case.[16]

3     **A.     Irreparable Harm**

4          Facebook has shown irreparable injury as a result of Defendants' violations of the law.

5     Judge Ware's previous order granting Facebook summary judgment cited undisputed evidence that

6     Defendants created a software program to access Facebook's website, scraped user information

7     from Facebook, repeatedly changed Power Venture's IP address in order to circumvent technical

8     barriers Facebook had installed, and used that information to cause Facebook's servers to send

9     spam emails to Facebook users with "@facebookmail.com" mailing addresses.  ECF No. 275 at 9-

10    13.  These activities constituted irreparable harm by harming Facebook's goodwill with its users

11    because Facebook users receiving these emails are likely to associate the spam messages with

12    Facebook.  ECF No. 213 at ¶¶ 4-5.  *Hotmail Corp. v. Van$ Money Pie Inc.*, 1998 U.S. Dist. LEXIS

13    10729, at *20-21 (N.D. Cal. Apr. 16, 1998) (holding that customer confusion from source of spam

14    emails, which can lead to loss of goodwill, constituted irreparable harm to plaintiff); *Meineke Car*

15    *Care Centers, Inc. v. Quinones*, 2006 WL 1549708, *3 (W.D.N.C. 2006) (finding, in preliminary

16    injunction context, that possible loss in customers resulting from defendants' deceptive suggestion

17    that they were associated with plaintiff constituted irreparable harm).  While Defendants argue that

18    Facebook has not produced evidence that its reputation or goodwill with its users has been

19    damaged as a result of Defendants' activities, *see* Defendants' Inj. Opp. at 5, 9, Defendants cite no

20    case law suggesting that such specific and direct evidence is needed to prove harm to goodwill.

21    *C.f. Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F.Supp.2d 1037, 1050 (N.D. Cal. 2004)

22    (emphasis added) ("Damage to a business' goodwill is typically an irreparable injury because it is

---

[16] Facebook objects to Vachani's declaration submitted in support of Defendants' Opposition to
Injunctive Relief on the grounds that Vachani lacks personal knowledge for his various
conclusions, including whether Facebook received any complaints about Defendants' conduct, and
because he is not competent to testify regarding the various legal conclusions he makes, such as
claiming "Power did not obtain [anything] . . . of value from Facebook."  ECF No. 357-1;
Facebook Injunction Brief at 2.  For purposes of this Order only, the Court finds that Vachani's
lack of qualifications and personal knowledge affect the weight his testimony should be accorded
and not its admissibility.  Thus, Facebook's objection is OVERRULED.

28

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   *difficult to calculate*”); *see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 17 (1st

2   Cir. 2004) (rejecting argument that “only *direct* evidence (with no room for inference) may

3   establish harm to goodwill” in the trademark law context).[17]  As Facebook has shown irreparable

4   harm, this factor weighs in favor of a permanent injunction.

5   **B.      Inadequacy of Money Damages**

6          Facebook has established that “remedies available at law, such as monetary damages, are

7   inadequate to compensate for [its] injury,” *eBay*, 547 U.S. at 391, for three reasons.  First, money

8   damages will not ensure that Defendants will not take steps again in the future to spam Facebook

9   users, which is a possibility.  Defendants may still possess the software that enabled their illegal

10  activities, and like in other cases in this district, Defendants also “deliberately implemented other

11  tactics to circumvent plaintiff’s security measures.”  *Tagged*, 2010 WL 370331, at *12.

12  Defendants may even still possess Facebook-user data which they misappropriated.  Because there

13  is a “reasonable likelihood of defendant’s future violations,” injunctive relief is warranted.  *Id;*

14  *Pyro Spectaculars North Inc. v. Souza*, 861 F.Supp.2d 1079, 1092 (E.D. Cal. March 21, 2012)

15  (granting injunction in part because defendant still possessed plaintiff’s data).  Second, money

16  damages will not compensate for the loss of goodwill Facebook may have suffered due to any

17  confusion created by Defendants’ emails.  *See Hotmail*, 1998 U.S. Dist. at *21 (holding that loss of

18  goodwill caused by confusion generated by misleading spam emails “is not easily quantified and

19  not adequately compensated with money damages.”).  Last, the Ninth Circuit has held that a district

20  court has authority to issue an injunction “where the plaintiffs can establish that money damages

21  will be an inadequate remedy due to impending insolvency of the defendant . . .”  *In re Estate of*

22  *Marcos*, 25 F.3d 1467 (9th Cir. 1994).  Here, Defendants’ voluntary petitions for bankruptcy, *see*

23

---

[17]  Defendants also argue Facebook has not shown irreparable harm because Facebook has failed to

24  submit proof of user complaints about the spam messages.  Defendants’ Inj. Opp. at 9.  However,
    Facebook has provided evidence that in general, deceptive spam messages detract from Facebook

25  user experiences and have been the source of complaints by Facebook users.  ECF 218-8 at ¶ 5
    (Declaration of Ryan McGeehan in support of Facebook’s Motion for Partial Summary Judgment

26  noting that “spam messages detract from the overall Facebook experience and are sometimes a
    source of complaints by Facebook users.

27

28                                                 29

1    ECF No. 323, 324, suggest they may be unable to satisfy a damages award and that non-monetary

2    relief may be necessary.

3          In rebuttal, Defendants argue they never misappropriated Facebook user data.  Defendants'

4    Inj. Opp. at 8.[18]  Defendants emphasize that one of their "primary" objections to injunctive relief is

5    that "Defendants are not in possession of any Facebook data or any user data that was not expressly

6    granted to Power by the users themselves."  *Id.* at 3.  This argument is irrelevant to the issue at

7    hand because the Court has already ruled that Defendants did misappropriate data without

8    Facebook's permission.  ECF No. 275 at 14-18.  Defendants also argue that the Court should not

9    consider the fact that they may still possess the software that enabled the alleged violations because

10   Power Ventures ceased operations in 2011.  Defendants' Inj. Opp. at 8.  But this argument ignores

11   the fact that Defendants could easily start another company or give the data to other entities that

12   wish to engage in the illegal spamming conduct.[19]  Overall, as money damages will likely be

13   inadequate, this factor weighs in favor of a permanent injunction.

14   **C.    Balance of Hardships**

15         The balance of hardships analysis also weighs in favor of granting Facebook a permanent

16   injunction.  Defendants have been found liable for violating various laws, *see* ECF No. 275, and

17   while an injunction would simply serve to force their compliance with the law, *see Myspace v.*

18   *Wallace*, 498 F.Supp.2d 1293, 1306 (C.D. Cal. July 3, 2007) (holding defendant would experience

19   no hardship if enjoined from committing further violations of the CAN-SPAM Act), Facebook may

20   suffer harm if an injunction is not issued.  As this Court previously concluded in its summary

21   judgment order, Facebook has already suffered harm, as it incurred expenditures to both block

22   Defendants' continued access to Facebook and to respond to the spamming emails.  ECF No. 275

23

24   ───────────────
     [18] *See also* Defendants' Inj. Opp. at 5 ("Facebook is unable to identify anything that Power
25   misappropriated from Facebook's network, as Power did not take anything that belonged to
     Facebook.")
26   [19] Defendants also argue that "damages were avoidable" because Defendants allegedly cooperated
     with Facebook through the litigation.  Defendants' Inj. Opp. at 3, 10.  This argument is irrelevant;
27   the issue is not whether damages were "avoidable" but whether damages are sufficient to
     compensate Facebook for its injury.
28                                                    30
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF                                                                              1-ER-91

1    at 7-10.  Absent an injunction Facebook may have to deal with future violations of the law.

