No. 17-16161

IN THE
# United States Court of Appeals for the Ninth Circuit

FACEBOOK, INC.,
*Plaintiff-Appellee,*

*v.*

POWER VENTURES, INC. & STEVEN SURAJ VACHANI,
*Defendant-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, Hon. Lucy Koh

## BRIEF OF PLAINTIFF-APPELLEE
## FACEBOOK, INC.

Brian P. Goldman
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

Eric A. Shumsky
Hannah Garden-Monheit
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

I. Neel Chatterjee
GOODWIN PROCTER LLP
135 Commonwealth Drive
Menlo Park, CA 94025
(650) 752-3100

Monte Cooper
Robert L. Uriarte
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

*Counsel for Plaintiff-Appellee*

May 31, 2018

# CORPORATE DISCLOSURE STATEMENT

Facebook, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of Facebook, Inc.'s stock.

Date:  May 31, 2018      ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*
Eric A. Shumsky
*Counsel for Plaintiff-Appellee*

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION ............................................................................... 1

JURISDICTION ................................................................................. 3

STATEMENT OF THE ISSUES.......................................................... 3

STATEMENT OF THE CASE ............................................................. 4

    Facebook operates a social network. ............................................ 4

    Defendants collect Facebook users' information........................... 6

    Defendants deliberately disregard Facebook's cease-and-
        desist letter........................................................................ 8

    This Court affirms Defendants' liability under the CFAA and
        § 502, reverses on the CAN-SPAM Act count, and
        remands for redetermination of remedies. .......................... 18

    On remand, the district court follows this Court's mandate
        by awarding Facebook reduced compensatory damages
        under the CFAA and § 502, and issuing a narrower
        permanent injunction. ........................................................ 21

    The district court holds Defendants in contempt and awards
        attorney's fees and sanctions............................................. 24

SUMMARY OF ARGUMENT ............................................................. 25

STANDARDS OF REVIEW ............................................................... 28

ARGUMENT .................................................................................... 30

I.    The District Court Correctly Recalculated
    Compensatory Damages Consistent With This Court's
    Mandate................................................................................... 30

    A.    The district court properly awarded damages
        limited to the period specified by this Court. ............. 30

B. Defendants' efforts to relitigate their liability violate the mandate rule and contravene the law of the case. .................................................. 34

C. Defendants' other challenges to the compensatory damages award are foreclosed by the terms of this Court's remand and are meritless in any event. .......................................................................... 36

    1. The district court properly followed this Court's direction to calculate damages as of December 1, 2008. ............................................... 37

    2. The district court properly followed this Court's direction to calculate damages through early 2009. ........................................... 43

    3. The district court correctly rejected Defendants' untimely challenges to Facebook's damages evidence. ........................... 46

II. The District Court Correctly Rejected Defendants' Renewed Argument That Facebook Did Not Establish A Qualifying "Loss" Under The CFAA And § 502. .............. 55

III. The District Court Did Not Abuse Its Discretion In Granting A Narrower Permanent Injunction. ..................... 64

A. The CFAA authorizes injunctive relief. ...................... 64

B. The district court properly found that an injunction remains necessary. ..................................... 65

C. The district court exercised sound discretion in crafting the scope and terms of the injunction. .......... 68

CONCLUSION ........................................................................... 73

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

iii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adler v. Federal Republic of Nigeria*,
219 F.3d 869 (9th Cir. 2000)................................................58

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991)........................................52, 65

*AtPac, Inc. v. Aptitude Sols., Inc.*,
730 F. Supp. 2d 1174 (E.D. Cal. 2010) ................................59

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) ...............................................45

*Brooks v. AM Resorts, LLC*,
954 F. Supp. 2d 331 (E.D. Pa. 2013) ..................................62

*Brown Jordan Int'l, Inc. v. Carmicle*,
846 F.3d 1167 (11th Cir. 2017)....................................45, 60

*Continental Grp., Inc. v. KW Prop. Mgmt. LLC*,
622 F. Supp. 2d 1357 (S.D. Fla. 2009)................................60

*Copart, Inc. v. Sparta Consulting, Inc.*,
277 F. Supp. 3d 1127 (E.D. Cal. 2017) ...............................45

*Creative Computing v. Getloaded.com LLC*,
386 F.3d 930 (9th Cir. 2004)............................29, 51, 65, 69

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ....................................................65, 66

*EF Cultural Travel BV v. Explorica, Inc.*,
274 F.3d 577 (1st Cir. 2001) ...............................................45

*Estes Forwarding Worldwide LLC v. Cuellar*,
239 F. Supp. 3d 918 (E.D. Va. 2017) ..................................63

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
    640 F.3d 1034 (9th Cir. 2011) ............................................................... 57

*Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*,
    No. 2:13-cv-00784, 2013 WL 3872950 (E.D. Cal. July 25,
    2013) ................................................................................................... 59

*Gonzalez v. Arizona*,
    677 F.3d 383 (9th Cir. 2012) ................................................................. 36

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    988 F. Supp. 2d 434 (D. Del. 2013) ...................................................... 60

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    806 F.3d 125 (3d Cir. 2015) ................................................................. 60

*Gospel Missions of Am. v. City of Los Angeles*,
    419 F.3d 1042 (9th Cir. 2005) ............................................................... 57

*Herrington v. Cty. of Sonoma*,
    12 F.3d 901 (9th Cir. 1993) ........................................................... 31, 48

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    273 F. Supp. 3d 1099 (N.D. Cal. 2017) ................................................. 36

*Horwitz v. Sw. Forest Indus., Inc.*,
    604 F. Supp. 1130 (D. Nev. 1985) ........................................................ 72

*Ingle v. Circuit City*,
    408 F.3d 592 (9th Cir. 2005) ................................................................. 29

*Kimball v. Callahan*,
    590 F.2d 768 (9th Cir. 1979) ................................................................. 56

*Leslie Salt Co. v. United States*,
    55 F.3d 1388 (9th Cir. 1995) ................................................................. 56

*Lexmark Int'l, Inc. v. Static Control Components Inc.*,
    134 S. Ct. 1377 (2014) .......................................................................... 57

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009) ............................................................... 57

v

*In re Mud King Prods., Inc.*,
    514 B.R. 496 (Bankr. S.D. Tex. 2014) ................................................. 62

*N. Am. Aircoach Sys. v. N. Am. Aviation*,
    231 F.2d 205 (9th Cir. 1955) ................................................................. 72

*Power Ventures, Inc. v. Facebook, Inc.*,
    138 S. Ct. 313 (2017) ............................................................................. 21

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) .......................................... 68, 69

*In re Sanford Fork & Tool Co.*,
    160 U.S. 247 (1895) ............................................................................... 31

*Sec. Inv'r Prot. Corp. v. Vigman*,
    74 F.3d 932 (9th Cir. 1996) ............................................................. 37, 39

*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed. Cir. 2008) .............................................................. 51

*Southwest Airlines Co. v. BoardFirst, L.L.C.*,
    No. 3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept.
    12, 2007) ......................................................................................... 50, 51

*TrafficSchool.com, Inc. v. Edriver Inc.*,
     653 F.3d 820 (9th Cir. 2011) .......................................................... 29, 30

*Travelers Cas. & Sur. Co. of Am. v. Brenneke*,
    551 F.3d 1132 (9th Cir. 2009) ......................................................... 29, 50

*United States v. Alisal Water Corp.*,
    431 F.3d 643 (9th Cir. 2005) ........................................................... 29, 68

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2016) ................................................................ 58

*United States v. Kwai Fun Wong*,
    135 S. Ct. 1625 (2015) .......................................................................... 58

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012) ................................................................ 19

*United States v. Thrasher,*
    483 F.3d 977 (9th Cir. 2007) ............................ 28, 30, 31, 32, 35, 36, 40

*Wilson v. Moreau,*
    440 F. Supp. 2d 81 (D.R.I. 2006) ........................................................ 62

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC,*
    774 F.3d 1065 (6th Cir. 2014) ............................................................. 45

## Statutes

15 U.S.C. § 7701 ................................................................................... 13

18 U.S.C. § 1030 ................................................................................... 13

18 U.S.C. § 1030(c)(4)(A)(i)(I) ............................................................ 55

18 U.S.C. § 1030(e)(11) ............................................................. 45, 59, 61

18 U.S.C. § 1030(g) ...................................................................... 55, 64

Cal. Penal Code § 502 .......................................................................... 13

Cal. Penal Code § 502(e) ..................................................................... 55

Cal. Penal Code § 502(e)(1) ................................................................ 45

## Other Authorities

18B Wright & Miller, Fed. Prac. & Proc. Juris. § 4478 (2d
    ed.) ..................................................................................................... 31

# INTRODUCTION

Last time this case was here, this Court held that Defendants violated the Computer Fraud and Abuse Act (CFAA) and California's analogous computer trespass law. The violation was clear: After Facebook caught Defendants "scraping" personal user information from Facebook and threatening the security of that information, Facebook sent Defendants a cease-and-desist letter and imposed technical measures to prevent Defendants' continued access. Defendants thus "knew that [they] no longer had authorization to access Facebook's computers, but continued to do so anyway." ER55.[*] They were therefore "liable under the CFAA" and California law. ER58.

The relief that the district court had granted, however, was potentially overbroad. The judgment covered damages Facebook incurred before Facebook had expressly told Defendants to stop. And the district court's grant of injunctive relief rested not just on the

---

[*] In this brief, "ER" refers to Defendants' excerpts of record, "SER" refers to Facebook's supplemental excerpts of record, "Doc." refers to the district court's docket entries in this case, and "Br." refers to Defendants' opening brief. "Defendants' *Facebook I* Br." refers to Defendants' opening brief filed in their prior appeal, Nos. 13-17102 & 13-17154, and "Facebook's *Facebook I* Br." refers to Facebook's answering brief in that appeal.

1

CFAA, but also on Defendants' liability under a different statute, the Controlling the Assault of Non-Solicited Pornography and Marketing (CAN-SPAM) Act, which this Court held did not apply to Defendants' conduct. Because this Court reversed in part, it "remand[ed] the case to the district court to reconsider appropriate remedies under the CFAA and [California Penal Code] section 502, including any injunctive relief." ER60. It added that, "[w]ith respect to damages, the district court shall calculate damages only for the period after Power received the cease and desist letter." *Id.*

The district court did just that. Compensatory damages had already been established by unrebutted evidence, so the district court simply subtracted out those damages incurred on or before December 1, 2008, when Defendants received Facebook's letter. The court then reassessed injunctive relief and concluded that it remained necessary in view of Defendants' "bad faith conduct" throughout this case. ER26. But the court narrowed the injunction to match the narrower basis for Defendants' liability.