2    *Tagged*, 2010 WL 370331, at *12 (granting a preliminary injunction against a defendant who

3    violated CFAA and California Penal Code § 502 in part because defendant might engage in future

4    violations).  Indeed, Defendants have demonstrated a willingness to do so, as they did not stop

5    even after requests from Facebook.  ECF No. 299-3 at 8-9 (Vachani admitting that he sent

6    Facebook an email informing Facebook that Power Ventures would continue to try to access

7    Facebook's services despite Facebook's request that the company stop).  On the other hand,

8    Defendants claim that the requested injunction impermissibly threatens Vachani's employability

9    and livelihood.  Defendants' Inj. Opp. at 10-11; Vachani Damages/Liability Brief at 9.  However,

10   Defendants fail to provide a persuasive reason why this is the case, and in any event, given that

11   Vachani brought this risk upon himself by violating the law, the balance would not shift in favor of

12   Defendants even if there were evidence to support this speculative claim.  Accordingly, the balance

13   of hardships weighs in favor of Facebook.

14   **D.     Public Interest**

15        The public interest weighs in favor of an injunction as well, and courts in this district have

16   reached this conclusion in analogous cases.  *See, e.g.*, *Craigslist, Inc. v. Troopal Strategies, Inc.*,

17   2011 U.S. Dist. LEXIS 15625, at *11 (N.D. Cal. 2011) (holding injunction would be in the public

18   interest where defendant violated CFAA).  Injunctive relief would serve the public interest by

19   preventing Defendants from impermissibly spamming Facebook users again and setting an

20   example to members of the public who may consider violating these various statutes as well.  In

21   passing the CAN–SPAM Act, Congress recognized the burdens which commercial spam poses to

22   the public.  15 U.S.C. § 7701(a)(2) ("The convenience and efficiency of electronic mail are

23   threatened by the extremely rapid growth in the volume of unsolicited commercial electronic

24   mail.").  Namely, the public "is forced to incur the costs of needlessly expended energy and time

25   evaluating and eventually discarding defendants' unsolicited messages[.]"  *F.T.C. v. Phoenix*

26   *Avatar, LLC*, 2004 WL 1746698, *14 (N.D. Ill. July 30, 2004) (enjoining defendants for violations

27   of the CAN–SPAM Act).  Because Defendants' activities fall within those activities Congress

28
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF                                                                          1-ER-92

31

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

1  deemed detrimental to the public, this factor weighs in favor of Facebook.  Defendants' arguments

2  to the contrary are unavailing.  While Defendants claim the injunction will pose "unacceptable

3  risks for innovators" and enhancements in social networking technology, Defendants' Inj. Opp. at

4  11, this argument fails to recognize that the injunction will serve to deter only conduct that violates

5  the law.  The law explicitly provides for injunctive relief.  Thus, to the extent that granting

6  Facebook injunctive relief for Defendants' violations of CFAA and CAN-SPAM may have

7  negative "impacts on innovation, competition, and the general 'openness' of the internet," courts

8  have held that it is up to Congress, not the courts, to decide whether to amend those statutes.

9  *Craigslist Inc. v. 3Taps*, No. CV 12–03816 CRB, 2013 WL 4447520, at *25 (N.D. Cal. Aug. 16,

10  2013) ("[I]t is for Congress to weigh the significance of those consequences and decide whether

11  amendment would be prudent.")

12  **E.     Balance of all four equitable factors**

13      The balance of all four factors weighs strongly in favor of granting an injunction in this

14  case.  Thus, the Court grants Facebook its request for permanent injunctive relief against both

15  Power Ventures and Vachani in his individual capacity.[20]  This decision is in line with past

16  decisions of this Court.  *See Tagged*, 2010 WL 370331, at *12 (granting injunctive relief for

17  violations of CFAA and California Penal Code § 502); *Facebook v. Fisher*, 2011 U.S. Dist. LEXIS

18  9668, at *7-8 (N.D. Cal. Jan. 26. 2011) (granting injunction for violations of CAN-SPAM Act and

19  CFAA); *Microsoft Corp. v. Neoburst Net LLC*, 2004 U.S. Dist. LEXIS 18733, at *2-4 (N.D. Cal.

20

21  [20]  While Defendants claim Facebook provides "no basis for enjoining the individual defendant
from any action given that Vachani never acted independently or otherwise in a personal or
22  individual capacity while employed by Power during the period of Facebook's grievances,"
Defendants' Inj. Opp. at 6, this argument fails for two reasons.  First, as this Court finds that
23  Vachani is personally liable, he may be enjoined in his individual capacity.  *FTC v. Sili
Neutraceuticals LLC*, 2008 U.S. Dist. LEXIS 105683 (N.D. Ill. Jan. 23, 2008).  Second, even
24  assuming this Court found Vachani was *not* personally liable, Defendants' argument ignores Ninth
Circuit law holding that Federal Rule of Procedure 65 "establishes that an injunction may bind not
25  only parties to the action but also 'their officers, agents, servants, employees, and attorneys, and
[upon] those persons in active concert or participation with them.'" *Comedy Club Inc. v. Improv
26  West Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (citing FED. R. CIV. P. 65(d)).  Here, Vachani
27  may be enjoined under FRCP 65 as an officer of Power Venture.

28  Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

2004) (granting injunctive relief for violations of CAN-SPAM Act, CFAA, and California Penal Code § 502).[21]  Facebook is hereby entitled to a permanent injunction against Power Ventures and Vachani as follows:

1. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-interest, and those in active concert or participation with them, are permanently enjoined from:

A. Sending, or assisting others in the sending of, or procuring the sending of unauthorized or unsolicited commercial electronic text messages to users of the Facebook website, www.facebook.com, or via the Facebook website or service.

B. Making, or assisting others in making, any false or misleading oral or written statement or representation of material fact when advertising, promoting or selling any good or service, including, but not limited to any false or misleading statement or representation that Defendants, their representatives, or any other person is affiliated or associated with, under contract with, acting in partnership with, endorsed or approved by, or otherwise connected to Facebook or to a service offered by Facebook.

C. Accessing or using, or directing, aiding, facilitating, causing, or conspiring with others to use or access the Facebook website or servers for any purpose, without Facebook's prior permission.

D. Using any data, including without limitation Facebook-user data and data regarding Facebook's website or computer networks, obtained as a result of the unlawful conduct alleged in the operative complaint in this action.

E. Developing, using, selling, offering for sale, or distributing, or directing, aiding, or conspiring with others to develop, sell, offer for sale, or distribute, any software that allows the user to engage in the unlawful conduct alleged in the operative complaint in this action.

2. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-

---

[21] Defendants' brief fails to distinguish or otherwise discuss these relevant authorities.

33

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

1-ER-94

United States District Court
For the Northern District of California

interest, and those in active concert or participation with them shall destroy any software, script(s) or code designed to access or interact with the Facebook website, Facebook users, or the Facebook service.  They shall also destroy Facebook data and/or information obtained from Facebook or Facebook's users, or anything derived from such data and/or information.

3. Within three calendar days of entry of this permanent injunction and order, Defendants shall notify their current and former officers, agents, servants, employees, successors, and assigns, and any persons acting in concert or participation with them of this permanent injunction.

4. Within seven calendar days of entry of this injunction and order, Defendants shall certify in writing, under penalty of perjury, that they have complied with the provision of this order.

5. The Court shall continue to retain jurisdiction over the parties for the purpose of enforcing this injunction and order.