In this second appeal, Defendants largely ignore the limited grounds on which this Court remanded and seek to relitigate issues

2

that the Court finally resolved. Large swaths of their argument boil down to disagreement with this Court's holding that they lacked authorization to access Facebook at all. They also raise a host of challenges that are either foreclosed by this Court's opinion (like the date when their violation began) or forfeited because they could have been—but were not—raised in Defendants' first appeal (like the validity of Facebook's damages evidence).

The law-of-the-case doctrine and the mandate rule prohibit this kind of piecemeal and repetitive litigation, as the district court correctly held. And each of Defendants' theories fails on the merits anyway. Because the district court faithfully complied with this Court's mandate, its judgment should be affirmed.

## JURISDICTION

Facebook does not dispute Defendants' jurisdictional statement, except to note that their notice of appeal was timely filed on June 1, 2017, ER118, not on "June 2, 2017," Br. 1.

## STATEMENT OF THE ISSUES

I.    In Defendants' first appeal, this Court affirmed the judgment in Facebook's favor under the CFAA and § 502 with respect to

3

Defendants' conduct after December 1, 2008. That was when "Facebook expressly rescinded [Power's] permission" to access Facebook's site. ER54. This Court therefore remanded for the district court to calculate Facebook's compensatory damages incurred after December 1, 2008. ER60. Did the district court correctly follow this Court's direction?

II.    In Defendants' first appeal, this Court rejected Defendants' arguments that Facebook did not suffer a "loss" within the meaning of the CFAA and § 502. Did the district court correctly reject, as foreclosed, Defendants' renewed (and still meritless) arguments on that point?

III.    On remand, the district court found that injunctive relief was still necessary given Defendants' repeated misconduct, but it narrowed the injunction to cover the CFAA and § 502 violations and not the now-reversed CAN-SPAM Act violation. Did the district court act within its discretion?

## STATEMENT OF THE CASE

### *Facebook operates a social network.*

Facebook "operates a social networking website, Facebook.com," which "more than 130 million" people used when the events underlying

4

this case took place in 2008-2009, ER44, and more than two billion people use today. Facebook users "establish connections with other Facebook users by 'friending' them." ER45. A user "can create a personal profile" and "customize her profile by adding personal information, photographs, or other content." ER44. Users may send each other private messages that are similar to e-mail but sent and received within Facebook. SER313.

Facebook's success has attracted businesses hoping to connect with Facebook's large user base. *Id.* News outlets like the Los Angeles Times, for example, allow a reader to "share" articles with Facebook friends by posting articles directly from latimes.com to their personal Facebook "profile." Facebook permits such third-party developers to interact with Facebook only through approved protocols and subject to conditions to protect the security and integrity of Facebook's services and user data—prohibiting, for example, "using automated scripts to collect information" or "misrepresenting oneself." SER341, 363-364. Thus, in order "to limit and control access[,] … Facebook requires third-party developers or websites that wish to contact its users through its site to enroll in a program called Facebook Connect" (known today as

5

Facebook Login). ER45. This program allows a user to securely "connect" her Facebook profile to external websites. SER97, 341, 363-364.

### Defendants collect Facebook users' information.

Defendant Power Ventures is a Cayman Islands corporation that, it says, was "a competitor in the market for social networking websites." SER353, 360. Defendant Vachani was its CEO. ER44; SER361. According to Power's "Internet User Bill of Rights," it "believes in a borderless Internet." SER332. And, having proclaimed this, Power built a business model predicated on "aggregat[ing] … social networking information." ER44. It collected user information from, and co-opted the networks that users had built on, other social media websites. *See* SER133 (screenshot reflecting how power.com takes information from other websites), 162, 207-210 (admissions 15, 18, 22, 37), 338.

To that end, Power developed a software program called "PowerScript" to collect (or "scrape") user information from social media websites like Facebook. SER118, 129-131, 187 (Power legal director writing, "I agree that what we are doing may be considered web

scraping"); *see also* SER97, 162, 167, 315. Users gave Power their credentials to access Facebook, and Power then copied data that the user could have viewed on facebook.com—including users' friends' personal information—and displayed it to the same users on power.com instead. *Id.* And, because Power held the digital equivalent of the person's house keys, it could take control of the Facebook user's account and thus appear to act on her behalf.

Website operators like Facebook typically prohibit the use of scraping software because it may compromise the security of personal information. SER130, 298, 341, 364. Because, however, scraping was central to Defendants' business, SER97, "Power resisted" any effort to "enroll[] in Facebook Connect" to access Facebook's network. ER46; *see also* SER291-292. Instead, Power solicited from users their credentials for logging into Facebook and "then accessed that user's Facebook data" directly. ER49; *see also* SER207-210 (admissions 15, 18, 22, 37).

Defendants knew that Facebook would disapprove because of the security risks this posed. They therefore "'prepared for Facebook to try to block [them].'" ER55 (quoting SER214); *see also* ER114; SER202-203. Specifically, Defendants expected that Facebook would block access to

7

facebook.com originating from Power's Internet Protocol (IP) address. *See* ER114; SER305-306 (discussing technical measures to circumvent IP blocking). Defendants therefore "intentionally implemented a system" to circumvent such barriers. ER114. They designed Power's software to circumvent IP blocking by connecting to Facebook not directly from their own IP address, but instead through "proxy servers" that would relay data and thereby conceal its origin. ER112-113 (citing SER202-203); SER143-146.

### *Defendants deliberately disregard Facebook's cease-and-desist letter.*

On December 1, 2008, Facebook detected scraping software operating on its network. ER104; SER315; *see also* ER46. With the login credentials it had obtained directly from users, Power was "'[u]sing automated scripts to collect information from [Facebook's] site'" and "'[i]ncorporating Facebook's site in [its own] database.'" ER55 n.4 (quoting SER187). Expert analysis later revealed that Power's software was automatically extracting user information, including users' "friend" lists, and then automatically sending electronic communications through Facebook's systems. SER295; ER45, 107-108, 113.

8

"[O]n that same date," December 1, "Facebook sent a 'cease and desist' letter to Power instructing Power to terminate its activities." ER46. Defendants received the letter that same day. SER214-215. "Facebook's cease and desist letter informed Power that it had violated Facebook's terms of use and demanded that Power stop soliciting Facebook users' information, using Facebook content, or otherwise interacting with Facebook through automated scripts." ER54-55; *see also* SER227-229. Accordingly, "when Facebook sent the cease and desist letter, Power, as it conceded, knew that it no longer had permission to access Facebook's computers at all." ER59.

Defendants responded to the letter, informing Facebook that they would stop scraping Facebook's network and would implement Facebook Connect by December 12. ER253; SER309-310. But Defendants did neither of those things. Nor did they ever intend to. Vachani simultaneously wrote his team to say, "'[W]e need to be prepared for Facebook to try to block us and the [sic] turn this into a national battle that gets us huge attention.'" ER55 (quoting SER214) (Dec. 1, 2008 e-mail). He added, "This is exciting. :) ." SER214.

9

Thus, "[t]he record shows unequivocally that Power knew that it no longer had authorization to access Facebook's computers, but continued to do so anyway." ER55. Indeed, "Power admitted that, after receiving notice that its use of or access to Facebook was forbidden by Facebook, it 'took, copied, or made use of data from the Facebook website *without Facebook's permission* to do so." ER55 (quoting SER246 (admission 22)). And "[o]n December 4, 2008, a Power executive sent an e-mail … acknowledging that Power may have 'intentionally and without authorization interfered with [Facebook's] possessory interest in the computer system.'" *Id.* (quoting SER186-187). "Nevertheless, Power continued to access Facebook's data and computers without Facebook's permission." ER56.

When December 12 arrived, Defendants told Facebook they would need more time to implement Facebook Connect. SER236-237. Facebook informed Defendants that it would allow them to regain access via Facebook Connect *if* Defendants were ready in two weeks. *See* SER234-235; *see also* SER249 (admission 53). It explicitly notified Defendants that, "[m]eanwhile," it had blocked Power's access to Facebook's network, and that "to fully initialize your integrated

10

Facebook Connect status, and to lift those technical measures," Defendants had to meet certain conditions. SER235.

Defendants remained undeterred. "E-mails sent later in December 2008 discussed the IP blocks that Facebook had imposed and the measures that Power took to evade them." ER56. Defendants deployed "workaround solution 1"—their plan to use proxy servers to mask their IP address to circumvent Facebook's block. SER158. Every time Facebook blocked a new IP address, Defendants would change it again "'in a game of cat and mouse.'" ER113 (quoting SER317). Finally, Defendants adopted the "Amazon solution," SER221: They switched to an IP address associated with a shared server operated by Amazon, which Facebook could not block without effectively blocking many authorized users of its system. SER157, 318.

When the December 26 deadline arrived, Vachani informed Facebook that Power would not implement Facebook Connect for at least another month. SER231-232. Moreover, Vachani said, Power had made the "business decision" to continue accessing Facebook's network via Power's scraping software in the meantime, even though Defendants knew "this is not your desired action." SER231. Complying

with Facebook's requirements would be "a serious strategic mistake," Vachani said, because "[t]he floodgates are about to open" to "hundreds of other well intentioned developers who are only looking to create new innovations for Facebook," and Facebook should welcome them regardless of whether they agreed to comply with Facebook's policies. SER232-233.

Defendants used their illicit access into Facebook's systems to engage in a massive marketing campaign in December 2008, which continued until "[t]oward the end of January 2009." ER45-46. During this campaign, Power offered users $100 to sign up 100 friends for Power's service. ER45. When users enrolled in this campaign, "[i]n many instances, Power caused a message to be transmitted to the user's friends within the Facebook system," which sometimes caused an e-mail message to be sent to the user's friends' external e-mail accounts as well. *Id.* The messages that Defendants sent under the user's name said, for example, "I am competing for the $100 prize in the 100x100x100 promotion and recommend you to participate too!" SER136, 301-302. All told, the records that Power did not destroy showed that Defendants sent over 60,000 such messages. SER317.

***Facebook files suit, and four judges rule against Defendants.***

Having failed to stop Power's access with cooperative discussion, formal demands, or technical blocks, Facebook brought this suit on December 30, 2008. ER264. Facebook claimed violations of, among other things, the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.*; the CFAA, 18 U.S.C. § 1030; and the California Comprehensive Data Access and Fraud Act, California Penal Code § 502. SER372-377.

When Facebook notified Defendants that it intended to seek a temporary restraining order unless Power stopped accessing Facebook's system, Defendants' gamesmanship continued. Defendants said that it would take a week; Facebook reiterated its intent to seek a TRO; Defendants promised to comply the next day. ER255. Even so, Facebook continued to detect access to its network from IP addresses traced to Power into early 2009, after Power promised to terminate these connections. ER257; SER318.