## VII.    CONCLUSION

The Court finds Defendants have failed to set forth grounds pursuant to Civil L.R. 7-9(b) for leave to file a motion for reconsideration of Judge Ware's February 16 order.  Thus, the request for leave is DENIED.  The Court finds Vachani personally liable as a matter of law for violations of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and California Penal Code § 502.  The Court further finds Facebook is entitled to statutory damages in the amount of $3,031,350, compensatory damages in the amount of $         , and permanent injunctive relief as described above.  The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: September 25, 2013

_____
LUCY H. KOH
United States District Judge

*United States District Court*
*For the Northern District of California*

34

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

1-ER-95

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

FACEBOOK, INC.,                                    )    Case No.: 5:08-CV-05780-LHK
                                                   )
12                        Plaintiff,               )
                                                   )
        v.                                         )
13                                                 )    MINUTE AND CASE MANAGEMENT
   POWER VENTURES, INC., a Cayman Island           )    ORDER
14 corporation, and STEVE VACHANI, an              )
   individual,                                     )
15                                                 )
                         Defendants.               )
16 _____)

17 Clerk:  Martha Parker Brown          Plaintiff's Attorney:      Neel Chatterjee and Monte Cooper
   Reporter:  Lee-Anne Shortridge       Defendants' Attorneys:     Amy Anderson for Power Ventures
18 Length of hearing: 31 minutes                                   Steven Vachani, pro per

19        An initial Case Management Conference was held on May 1, 2013.  A further CMC will be
   held on September 26, 2013.
20

21        The parties shall file a motion before Magistrate Judge Joseph C. Spero to enforce Judge
   Spero's 2012 Order that Defendant shall pay reasonable costs, including attorneys' fees, for a
22 renewed 30(b)(6) deposition.

23        For the reasons stated on the record, the Court GRANTED Defendant Power Venture's
   motion to set aside default, ECF No. 321.  For the reasons stated on the record, the Court DENIED
24 Plaintiff's motion for default judgment, ECF No. 322.

25        The Court DENIED as moot Defendant Steven Vachani's motion for clarification regarding
   the status of Vachani's liability, ECF No. 332.  The Court clarified that Judge Ware's Order
26 Granting Plaintiff's Motions for Summary Judgment; Denying Defendants' Motion for Summary
   Judgment, filed on February 16, 2012, ECF No. 275, did not decide Defendant Vachani's liability
27 or damages, and no subsequent decision has decided these issues.

28        The Court set the briefing schedule on Plaintiff's motion for injunctive relief and damages
   as follows: motion to be filed on August 1, 2013; opposition to be filed on August 15, 2013; and
   reply to be filed on August 22, 2013.

Case No.: 5:08-CV-05780-LHK
MINUTE AND CASE MANAGEMENT ORDER                                           1-ER-96

1       The hearing on Defendant Vachani's liability, damages, injunctive relief and attorney's fees will be held on September 26, 2013, at 1:30 p.m.

2

3   **IT IS SO ORDERED.**

4

  Dated: May 2, 2013

5                      LUCY H. KOH

6                      United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

Case No.: 5:08-CV-05780-LHK
MINUTE AND CASE MANAGEMENT ORDER

1-ER-97

1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7          SAN FRANCISCO DIVISION

8   Facebook, Inc.,                          NO. C 08-05780 JW

9                    Plaintiff,              **ORDER GRANTING PLAINTIFF'S**
                                             **MOTIONS FOR SUMMARY JUDGMENT;**
10        v.                                 **DENYING DEFENDANTS' MOTION FOR**
                                             **SUMMARY JUDGMENT**
    Power Ventures, Inc., et al.,
11
12                   Defendants.
                                        /

13                          **I.  INTRODUCTION**

14        Facebook, Inc. ("Plaintiff") brings this action against Defendants[1] alleging violations of the

15   Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM Act"), 15

16   U.S.C. §§ 7701 *et seq.*, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and

17   California Penal Code § 502.  Plaintiff alleges that Defendants accessed its website in an

18   unauthorized manner, and then utilized this unauthorized access to send unsolicited and misleading

19   commercial e-mails to Facebook users.

20        Presently before the Court are Plaintiff's Motions for Summary Judgment on Counts One,[2]

21   Two and Three,[3] and Defendants' Motion for Summary Judgment on all counts.[4]  The Court

22   _____

23        [1] Defendants are Power Ventures, Inc. ("Power") and Steven Vachani ("Vachani").

24        [2] (Facebook, Inc.'s Corrected Notice of Motion and Motion for Partial Summary Judgment
     on Count 1; Memorandum of Points and Authorities in Support Thereof, hereafter, "CAN-SPAM
25   MSJ," Docket Item No. 215.)

26        [3] (Notice of Motion, Motion and Memorandum of Points and Authorities for Partial
     Summary Judgment under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18
27   U.S.C. § 1030, hereafter, "Fraud MSJ," Docket Item No. 214.)

28        [4] (Notice of Motion, Motion, and Memorandum of Law in Support of Defendants' Motion
     for Summary Judgment, hereafter, "Defendants' MSJ," Docket Item No. 98.)

*United States District Court*
For the Northern District of California

conducted a hearing on January 23, 2012.  Based on the papers submitted to date and oral argument,

the Court GRANTS Plaintiff's Motions for Summary Judgment on all counts, and DENIES

Defendants' Motion for Summary Judgment.

## II.  BACKGROUND

### A.   Undisputed Facts

Plaintiff owns and operates the widely popular social networking website located at

http://www.facebook.com.[5]  Defendant Power is a corporation incorporated in the Cayman Islands

doing business in the State of California.[6]  Defendants operate a website, www.power.com, which

offers to integrate multiple social networking accounts into a single experience on Power.com.

(FAC ¶ 5; Answer ¶ 5.)  Defendant Vachani is the CEO of Power.  (Id. ¶ 11; Id. ¶ 11.)

Users of Plaintiff's website register with a unique username and password.  (FAC ¶ 21;

Answer ¶ 21.)  Before Plaintiff activates a username and permits a user to access certain features of

Facebook, the user must agree to Plaintiff's Terms of Use.  (Id. ¶ 29; Id. ¶ 29.)  The Terms of Use

require users to refrain from using automated scripts to collect information from or otherwise

interact with Facebook, impersonating any person or entity, or using Facebook website for

commercial use without the express permission of Facebook.  (Id. ¶ 30; Id. ¶ 30.)

On or before December 1, 2008, Power began advertising and offering integration with

Plaintiff's site.  (FAC ¶ 49; Answer ¶ 49.)  Power permitted users to enter their Facebook account

information and access Facebook site through Power.com.  (Id. ¶ 50; Id. ¶ 50.)  At no time did

Defendants receive permission from Plaintiff to represent that solicitation of Facebook usernames

and passwords was authorized or endorsed by Plaintiff.  (Id. ¶ 53; Id. ¶ 53.)

On or before December 26, 2008, Power began a "Launch Promotion" that promised

Power.com's users the chance to win one hundred dollars if they successfully invited and signed up

---

[5]  (First Amended Complaint ¶ 20, hereafter, "FAC," Docket Item No. 9; Amended Answer and Counterclaims of Defendants Power Ventures, Inc. and Steve Vachani ¶ 20, hereafter, "Answer," Docket Item No. 54.)

[6]  (FAC ¶ 10; Answer ¶ 10.)

United States District Court
For the Northern District of California

2

1   new Power.com users.  (FAC ¶ 65; Answer ¶ 65.)  As part of this promotion, Power provided

2   participants with a list of their Facebook friends, obtained by Power from Facebook, and asked the

3   participant to select which of those friends should receive a Power invitation.  (Id. ¶ 66; Id. ¶ 66.)

4   The invitations sent to those friends purport to come from "Facebook" and used an

5   "@facebookmail.com" address, not a Power.com address.  (Id. ¶ 68; Id. ¶ 68.)

6         On December 1, 2008, Plaintiff notified Defendant Vachani of its belief that Power's access

7   of Plaintiff's website and servers was unauthorized and violated Plaintiff's rights.  (FAC ¶ 57;

8   Answer ¶ 57.)  Facebook subsequently implemented technical measures to block users from

9   accessing Facebook through Power.com.  (Id. ¶ 63; Id. ¶ 63.)