Protracted litigation ensued. Judge Fogel denied Defendants' motion to dismiss, Doc. 38, and granted Facebook's motion to dismiss Defendants' counterclaims, Doc. 52, before recusing himself, Doc. 72; *see also* Doc. 89 (dismissal of amended counterclaims). Discovery followed,

which included multiple orders requiring Defendants to follow the rules.
*E.g.*, Docs. 127, 166, 282. At one point, Magistrate Judge Spero
required Vachani to swear under oath that Defendants had produced all
relevant e-mails and documents stored on a hard drive in Vachani's
possession. SER325-327. Yet months later, after discovery closed and
after summary judgment briefing was complete, Defendants produced
74.6 gigabytes of additional information from that same hard drive,
prompting the court to sanction Defendants. SER63-69. In sanctioning
Defendants, Judge Spero further found that Vachani had treated his
deposition like "a game," engaging in "argumentative" and "evasive"
conduct that "was inexcusable." SER192-193. Judge Spero later
ordered Defendants, jointly and severally, to pay Facebook a discovery
sanction of $39,796.73. SER63-69; *see also* ER298-299.

Ultimately, then-Chief Judge Ware entered summary judgment
for Facebook in February 2012. ER116. The court held that
Defendants violated the CAN-SPAM Act when they initiated materially
misleading e-mails to Facebook users. ER111. Turning to Facebook's
claim under California Penal Code § 502, the court first explained that
Facebook suffered a "loss" within the meaning of § 502. ER111 & n.34.

14

It then held that Defendants violated § 502 when they accessed Facebook's site "without permission" by "circumvent[ing] technical barriers to access"—Facebook's IP blocks on Power's access to facebook.com. ER114. As for the CFAA, the court held that circumventing technical barriers was also access "without authorization" in violation of that statute. The court rejected Defendants' contention that Facebook did not suffer a "loss" within the meaning of the CFAA, holding that Facebook had provided "uncontradicted evidence" of "documented costs … well in excess of the $5000 CFAA threshold." ER115 & n.44. Specifically, it cited declarations regarding the external expenses paid to Facebook's counsel to investigate and respond to Defendants' activities and the internal costs of Facebook's own response efforts. *Id.*

The court directed the parties to file supplemental briefs addressing Facebook's damages and Vachani's personal liability. ER116. Facebook sought to hold Defendants jointly and severally liable for $18,188,100 in statutory damages under the CAN-SPAM Act, $80,543 in compensatory damages under the CFAA and § 502,

15

additional punitive damages under § 502, and injunctive relief under all three statutes. *See* Docs. 299, 333.

In April 2013, the case was reassigned to Judge Koh after Judge Ware retired. ER296. Defendants filed a motion to seek reconsideration of Judge Ware's summary judgment order, and both parties filed supplemental briefs addressing injunctive relief. ER299-300. The district court eventually denied Defendants' motion for leave to seek reconsideration and addressed the outstanding remedies issues. SER29-62. The court explained that Judge Ware had not clearly erred when he rejected "essentially the same arguments," SER37; *see also* SER40 n.2, 42-43; and that, to the extent Defendants raised new arguments, their arguments were waived or, in the alternative, meritless, SER37, 40, 42-43.

In particular, the court rejected Defendant's contentions that Facebook had not established a qualifying loss under the CFAA and § 502, ruling that "Judge Ware specifically determined that the costs Facebook incurred to block Defendants from the site, to investigate Defendants' activities, and to have its attorneys attempt to stop Defendants from continuing the activities were sufficient to establish

16

loss under the CFAA and § 502," and that there was "no manifest injustice or clear error." SER43 (citing ER115, SER77).

As for remedies, the district court held Vachani jointly liable in his personal capacity. SER44-49. It awarded Facebook $3,031,350 in statutory damages under the CAN-SPAM Act, SER50-54, $80,543 in compensatory damages under the CFAA, SER54-55, and a permanent injunction, SER55-62. With respect to the amount of compensatory damages, the court held that "Facebook has established through undisputed testimony that it expended $80,543 to investigate Defendants' actions and for outside legal services in connection with the Defendants' actions." SER54. It reiterated that Defendants had failed to "dispute the accuracy or veracity of [the] evidence of [Facebook's] expenditures," and that Defendants had also failed to rebut Facebook's expert report on damages, SER54 n.13. The court also explained that, contrary to Defendants' arguments, Judge Ware had already ruled that "Facebook *did* incur a 'loss' under CFAA, and that Power Ventures *did* obtain information from Facebook without permission," SER54-55. The court thus entered judgment for Facebook. ER61.

17

***This Court affirms Defendants' liability under the CFAA and § 502, reverses on the CAN-SPAM Act count, and remands for redetermination of remedies.***

On appeal, this Court affirmed in part, reversed in part, and remanded. ER40-60. The Court reversed as to Facebook's CAN-SPAM Act claim, holding that "neither [the] e-mails nor internal messages sent though Power's promotional campaign were materially misleading" within the narrow definition of that statute. ER51. As to the CFAA, the Court "[f]irst … h[e]ld that Facebook suffered a loss within the meaning of the CFAA," because "[i]t is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions." ER51-52. It then held that "after receiving written notification from Facebook on December 1, 2008, Power accessed Facebook's computers 'without authorization' within the meaning of the CFAA and is liable under that statute." ER57.

The Court explained that although neither "violation of the terms of use of a website[,] without more," ER53, nor "[s]imply bypassing an IP address, without more, would … constitute unauthorized use," ER57 n.5, accessing a protected computer when "permission has been revoked

explicitly" violates the CFAA, ER53.  The Court thus distinguished *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc) (*Nosal I*), which, applying the rule of lenity, held that "the phrase 'exceeds authorized access' in the CFAA does not extend to violations of use restrictions." ER53.  Unlike in *Nosal I*, "Facebook expressly rescinded … permission [to access its site] when Facebook issued its written cease and desist letter to Power on December 1, 2008." ER54.  And, once Facebook issued that letter, "[t]he record shows unequivocally that Power knew that it no longer had authorization to access Facebook's computers, but continued to do so anyway." ER55.

This Court also rejected Defendants' argument that Facebook *users* had granted Power "authorization" to access Facebook's site with their passwords, notwithstanding Facebook's express command to keep out.  The Court explained that "[o]nce permission [to access a site] has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability." ER53.  Thus, "[t]he consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computers after Facebook's express revocation of permission." ER56.

19

The Court then held that "despite differences in wording" between § 502 and the CFAA, "the analysis under both statutes is similar in the present case." ER58. Accordingly, Defendants violated the California law because "when Facebook sent the cease and desist letter, Power, as it conceded, knew that it no longer had permission to access Facebook's computers at all." ER59.

The Court also "affirm[ed] the district court's holding that Vachani is personally liable for Power's actions," because "[i]t is undisputed … that Vachani was the guiding spirit and central figure in Power's challenged actions." *Id.* And the Court "affirm[ed] the discovery sanctions," because "[t]he magistrate judge's finding that Vachani was unprepared, unresponsive, and argumentative and that Power had failed to produce many e-mails responsive to Facebook's requests prior to discovery are supported by the record." ER60.

Finally, this Court explained that "[b]ecause we reverse in significant part, we also vacate the injunction and the award of damages." *Id.* It "remand[ed] the case to the district court to reconsider appropriate remedies under the CFAA and section 502, including any injunctive relief." *Id.* "With respect to damages," the Court ordered

20

that "the district court shall calculate damages only for the period after Power received the cease and desist letter, when Power continued to access data contained in Facebook's servers and memory banks." *Id.*

This Court then denied Defendants' petition for rehearing and rehearing en banc, ER43, and the Supreme Court denied Defendants' petition for certiorari, *Power Ventures, Inc. v. Facebook*, *Inc.*, 138 S. Ct. 313 (2017) (mem.).

### *On remand, the district court follows this Court's mandate by awarding Facebook reduced compensatory damages under the CFAA and § 502, and issuing a narrower permanent injunction.*

The district court ordered supplemental briefing on remedies, cautioning "the parties [to] limit their arguments to the issues that the Ninth Circuit remanded for consideration." ER35. It explained that "[t]he parties shall not present arguments regarding aspects of the Court's decision which the Ninth Circuit did not reverse on appeal. For example, the Court will not consider arguments regarding whether attorney's fees constitute compensable damages under the CFAA." *Id.* (citing SER43). The district court also ordered Defendants to pay the $39,796.73 discovery sanction affirmed by this Court. ER36.

21

Facebook proposed narrowing the injunction and excluding the $3 million in statutory damages under the now-reversed CAN-SPAM Act claim. Consistent with this Court's holding, Facebook also proposed limiting compensatory damages under the CFAA and § 502 to only those incurred *after* December 1, 2008, when Defendants received the cease-and-desist letter, for a total of $79,640,50. ER146-148, 152.

The district court entered an order awarding Facebook the reduced damages award it sought and permanent injunctive relief under the CFAA and § 502. ER34. And the court "again order[ed] Defendants to pay the $39,796.73 discovery sanction," which they still had not done. *Id.* Before addressing the parties' arguments, the court "note[d] that Defendants failed to comply with the Court's instructions" because their "briefing contain[ed] many arguments that essentially re-raise issues that the Court has already resolved or raise issues that Defendants never raised before either this Court or the Ninth Circuit." ER14-15. The district court nonetheless "discuss[ed] these issues in detail" even though "issues that were previously resolved and were not raised on appeal are the law of the case and are not subject to

22

relitigation absent a motion for leave to file a motion for reconsideration." ER15.

The district court rejected each of Defendants' arguments both under the law of the case and on the merits:  their argument that the damages calculation should start on December 26, 2008 and end on December 30, 2008, ER15-20; their argument that Facebook's claimed damages included CAN-SPAM Act damages, ER20-21; and their argument that Facebook failed to adequately document or justify its compensatory damages, ER22-23.  The court held that "Facebook has established through undisputed evidence that of the $80,543 in damages that [the] Court granted prior to appeal, only $902.50 was incurred on or before December 1, 2008"—the key date under this Court's opinion.  ER24.  Accordingly, "[s]ubtracting this amount from the $80,543 that the Court previously granted in damages, the Court determines that Facebook incurred $79,640.50 in losses on December 2, 2008 or later."  *Id.*

The court also granted a permanent injunction that was "narrower than the injunction that the Court granted [originally] … in two important ways."  ER24.  It omitted provisions "specific to the CAN-

SPAM violation," and it forbade Defendants from accessing Facebook "for any *commercial* purpose" without permission, rather than "for any purpose" at all, as the original injunction provided. *Id.* The court found that an injunction remained necessary because, absent "a permanent injunction, it is very likely that … Defendants will again attempt to access Facebook's servers without authorization," given that they "have frequently exhibited bad faith conduct that indicates that they will not easily be deterred." ER26. It rejected on the merits each of Defendants' arguments that the injunction was too broad. ER29-34.