10  **B.    Procedural History**

11        On December 30, 2008, Plaintiff filed its initial Complaint.  (See Docket Item No. 1.)  On

12  January 13, 2009, Plaintiff filed the First Amended Complaint naming both Power Ventures and

13  Vachani as Defendants.  (See FAC at 1.)  On March 23, 2009, Defendants moved to dismiss

14  Plaintiff's Complaint or, in the alternative, for a more definite statement.  (See Docket Item No. 17.)

15  On May 11, 2009, the Court denied Defendants' Motion to Dismiss as to all claims.  (See Docket

16  Item No. 38.)  On November 23, 2009, Defendants answered Plaintiff's First Amended Complaint

17  and asserted counterclaims under the Sherman Antitrust Act and California's Unfair Competition

18  Law.  (See Answer ¶¶ 167-185.)

19        On December 23, 2009, Plaintiff filed a Motion for Judgment on the Pleadings or, in the

20  Alternative, Partial Summary Judgment of Liability Under California Penal Code Section 502(c).

21  (See Docket Item No. 56.)  The same day, Plaintiff also filed a Motion to Dismiss Defendants'

22  Counterclaims and Strike Defendants' Affirmative Defenses.  (See Docket Item No. 58.)  On

23  January 15, 2010, Defendants filed a Cross-Motion for Summary Judgment.  (See Docket Item No.

24  62.)  On February 26, 2010, Judge Fogel recused himself from the case.  (See Docket Item No. 72.)

25  On March 2, 2010, the case was reassigned to Judge Ware.  (See Docket Item No. 73.)  On July 20,

26  2010, the Court denied Plaintiff's Motion for Judgment on the Pleadings or Summary Judgment,

27

28

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1   denied Plaintiff's Motion to Strike Defendants' Affirmative Defenses, denied Defendants' Motion

2   for Summary Judgment and granted Plaintiff's Motion to Dismiss Defendants' Counterclaims.[7]

3   　　　　Presently before the Court are the parties' Motions for Summary Judgment.

4   　　　　　　　　　　　　　**III.  STANDARDS**

5   　　　　Summary judgment is proper when the moving party shows that there is no genuine dispute

6   as to any material fact.  Fed. R. Civ. P. 56(a).  The purpose of summary judgment "is to isolate and

7   dispose of factually unsupported claims or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-24

8   (1986).  The moving party "always bears the initial responsibility of informing the district court of

9   the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a

10  genuine issue of material fact."  Id. at 323.  If the moving party meets its initial burden, the "burden

11  then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue

12  for trial."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006) (citing Celotex, 477

13  U.S. at 324).

14  　　　　When evaluating a motion for summary judgment, the court views the evidence through the

15  prism of the evidentiary standard of proof that would pertain at trial.  Anderson v. Liberty Lobby

16  Inc., 477 U.S. 242, 255 (1986).  The court draws all reasonable inferences in favor of the non-

17  moving party, including questions of credibility and of the weight that particular evidence is

18  accorded.  See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court

19  determines whether the non-moving party's "specific facts," coupled with disputed background or

20  contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

21  　　T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987).   In such a

22  case, summary judgment is inappropriate.  Anderson, 477 U.S. at 248.  However, where a rational

23  trier of fact could not find for the non-moving party based on the record as a whole, there is no

24  "genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

25  

26  　　　　[7] (See Order Denying Facebook's Motion for Judgment on the Pleadings; Denying the
Parties' Cross-Motions for Summary Judgment; Granting Facebook's Motion to Dismiss

27  Defendants' Counterclaims; Denying Facebook's Motion to Strike Defendants' Affirmative
Defenses, hereafter, "July 20 Order," Docket Item No. 89.)

28  　　　　　　　　　　　　　　　4

1    Although the district court has discretion to consider materials in the court file not referenced

2    in the opposing papers, it need not do so.  See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d

3    1026, 1028-29 (9th Cir. 2001).  "The district court need not examine the entire file for evidence

4    establishing a genuine issue of fact." Id. at 1031.  However, when the parties file cross-motions for

5    summary judgment, the district court must consider all of the evidence submitted in support of both

6    motions to evaluate whether a genuine issue of material fact exists precluding summary judgment

7    for either party.  Fair Housing Council of Riverside Cnty, Inc. v. Riverside Two, 249 F.3d 1132,

8    1135 (9th Cir. 2001).

9    **IV.  DISCUSSION**

10    Plaintiff moves for summary judgment on the grounds that: (1) the undisputed evidence

11    establishes that Defendants sent misleading commercial e-mails through Facebook's network in

12    violation of the CAN-SPAM Act;[8] and (2) the undisputed evidence also establishes that Defendants

13    utilized technical measures to access Facebook without authorization, in violation of both the CFAA

14    and California Penal Code Section 502.[9]  Defendants respond that: (1) because Plaintiff's own

15    servers sent the commercial e-mails at issue, Defendants did not initiate the e-mails as a matter of

16    law; and (2) Defendants did not circumvent any technical barriers in order to access Facebook site,

17    precluding liability under the CFAA or Section 502.[10]  Defendants further contend that Plaintiff

18    suffered no damages as a result of Defendants' actions, and thus lacks standing to bring a private suit

19    for Defendants' conduct.  (Id. at 15-16, 19-20.)

20    **A.    The CAN-SPAM Act**

21    At issue is whether the conduct of Defendants, as established by the undisputed evidence,

22    constitutes a violation of the CAN-SPAM Act.

23

24    _____

25    [8]  (CAN-SPAM MSJ at 12-16.)

26    [9]  (Fraud MSJ at 1.)

27    [10]  (Defendants' MSJ at 5, 16-17.)

28    5

United States District Court
For the Northern District of California

1    The CAN-SPAM Act provides that "[i]t is unlawful for any person to initiate the

2 transmission, to a protected computer, of a commercial electronic mail message, or a transactional or

3 relationship message, that contains, or is accompanied by, header information that is materially false

4 or materially misleading." 15 U.S.C. § 7704(a)(1). The Act also creates a private right of action for

5 internet service providers adversely affected by violations of this provision. See id. § 7706(g)(1).

6 To prevail on a CAN-SPAM Act claim, a plaintiff must establish not only that the defendant violated

7 the substantive provisions of the Act, but also that the plaintiff was adversely affected by this

8 violation such that it satisfies the statutory standing requirements. See Gordon v. Virtumundo, Inc.,

9 575 F.3d 1040, 1048 (9th Cir. 2009). The Court considers each requirement in turn.

10    **1.    Standing**

11    At issue is whether Plaintiff has standing to assert a claim under the CAN-SPAM Act.

12    Standing under Section 7706 "involves two general components: (1) whether the plaintiff is

13 an 'Internet access service' provider ('IAS provider'), and (2) whether the plaintiff was 'adversely

14 affected by' statutory violations." Gordon, 575 F.3d at 1049 (citation omitted).

15    Here, Defendants concede that Plaintiff is an IAS provider.[11] Therefore, the only question

16 before the Court in determining Plaintiff's standing is whether Plaintiff was "adversely affected" by

17 the alleged violations at issue.

18    In Gordon, the Ninth Circuit explained that not all possible harms to an IAS provider

19 constitute harm within the meaning of the Act, and distinguished those harms sufficient to confer

20 standing from those outside the scope of Congress' intent. See 575 F.3d at 1049-55. After

21 discussing the congressional decision to confer standing upon IAS providers but not end-consumers

22 affected by commercial e-mails, the court concluded that "[l]ogically, the harms redressable under

23 the CAN-SPAM Act must parallel the limited private right of action and therefore should reflect

24 those types of harms uniquely encountered by IAS providers." Id. at 1053. Thus, while the "mere

25

26

27    [11]  (See Defendants' MSJ at 13.)

28                                6

United States District Court

For the Northern District of California

1   annoyance"[12] of spam encountered by all e-mail users is not sufficient to confer standing, the court

2   identified the costs of investing in new equipment to increase capacity, customer service personnel

3   to address increased subscriber complaints, increased bandwidth, network crashes, and the

4   maintenance of anti-spam and filtering technologies as the "sorts of ISP-type harms" that Congress

5   intended to confer standing. Id. at 1053. Thus, the court noted, "[i]n most cases, evidence of some

6   combination of operational or technical impairments and related financial costs attributable to

7   unwanted commercial e-mail would suffice." Id. at 1054 (citation omitted).