The court thus entered a new final judgment awarding both damages and injunctive relief. ER1-3. Defendants then filed this appeal. ER118-119.

### The district court holds Defendants in contempt and awards attorney's fees and sanctions.

Following Defendants' appeal to this Court, the district court entered an additional order in August 2017 to enforce its judgment in light of Defendants' continued noncompliance with the court's orders. Among other things, the permanent injunction required Defendants to "certify in writing, under penalty of perjury" that they had complied with the injunction, including its requirement that they "destroy

24

Facebook data and/or information obtained from Facebook or Facebook's users." ER32. Nearly three months after the district court's deadline for certification, Vachani had not adequately done so. The court ordered him to comply once more. SER24-26.

In the same order, the court "h[e]ld Power and Vachani … in contempt of court for failing to pay the $39,796.73 discovery sanction," now several years after it had been imposed. SER26. The court also awarded Facebook $145,028.40 in attorney's fees as the prevailing party under § 502, SER15; Facebook had "request[ed] only a small subset of th[e] attorney's fees" it was entitled to, covering only "'post-remand proceedings'" but not "any other work performed" in the first eight years of the litigation. SER12-13, 15. To date, Defendants still have not paid these sums. Contempt sanctions of $100 per day continue to accrue. SER28. Defendants did not file a notice of appeal from the district court's August 2017 order, which has therefore become final.

## SUMMARY OF ARGUMENT

**I.** In Defendants' first appeal, this Court held that "after receiving written notification from Facebook on December 1, 2008, Power accessed Facebook's computers 'without authorization'" and thus "is

liable" under the CFAA and § 502. ER57. With respect to compensatory damages for those claims, this Court remanded for the narrow purpose of "calculat[ing] damages only for the period after Power received the cease and desist letter." ER60. The district court correctly did just that, subtracting from the prior damages award— which was undisputed—those expenses that Facebook incurred on or before December 1, 2008.

The mandate rule and the law-of-the-case doctrine bar Defendants' new arguments that they accessed Facebook without authorization only for five days, rather than several months. Their new theories directly contravene this Court's decision, which squarely held that Defendants accessed Facebook without authorization from the time of the cease-and-desist letter into early 2009. And these arguments are forfeited because Defendants could have pressed them in their first appeal. They are without merit in any event: Facebook never rescinded its cease-and-desist order while negotiating with Defendants whether their access to Facebook could ever be restored. And the undisputed evidence showed that Power continued accessing Facebook into the first quarter of 2009.

26

Likewise, Defendants' challenge to the sufficiency of Facebook's damages evidence comes much too late because the district court had accepted this evidence as credible and unrebutted before the first appeal. On remand, the district court's task was simply a matter of accounting: determining which of the undisputed expenses were incurred on or before December 1, 2008. It properly refrained from revisiting evidentiary matters that were either raised or forfeited in the first appeal.

**II.** This Court previously held that "Facebook suffered a loss within the meaning of the CFAA," meeting the threshold requirement that it establish a loss of at least $5,000. ER51. It rejected three arguments that Defendants raised in their first appeal: (1) that Facebook needed to show "impairment" or "disruption" of its services or data; (2) that Facebook's fees for outside counsel to investigate and respond to Power's activities do not constitute covered "loss"; and (3) that Facebook's claims of expenses were too general. Defendants now retread those arguments, but they too are barred by law of the case and the mandate rule, and they remain meritless.

**III.** The district court did not abuse its discretion in granting a new, narrowed permanent injunction against Defendants. Defendants "frequently exhibited bad faith conduct that indicates that they will not easily be deterred" from violating the computer-fraud laws. ER26. Their defiance over the past decade convinced the district court that they are "very likely" to resume their misconduct absent an injunction. *Id*. And their unrepentant, unauthorized access to Facebook's computers and user data offends the public interest and irreparably injures Facebook.

Defendants do not dispute these findings. They challenge only the injunction's scope. But the new injunction prohibits only illegal conduct, and it properly excludes provisions of the previous injunction that were specific to the CAN-SPAM Act claim. And Defendants hardly are in a position to appeal to equity, given that they remain in contempt of court.

## STANDARDS OF REVIEW

This Court reviews de novo whether the district court complied with this Court's mandate. *United States v. Thrasher*, 483 F.3d 977, 982 (9th Cir. 2007). It "review[s] a district court's decision to apply the

law of the case for an abuse of discretion." *Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005).

A "district court's grant of summary judgment," including as to "the amount of damages[,]" "is reviewed *de novo*." *Travelers Cas. & Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1137 (9th Cir. 2009) (internal quotation marks omitted). This Court's "review is governed by the same standard used by the trial court." *Id.* Where the moving party presents "[e]vidence of the amount of damages … by means of [an] affidavit and its accompanying exhibits," the burden "shift[s] … to [the non-moving party] to demonstrate the existence of a triable issue of fact with respect to those damages." *Id.* at 1137-38.

The district court's grant of a permanent injunction, as well as "the scope of injunctive relief," is reviewed "for an abuse of discretion." *United States v. Alisal Water Corp.*, 431 F.3d 643, 654 (9th Cir. 2005); *see Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 937 (9th Cir. 2004). Defendants mistakenly suggest that review is de novo. They cite (Br. 45) *TrafficSchool.com, Inc. v. Edriver Inc.*, but that case similarly provides that "[t]he scope of an injunction is within the broad

discretion of the district court" and held that "the district court ... didn't abuse that discretion."  653 F.3d 820, 829 (9th Cir. 2011).

## ARGUMENT

## I.    The District Court Correctly Recalculated Compensatory Damages Consistent With This Court's Mandate.

The district court properly followed this Court's mandate by limiting Facebook's CFAA compensatory damages to those incurred after Defendants received Facebook's cease-and-desist letter and by excluding CAN-SPAM Act damages entirely.  *Infra* § I.A.  The district court also correctly refused to revisit liability-phase issues that this Court already resolved.  *Infra* § I.B.  Similarly, the district court properly rejected Defendants' challenges to aspects of the damages award that were not contemplated by this Court's remand and that either were raised or could have been raised in their first appeal.  And even if the law of the case and forfeiture were not dispositive, each of Defendants' arguments fails on the merits.  *Infra* § I.C.

### A.    The district court properly awarded damages limited to the period specified by this Court.

"The rule of mandate doctrine ... provides" that this Court's "mandate ... limit[s] the district court's 'authority' on remand."  *United States v. Thrasher*, 483 F.3d 977, 981-82 (9th Cir. 2007).  Thus, on

remand, a district court lacks authority to "vary" from this Court's ruling, to "give any other or further relief," or to otherwise "intermeddle with it, further than to settle so much as has been remanded." *Id.* at 981 (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). And "whatever was before th[e] [appellate] court, and disposed of by its decree, is considered as finally settled." *Id.* (quoting *Sanford Fork*, 160 U.S. at 255). This rule "serve[s] an interest in consistency, finality and efficiency," as well as "an interest in preserving the hierarchical structure of the court system." *Id.* at 982.

The law-of-the-case doctrine is closely related. Under that rule, the district court "is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case," including "issue[s] … decided explicitly or by necessary implication in the previous disposition." *Id.* at 981 (quoting *Herrington v. Cty. of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993)). Like the mandate rule, "[l]aw-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18B Wright & Miller, Fed. Prac. & Proc. Juris. § 4478 (2d ed.). They "rest[] on good sense and the desire to

protect both court and parties against the burdens of repeated reargument by indefatigable diehards." *Id.*

In its opinion, this Court issued a narrow remand concerning only the question of "appropriate remedies." ER60. This Court affirmed Defendants' liability under the CFAA and § 502, specifying that Defendants violated both statutes by accessing Facebook without permission in "the period after Power received the cease and desist letter" on December 1, 2008. ER60; *see* ER54-57, 59. But because the district court had previously issued remedies under both the computer-fraud claims and the now-reversed CAN-SPAM Act claim, and because the district court had not expressly used Facebook's cease-and-desist letter as the starting point for calculating damages, this Court remanded.

This Court made "the scope of the remand" very "clear," *Thrasher*, 483 F.3d at 982 (internal quotation marks omitted): "With respect to damages," it ordered "the district court [to] calculate damages only for the period *after Power received the cease and desist letter*, when Power continued to access data contained in Facebook's servers and memory banks." ER60 (emphasis added). And with respect to the

32

"injunctive relief," it directed the district court to consider the appropriate scope of relief for Defendants' violations of the CFAA and § 502. ER51, 60.

The district court followed this Court's directive precisely, "[w]ith the narrow scope of the Ninth Circuit's remand in mind." ER15. It recalculated "which of the CFAA damages that [it had] granted in its September 25, 2013 order were incurred after Facebook revoked its permission by sending a cease and desist letter to Power on December 1, 2008." *Id.* To do so, it "[s]ubtract[ed] th[e] amount" of expenses incurred on or before December 1, 2008 "from the $80,543 that [it] previously granted in damages." ER24. It carefully examined the record and found that "Facebook ha[d] established through undisputed evidence that of the $80,543 in damages that [the] Court granted prior to appeal, only $902.50 was incurred on or before December 1, 2008." ER24; *see also* ER15-24. "Therefore, in accordance with the Ninth Circuit's order," it awarded "Facebook $79,640.50 in compensatory damages under the CFAA," ER24, and it excluded all CAN-SPAM Act damages, ER21-22. And, as explained below (§ III), in issuing a narrowed permanent injunction, the district court was equally careful

33

to weigh the relevant evidence and to grant only "appropriate remedies," ER60, just as this Court directed.

### B. Defendants' efforts to relitigate their liability violate the mandate rule and contravene the law of the case.

Threaded through Defendants' various attacks on the district court's order is the common suggestion that Defendants should not have been held liable during the first appeal. The same was true in the district court, as Judge Koh noted. ER15 (Defendants' "briefing contains many arguments that essentially re-raise issues that the Court has already resolved or raise issues that Defendants never raised before either [the district court] or the Ninth Circuit"). For example, Defendants continue to treat the CFAA and § 502 claims as "highly disputed," protesting that these claims were "summarily adjudged in Facebook's favor despite material insufficiencies" in the evidence. Br. 2. And they continue to insist that their "access [to facebook.com] was authorized," and that their liability to Facebook improperly "leverag[es] criminal hacking statutes" by requiring "competitor compliance with … Terms [of Service]." Br. 17. But this Court already ruled otherwise. It held that Defendants engaged in unauthorized access in violation of the CFAA and § 502 "after receiving written notification from Facebook on

34

December 1, 2008," ER57, 59—liability that was *not* based on mere "[v]iolation of Facebook's terms of use," but rather on ignoring an express and direct command to keep out of Facebook's systems, ER55 n.3.