8        Here, in support of its contention that it has standing to pursue a CAN-SPAM Act claim,

9   Plaintiff offers the following evidence:

10      (1)      Around December 1, 2008 Ryan McGeehan, manager of Plaintiff's Security
        Incident Response Team ("SIR Team"), determined that Power was running an
11      automated scripting routine to harvest data and download it to the Power.com
        website.[13] McGeehan then spent substantial time and effort determining what steps
12      were necessary to contain Power's spamming. (Id. ¶ 12.)  It was determined that at
        least 60,627 event invitations were sent to Facebook users due to Power's activities.
13      (Id.) On December 12, 2008, after Plaintiff's counsel sent Power a cease and desist
        letter, and the activity did not stop, Plaintiff attempted to block Power's access by
14      blocking what appeared to be its primary IP address. (Id. ¶ 13.) On December 22,
        2008, McGeehan determined that Power was still accessing Facebook through new IP
15      addresses. (Id. ¶ 14.)  Plaintiff then attempted to block these IP addresses as well.
        (Id. ¶ 13.)  In early 2009, Facebook blacklisted the term Power.com, preventing that
16      term from appearing anywhere on the site. (Id. ¶ 16.)  In implementing these
        measures, McGeehan spent at least three to four days of his own engineering time
17      addressing security issues presented by Power. (Id. ¶ 17.)

18      (2)      On December 1, 2008, Joseph Cutler sent a cease and desist letter to
        Power.com.[14]  After this letter was sent Cutler was contacted by Steve Vachani, who
19      identified himself as the owner and operator of Power Ventures. (Id. ¶ 7.)  In this and
        subsequent discussions, Vachani assured Cutler that the functionality of the Power
20      website would be changed to comply with Facebook's requests. (Id. ¶¶ 9-10.)  On
        December 27, 2008, Cutler received an e-mail saying that Power Ventures would not
21      change its website as earlier stated. (Id. ¶ 13.)  From fall of 2008 through early 2009,

22

23      [12] Id. at 1053-54.

24      [13] (See Declaration of Ryan McGeehan in Support of Facebook's Motion for Partial
25   Summary Judgment on Count 1 Under the CAN-SPAM Act ¶¶ 1, 7, hereafter, "McGeehan Decl.,"
     Docket Item No. 213-4.)

26      [14] (See Declaration of Joseph Cutler in Support of Facebook, Inc.'s Motion for Partial
27   Summary Judgment for Liability Under the CAN-SPAM Act ¶ 6, hereafter, "Cutler Decl.," Docket
     Item No. 213-2.)

28                  7

United States District Court
For the Northern District of California

1    Facebook spent approximately $75,000 on Cutler's firm related to Power Venture's

2    actions.  (Id. ¶ 15.)

3        Defendants do not dispute the accuracy or veracity of this evidence of Plaintiff's

4    expenditures.  Instead, Defendants contend that, as a matter of law, these are not the sorts of harm

5    that give rise to standing under Gordon, as they fall within the category of negligible burdens

6    routinely borne by IAS providers.[15]  In support of this contention, Defendants rely on the following

7    evidence:

8        (1)       In the fourth quarter of 2008, Plaintiff received 71,256 user complaints that
              contained the word "spam."  (McGeehan Decl. ¶ 5.)  Facebook did not produce any
9              evidence of customer complaints specifically referencing the e-mails at issue in this
              case.[16]

10       (2)       Craig Clark, litigation counsel at Facebook, testified that he was not aware of
              any documents that would be responsive to any of the requests for production made
11             by Defendants.[17]  These requests for production included requests for all documents
              regarding any injury that Plaintiff suffered, expenditures Plaintiff made, or user
12             complaints that Plaintiff received as a result of the events complained of in Plaintiff's
              First Amended Complaint.[18]

13       Upon review, on the basis of these undisputed facts, the Court finds that Plaintiff has

14   demonstrated an "adverse effect" from Defendants' conduct sufficient to confer standing.  The

15   evidence submitted by Plaintiff is not limited to documenting a general response to spam prevention,

16

17

18       [15] (Defendants' Memorandum of Points and Authorities in Opposition to Facebook's Motion
     for Partial Summary Judgment on Count 1 (CAN-SPAM Act, 15 U.S.C. § 7704) at 14-15, hereafter,
19   "CAN-SPAM Opp'n," Docket Item No. 234.)

20       [16] (See Declaration of L. Timothy Fisher in Support of Defendants' Motion for Summary
     Judgment ¶ 4, hereafter, "Fisher Decl.," Docket Item No. 106; see also Fisher Decl., Ex. B,
21   Facebook, Inc.'s Objections and Response to Defendants' Requests for Production, Set One, Docket
     Item No. 106.)

22

23       [17] (Fisher Decl., Ex. C, Deposition of Craig Clark at 118:20-118:23, hereafter, "Clark
     Depo.," Docket Item No. 106.)  Plaintiff objects to Defendants' reliance on Mr. Clark's testimony
24   because Mr. Clark was deposed in his personal capacity, rather than pursuant to Fed. R. Civ. P.
     30(b)(6), and thus Plaintiff contends that Mr. Clark's answers to the questions presented to him are
25   irrelevant because he does not speak on behalf of Facebook.  (See Docket Item No. 240 at 17-23.)
     For the purposes of this Order only, Plaintiff's objection to the Clark deposition is OVERRULED
26   because harm to Plaintiff is established irregardless of Mr. Clark's testimony.

27       [18] (Fisher Decl., Ex. A, Defendants' First Requests for Production Pursuant to Fed. R. Civ.
     P. 34, Docket Item No. 106.)

28                                            8

1    but rather shows acts taken and expenditures made in response to Defendants' specific acts.[19]   These

2    specific responses to Defendants' actions distinguish Plaintiff's damages from those in the cases

3    relied upon by Defendants, which asserted only the costs of general spam prevention as the basis for

4    standing.[20]   In particular, since Plaintiff documented a minimum of 60,000 instances of spamming by

5    Defendants, the costs of responding to such a volume of spamming cannot be categorized as

6    "negligible."  See Gordon, 575 F.3d at 1055-56.  The Court finds that under Gordon and Azoogle,

7    though the general costs of spam prevention may not confer standing under the CAN-SPAM Act,

8    documented expenditures related to blocking a specific offender may.  This is particularly true

9    where, as here, Defendants' spamming activity was ongoing, prolific, and did not stop after requests

10   from the network owner.  Thus, as the undisputed evidence establishes that Plaintiff expended

11   significant resources to block Defendants' specific spamming activity, the Court finds that Plaintiff

12   has standing to maintain a CAN-SPAM action.

13           **2.       Merits of CAN-SPAM Act Claim**

14           At issue is whether Defendants' conduct, as established by the undisputed facts, violates the

15   substantive provisions of the CAN-SPAM Act.  The Act makes it unlawful, *inter alia,* "for any

16   person to initiate the transmission, to a protected computer, of a commercial electronic mail

17   message, or a transactional or relationship message, that contains, or is accompanied by, header

18   information that is materially false or materially misleading."  15 U.S.C. § 7704(a)(1).  Defendants

19   contend that Plaintiff's CAN-SPAM Act claim must fail because: (1) the undisputed facts establish

20   that Plaintiff itself, and not Defendants, initiated the e-mails at issue; and (2) because Plaintiff sent

21   the e-mails, the header information identifying Facebook as the sender was accurate and not

22   misleading.[21]   The Court considers each element in turn.

23   _____

24           [19]  (See, e.g., McGeehan Decl. ¶¶ 8-17; see also id., Ex. 4, Electronic Ticket Documenting

25   McGeehan's Attempts to Block Defendant's Access to Facebook, Docket Item No. 213-7.)

26           [20]  (See, e.g., CAN-SPAM Opp'n at 15 (citing ASIS Internet Servs. v. Azoogle.com, Inc.,
     357 Fed. Appx. 112, 113-14 (9th Cir. 2009).)