Similarly, Defendants reprise their claim that "Facebook has not shown that Power accessed Facebook's data or any part of its website other than what is either publicly available or within each authorizing user's possession and control." Br. 21; *compare* Defendants' *Facebook I* Br. 36, 44-45, 52. But this Court rejected that very argument when it held that "[t]he consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computers after Facebook's express revocation of permission … [when] Facebook issued the cease and desist letter." ER56.

Defendants' efforts to relitigate their liability under the CFAA and § 502 are improper. This Court "remanded for a single purpose," *Thrasher*, 483 F.3d at 983—"to reconsider appropriate remedies under the CFAA and section 502," ER60. "The plain language of the disposition [thus] precluded the district court from considering any other arguments concerning" whether and when Power engaged in

35

unauthorized access to Facebook's site. *Thrasher*, 483 F.3d at 983.

Defendants' challenges to the fact and scope of their liability thus flout

the law of the case and the mandate rule, and the district court properly

rejected them. The court certainly did not deny Defendants "due

process," Br. 17, when it faithfully applied this Court's directives on

remand.[1]

## C. Defendants' other challenges to the compensatory damages award are foreclosed by the terms of this Court's remand and are meritless in any event.

Defendants also raise a smattering of more limited challenges to

the timeframe and evidence that the district court used to recalculate

compensatory damages. But the district court correctly held that these

---

[1] Defendants appear to suggest (Br. 15-18, 52) that *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099 (N.D. Cal. 2017), constitutes a change in the law that warrants departing from the law of the case. But plainly a district court decision cannot be an intervening change in this Court's law. And any exception to the law-of-the-case rule would not apply anyway where the prior decision was, as here, "a published decision of this court" constituting "binding authority." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc), *aff'd sub nom.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). This Court's prior opinion thus cannot be disregarded absent "intervening *higher* authority." *Id.* (internal quotation marks omitted) (emphasis added). Moreover, *hiQ* did not purport to change the law; the district court there *distinguished* the opinion in this case on the ground that the data scraped from LinkedIn's website, unlike Facebook's, is not protected by a password. 273 F. Supp. 3d at 1109-15, 1120.

arguments were not properly presented because they exceeded the scope of this Court's remand. Some were forfeited when they were not raised in the first appeal; a party "gets only one opportunity to appeal from any one judgment," so a "party who appeals from a judgment once on one theory and loses cannot on remand relitigate the same claim on a new theory." *Sec. Inv'r Prot. Corp. v. Vigman*, 74 F.3d 932, 938 (9th Cir. 1996) (internal quotation marks omitted). Some were forfeited again when Defendants failed to present them even on remand to the district court. And all lack merit in any event.

### 1. The district court properly followed this Court's direction to calculate damages as of December 1, 2008.

**a.** Defendants raise a new theory to challenge the scope of their liability under the CFAA and § 502: They assert that the district court "determined both [their] liability and damages based on alleged loss … during a period when [their] access was authorized" because, in their view, their liability (and thus the damages) for unlawful access to Facebook did not start until December 26, 2008. Br. 17, 32. And they contend that "[i]rrespective of the absence of specific guidance in the December 2016 decision [of this Court], it was incumbent on the District

37

Court to consider the time periods when Appellants actually acted without authorization." Br. 22.

But this Court *did* give specific guidance on that very point, which the district court was not free to disregard. This Court held that "after receiving written notification from Facebook *on December 1, 2008*, Power accessed Facebook's computers 'without authorization' … and is liable." ER57 (emphasis added). It therefore remanded for the district court to recalculate Facebook's damages only for this slightly shorter "period after Power received the cease and desist letter"—not to second-guess this Court's holding. ER60. Defendants' attempt to narrow the window of their liability for accessing Facebook without authorization "is flatly contradicted by the Ninth Circuit's order." ER17.

Defendants contend that this Court "left [the] matter of [the damages period] to the District Court" because it "made no mention of the parties' negotiations throughout the month of December or the critical fact that Facebook expressly permitted (or extended its revocation of permission to) Power to continue its access … until December 26, 2008"—the deadline for compliance "with Facebook's 'Terms and applicable Connect policies.'" Br. 13. But Defendants never

38

argued in the first appeal that their liability under the CFAA and § 502 should be narrowed to the late-December period. Having forgone that opportunity, Defendants "cannot offer up successively different legal or factual theories that could have been presented in [the] prior request for review." *Vigman*, 74 F.3d at 937.

Moreover, this Court necessarily rejected Defendants' argument in the first appeal. Defendants' current theory (Br. 50; *see also* Br. 13, 34) is that Facebook "expressly extended authorization of Power's continued access of facebook.com" until the December 26 deadline to implement Facebook Connect. But Facebook plainly never withdrew its December 1 cease-and-desist letter or allowed Power to resume its unsecure scraping activity in the meantime. *See infra* 40-42. That is law of the case because this Court held that the cease-and-desist letter "explicitly revoked authorization for *any* access." ER57.

In reaching that conclusion, this Court considered the parties' ongoing discussions regarding implementation of Facebook Connect: Defendants' brief in their first appeal addressed the email from Facebook that they now characterize as granting their access to Facebook. *See* Defendants' *Facebook I* Br. 44-45 nn.28, 31. And this

Court then observed that, after revoking Defendants' access, "Facebook tried to get Power to sign its Developer Terms of Use Agreement and enroll in Facebook Connect; Power resisted." ER46. The parties' ongoing discussions about Facebook Connect thus did not alter its conclusion that Facebook rescinded Defendants' authorization as of December 1.

In short, this Court "finally adjudicated all issues" regarding when Defendants' access became unauthorized. *Thrasher*, 483 F.3d at 983 (internal quotation marks omitted). The district court correctly recognized that its sole charge on remand was to recalculate damages "for the period after Power received the cease and desist letter." ER60.

**b.** Even if Defendants' theory were properly presented, the district court rightly rejected it on the merits. As the court explained, the notion that "Facebook gave Power permission to use its website until December 26, 2008 is incorrect." ER17. During that time, Facebook's representative "repeatedly demanded that Power cease its activities." ER17; *see also*, *e.g.*, SER309-311. Facebook was actively working "to block IP addresses associated with Power from accessing Facebook's servers," and "Power was actively evading" those blocks. ER17; *see also,*

40

*e.g.*, SER157-158. Contrary to Defendants' assertion that Facebook "fraudulent[ly] induce[d] … Power to continue accessing facebook.com," Br. 14-15, at no point after December 1, 2008 was there anything equivocal about Facebook's directive to keep out.

Nothing supports Defendants' statement that Facebook "expressly delayed revocation" of authorization. Br. 32. Facebook certainly has never agreed with that bare assertion. *Contra* Br. 14. When Facebook "extend[ed] its deadline for compliance to December 26, 2008," Br. 14, it did not authorize Defendants' access in the meantime. Rather, Facebook's representative explained that authorization to access facebook.com could not be *restored* unless, by that date, Power fully implemented Facebook Connect and met other preconditions. SER234-235; *see also* SER310. "The mere fact that [Facebook's representative] gave Power a two-week deadline before Facebook took *further* action does not indicate that Facebook gave Power permission to access Facebook" using its scraping software until it was ready to implement Facebook Connect. ER17 (emphasis added). On the contrary, Facebook imposed technical blocks in the "[m]eanwhile" to stop Defendants' unsecure scraping completely. SER235.

Defendants' related claim that they "continued working to develop software in compliance with Facebook's Terms," Br. 7, contradicts this Court's conclusion that they "resisted" doing just that, ER46. Instead, they continued to access Facebook's systems *knowing* they lacked authorization while simultaneously misrepresenting to Facebook their intent to develop compliant software, ER55-56; *supra* 9-12.

Defendants also argue that, on remand, the district court relied on an "'IP block' standard" that this Court had rejected. *See* Br. 20. They say the district court found them liable between December 1 and December 26, 2008, based solely on the fact that Facebook "continued to leave its attempted 'IP blocks' in place" during that time. Br. 19-20. That is incorrect. The district court took December 1 as the starting point because that is what this Court directed, based on when Defendants received the cease-and-desist letter. ER17. The district court cited Facebook's IP blocks "between December 2, 2008 and December 26, 2008" (and Power's efforts to evade them) simply to illustrate the incoherence of Defendants' new position that Facebook had granted them permission to access Facebook during this period. ER17. The continuing existence of IP blocks belied Defendants' theory.

42

And that conclusion was entirely consistent with this Court's decision. *E.g.*, ER57 (explaining that that Power's post-December 1 "circumvent[ion] [of] IP barriers … further demonstrated that Facebook had rescinded permission for Power to access Facebook's computers").

> ### 2. The district court properly followed this Court's direction to calculate damages through early 2009.

Likewise, Defendants' theory (Br. 33-34) that damages were available only through December 30, 2008, is both foreclosed and wrong.

**a.** This Court held that Power's unauthorized access continued until at least "[t]oward the end of January 2009"—a month *after* "Facebook filed this action." ER46. Indeed, in the order underlying the first appeal, the district court had "already decided that Facebook's attorney's fees and investigation and enforcement costs through *March 2009* are compensable even though Power was not actively interacting with Facebook's website for significant portions of that time." ER18-19 (citing SER54) (emphasis added). That became law of the case when "[t]he Ninth Circuit did not question this finding in its order" and "the Ninth Circuit stated that Facebook had 'suffered a loss' based on all

43

time spent 'analyzing, investigating, and responding to Power's actions.'" ER19 (quoting ER52).

**b.** On the merits, the district court correctly held that Power continued to access Facebook without authorization until "the end of January 2009," as shown by the promotional messages it continued sending via Facebook during that time. ER18 (quoting ER46). The district court further held that "Defendants accessed Facebook's computers again through the Facebook Connect program on February 5, 2009." ER18; *see also* SER318. Defendants point to no evidence that supports their bare assertion that they stopped accessing Facebook's computers on December 30. *See* Br. 6, 33-34.[2]

Besides, it does not matter when Defendants ceased their unlawful access. Even if Defendants had stopped on December 30, 2008, "Facebook's attorney's fees and investigation and enforcement costs are compensable even if Power was not actively interacting with Facebook's website at the time the expenses were incurred." ER19. By

---

[2] As the district court explained, "the full extent of Defendants' activities after December 2008 is unknown because [as] Vachani testified at his deposition that in April 2011, Vachani destroyed a logging database that contained evidence about the scope of Defendants' activities after December 2008." ER18 (citing SER171-172).

its plain terms, the CFAA encompasses damages incurred *after* an offense, "including the cost of responding to an offense" and "conducting a damage assessment." 18 U.S.C. § 1030(e)(11). Thus, "courts have granted damages under the CFAA for actions taken after the offense itself." ER19 (citing *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174-1175 (11th Cir. 2017); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009); *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 584 n.17 (1st Cir. 2001)); *see also Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073-1074 (6th Cir. 2014) (investigation of CFAA violation).