27           [21]  (Defendants' MSJ at 12-14.)

28                                                        9

United States District Court
For the Northern District of California

### a.    Initiation of Commercial E-mails

At issue is whether Defendants initiated the e-mails associated with the Launch Promotion.

The CAN-SPAM Act provides that "[t]he term 'initiate,' when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message.  For purposes of this paragraph, more than one person may be considered to have initiated a message."  15 U.S.C. § 7702(9).  The word "procure," in turn, is defined to mean "intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf."  Id. § 7702(12).

In support of its claim that Defendants initiated the e-mails at issue, Plaintiff offers the following undisputed evidence:

(1)     On or before December 26, 2008, Defendant Power began a "Launch Promotion" that offered site users $100 if they successfully invited and signed up the most new Power.com users. (FAC ¶ 65; Answer ¶ 65.)  As part of the promotion, Power obtained a list of the user's Facebook friends and asked the participant to select which of those friends should receive a Power.com invitation.  (Id. ¶ 66; Id. ¶ 66.)  Selected friends would then receive an e-mail in which Facebook was listed as the sender, promoting an event "Bring 100 Friends and win 100 bucks!"  (Id. ¶70; Id. ¶ 70.)  Defendant admits that Power.com's "offer of potential monetary compensation may have induced some Facebook users to participate in Power's launch program."  (Id. ¶ 72; Id. ¶ 72.)

(2)     The testimony of Vachani that Power.com both authored the text contained in the e-mails and provided the link contained therein that would allow recipients to sign up for Power.com.[22]

(3)     The launch promotion feature that offered the $100 reward was made available to Power.com users through Power.com.  (Vachani Depo. at 264:2-264:8.)  None of the social networking networks on Power.com created the contents of the launch promotion feature.  (Id. at 264:9-264:12.)

(4)     The declaration of Facebook's technical expert, Lawrence Melling, that based on his study of the software created by Defendant Power and its code, the script

----

[22] (Declaration of Monte M.F. Cooper in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 under the CAN-SPAM Act, hereafter, "Cooper Decl.," Ex. 2, Deposition of Steven Vachani at 197:4-197:12, hereafter, "Vachani Depo.," Docket Item No. 229.)

10

United States District Court
For the Northern District of California

1
2
3

would automatically insert Power as the host of the event and the event location.[23] The script also automatically generated a guest list for the event if one was not provided, and did so by accessing the user's Facebook friends list.  (Id. ¶ 19.)  The script would then automatically send Facebook event invitations to each Facebook user on the guest list on behalf of Power.  (Id. ¶ 20.)

4
5

(5)        The testimony of Vachani that Power eventually paid 30-40 people who got 100 or more friends to sign up.  (Vachani Depo. at 189:5-9.)

6        Defendants, while not disputing the accuracy of the above facts, contend that as a matter of

7   law, they did not "initiate" the e-mails at issue because the e-mails were authorized by Facebook

8   users and sent from Facebook's own servers.[24]  In support of this contention, Defendants rely upon

9   the facts, also undisputed, that after a user authorized the creation of an event as part of the Launch

10  Promotion, Facebook servers automatically filled in the header information and sent an e-mail to

11  each person on the event guest list.[25]

12       Upon review, the Court finds that based on these undisputed facts, Defendants initiated the e-

13  mails sent through the Launch Promotion.  Although Facebook servers did automatically send the e-

14  mails at the instruction of the Launch Program, it is clear that Defendants' actions–in creating the

15  Launch Promotion, importing users' friends to the guest list, and authoring the e-mail text–served to

16  "originate" the e-mails as is required by the Act.[26]  To hold that Plaintiff originated the e-mails

17  merely because Facebook servers sent them would ignore the fact that Defendants intentionally

18  caused Facebook's servers to do so, and created a software program specifically designed to achieve

19  that effect.  Further, while Defendants emphasize that Facebook users authorized the creation of

20  events resulting in the e-mails,[27] the Court finds that Defendants procured these users to do so by

21  offering and awarding monetary incentives to provide such authorization.  Thus, even if Facebook

---

22   [23] (Declaration of Lawrence Melling in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 of the CAN-SPAM Act ¶ 18, hereafter, "Melling Decl.," Docket Item No. 217.)

23

24   [24] (See Defendants' MSJ at 5-8.)

25   [25] (See Clark Depo. at 98:18-99:25.)

26   [26] See 15 U.S.C. § 7702(9).

27   [27] (See, e.g., Defendants' MSJ at 7.)

28                                                    11

United States District Court
For the Northern District of California

1     users may be viewed as initiators of the e-mails because of their participation in the Launch

2     Promotion, Defendants are nonetheless also initiators as a matter of law because of their

3     procurement of user participation.[28]

4          Accordingly, the Court finds that Defendants did initiate the e-mails at issue within the

5     meaning of the CAN-SPAM Act.

6          **b.     Whether the E-mails Are Misleading**

7          At issue is whether the e-mails sent as a result of the Launch Promotion contain header

8     information that is false or misleading.

9          The CAN-SPAM Act defines header information as "the source, destination, and routing

10    information attached to an electronic mail message, including the originating domain name and

11    originating electronic mail address, and any other information that appears in the line identifying, or

12    purporting to identify, a person initiating the message."  15 U.S.C. § 7702(8).  The Act further

13    provides that "header information shall be considered materially misleading if it fails to identify

14    accurately a protected computer used to initiate the message because the person initiating the

15    message knowingly uses another protected computer to relay or retransmit the message for purposes

16    of disguising its origin."  Id. § 7704(a)(1)(C).  A false or misleading statement is considered material

17    if "the alteration or concealment of header information" would impair the ability of an IAS provider

18    or a recipient to "identify, locate, or respond to a person who initiated the electronic mail message."

19    Id. § 7704(a)(6).

20         Here, for the reasons discussed above, Defendants were initiators of the e-mail messages at

21    issue.  But because Defendants' program caused Facebook servers to automatically send the e-mails,

22    these e-mails contained an "@facebookmail.com" address.[29]  These e-mails did not contain any

23    return address, or any address anywhere in the e-mail, that would allow a recipient to respond to

24

25    _____

26         [28] See 15 U.S.C. § 7702(12).

27         [29] (FAC ¶¶ 68-69; Answer ¶¶ 68-69.)

28                                                    12

United States District Court
For the Northern District of California

1  Defendants.[30]  Thus, as the header information does not accurately identify the party that actually

2  initiated the e-mail within the meaning of the Act, the Court finds that the header information is

3  materially misleading as to who initiated the e-mail.

4        Defendants contend that even if the Court finds that they did initiate the e-mails at issue, they

5  cannot be held liable for violations of the CAN-SPAM Act on the grounds that: (1) the text of the e-

6  mails itself includes information about Power.com; and (2) Defendants had no control over the

7  headers of the e-mails.[31]  The Court finds that both of these contentions are unavailing.  First, the

8  presence of a misleading header in an e-mail is, in and of itself, a violation of the CAN-SPAM Act,

9  insofar as the Act prohibits the use of misleading header information.[32]  Thus, the fact that the text of

10  the e-mails at issue may have included information about Power.com is irrelevant, for purposes of

11  liability under the Act.  Second, the question of whether Defendants had control over the headers is

12  also irrelevant.  In particular, the Court finds that the fact that Defendants used a program that was

13  created and controlled by another to send e-mails with misleading headers does not absolve them of

14  liability for sending those e-mails.[33]

15

16      [30]  (Declaration of Theresa Sutton in Support of Plaintiff Facebook, Inc.'s Opposition to
Defendants' Motion for Summary Judgment, hereafter, "Sutton Decl.," Ex. 4, Defendant Power
17  Ventures, Inc.'s Responses to Facebook, Inc.'s First Set of Requests for Admissions at No. 50,
hereafter, "Defendants' Admissions," Docket Item No. 241-3.)