Section 502 similarly covers damages incurred after an offense to assess whether computers or data were "altered, damaged, or deleted." § 502(e)(1); *see Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1161-1162 (E.D. Cal. 2017). Defendants offer no authority for their suggestion that Facebook can recover only for damages incurred while Defendants' violation remained underway, or that filing this lawsuit cut off damages.

### 3. The district court correctly rejected Defendants' untimely challenges to Facebook's damages evidence.

Next, Defendants challenge Facebook's evidence supporting the amount of damages. Br. 29-42. But the district court recognized that those arguments were also beyond the scope of this Court's remand and equally meritless.

**a.** Defendants argue that the district court failed to "to hold Facebook to its burden of proving damages by a preponderance of evidence and not merely based on statements that certain sums were incurred for generalized activities over broad periods of time." Br. 31; *see* Br. 38-42. But "although Facebook does bear the burden of justifying its damages by a preponderance of the evidence," the district court had "already found that Facebook met this burden" before the first appeal. ER15. Most notably, the district court's original remedies order awarded Facebook the amount of compensatory damages calculated in Facebook's expert report, which, the court observed, Defendants had not rebutted and "d[id] not dispute." SER54 n.13, 62; *see also* ER104-105, 115 & n.44 (summary judgment order noting that

Defendants failed to dispute Facebook's damages evidence); ER158-60, 170 (Facebook's damages expert report).

In the first appeal, this Court did not disturb the district court's conclusion on this point, so it is now law of the case. Instead, this Court directed the district court only to subtract out the pre-cease-and-desist-letter damages from the unrebutted sum—which is what the district court did. *See supra* § I.A; ER23-24. Contrary to Defendants' claim that the district court "refused to make any evidentiary findings on [F]acebook's questionable new 'evidence,'" Br. 23, the court awarded Facebook reduced damages of $79,640.50 based on a straightforward analysis of Facebook's evidence establishing which expenses were incurred on or before December 1, 2008, ER23-24.

The district court considered a supplemental declaration explaining which of the external expenditures were made on or before December 1, 2008, as well as the previously submitted records of when the internal expenses were incurred. ER22-24. That declaration showed that only $852.50 of the previously established external expenses were incurred on or before December 1, 2008. ER176. And regarding the internal expenses, Facebook's expert report established

47

the cost of a Facebook security official's time at $100 per hour, ER160, and previously submitted activity logs indicated that he had spent half an hour responding to Defendants' activities on December 1, 2008, ER147, so the excludable portion of Facebook's internal expenses was $50, ER147. Based on this evidence, the district court found that Facebook established that $902.50 (i.e., $852.50 + $50) of its previously claimed expenses were not compensable, while the rest—$79,640.50 (i.e., $80,543 – $902.50)—remained unaffected by this Court's decision. ER24.

Defendants nevertheless contend (Br. 38-42) that the district court was required to revisit the sufficiency of the original declarations and the expert report. That is not so. In *Herrington*, for example, the district court did not err by treating as final a property valuation that had been addressed in a prior appeal, even though one party sought to introduce a new (and different) appraisal on remand. 12 F.3d at 905. A contrary rule would defeat the purpose of the law-of-the-case doctrine: "to aid in the efficient operation of court affairs." *Id.* at 904 (internal quotation marks omitted).

48

Likewise, the remand here to exclude pre-December 1 damages was not a fresh opportunity to demand that Facebook "produce a schedule of hours or other evidence supporting the dates on which efforts were made and for what activities costs were incurred." Br. 30. Defendants assert that Facebook should have submitted "the best evidence supporting its two sources of alleged damages" instead of "hid[ing] the ball by offering 'expert' third-party interpretation and estimation of … hours." Br. 38-39. That claim was forfeited when they failed to contest the expert report in their first appeal. SER54 & n.13. So too their assertion that the expert report was an "unnecessary 'expert opinion.'" Br. 39. Any challenge to Facebook's expert under Federal Rule of Evidence 702 had to be brought before summary judgment, and certainly no later than Defendants' first appeal—not six years later on a narrow remand to tweak the damages award. It does not violate "due process," Br. 23, 43, to decline to consider arguments when earlier opportunities were forfeited.

**b.** But even if the sufficiency of Facebook's compensatory damages evidence were an open question after the last appeal, the district court rightly rejected Defendants' arguments on the merits. ER22-23.

49

Facebook's expert report relied on clear and reliable sources (which were all disclosed, ER158, 166), and Facebook's declarations were reliable as well. ER22-23; *see* ER154-177; SER308-311, 313. And more to the point, Defendants never offered any evidence of their own that would cast doubt on Facebook's damages evidence. Facebook's declarations "w[ere] sufficient to shift the burden to [Defendants] to demonstrate the existence of a triable issue of fact with respect to th[e amount of] damages," but "there was no evidentiary submission from [them] to rebut [Facebook's] sworn statement[s] (and accompanying exhibits)." *Travelers*, 551 F.3d at 1137-1138. The district court thus rightly concluded that "Facebook's damages calculations were fully justified by 'undisputed testimony,'" so there was no factual dispute to try. ER22.

Defendants cite a decade-old unpublished district court case, *Southwest Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007), for the proposition that "there is simply no basis upon which the court may determine whether Facebook's responsive efforts constitute reasonable loss." Br. 41 (internal quotation marks omitted). But in that case, Southwest offered

50

only a "fairly conclusory" declaration that did not describe "the precise steps taken" during its response, unlike the multiple declarations submitted here. 2007 WL 4823761, at *16. Defendants also cite (Br. 42) a patent invalidity case, *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 995 (Fed. Cir. 2008), but that case is even further afield: It has nothing to do with proving damages or computer-fraud claims and states only the standard principle that a conclusory declaration cannot *defeat* summary judgment.

Defendants claim that Facebook should have provided line-item billing records instead of using an expert report to establish the costs of Facebook's internal and external response efforts. Br. 39-40. But there is nothing unusual about using expert testimony to quantify damages. *Contra* Br. 39. *See, e.g.*, *Creative Computing*, 386 F.3d at 936 (rejecting argument "that the evidence was insufficient" to establish "loss" under the CFAA because of "the form in which Creative Computing's expert witness presented the damages"). Facebook's expert report provided a granular determination of costs by analyzing and apportioning those parts of Facebook's outside counsel fees and security manager's compensation that were attributable to responding to Defendants'

51

unauthorized activities, based on, among other things, the declarations in the record and additional interviews. ER158-163.

**c.** Defendants' other challenges to the compensatory damages evidence similarly lack merit.

First, Defendants claim that Facebook's evidence is not credible because "post-remand admissions undermine" it. Br. 32. They claim Facebook admitted on remand that its evidence of damages was inaccurate. *See* Br. 35-36. But they forfeited this argument because it "was not raised below," *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 n.15 (9th Cir. 1991); *see* Doc. 423 (Defendants' remedies brief on remand), and it is simply incorrect.

Facebook made no such admission. At a preliminary case-management conference on remand, Facebook proposed, purely in the interest of efficiency, to claim only $46,883 of the original $80,543 damages award by essentially "cutting out all of December"—30 days more than this Court required be excluded—for some categories of damages that Facebook's expert report had calculated only on a monthly rather than a daily basis. ER207; *see* ER183-185; SER108-110. But when Defendants made clear at that conference that they intended

to dispute even that, Facebook clarified that if supplemental briefing on compensatory damages would be necessary anyway, it would "probably ask for some of December at least," and so the "numbers … in our request" thus "might change."  ER207.  Facebook's ultimate damages request did fully apportion the original $80,543 compensatory damages to exclude only December 1, not the full month of December 2008. *Supra* § I.C.3.  But at no point did Facebook "admit[] to the court that the expert report and [Cutler] declaration, on which the Court based its determinations of Facebook's standing and prior order of damages, was wrong."  Br. 35.

Second, Defendants contend that by merely deducting losses incurred on or before December 1, 2008, the district court awarded "compensatory damages … based in substantial part on the alleged CAN-SPAM violations."  Br. 30.  In particular, they assert that Facebook failed "to exclude or even define the 'substantial amount' of Mr. McGeehan's time specifically related to spamming," and that "the District Court refused to exclude that cost when reconsidering damages on remand."  Br. 29-30.  But this argument was forfeited long ago, as the district court explained:  "Defendants never raised, either before [it]

53

or before the Ninth Circuit on appeal, the argument that the compensatory damages that Facebook requested under the CFAA included damages attributable only to the CAN-SPAM Act violation." ER21 (internal citations omitted).

In any event, as the district court explained, *see* ER21, this argument is wrong too. Facebook never sought compensation under the CAN-SPAM Act for any portion of McGeehan's time. With respect to the CAN-SPAM Act, Facebook elected to pursue only *statutory* damages—and *not* damages for "actual losses." *See* Doc. 299 (Facebook's original remedies brief); *see also* ER158-159. Accordingly, the district court's "earlier compensatory damages award did not include a portion of compensatory damages attributable to Defendants' CAN-SPAM Act violation." ER21; *see also* SER50.[3]

---

[3] The district court identified yet a third reason Defendants' argument fails: Because Defendants sent their promotional messages "using data acquired in violation of the CFAA …, all enforcement or investigation actions that Facebook took regarding the messages were a reasonable response to the CFAA violation" itself, even though "these messages did not violate the CAN-SPAM Act" as well. ER21-22.

54

**II.   The District Court Correctly Rejected Defendants'
        Renewed Argument That Facebook Did Not Establish A
        Qualifying "Loss" Under The CFAA And § 502.**

Both the CFAA and § 502 require that a plaintiff have suffered
"damage or loss" to bring suit.  18 U.S.C. § 1030(g); Cal. Penal Code
§ 502(e).  As relevant here, the CFAA further requires "loss to 1 or more
persons during any 1-year period … aggregating at least $5,000 in
value."  18 U.S.C. § 1030(c)(4)(A)(i)(I), (g).  This Court already has
determined that these requirements are satisfied.  It held in the first
appeal that "Facebook suffered a loss within the meaning of the CFAA,"
affirming the district court's conclusion on that point and rejecting
Defendants' contrary arguments.  ER51; *see also* ER58 (holding that the
§ 502 analysis is similar and finding violation of § 502).  That holding is
now law of the case, and the mandate rule likewise precluded the
district court from revisiting the issue.