18

19      [31]  (Defendant's Motion at 14.)  The latter argument was also made by *Amicus Curiae*
Electronic Frontier Foundation ("EFF"), which contends that because the Facebook system auto-
20  generates the header information provided in the e-mails, commercial users should not be held
responsible for their content.  (See Brief of Amicus Curiae Electronic Frontier Foundation in
21  Support of Defendant Power Ventures' Motion for Summary Judgment on Count 1 (CAN-SPAM
Act, 15 U.S.C. § 7704) and Under California Penal Code § 502 and the Computer Fraud and Abuse
22  Act at 18-19, hereafter, "EFF Brief," Docket Item No. 206-2.)

23      [32]  See 15 U.S.C. § 7704(a)(1).

24      [33]  Amicus EFF contends that the CAN-SPAM Act's prohibition on the sending of
misleading commercial e-mails should not be applied to e-mails sent through a system like that of
25  Facebook, in which the headers are auto-generated by servers and not controlled by the individual
users.  (EFF Brief at 20.)  However, the Court finds no statutory basis for creating such an exception
26  to the CAN-SPAM Act.  The Act makes it unlawful to "initiate the transmission" of any e-mail
message that is "accompanied by" misleading header information.  15 U.S.C. § 7704(a)(1).  Nothing
27  in this language requires that the user actually create the misleading header information, as opposed
to utilizing a system already in place to auto-generate a header.

28                              13

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    In sum, the Court finds that the undisputed facts establish that Defendants initiated the

2    sending of e-mails with false or misleading heading information under the CAN-SPAM Act, and that

3    Plaintiff suffered adverse effects as contemplated by the Act sufficient to convey standing to

4    maintain a private cause of action.  Accordingly, the Court GRANTS Plaintiff's Motion for

5    Summary Judgment on Count One, and DENIES Defendants' Motion for Summary Judgment as to

6    Count One.

7    **B.    California Penal Code § 502**

8    At issue is whether Defendants' conduct, as established by the undisputed facts, violated

9    California Penal Code § 502 ("Section 502").

10    Section 502(c) provides that a person is guilty of a public offense if he, *inter alia*: (1)

11    knowingly accesses and without permission takes, copies, or makes use of any data from a

12    computer, computer system, or computer network; (2) knowingly and without permission uses or

13    causes to be used computer services; or (3) knowingly and without permission accesses or causes to

14    be accessed any computer, computer system, or computer network.  See Cal. Penal Code §

15    502(c)(2), (3) & (7).  Section 502(e) provides that "the owner or lessee of the computer, computer

16    system, computer network, computer program, or data who suffers damage or loss by reason of a

17    violation of any of the provisions of subdivision (c) may bring a civil action against the violator for

18    compensatory damages and injunctive relief or other equitable relief."  See id. § 502(e).

19    Here, the Court has already held that Plaintiff has suffered sufficient harm to have standing

20    under Section 502.  (See July 20 Order at 8.)  In addition, Defendants admit that they took, copied,

21    or made use of data from Facebook website without Facebook's permission to do so.  (Defendants'

22    Admissions at 22.)  Therefore the only question remaining before the Court, in determining whether

23    Defendants violated Section 502, is whether Defendants' access to Facebook was "without

24    permission" within the meaning of Section 502.[34]

25

26    [34] Defendants continue to contend that Plaintiff did not suffer any loss as is required by
    Section 502 and therefore lacks standing to bring a private cause of action.  (See Defendants' MSJ at
27    19-20.)  In so doing, Defendants suggest that the Court's July 20 Order declined to reach the issue of

28                                                     14

1    In its July 20 Order, the Court explained at great length that a particular use of a computer

2    network which violates that network's terms of use is insufficient to establish that the use was

3    "without permission" pursuant Section 502.[35]  Where, however, a party accesses the network in a

4    manner that circumvents technical or code-based barriers in place to restrict or bar a user's access,

5    then the access does qualify as being "without permission."  (See id. at 18-20.)  Accordingly, the

6    question before the Court is whether the undisputed evidence establishes that Defendants

7    circumvented technical or code-based barriers in order to access Facebook.

8    In support of the contention that Defendants did circumvent technical barriers designed to

9    block their access to Facebook, Plaintiff relies on the following evidence:

10       (1)        In response to the question if he at any time became aware that Facebook was
                    attempting to block Power, Vachani answered: "I don't know if they
11                  were–[o]bviously, we expected that they would but he we [sic] also know that our
                    system doesn't get blocked because there's nothing–there's nothing it's technically
12                  doing.  It's just users accessing the site so that it can't really be blocked. . . .We know
                    [sic] that they would try, but we also know that it was built to – it would not be
13                  blockable."[36]

14       (2)        The expert of report of Bob Zeidman and Lawrence Melling, who analyzed
                    the code and software used by Power.com to determine if it was designed to
15                  circumvent technical barriers.[37]  The report concludes that the code used a number of
                    routines to avoid being blocked by websites like Facebook, including the use of proxy
16                  servers if one server was blocked by a website.  (Id. ¶¶ 55-60.)  The code would
                    routinely monitor each server to see if an IP address was blocked and change the IP
17                  address if it was.  (Id. ¶¶ 59-60.)  The report concludes that substantial effort went

18   _____

19   loss because it denied both parties' motions for summary judgment at that time.  (Id.)  The Court
     finds, however, that this interpretation of its Order is misguided, as it ignores the plain statement that
20   "[s]ince the undisputed facts demonstrate that Facebook has suffered some damage or loss in
     attempting to block Power's access to Plaintiff's website, the Court finds that Facebook has standing
21   to bring suit under Section 502."  (July 20 Order at 8.)

22       [35]  (See July 20 Order at 8-20.)

23       [36]  (Declaration of Morvarid Metanat in Support of Facebook's Motion for Partial Summary
     Judgment Under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. §
24   1030, hereafter, "Metanat Decl.," Ex. 2, Deposition of Steve Vachani at 323:17-324:8, hereafter,
     "Vachani Depo. 2," Docket Item No. 236-2.)

25

26       [37]  (Expert Report of Bob Zeidman and Lawrence Melling ¶¶ 25, filed under seal.)  This
     Report was filed under seal.  However, the Court finds that the portions of the Report discussed in
27   this Order were not appropriately sealed.  Accordingly, the Court UNSEALS the Report for
     purposes of discussing its contents in this Order.

28
                                        15

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

into designing the proxy system and that one of the objectives of the design was to reconfigure the IP connections if an IP address was blocked.  (Id. ¶ 61.)

(3)        The testimony of Ryan McGeehan that on December 12, 2008, Facebook attempted to block Power's access to the site by blocking what appeared to be its primary IP address.  (McGeehan Decl. ¶ 13.)  Following the block, Facebook determined that Powers was circumventing the block by using other IP addresses.  (Id.)  Facebook attempted to block these addresses as they discovered them "in a game of cat and mouse."  (Id.)

(4)        An e-mail from Vachani to members of his staff, sent after Vachani received a cease and desist letter from Plaintiff, stating "we need to be prepared for Facebook to try and block us and then turn this into a national battle that gets us huge attention."[38]

(5)        A transcript of a discussion between Vachani and a member of his staff in which the they discuss the process of starting to fetch profile data from another social networking website, Orkut.[39]  Vachani says "we also need to do some planning to make sure that we do it in a way where we are not really detected.  [P]ossible rotating IP's or something.  [D]on't really understand this too well.  Greg may also have some ideas."  (Id. at 3.)  The staff member responds "yah.  [R]otating IP if we can set then its very good as when [O]rkut will see so much band[w]idth use by perticular [sic] IP then they will block that perticulat [sic] IP."  (Id. at 3-4.)  Vachani responds "We need to plan this very carefully since we will have only one chance to do it. . . we might need to rotate with over 200 IP's or even more to do it perfectly."  (Id. at 4.)