**A.** Defendants in the last appeal raised the same three points they
raise here:  (1) Facebook failed to "identify impairment of or damage to
[its] computer system" or show that its "network suffered disruption,"
Defendants' *Facebook I* Br. 28 (internal quotation marks omitted;
*compare* Br. 27-28, 41; (2) "neither attorney fees nor any costs unrelated

55

to the computer itself counts toward the $5,000 jurisdictional 'loss' requirement," Defendants' *Facebook I* Br. 29; *compare* Br. 27-28; and (3) "all of the 'harms' identified by Facebook's security manager Ryan McGeehan are vague and lacking in any sort of specificity," Defendants' *Facebook I* Br. 26-27; *compare* Br. 30-39, 41.

This Court did not dwell on these arguments at length, *see* ER51, but its holding that Facebook satisfied the loss element of its claims at least "implicitly rejected all [of Defendants'] arguments that" Facebook failed to establish a qualifying loss. *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995). That the Court's holding was "succinct" does not make it any less binding where "the briefs and other materials submitted to [this Court] reveal that it was aware of both the arguments and the cases relied upon by [Defendants]," because "even summarily treated issues become the law of the case." *Id.* at 1392-1393 (internal quotation marks omitted).

Defendants' position is essentially that "question[s] once considered and decided by [the appellate court should] … be litigated anew in the same case upon any and every subsequent appeal." *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979) (internal

quotation marks omitted). But that contravenes "the sound public policy that litigation must come to an end." *Id.*; *see also Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011) ("At some point, litigation must come to an end. That point has now been reached."). This Court should "not entertain a second attempt to litigate these issues." *Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1049 (9th Cir. 2005).

Defendants suggest that whether Facebook "prove[d] at [l]east $5,000 in qualifying losses" is a non-waivable and jurisdictional issue of "standing" that this Court must address. *See* Br. 26-27. But that is incorrect. "Loss" under the CFAA is one of the five elements of the cause of action, not a requirement of subject-matter jurisdiction. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009). Indeed, the Supreme Court has recently clarified that whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" is a *merits* question of the "element[s] of a cause of action," not a *jurisdictional* question of "standing." *Lexmark Int'l, Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377, 1387 & n.4, 1391 n.6 (2014). Congress did not "imbue[] [the CFAA's loss requirement] with

jurisdictional consequences" such that "a court must enforce the limitation even if the other party has waived any … objection" or already litigated it and lost. *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1631-1632 (2015).

Defendants also cite *United States v. Christensen*, 828 F.3d 763 (9th Cir. 2016), for the proposition that the district court "has a duty to reconsider its prior determinations of 'loss' when the bases for those determinations are implicated on remand." Br. 44. But *Christensen* concerned whether jury instructions correctly defined "exceeds authorized access" under the CFAA, 828 F.3d at 786-787; it says nothing about reviewing the "loss" element. And nothing in this Court's decision implicated the district court's prior determination that Facebook satisfied the "loss" element of its cause of action.

Defendants also assert that the law-of-the-case rule is inapplicable when the "prior judicial determination … was based on substantially different evidence." Br. 44 (citing *Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 874 n.4 (9th Cir. 2000). But they cite no new evidence nor make any argument they did not press before.

58

**B.** In any event, Defendants' arguments have grown no more meritorious with time.

First, Defendants argue that under the CFAA, "[i]njury solely related to the loss or misuse of information acquired from a plaintiff's computer" does not suffice; there must be "impairment of performance or functioning of their computers[,]" "impairment of Facebook's data," or "interruption of service." Br. 27-28, Br. 41. But as Facebook explained in the last appeal, that is simply wrong. *See* Facebook's *Facebook I* Br. 33-34. "Loss" under the CFAA "means *two* things: 'any reasonable cost to the victim' *and* lost revenue or other damages incurred as a result of an interruption of service." *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1184 (E.D. Cal. 2010) (emphasis added); *see* 18 U.S.C. § 1030(e)(11); *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, No. 2:13-cv-00784, 2013 WL 3872950, at *20-21 (E.D. Cal. July 25, 2013). Either suffices. So even if Facebook's diversion of engineering personnel were not an impairment or interruption, Facebook's claimed expenses qualify as losses incurred "responding to an offense" or "conducting a damage assessment." § 1030(e)(11).

Defendants now supplement their prior argument with two additional district court citations, neither of which postdates their first appeal. *See* Br. 27-28, 41. The first does not support them, because the court held only that "the unauthorized collection, use, or disclosure of personal information"—without more—did not constitute "economic damages for the purposes of the CFAA." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 988 F. Supp. 2d 434, 448 (D. Del. 2013) (emphasis added), *aff'd in part and vacated in part*, 806 F.3d 125 (3d Cir. 2015). The plaintiffs there, unlike Facebook, failed to "allege that they incurred costs" at all. 806 F.3d at 149. As for Defendants' second case, the Eleventh Circuit expressly overruled the holding they cite. *See Brown Jordan*, 846 F.3d at 1174 (holding that "under a plain reading of the statute … loss … from … violation of the CFAA does not need to be related to an interruption of service in order to be compensable"; abrogating *Continental Grp., Inc. v. KW Prop. Mgmt. LLC*, 622 F. Supp. 2d 1357 (S.D. Fla. 2009)).[4]

---

[4] Defendants' argument that Facebook failed to show impairment or disruption of service or data fails for the further reason that they forfeited it by failing to raise it in their remedies brief on remand. Doc. 423.

60

Second, Defendants' renewed argument (Br. 27-28) that expenses paid to Facebook's outside counsel cannot count toward the $5,000 loss threshold under the CFAA is still incorrect. According to Defendants, these expenses constitute "attorney's fees [that] have explicitly been held not to qualify." Br. 28; *compare* Defendants' *Facebook I* Br. 29. But, as Facebook explained in the last appeal, Facebook's response to Defendants' unauthorized access came via outside counsel, who repeatedly conveyed that Facebook had rescinded Defendants' access, sought assurances that Defendants would stop scraping Facebook's site, and ultimately used the threat of a TRO to get Defendants to stand down. Facebook's *Facebook I* Br. 32; *see* SER309-311; ER255.

Those are valid costs of "responding to an offense." 18 U.S.C. § 1030(e)(11). And they do not cease to be legitimate costs of a response the moment attorneys get involved. After all, *Facebook I* held that a cease-and-desist letter is a critical step in terminating someone's access, *see* ER53-58, and cease-and-desist letters are generally written and enforced by lawyers. If the cost of those response efforts is high here, that is only because the process was prolonged when Vachani misled

Facebook's counsel, promising to comply while instructing his staff to do the opposite. *Supra* 9-13.

Defendants now cite three district court cases declining to count expenses incurred for the purposes of litigation as qualifying losses under the CFAA. *See* Br. 28. But none involves expenses akin to the costs Facebook incurred here to *investigate and respond* to Defendants' unlawful activities. Rather, each concerns expenses incurred solely for *litigation* purposes. *See In re Mud King Prods., Inc.*, 514 B.R. 496, 520-521 (Bankr. S.D. Tex. 2014) (rejecting fees paid to law firm to assist in electronic discovery and to collect and analyze data from witnesses), *aff'd*, No. BR 13-32101, 2015 WL 862319 (S.D. Tex. Feb. 27, 2015); *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338-339 (E.D. Pa. 2013) (rejecting "the litigation costs associated with hiring court reporters and videographers, and obtaining deposition transcripts" and forensic expert "retained … for assistance in [the] lawsuit"); *Wilson v. Moreau*, 440 F. Supp. 2d 81, 110 (D.R.I. 2006) (rejecting "litigation expenses [that] are not directly attributable to Defendants' computer browsing"), *aff'd on other grounds*, 492 F.3d 50 (1st Cir. 2007). To the extent the Court looks beyond its prior opinion in this case to out-of-

circuit district court opinions, more on-point is *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 927-928 (E.D. Va. 2017), which held that legal fees incurred "to investigate and respond to the incident" *do* constitute "loss."

In any event, Defendants contend only that the cost of responding via lawyers is disallowed with respect to *the CFAA*. Br. 28-29, 42-43. This offers no reason to disturb the damages award, which rests equally on § 502. ER1.

Third, Defendants also seek to relitigate whether Facebook sufficiently established a loss by submitting "statements that certain sums were incurred for generalized activities over broad periods of time," rather than more detailed evidence of "[w]hat [Facebook Security Manager] McGeehan [a]ctually [d]id or [w]hen [h]e [d]id it." Br. 31, 41; *see also* Br. 28 (asserting Facebook made only "[g]eneral claims of expenses"); *compare* Defendants' *Facebook I* Br. 26-27. This argument is essentially the same as Defendants' argument that Facebook failed adequately to prove its damages, and it fails for the same reasons. *Supra* § I.C.3. Moreover, as Facebook explained in the prior appeal, the uncontroverted McGeehan declaration explained in detail the steps

63

Facebook's Security Incident Response Team took to respond to Defendants' unlawful activities, including analyzing and investigating the attack, blocking Power's IP address, and continually working to block Power's efforts to circumvent Facebook's blocks in a time-consuming "game of 'cat and mouse.'" SER313-319; *see* Facebook's *Facebook I* Br. 30-31.

## III. The District Court Did Not Abuse Its Discretion In Granting A Narrower Permanent Injunction.

### A. The CFAA authorizes injunctive relief.

In a civil action under the CFAA, a plaintiff may "obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). Despite this plain text, Defendants dispute that injunctive relief is available. Their argument hinges on a misreading of another sentence in § 1030(g): "Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) [the provision at issue here] are limited to economic damages." In Defendants' view, that sentence means that no injunctive relief may be granted because injunctive relief is a "non-economic remedy." Br. 46. But the sentence only addresses "Damages"; the prohibition on non-economic *damages* does not limit the availability of injunctive relief. Rather, it merely

"precludes damages for death, personal injury, mental distress, and the like." *Creative Computing*, 386 F.3d at 935. Other remedies, like injunctive relief, are addressed separately in § 1030(g). *See* ER60 (this Court holding that the district court could consider "any injunctive relief" on remand); *Creative Computing*, 386 F.3d at 937-938 (affirming an injunction under the CFAA).

Defendants also forfeited this argument by not raising it below. *See Alaska Airlines*, 948 F.2d at 546 n.15. And in any event, they do not dispute that § 502 authorizes injunctive relief, *see* Br. 47, and the injunction rests on § 502 as well, ER13, 25-26.