In support of their contention that they did not circumvent technical barriers imposed by Plaintiff, Defendants offer the following evidence:

Vachani's testimony that in December 2008, Facebook attempted to prevent Power's users from accessing Facebook through Power.com by blocking one IP address utilized by Power.[40]  "Facebook's IP block was ineffective because it blocked only one outdated IP address Power had used, and did not block other IPs that Power was using in the normal course of business."  (Id. ¶ 11.)  "Power did not undertake any effort to circumvent that block, and did not provide users with any tools designed to circumvent it."  (Id.)  After it

---

[38] (Metanat Decl., Ex. 6, E-mail from Steven Vachani, Docket Item No. 236-6; see also Vachani Depo. 2 at 313:3-313:7.)

[39] (Declaration of I. Neel Chatterjee in Support of Reply Memorandum in Support of Facebook's Motions for Partial Summary Judgment Under: 1) on [sic] Count 1 the Can-Spam Act; and 2) California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Ex. 2, Docket Item No. 248-2.)

[40] (Declaration of Steve Vachani in Support of Defendants' Opposition to Facebook's Motions for Partial Summary Judgment on Count 1 (Can-spam Act, 15 U.S.C [sic] § 7704) and Under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ¶ 10, Docket No. 189.)

16

became aware of the attempted IP blocking, Power undertook efforts to implement Facebook Connect as Facebook had requested.  (Id. ¶ 12.)[41]

Upon review, the Court finds that the undisputed facts establish that Defendants circumvented technical barriers to access Facebook site, and thus accessed the site "without permission."  Although the evidence shows that Defendants did not take additional steps to circumvent individual IP blocks imposed by Plaintiff after the fact, this does nothing to cast doubt on the overwhelming evidence that Defendants designed their system to render such blocks ineffective.  The Court finds no reason to distinguish between methods of circumvention built into a software system to render barriers ineffective and those which respond to barriers after they have been imposed.  This is particularly true where, as here, Defendant Vachani's own statements provide compelling evidence that he anticipated attempts to block access by network owners and intentionally implemented a system that would be immune to such technical barriers.[42]  Thus, in light of the undisputed evidence that Defendants anticipated attempts to block their access by Plaintiff, and utilized multiple IP addresses to effectively circumvent these barriers, the Court finds that Defendants violated Section 502 by accessing Plaintiff's network without permission.

Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment as to Count Three and DENIES Defendants' Motion for Summary Judgment as to Count Three.

## C.    The Computer Fraud and Abuse Act

At issue is whether Defendants' conduct constitutes a violation of the CFAA.

The CFAA imposes liability on any party that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains," *inter alia*, "information from any

---

[41]  Plaintiff objects to Vachani's testimony regarding Facebook's blocks of the Power site on the grounds that Vachani lacks personal knowledge of how such technical measures worked and because he is not an expert qualified to opine on the functionality of a technical barrier.  (See Docket Item No. 240 at 14.)  For purposes of this Order only, the Court finds that Vachani's lack of qualifications as an expert affects the weight his testimony should be accorded and not its admissibility.  Thus, Plaintiff's objection is OVERRULED.

[42]  (See, e.g., Vachani Depo. 2 at 323:17-324:8.)

17

United States District Court
For the Northern District of California

1   protected computer."  18 U.S.C. § 1030(a)(2).  Suit may be brought by any person who suffers

2   damage or loss in an amount above $5000.  See id. §1030(g); §1030(c)(4)(A)(i)(I).

3        Here, for the reasons discussed above, the undisputed facts establish that Defendants' access

4   to Facebook was without authorization.  In addition, Defendants admit that they obtained

5   information from Facebook website.  (Defendants' Admissions at 22.)  Thus, the only finding

6   necessary for Plaintiff to prevail on its CFAA claim is whether Plaintiff's damages exceed $5000,

7   thereby giving Plaintiff standing under the statute.[43]

8        The CFAA defines "loss" to include "any reasonable cost to any victim, including the cost of

9   responding to an offense, conducting a damage assessment, and restoring the data, program, system,

10  or information to its condition prior to the offense, and any revenue lost, cost incurred, or other

11  consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

12  "Costs associated with investigating intrusions into a computer network and taking subsequent

13  remedial measures are losses within the meaning of the statute."  Multiven, 725 F. Supp. 2d at 895

14  (citation omitted).

15       Here, as discussed above with regard to Plaintiff's CAN-SPAM claim, Plaintiff has provided

16  uncontradicted evidence of the costs of attempting to thwart Defendants' unauthorized access into its

17  network.[44]  These documented costs were well in excess of the $5000 CFAA threshold.  (See Cutler

18  Decl. ¶ 15.)  Thus, the Court finds that on the basis of these costs, Defendants' unauthorized access

19  of Plaintiff's network did cause sufficient loss to Plaintiff to confer standing upon Plaintiff.

20       In sum, for the reasons discussed above regarding Plaintiff's Section 502 claim, the Court

21  finds that Defendants accessed Plaintiff's website without authorization and obtained information

22  from Facebook.  The Court further finds that Plaintiff suffered loss sufficient to confer standing as a

23

24

25       [43]  See Mutiven, Inc. v. Cisco Sys., Inc., 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010)
    (explaining that elements of a CFAA claim do not differ materially from the elements of a claim
26  under Section 502).

27       [44]  (See, e.g., McGeehan Decl. ¶¶ 11-17; Cutler Decl. ¶¶ 7-15.)

28                                           18

                                                                            1-ER-115

1  result of such access.  Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment

2  as to Count Two and DENIES Defendants' Motion for Summary Judgment as to Count Two.

3  **V.  CONCLUSION**

4  The Court GRANTS Plaintiff's Motions for Summary Judgment on all counts. The Court

5  DENIES Defendants' Motion for Summary Judgment on all counts.[45]

6  In light of this Order, the Court finds that additional briefing is warranted on two issues: (1)

7  the amount of damages Plaintiff should receive in light of this Order; and (2) the individual liability

8  of Defendant Vachani.

9  On or before **March 2, 2012**, the parties shall file simultaneous briefings addressing the two

10  issues identified above.  Unless otherwise indicated by the Court, the matter will be taken under

11  submission for decision without a hearing.  See Civ. L.R. 7-1(b).

12

13

14  Dated:  February 16, 2012

_James Ware_

15  JAMES WARE
United States District Chief Judge

16

17

18

19

20

21

22

23

24  _____

[45]  Because the Court finds that the undisputed evidence submitted by Plaintiff with its

25  Motions for Summary Judgment establishes that Plaintiff is entitled to judgment as a matter of law, the Court DENIES as moot Plaintiff's Motion to File Supplemental Evidence.  (See Docket Item No.

26  251.)
In addition, the Court DENIES as moot Plaintiff's Motion to Enlarge Time for Hearing

27  Dispositive Motions.  (See Docket Item No. 261.)

28  19

1   **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2   Alan R Plutzik aplutzik@bramsonplutzik.com
    Cindy Ann Cohn cindy@eff.org
3   David P. Chiappetta david.chiappetta@corrs.com.au
    Indra Neel Chatterjee nchatterjee@orrick.com
4   Joseph Perry Cutler Jcutler@perkinscoie.com
    Lawrence Timothy Fisher ltfisher@bursor.com
5   Monte M.F. Cooper mcooper@orrick.com
    Morvarid Metanat mmetanat@orrick.com
6   Sarah Nicole Westcot swestcot@bursor.com
    Scott A. Bursor scott@bursor.com
7   Theresa Ann Sutton tsutton@orrick.com

8

9   **Dated:  February 16, 2012**                    **Richard W. Wieking, Clerk**

10

11                                                    **By:_____/s/ JW Chambers_____**
                                                      **Susan Imbriani**
12                                                    **Courtroom Deputy**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California