## B. The district court properly found that an injunction remains necessary.

The district court exercised sound discretion when it granted injunctive relief after carefully weighing each of the four permanent injunction factors. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

First, the district court noted that "Defendants do not contest that Facebook has suffered irreparable harm." ER27. It emphasized that Defendants "have interfered with Facebook's right to control access to its own computers and have acquired data to which Defendants have no

65

lawful right." ER26. Critically, the court found that "unless the Court issues a permanent injunction, it is very likely that Facebook will suffer irreparable harm again because … Defendants have frequently exhibited bad faith conduct that indicates that they will not easily be deterred" from accessing Facebook's site without authorization. *Id.*

The court also held that Defendants failed to contest the inadequacy of damages, ER28, but that in any event, "Facebook has established that 'remedies available at law, such as monetary damages, are inadequate to compensate for its injury.'" ER27-28 (quoting *eBay*, 547 U.S. at 391). The court again cited "a high probability that Defendants will repeat their illegal conduct" absent an injunction, and explained that monetary relief would likely be illusory given Defendants' impending insolvency. ER28-29. In particular, it pointed to Defendants' continuing failure to pay the discovery sanction— notwithstanding this Court's affirmance and multiple orders to pay—as evidence that "it is unlikely that Facebook will be able recover the monetary damages that the Court has awarded." ER28-29.

As for the balance of hardships and the public interest, the district court found that both favored granting a permanent injunction. ER29.

Facebook "has suffered substantial harm because of Defendants' activities" and, absent an injunction, would likely "suffer significant hardship" because of the "probability that Defendants will engage in similar conduct in the future." ER29. Meanwhile, Defendants failed to show that they would suffer any harm from a narrowly tailored injunction, which prohibits them only from engaging in unlawful activity, like accessing a computer system without authorization. ER30-31. And the public interest favors protecting computers from unauthorized access. ER31.

The district court thus entered an injunction that targets Defendants' unlawful conduct and protects the public interest by prohibiting Defendants from (1) "[a]ccessing or using … the Facebook website or servers from any commercial purpose, without Facebook's prior permission," (2) "[u]sing any data … obtained as a result of the unlawful conduct for which Defendants have been found liable," or (3) "[d]eveloping, using, [or] selling … any software that allows the user to engage in the conduct found to be unlawful." ER31-32. And it required them to "destroy any software, script[s] or code designed to access or interact with the Facebook website, Facebook users, or the Facebook

67

service" as well as "Facebook data and/or information obtained," and to certify to the court under penalty of perjury that they complied. ER32-33.

### C. The district court exercised sound discretion in crafting the scope and terms of the injunction.

Defendants challenge only the scope of the permanent injunction. Where, as here, "Appellants do not allege that there were any clearly erroneous findings of fact," this Court will find an abuse of discretion only if "the district court misapplied the law or 'rule[d] in an irrational manner.'" *Alisal Water*, 431 F.3d at 654-655. Defendants fail to make that showing.

First, Defendants assert that § 1.A of the injunction (ER31-32) is overbroad because it prohibits Vachani and Power from using or accessing Facebook, which they claim will prevent them from "operating in any kind of online or technology-centered business." Br. 48. But, as the district court explained, they made the same argument before the court's original remedies order (at least with respect to Vachani). Now as before, they "'fail[ed] to provide a persuasive reason why'" they cannot run a business without Facebook. ER 31 (quoting SER59). Certainly "[t]here is no fundamental right to use Facebook." *Sambreel*

68

*Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1080 (S.D. Cal. 2012).

Regardless, because Defendants "brought this risk upon [themselves] by violating the law, the balance would not shift in favor of Defendants even if there were evidence to support this speculative claim." ER31 (quoting SER59). Defendants have only themselves to blame for any hardship. *See Creative Computing*, 386 F.3d at 937-938 (affirming an injunction against accessing a public website).

Moreover, the injunction is narrowly tailored. As the district court explained, it enjoins only *illegal* conduct: accessing Facebook's computers without authorization. ER29-30. Under the CFAA, Facebook can revoke—and has revoked—Defendants' authorization to access Facebook at all. The injunction is even narrower. Whereas the initial injunction barred using or accessing Facebook "for any purpose" without prior permission, SER61, on remand the district court further limited it to prohibit only access or use "for any *commercial* purpose." ER31-32 (emphasis added). But "even if [the] … injunction prohibits [otherwise] legal conduct, [it] is not overbroad in light of Defendants'

69

conduct in the instant case" because it is necessary "to prevent 'continued violations' of the law." ER30.

Second, Defendants argue (Br. 47) that the injunction is invalid because it prohibits "sending or assisting others in sending, or procuring the sending, of unsolicited commercial electronic text messages via the Facebook website or service" without Facebook's prior permission, ER32—a prohibition that Defendants say is based on the overturned CAN-SPAM Act count, Br. 47. But the district court did not abuse its discretion in reasoning that Defendants' prior messaging activity was unlawful—and therefore that analogous future conduct should be enjoined—wholly apart from whether the messages were illegal spam. Sending messages via Facebook was prohibited instead because Defendants had to access Facebook without authorization to trigger those messages. ER21-22. That is why the injunction targets only those messages sent "via the Facebook website or service." Messaging is just one "example" of the types of interactions with Facebook that Defendants are prohibited from undertaking. ER32.

Indeed, the district court exercised its discretion with care. As Defendants concede, "the new injunction was revised following

70

remand." Br. 45. The court deleted the provision of the original injunction that prohibited "Making, or assisting others in making, any false or misleading oral or written statement or representation of material fact when advertising, promoting or selling any good or service," SER61, because that provision—unlike the ban on sending messages via Facebook—related only to Facebook's CAN-SPAM Act claim, not to Defendants' access without authorization.

Third, Defendants claim that § 1.C of the injunction (ER32) "specifically covers activities associated with software development, sales, and use, none of which falls within the scope of § 502." Br. 48. But this provision covers only illegal activities—"[d]eveloping, using, selling, offering for sale, or distributing, … any software *that allows the user to engage in the conduct found to be unlawful*." ER32 (emphasis added). The CFAA and § 502 plainly prohibit unauthorized access to Facebook's site, and this provision merely prohibits Defendants from again creating software that does just that.

Fourth, Defendants assert that "the permanent injunction enjoins persons and entities unrelated to the activities at issue in this litigation." Br. 49. That is inaccurate. As the district court explained,

71

this injunction "closely tracks the terms of Federal Rule of Civil Procedure 65(d)(2)," ER30, in binding "Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-interest, and those in active concert or participation with them," ER31. The scope of this injunction is standard and plainly permitted by the rules.[5]

Finally, the public interest in enforcing court orders counsels strongly against granting Defendants the relief they request. Nearly a decade into this litigation, Defendants still refuse to accept or abide by this Court's and the district court's rulings. They remain in contempt of the district court to this day. *See* SER28. "Defendants are asking the grace of the chancellor when they ask for this amelioration of the terms of the injunction. But the hands they stretch out in prayer are unclean." *N. Am. Aircoach Sys. v. N. Am. Aviation*, 231 F.2d 205, 213 (9th Cir. 1955).

---

[5] Defendants say *Horwitz v. Southwest Forest Industries, Inc.*, 604 F. Supp. 1130 (D. Nev. 1985), is to the contrary, but *Horowitz* did not address who may be bound where an injunction issues. It held only that a plaintiff failed to show a likelihood of prevailing on the merits and thus was not entitled to a preliminary injunction at all. *Id.* at 1136.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Eric A. Shumsky*

| | |
|---|---|
| Brian P. Goldman | Eric A. Shumsky |
| ORRICK, HERRINGTON & | Hannah Garden-Monheit |
| SUTCLIFFE LLP | ORRICK, HERRINGTON & |
| 405 Howard Street | SUTCLIFFE LLP |
| San Francisco, CA 94105 | 1152 15th Street NW |
| (415) 773-5700 | Washington, DC 20005 |
| | (202) 339-8400 |
| | |
| I. Neel Chatterjee | Monte Cooper |
| GOODWIN PROCTER LLP | Robert L. Uriarte |
| 135 Commonwealth Drive | ORRICK, HERRINGTON & |
| Menlo Park, CA 94025 | SUTCLIFFE LLP |
| (650) 752-3100 | 1000 Marsh Road |
| | Menlo Park, CA 94025 |
| | (650) 614-7400 |

*Counsel for Plaintiff-Appellee*

May 31, 2018

## STATEMENT OF RELATED CASES

This appeal follows proceedings on remand from this Court in Defendants' first appeal in this case, *Facebook, Inc. v. Power Ventures, Inc.*, Nos. 13-17102 & 13-17154.

Pursuant to Ninth Circuit Rule 28-2.6, Facebook is unaware of any other related case pending in this Court.

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 17-16161

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is [          ] words or [          ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 13505 words or [          ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [          ] words or [          ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [          ]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [          ] words or [          ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is [          ] words or [          ] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [          ] words or [          ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [          ] words or [          ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | s/ Eric A. Shumsky | Date | May 31, 2018

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 31, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*
Eric A. Shumsky
*Counsel for Plaintiff-Appellee*

# ADDENDUM

# TABLE OF CONTENTS

Pages

**Computer Fraud And Abuse Act**

18 U.S.C. § 1030.................................................................... A1

**California Penal Code**

§ 502 (2008) ......................................................................... A4

## 18 U.S.C. § 1030

## Fraud And Related Activity In Connection With Computers

(a) Whoever—

. . . .

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

(A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

(B) information from any department or agency of the United States; or

(C) information from any protected computer;

. . . .

(4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

. . . .

(c) The punishment for an offense under subsection (a) or (b) of this section is—

. . . .

A1

(4)(A) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of—

(i) an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)—

(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(III) physical injury to any person;

(IV) a threat to public health or safety;

(V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

(VI) damage affecting 10 or more protected computers during any 1-year period; or

. . . .

(e) As used in this section—

(1) the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an

automated typewriter or typesetter, a portable hand held calculator, or other similar device;

(2) the term "protected computer" means a computer—

. . . .

  (B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;

. . . .

(8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

. . . .

(11) the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and

. . . .

(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

  . . . .

A3

# Cal. Penal Code § 502 (2008)

## Unauthorized Access To Computers, Computer Systems And Computer Data

(a) It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

(1) "Access" means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

. . . .

(8) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program.

(9) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not

A4

altered, deleted, damaged, or destroyed by the access.

. . . .

(c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:

. . . .

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

. . . .

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

. . . .

(e)(1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

A5

. . . .

(h)(1) Subdivision (c) does not apply to punish any acts which are committed by a person within the scope of his or her lawful employment. For purposes of this section, a person acts within the scope of his or her employment when he or she performs acts which are reasonably necessary to the performance of his or her work assignment.

(2) Paragraph (3) of subdivision (c) does not apply to penalize any acts committed by a person acting outside of his or her lawful employment, provided that the employee's activities do not cause an injury, as defined in paragraph (8) of subdivision (b), to the employer or another, or provided that the value of supplies or computer services, as defined in paragraph (4) of subdivision (b), which are used does not exceed an accumulated total of one hundred dollars ($100).