No. 17-16161

IN THE
# United States Court of Appeals for the Ninth Circuit

FACEBOOK, INC.,
*Plaintiff-Appellee*,

*v.*

POWER VENTURES, INC. & STEVEN SURAJ VACHANI,
*Defendant-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, Hon. Lucy Koh

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME II OF II (SER106 TO SER383)**

Brian P. Goldman
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

I. Neel Chatterjee
GOODWIN PROCTER LLP
135 Commonwealth Drive
Menlo Park, CA 94025
(650) 752-3100

Eric A. Shumsky
Hannah Garden-Monheit
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

Monte Cooper
Robert L. Uriarte
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

*Counsel for Plaintiff-Appellee*

May 31, 2018

# TABLE OF CONTENTS

## VOLUME I OF II

**Record Entry**[*]                                                    **SER**

### *District Court Orders*

Order Granting Motion for Attorney's Fees and Granting in
  Part Motion for Contempt Sanctions,
  Dkt. No. 470 (Filed Aug. 8, 2017) ........................................................ 1

Order Denying Leave to File Motion for Reconsideration,
  Finding Defendant Steven Vachani Liable as a Matter of
  Law, and Granting Damages and Permanent Injunctive
  Relief,
  Dkt. No. 372 (Filed Sept. 25, 2013) .................................................... 29

Order re Attorneys Fees and Costs for Renewed Deposition,
  Dkt. No. 356 (Filed Aug. 7, 2013) ...................................................... 63

Order Denying Facebook's Motion for Judgment on the
  Pleadings; Denying the Parties' Cross-Motions for
  Summary Judgment; Granting Facebook's Motion to
  Dismiss Defendants' Counterclaims; Denying Facebook's
  Motion to Strike Defendants' Affirmative Defenses,
  Dkt. No. 89 (Filed July 20, 2010) ...................................................... 70

Order Denying Motion to Dismiss and Granting in Part and
  Denying in Part Motion for Definite Statement,
  Dkt. No. 38 (Filed May 11, 2009) ...................................................... 95

---

[*] None of the documents included in this Supplemental Excerpts of
Record remains confidential, although many of the documents are so
marked. Some of the documents were stamped confidential but never
sealed (Dkt. Nos. 236-2, 236-6). Other documents were filed under seal,
but were later unsealed by the district court. *See* Dkt. No. 298
(unsealing Dkt. Nos. 299-6, 299-9, 299-15, 299-21); Dkt. No. 395
(unsealing Dkt. Nos. 213-2, 213-4, 217, 372, 396).

# VOLUME II OF II

## *Other Record Materials*

Joint Case Management Statement,
 Dkt. No. 404 (Filed Jan. 4, 2017) ....................................................... 106

Expert Report of Bob Zeidman and Lawrence Melling,
 Dkt. No. 396 (Filed May 29, 2014) ..................................................... 115

December 29, 2008, E-mail Chain among Power Employees,
 Exhibit 5 to the Declaration of Monte Cooper in Support
 of Facebook Inc.'s Supplemental Brief Regarding
 Damages and Liability of Defendant Steve Vachani,
 Dkt. No. 299-6 (Filed Apr. 17, 2012) .................................................. 154

December 1, 2008, Press Release for Power.com,
 Exhibit 8 to Declaration of Monte Cooper in Support of
 Facebook Inc.'s Supplemental Brief Regarding Damages
 and Liability of Defendant Steve Vachani,
 Dkt. No. 299-9 (Filed Apr. 17, 2012) .................................................. 160

Excerpts from the January 9, 2012, Deposition Transcript of
 Steven Vachani (as Power Ventures, Inc.'s 30(b)(6)
 designee),
 Exhibit 14 to the Declaration of Monte Cooper in Support
 of Facebook Inc.'s Supplemental Brief Regarding
 Damages and Liability of Defendant Steve Vachani,
 Dkt. No. 299-15 (Filed Apr. 17, 2012) ............................................... 168

December 4, 2008, E-mail from Felipe Herrera to Steve
 Vachani,
 Exhibit 20 to the Declaration of Monte Cooper in Support
 of Facebook Inc.'s Supplemental Brief Regarding
 Damages and Liability of Defendant Steve Vachani,
 Dkt. No. 299-21 (Filed Apr. 17, 2012) ............................................... 185

Transcript of Proceedings Held on Feb. 24, 2012, before
 Magistrate Judge Joseph C. Spero,
 Dkt. No. 280 (Filed Feb. 27. 2012) (Excerpted) ................................ 189

Excerpts from the July 20, 2011, Deposition Transcript of
    Defendant Steve Vachani,
    Exhibit 2 to the Declaration of Morvarid Metanat in
    Support of Facebook's Motion for Partial Summary
    Judgment under California Penal Code § 502 and CFAA,
    Dkt. No. 236-2 (Filed Jan. 19, 2012) ................................................. 194

Excerpts from Power Ventures, Inc.'s Responses to Facebook,
    Inc's First Set of Interrogatories,
    Exhibit 4, Declaration of Morvarid Metanat in Support of
    Facebook's Motion for Partial Summary Judgment under
    California Penal Code § 502 and CFAA,
    Dkt. No. 236-4 (Filed Jan. 19, 2012) ................................................. 205

December 1, 2008, E-mail from Steve Vachani to Felipe
    Herrera and Eric Santos,
    Exhibit 6 to the Declaration of Morvarid Metanat in
    Support of Facebook's Motion for Partial Summary
    Judgment under California Penal Code § 502 and CFAA,
    Dkt. No. 236-6 (Filed Jan. 19, 2012) ................................................. 213

December 17-18, 2008, E-mails among Power Employees,
    Exhibit 7 to the Declaration of Morvarid Metanat in
    Support of Facebook's Motion for Partial Summary
    Judgment under California Penal Code § 502 and CFAA,
    Dkt. No. 236-7 (Filed Jan. 19, 2012) ................................................. 216

December 1, 2008, Cease-and-desist Letter,
    Exhibit A to the Declaration of Joseph Cutler in Support
    of Facebook, Inc.'s Motion for Partial Summary Judgment
    for Liability under the CAN-SPAM Act,
    Dkt. 233 (Filed Jan. 19, 2012) .......................................................... 226

December 12-26, 2008, E-mail Chain between Steve Vachani
    and Facebook Counsel Joseph Cutler,
    Exhibit B to the Declaration of Joseph Cutler in Support
    of Facebook, Inc.'s Motion for Partial Summary Judgment
    for Liability under the CAN-SPAM Act,
    Dkt. 233-1 (Filed Jan. 19, 2012) ....................................................... 230

Excerpts from Power Ventures, Inc.'s Responses to Facebook,
    Inc.'s First Set of Requests for Admissions,
    Exhibit 6 to the Declaration of Monte M.F. Cooper in
    Support of Facebook, Inc.'s Motion for Partial Summary
    Judgment on Count I under the CAN-SPAM Act,
    Dkt. No. 232-3 (Filed Jan. 19, 2012) ................................................. 239

Excerpts from the July 20, 2011, Deposition Transcript of
    Steven Vachani,
    Exhibit 2 to the Declaration of Monte M.F. Cooper in
    Support of Facebook Inc.'s Motion for Partial Summary
    Judgment on Count I under the CAN-SPAM Act,
    Dkt. No. 229 (Filed Jan. 19, 2012) ..................................................... 252

Declaration of Lawrence Melling in Support of Facebook,
    Inc.'s Motion for Partial Summary Judgment On Count I
    under the CAN-SPAM Act,
    Dkt. No. 217 (Filed Jan. 19, 2012) ..................................................... 294

Declaration of Joseph Cutler in Support of Facebook, Inc.'s
    Motion for Partial Summary Judgment For Liability
    Under the CAN-SPAM Act,
    Dkt. No. 213-2 (Filed Jan. 19, 2012) ................................................. 308

Declaration of Ryan McGeehan in Support of Facebook's
    Motion for Partial Summary Judgment on Count I under
    the CAN-SPAM Act,
    Dkt. No. 213-4 (Filed Jan. 19, 2012) ................................................. 312

Transcript of Proceedings Held on Nov. 4, 2011, before
    Magistrate Judge Joseph C. Spero,
    Dkt. No. 176 (Filed Nov. 21, 2011) .................................................... 320

Amended Answer and Counterclaims of Defendants Power
    Ventures, Inc. and Steve Vachani,
    Dkt. No. 54 (Filed Nov. 23, 2009) ...................................................... 331

First Amended Complaint,
    Dkt. No. 9 (Filed Jan. 13, 2009) ........................................................ 358

1   I. NEEL CHATTERJEE (STATE BAR NO. 173985)
    nchatterjee@orrick.com
2   MONTE M.F. COOPER (STATE BAR NO. 196746)
    mcooper@orrick.com
3   ROBERT  L. URIARTE (STATE BAR NO. 258274)
    ruriarte@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
5   Menlo Park, CA  94025
    Telephone:     +1-650-614-7400
6   Facsimile:     +1-650-614-7401

7   FREDERICK D. HOLDEN, JR. (Calif. Bar No. 61526)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
8   The Orrick Building
    405 Howard Street
9   San Francisco, California  94105-2669
    Telephone:     (415) 773-5985
10  Facsimile:     (415) 773-5759

11  Attorneys for Plaintiff
    FACEBOOK, INC.

12

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                        SAN JOSE DIVISION

16

17  FACEBOOK, INC.,                      Case No.  5:08-cv-05780 LHK

18                  Plaintiff,           **JOINT CASE MANAGEMENT
                                         STATEMENT**
19          v.
                                         Date:      January 11, 2017
20  POWER VENTURES, INC. a Cayman Island Time:      2:00 P.M.
    Corporation; STEVE VACHANI, an       Judge:     Hon. Lucy J. Koh
21  individual; DOE 1, d/b/a POWER.COM,  Courtroom: 8, 4th Floor
    DOES 2-25, inclusive,
22
23                  Defendants.

24

25

26

27

28

1    This Court has set a further Case Management Conference for January 11, 2017.  Pursuant

2    to the Minute Order setting such Case Management Conference [Dkt. No. 402], Plaintiff

3    Facebook, Inc. ("Facebook") hereby submits this Joint Case Management Statement, without

4    input from Defendants Power Ventures, Inc. ("Power") or Steven Vachani ("Vachani")[1].

5    **I.**    **JURISDICTION AND SERVICE**

6    On December 19, 2016, the Ninth Circuit issued the mandate associated with its Order

7    and Amended Opinion in *Facebook, Inc. v. Power Ventures, Inc.*, No. 13-17154 (9th Cir. Dec. 9,

8    2016)("Ninth Circuit Order").  All parties previously were served with all relevant pleadings.

9    The parties agree and the Ninth Circuit has concluded that this Court has subject matter

10   jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Facebook asserted various state and federal

11   claims against Defendants, including two claims alleging violations of the Computer Fraud and

12   Abuse Act, 18 U.S.C. § 1030 *et. seq.* ("CFAA"), and California Penal Code § 502(c), for which

13   this Court in two Orders [Dkt. Nos. 275 & 373] previously concluded Defendants were liable.

14   Separately, the Court by Order [Dkt. No. 356] also awarded Facebook costs and attorney fees

15   from Defendants as a discovery sanction arising from the need to take an additional deposition of

16   Power while the matter was pending before this Court.   The liability findings by this Court with

17   respect to the CFAA and Section 502(c) claims, as well as the discovery sanctions, have been

18   affirmed by the Ninth Circuit.  The Court's ruling with respect to the Controlling the Assault of

19   Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act") has been reversed.

20   Venue is proper under 28 U.S.C. §1391(b).

21

22

23   _____

24   [1] Facebook on January 3, 2017 forwarded copies of its positions set forth in this Joint Case
     Management Statement to Defendants.  However, on January 4, 2017, shortly before the deadline

25   to file this Joint Case Management Statement, Facebook was apprised by counsel for Power that
     both Power and Vachani had personal crises that prevented them from preparing and contributing

26   Defendants' portions of this Joint Case Management Statement.  Defendants further indicated that
     they would file a request for ex parte relief seeking a continuance of the Case Management

27   Conference – a request to which Facebook does not object given Defendants' circumstances.
     However, Facebook is filing this Joint Case Management Statement without Defendants'

28   contributions due to the fact a continuance has not been granted as of the January 4, 2017
     deadline set forth in Docket No. 402 (the Court's December 19, 2017 Minute Order).

- 1 -

CASE MANAGEMENT STATEMENT
5:08-CV-05780 LHK

## II.    FACTS

### A.    Facebook's Position

This Court should enter a revised Judgment and Permanent Injunction in the form set out in Facebook's attached proposed Order, whereby Facebook receives an adjusted award of $46,883 in damages from Defendants, jointly and severally, for their violations of the CFAA and California Penal Code Section 502(b).  This amount of damages, which reflects the damages Facebook introduced into the record reflecting expenses incurred internally and via outside counsel for the period following December 1, 2008, when Facebook served its cease and desist letter on Power.  The revised Judgment and Permanent Injunction also include the $39,796.73 previously awarded to Facebook against Power and Vachani for discovery abuse, as well as the $49,637.93 in taxable costs awarded to Facebook.  Accordingly, the total amount to be awarded to Facebook is $136,317.66, jointly and severally, against Defendants.

### B.    Facebook's Proposal Conforms to the Ninth Circuit Remand Order

This Court previously entered Orders granting Facebook summary judgment of liability [Dkt. No. 275] and awarding Facebook damages from both Defendants in the amount of $80,543 for violations of both the CFAA and California Penal Code Section 502(b) [Dkt. No. 373].  The Court in two other Orders separately awarded Facebook sanctions from both Defendants in the amount of $39,796.73 for discovery abuse related to a Rule 30(b)(6) deposition and failure to produce relevant documents [Dkt. No. 356], and taxed Defendants $49,637.93 in costs [Dkt. No. 390].  In denying Defendants' petition for rehearing en banc, the Ninth Circuit (1) upheld the discovery sanction imposed against Defendants, (2) upheld the Court's conclusion that Defendant Vachani is personally liable for all CFAA and Penal Code Section 502 violations, and (3) remanded the matter to this Court solely "to reconsider appropriate remedies under the CFAA and Section 502, including any injunctive relief."  *Facebook, Inc. v. Power Ventures, Inc.*, No. 13-17154, slip op. at 21-22 (9th Cir. Dec. 9, 2016).  The Court of Appeals instructed, "With respect to damages, the district court shall calculate damages only for the period after which Power [on December 1, 2008] received the cease and desist letter, when Power continued to access data contained in Facebook's servers and memory banks."  *Id.* at 22.  No other issues remain for the

1    Court's resolution.

2    **1.    The Court's Prior Award of $80,543 in Damages for CFAA and Penal Code Section 502(b) Violations Can Be Reinstated**

3    Facebook previously established through undisputed testimony from both its outside

4    counsel, its security expert assigned to respond to Defendants' violations, and its damages expert

5    witness, that it expended $80,543 on or after December 1, 2008, as a result of its internal and

6    external investigations and implementing technical measures that served as the basis for its CFAA

7    and Penal Code Section 502(b) claims. *See* Dkt. No. 299-25 (Expert Report of Damages Expert

8    Richard Ostiller), ¶¶ 13-29 & Schedule 1[2]; *see also* Dkt. No. 213-4 (Declaration of Facebook

9    Security Manager Ryan McGeehan), ¶¶ 7-18 (reflecting that his investigation of Defendants'

10   activities in connecting to the Facebook site began on December 1, 2008, and that all actions

11   taken to attempt to prevent Defendants' further connections to the site, including imposition of IP

12   blocks, occurred after Facebook served the cease and desist order); Dkt. No. 213-2 (Declaration

13   of Facebook Attorney Joseph Cutler), ¶¶ 4-15  (describing Perkins Coie's legal work in

14   December 2008 and early 2009).  Further, as this Court itself noted, "Defendants do not dispute

15   the accuracy or veracity of [the] evidence of [Facebook's] expenditures." Dkt. No. 275, at 8.

16   Paragraphs 21, 30 and Schedule 1 of the Expert Report of Richard Ostiller reflect that in

17   addition to $5000 in internal damages sustained by Facebook in December 2008 in employing its

18   Security Manager Ryan McGeehan to respond to Power's attempts to circumvent IP blocks,

19   Facebook incurred $36,824 in CFAA and Penal Code Section 502 damages as a result of

20   payments to outside counsel Perkins Coie for the months of January through March, 2009.  *See*

21   Dkt. No. 299-25, ¶¶ 21, 30 & Schedule 1. Additionally, paragraph 15 of the Declaration of Joseph

22   Cutler reflects he personally billed Facebook $5059 in legal fees for his activities in December of

23   2008.  This reflects that Facebook sustained $46,883 in damages from Defendants for the period

24   after December 1 2008, and hence satisfies the Ninth Circuit's criteria for an adjusted award from

25   ────────────────────

26   [2] The full Expert Report of Facebook's Damages Expert Richard Ostiller was served on Defendants and lodged, but not filed, with the Court on December 19, 2011 pursuant to Chief

27   Judge Ware's Case Management Order.  *See* Dkt. No. 92, ¶ 4.  In the event that this Court requests that report now to be filed with the Court rather than lodged, Facebook does not object.

28   A portion of the Report was filed under seal as Dkt. No. 299-325, and later unsealed as Dkt. No. 300.

CASE MANAGEMENT STATEMENT
5:08-CV-05780 LHK

the $80,543 originally awarded in damages for violation of the CFAA and Penal Code Section 502.

**2.    The $89,434.66 Previously Awarded for Discovery Sanctions and Costs Remain Undisturbed**

The Ninth Circuit upheld this Court's prior award of $39,796.73 in sanctions against both Power and Vachani relating to their discovery abuse in conjunction with a Rule 30(b)(6) deposition at which Vachani failed to provide adequate answers to questions, and then failed to produce highly relevant documents until after the conclusion of discovery. *Facebook, Inc. v. Power Ventures, Inc.*, No. 13-17154, slip op. at 22 (9th Cir. Dec. 9, 2016).   Accordingly, the Judgment on remand should once again include the $39,796.73 sanction award previously awarded against both Power and Vachani to Facebook.  Likewise, inasmuch as the $49,637.93 in costs that the Court awarded Facebook also was not challenged on appeal, that award also should be reinstated in the Judgment.

**3.    The Permanent Injunction Need Only Remove Conditions Specifically Related to CAN-SPAM Violations, and Be Amended To Ensure Proper Compliance by Defendants**

Facebook's proposed Permanent Injunction modifies and simplifies the earlier Permanent Injunction to delete all elements of relief that were specific to CAN-SPAM violations, while also ensuring that Defendants have already complied with its terms.

**C.    Defendants' Position**

As noted in footnote 1, *supra*, Defendants were not able to provide Facebook with their positions by the deadline to file this Joint Case Management Statement.

**III.   LEGAL ISSUES**

**A.    Facebook's Position**

The only legal issues remaining in this action are the following:

**1.    **What amount of damages should be awarded to Facebook for Defendants' violations of the CFAA and California Penal Code Section 502, for the period on an after December 1, 2008, when Defendants received the cease and desist letter notifying them of their violations of the Acts?

CASE MANAGEMENT STATEMENT
5:08-CV-05780 LHK

SER110

1       **2.**     What should be the scope of permanent injunctive relief arising from

2      Defendants' unlawful actions?

3     **B.**    **Defendants' Position**

4     As noted in footnote 1, *supra*, Defendants were not able to provide Facebook with their

5  positions by the deadline to file this Joint Case Management Statement.  Facebook understands

6  instead that Defendants will be seeking a continuance of the Case Management Conference.

7  **IV.**    **MOTIONS**

8     **A.**    **Pending Motions**

9     There are no pending motions filed by the Parties.

10    **B.**    **Anticipated Motions**

11      **1.**    **Facebook's Position**

12     Facebook believes the Court already is in position to enter an award of damages and an

13  order granting permanent injunctive relief in the proposed draft form it provides with this Joint

14  Case Management Statement.  Facebook does not anticipate filing any additional motions, but is

15  prepared to further brief the remanded issues, should the Court so desire.

16      **2.**    **Defendants' Position**

17     As noted in footnote 1, *supra*, Defendants were not able to provide Facebook with their

18  positions by the deadline to file this Joint Case Management Statement.

19  **V.**    **AMENDMENT OF PLEADINGS**

20     The case is now fully at issue.

21  **VI.**    **EVIDENCE PRESERVATION**

22    **A.**    **Facebook's Position**

23     To the extent the issue is relevant in the wake of the Ninth Circuit's remand Order,

24  Facebook has taken appropriate measures to preserve relevant evidence.  Facebook has reviewed

25  the Guidelines Relating to the Discovery of Electronically Stored Information and that parties

26  have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate

27  steps taken to preserve evidence relevant to the issues reasonably evident in this action.

28

CASE MANAGEMENT STATEMENT
5:08-CV-05780 LHK

**B.    Defendants' Position**

As noted in footnote 1, *supra*, Defendants were not able to provide Facebook with their positions by the deadline to file this Joint Case Management Statement.

**VII.    INITIAL DISCLOSURES**

Facebook served its initial disclosures on Defendants on July 29, 2011.  Facebook served its supplemental and second supplemental initial disclosures on Defendants on October 14, 2011 and January 13, 2012, respectively.  Defendants served their initial disclosures on Facebook on August 15, 2011.  To date, Defendants have not supplemented the initial disclosures.

**VIII.    DISCOVERY**

Discovery closed on January 20, 2012.  The parties agree that no additional discovery is necessary at this time.

**IX.    CLASS ACTIONS**

This is not a class action case.

**X.    RELATED CASES**

Vachani's bankruptcy proceeding in the United States Bankruptcy Court for the Northern District of California, Oakland Division, Case No. 12-47150 RLE 13, is related to this matter. The Bankruptcy Court has by Order dated February 13, 2013 [Dkt. No. 122] granted Facebook relief from the automatic stay imposed by 11 U.S.C. § 362(a), in order "to permit Facebook to take any and all actions necessary and appropriate to cause the reopening and completion of [this District Court action]…."

**XI.    RELIEF**

Facebook prays for injunctive relief and the monetary damages set forth in its Proposed Judgment and Permanent Injunction.  The bases for Plaintiff's request for monetary damages include compensatory, statutory, and attorneys' fees permitted by law, and upheld by the Ninth Circuit as appropriate in this case.

**XII.    SETTLEMENT AND ADR**

The parties engaged in an ADR mediation session on December 14, 2009.  The session was facilitated by mediator Daralyn Durie, who has filed papers with the Court indicating that the

1   ADR process is not yet complete and that further facilitated discussions are expected. *See* Dkt.

2   No. 59.  To date, the parties have engaged in numerous settlement discussions, but have been

3   unable to reach resolution. The latest of these settlement discussions was on or around April 26,

4   2013.

5   **XIII.**    **CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES**

6        The parties have not consented to a magistrate judge.

7   **XIV.**    **OTHER REFERENCES**

8        **A.**     **Facebook's Position**

9   Facebook does not believe any additional references are necessary at this time.

10        **B.**     **Defendants' Position**

11        As noted in footnote 1, *supra*, Defendants were not able to provide Facebook with their

12   positions by the deadline to file this Joint Case Management Statement.

13   **XV.**    **NARROWING OF ISSUES**

14        Facebook does not believe that the remaining issues can be narrowed at this time,

15   inasmuch as liability already has been established and upheld by the Ninth Circuit.

16   **XVI.**    **EXPEDITED TRIAL PROCEDURES**

17        An expedited schedule is not necessary in this case.

18   **XVII.**   **SCHEDULING**

19

20        Facebook believes the matter already is positioned for entry of a final Judgment and

Permanent Injunction, in the form proposed by Facebook.

21   **XVIII. TRIAL**

22        No trial is necessary.  This Court has already found that the damages amounts are

23   unrebutted.

24   **XIX.**    **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES AND PERSONS**

25        Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

26   named parties, there is no such interest to report.

27

28

CASE MANAGEMENT STATEMENT
5:08-CV-05780 LHK

1    **XX.    OTHER MATTERS**

2         None.

3

4    Dated: January 4, 2017                    ORRICK, HERRINGTON & SUTCLIFFE LLP

5
                                                  */s/ Monte M.F. Cooper*
6    _____
                                                  MONTE M.F. COOPER
7                                                 Attorneys for Plaintiff
                                                  FACEBOOK, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FACEBOOK, INC.,

## PLAINTIFF,

## V.

## POWER VENTURES, INC. DBA POWER.COM, ET AL,

## DEFENDANTS

_____

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

## CASE NO. C-08-05780-JW

## EXPERT REPORT OF BOB ZEIDMAN AND LAWRENCE MELLING

## ZEIDMAN CONSULTING

## DECEMBER 19, 2011

# Table of Contents

I.     SUMMARY OF FINDINGS ............................................................... 1

II.    BACKGROUND ................................................................................ 2

   A.   PERSONAL EXPERIENCE AND BACKGROUND OF BOB ZEIDMAN ...................3

   B.   PERSONAL EXPERIENCE AND BACKGROUND OF LAWRENCE MELLING......4

III.   DEFINITIONS................................................................................... 4

   A.   WEBSITE................................................................................................4

   B.   INTERNET BROWSER ..............................................................................5

   C.   CLIENT..................................................................................................5

   D.   SERVER.................................................................................................6

   E.   PROXY SERVER .....................................................................................6

   F.   WEB SCRIPTS .......................................................................................7

   G.   WEB CRAWLER OR SPIDER ....................................................................7

   H.   COMPUTER DATABASE...........................................................................8

   I.   SQL SERVER ........................................................................................9

   J.   SOURCE CODE ......................................................................................9

IV.    SCOPE OF REPORT ........................................................................ 10

V.     COMPENSATION ............................................................................ 11

VI.    ANALYSIS........................................................................................ 12

   A.   DEFENDANT'S SOFTWARE USED TO CONNECT TO THE FACEBOOK
   WEBSITE, SPIDER THE FACEBOOK WEBSITE, SCRAPE FACEBOOK USER
   INFORMATION FROM THE FACEBOOK WEBSITE, DOWNLOAD FACEBOOK
   USER INFORMATION TO THE POWER WEBSITE, AND TO "PROXY"
   FACEBOOK ..........................................................................................13

   B.   DEFENDANTS' SOFTWARE USED TO INITIATE SPAM EMAILS ..................17

   C.   POWER DATABASES ............................................................................24

   D.   DEFENDANTS' EFFORTS TO CIRCUMVENT IP BLOCKS ...................26

   E.   DEFENDANTS HAVE DELETED IMPORTANT DATA ...........................29

   F.   TECHNICAL ANALYSIS OF DECLARATION OF MR. VACHANI .......................30

   G.   CONCLUSION ......................................................................................33

EXHIBIT A: RESUME OF ROBERT ZEIDMAN ....................................... 1

EXHIBIT B: LARRY MELLING RESUME ................................................ 1

EXHIBIT C: EXPERT REPORT SOURCE CODE INSPECTION LOG 2011-12-19 ................ 1

EXHIBIT D: CREATE_EVENT_FACEBOOK.XML ................................... 1

EXHIBIT E: POWERCALLBACK.ASPX.EN.RESX.................................................................. 1

EXHIBIT F: POWERCALLBACK.ASPX.CS........................................................................... 1

EXHIBIT G: POWERMESSAGEMANAGER.CS.................................................................... 1

EXHIBIT H: POWERMESSAGEFACTORY.CS ..................................................................... 1

EXHIBIT I: WRITE.CS......................................................................................................... 1

EXHIBIT J: INSERTMESSAGESCRIPT.SQL ...................................................................... 1

EXHIBIT K: PN_SEND_SCRAP_FACEBOOK.XML.............................................................. 1

EXHIBIT L: HTTPPROXYCONFIG.CS................................................................................. 1

EXHIBIT M: ASYNCSETUP ASYNCHTTPPROXY.CSV ...................................................... 1

EXHIBIT N: SERVERMANAGER.JAVA................................................................................ 1

EXHIBIT O: CREATECAMPAIGNEVENT.CS....................................................................... 1

EXHIBIT P: CONFIGURATIONPOWERPROXY.CS.............................................................. 1

EXHIBIT Q: UPDATESERVERLISTMANAGER.JAVA ......................................................... 1

EXHIBIT R: POWERPROXY.JAVA ...................................................................................... 1

EXHIBIT S: FRIENDLIST2.XML ......................................................................................... 1

We, Bob Zeidman and Lawrence Melling, on behalf of Zeidman Consulting, provide the following expert disclosures.

## I.   SUMMARY OF FINDINGS

1.   Based upon the review of Defendants' source code for various code projects named PowerScript, PowerNavigtor, PowerProxy, and spider, as well as other documentation produced to date, we have concluded the following:

(a) Defendants developed proprietary software named PowerScript and spider in order to crawl various social network websites, including particularly www.facebook.com ("Facebook"), to extract or "scrape" website user information such as Facebook photo images, wall content, friends' lists, and the like, and to then reformat that user information on Defendants' own website, www.power.com ("Power.com" or "the Power website"), in order to "proxy" Facebook and permit Defendants' own website users to log into Facebook through Defendants' own Graphical User Interface ("GUI"), rather than through Facebook's interface.

(b) Defendants designed their proprietary PowerScript and spider software to automatically post on the Facebook website new Events soliciting Facebook users to join Power.com as part of what Defendants called the "Power 100" or "100x100x100" Campaign. Defendants likewise designed their software to automatically post Power Invitations on Facebook users' Walls soliciting them to join Power.com.

(c) Based upon available information from Defendants' databases, at least 39,137 users of the Power website also had Facebook accounts. Because of missing information from those databases that is solely in the control of Defendants, we were unable to quantify exactly how many Facebook Event or wall posting transactions took place between the Power website and Facebook in which Facebook users were solicited to join Power.com.  We are able to state that both kinds of solicitations did occur, however, and were initiated by Defendants' proprietary software.

CONFIDENTIAL                                                                    1

(d) In addition to the electronic mail communications that Defendants' software automatically posted on the Facebook website when it created Facebook Events and when it posted Facebook wall messages, the same proprietary software that Defendants used to automatically create Event notifications and post Facebook Wall messages also would initiate automated "spam" email messages being sent on Defendants' behalf to Facebook users as a result of the software's ability to exploit Facebook's own email notification processes.

(e) Defendants designed their network architecture to circumvent technical barriers – such as blocks of IP addresses – that Facebook and other websites put in place to block the Power website's continued access.  Defendants' source code includes routines that create a list of proxy servers.  These proxy servers were continuously monitored by Defendants' software to determine if they were blocked by a website like Facebook.  When blocked, the software could add a new host IP address for the PowerScript to access that would be employed to ensure continued access to the blocking website.

(f) Defendants formerly maintained "Power_Logger" and Async databases which logged information concerning the number of times Facebook users were contacted by the Power website and/or Power users.  Among the information that was formerly contained in one or both of those databases was information identifying how many times Facebook users were sent invitations, either through Event notifications or Wall posts, to join Power.com as part of the "Power 100" or 100x100x100 campaign.  That information, which was solely within the control of Defendants to document in its databases, has been deleted, preventing Facebook from knowing the true total number of spam invitations that were sent as a result of the execution by Defendants of their PowerScript software.

## II.      BACKGROUND

2. This introductory section of our report gives information about our qualifications.

### A.    PERSONAL EXPERIENCE AND BACKGROUND OF BOB ZEIDMAN

3.    Robert is an engineer and the founder and president of Zeidman Consulting, which provides engineering consulting services to high-tech companies. Among the types of services Robert provide are hardware and software design. My clients have included Fortune 500 computer and technology companies as well as smaller companies and startups. A copy of my resume is attached hereto as Exhibit A.

4.    Robert holds a Master's degree from Stanford University in Electrical Engineering and two Bachelor's degrees from Cornell University, one in Electrical Engineering and one in Physics.

5.    Robert has been a computer software and hardware designer for over 25 years. Robert have designed and developed a variety of computer hardware and software products. These software products include Internet-based training courses and web-based course administration software, an operating system synthesis tool, a source code comparison tool, a network emulation software bridge, and a remote backup system whereby user data is automatically transmitted and stored at a remote location. Robert have founded several companies including eVault, a remote backup company; the Chalkboard Network, an e-learning company; Zeidman Technologies, a company that develops software tools for enabling and improving hardware and software development; and Software Analysis and Forensic Engineering Corporation, a company that develops software analysis tools.

6.    Robert has written a variety of papers, books, and presentations on computer hardware and software and other engineering subjects. Robert am the developer of the Universal Design Methodology, a process for efficiently developing reliable systems, about which Robert have written extensively. A list of my publications is included in my resume attached as Exhibit A.

7.    Robert holds a number of patents for software synthesis, hardware emulation, hardware synthesis, hardware simulation, and software code comparison. Robert have created a tool called CodeSuite® that incorporates BitMatch®, CodeCross®, CodeDiff®, CodeMatch®,

CodeCLOC®, and SourceDetective® for detecting whether one computer program has been plagiarized from another computer program.

8. Robert has consulted on matters involving intellectual property disputes, including instances of alleged misappropriation and infringement. My work in this capacity has included, among other things, reviewing and analyzing software source code, reviewing and analyzing patents, reverse engineering hardware and software, writing expert reports, and testifying in court.

9. Robert has testified at deposition and at trial in a number of cases involving software copyright infringement, trade secret theft, and patent infringement. The specific cases can be found in my resume, attached as Exhibit A.

**B.      PERSONAL EXPERIENCE AND BACKGROUND OF LAWRENCE MELLING**

10. Lawrence is a research engineer at Zeidman Consulting. Lawrence has over 30 years of executive management and engineering experience in developing new hardware and software technologies and bringing them to market. Lawrence has been engaged in applications engineering and marketing of electronic design automation (EDA) tools at major companies and small startups. Lawrence has also been involved in the development of sophisticated tools for source code and object code analysis for finding intellectual property infringement. Lawrence has not previously testified at trial or in a deposition. My resume is attached as Exhibit B to this report.

**III.      DEFINITIONS**

This section provides a discussion of technical terms needed to understand this report, which we are prepared to further explain at trial.

**A.      WEBSITE**

11. A "website" is a location on the World Wide Web that contains a group of web pages typically created using a popular programming language called the Hypertext Markup Language (HTML).  Websites are usually connected to each other using "hyperlinks," and

are made available to the public by an individual, company, educational institution, government body, or other organization. These web pages are hosted on one or more computers called "web servers" and are viewed by users on "client computers" that are connected to the web servers via the Internet. The web pages are viewed using an Internet browser, such as Microsoft's Internet Explorer. In conjunction with this Expert Report, we make extensive reference to two websites located at the Uniform Resource Locators ("URLs") http://www.facebook.com (the "Facebook website") and http://www.power.com ("Power.com" or the "Power website").

**B.    INTERNET BROWSER**

12. An "Internet browser" or web browser is a typical client application used to navigate the Internet. The browser accesses information such as web pages, images, videos, and games from Internet servers. The URL is the "address" through which online information is located and retrieved by the user from her client computer. Servers may provide static information to an Internet browser or may dynamically generate the information that is transmitted to an Internet browser based on input from the user and the internal state of the server. The browser provides the graphical user interface (GUI) to the web pages on the server. However, some websites make use of client-side software to offload processing from the server to use the client's computer. This is important because the browsers include functionality to execute client-side "web scripts," which concept we discuss below. Three popular Internet browsers in use today are: Microsoft's Internet Explorer, Mozilla's Firefox, and Google's Chrome.

**C.    CLIENT**

13. A "client" is a computer that makes a service request to a server (defined below); the server fulfills the request. Computer interactions using the client/server model are very common. For example, when an individual checks a bank account from his or her computer, a client

program in the individual's computer forwards the request to a server program at the bank. The bank's program may respond, or it may, in turn, forward the request to its own client program that makes a request to another bank computer. With regard to the World Wide Web, the browser on an individual's computer is a client program. A client application can also be referred to as the "front-end" and the server application is often called the "back-end."

**D.     SERVER**

14. A "server" is a computer on a network (such as an internal corporate network or the Internet) that is dedicated to a particular purpose; it stores information and performs critical functions. For example, a "database server" could store all of an organization's data on a single machine, while providing database services to multiple users anywhere in the office, or even the world, and while also allowing access and control over the data. A typical "database server" will allow users to utilize their data from custom applications designed to meet their specific needs. Server software refers to software running on the server computer that "serves up" information to a client computer. With regard to the World Wide Web, a web server responds to web client requests to view web pages. These pages can be static (content doesn't change) or dynamic (content is determined when requested).

**E.     PROXY SERVER**

15. A proxy server is a machine used to relay Internet transactions between clients and websites such that the transactions with the website appear to originate from the proxy server's IP address. An IP address is the Internet Protocol address used to identify a machine, such as a server or proxy server, connected to the Internet. Proxy servers are used for a number of purposes, including the following activities:  (a) keeping machines behind the proxy (such as the website's actual host servers) anonymous;  (b) speeding up access to resources frequently used by multiple users behind the proxy by using caching techniques; (c) controlling access

to website content or services;  (d) accessing websites from a computer whose own IP address otherwise would be blocked by the accessed website;  (e) logging or auditing Internet use;  and (f) circumventing security procedures or controls aimed at limiting access to or blocking a particular IP address.

## F.   WEB SCRIPTS

16. "Web scripts" are written to generate dynamic web pages -- that is, web pages with rapidly changing content and imagery or content that must be somehow calculated via software mechanisms. For example, webscripts can be used to calculate and display the total visitor count to a website.  Such scripts are written in a variety of scripting languages such as PHP, CGI, Perl, and JavaScript.  Some scripts run on the web server (server-side), while other scripts run on the user's machine (client-side).  Such webscripts also can be embedded within HTML in order to affect the behavior of web pages.  Of the languages mentioned, JavaScript is the language of choice for client-side scripting and is supported by all the Internet browsers popularly in use, while PHP, CGI, and Perl are popular for server-side scripting.

17. In Microsoft Windows systems, component-based scripting is implemented through a technology called "Active Scripting," and employs what are commonly called "script engines."  One particularly popular form of a server-side Active Scripting engine is called ASP, or "Active Server Pages," which is used to develop dynamically-generated web page content.

## G.   WEB CRAWLER OR SPIDER

18. A "web crawler" or "spider" is a computer program used to browse the Internet in a systematic, comprehensive way. Web crawlers are typically associated with search engines and are used to collect website information for search engine indexing.  Nonetheless, spiders and web crawlers are now commonly being used to collect or "harvest" web page information for non-search related applications such as web scraping. Web scraping can be

used to locate input fields and variable fields that allow a program to automatically fill out forms to login, send messages, request information, or any other website activity initiated by the filling out of a form. Because web scraping often is employed by entities for unwanted or unlawful purposes (like Defendants' harvesting of user information such as "friends' lists," and similar data from Facebook in order to later use that information to send "spam" email and electronic mail messages), many website operators (including Facebook) publish Terms of Use provisions that prohibit the use of web scrapers on their websites by their registered users.

## H.   COMPUTER DATABASE

19. Computer databases consist not only of data, such as user names and addresses, but also consist of schema and procedures represented by source code. The term "schema" refers to the structure of the database, including where to place the data, how to organize the data, and the particular relationships between the data. For example, customer names may be placed in a field called "Name," and that name is referenced in a table called "Customers." A table can be visualized as a spreadsheet and the field would correspond to a particular column in the spreadsheet. In a database there are many different tables. Each customer name may have an associated table that has fields that contain the customer's address, credit card number, account balance, and comments about the customer. The table names, field names, types of data in the fields, and relationships between different tables and different fields constitute the schema of the database, which is described using a special programming language such as the Structured Query Language, also known as SQL. Two popular forms of SQL servers are MySQL, an open source relational database management system, and Microsoft SQL Server (MSSQL).

20. Procedures for manipulating the data may also be stored in databases and are represented by a special programming language such as SQL. These "stored procedures" can be used by programs that access the database to manipulate the data in the database. For example, a

CONFIDENTIAL                                                          8

stored procedure may exist to compute the average outstanding balance for a list of customers. A program that is written to access the database could also access the stored procedure in order to calculate this average.

## I.      SQL SERVER

21. Microsoft SQL Server (MSSQL) is a relational database management system. A relational database is a sophisticated method of grouping data together based upon common attributes to provide greater speed and reliability for data access.

22. SQL tables will often involve common English words, but the sequence of items is usually arbitrary. The tables are used to organize data, and do not have to be in any specific order to function correctly. Each specific category of data is known as a tuple. There is no order imposed upon how the tuples are organized. The order of tuples in a relational database is arbitrary. If similar or identical sequences of elements are found in a SQL table, it can be a sign of copying despite the elements having common names.

## J.      SOURCE CODE

23. In computer science, "source code" is a kind of text that is written using the format and syntax of the programming language that it is being written in, and typically is the only format that is readable by humans.  Computer programs can be written using complex instructions that look like English. For example, the instruction a = b*c+2 tells the computer to take the number stored in memory and represented by variable b, multiply that by the number stored in memory and represented by the variable c, add 2 and store the result in memory represented by the variable a. Similarly, the statement printf("Hello world!") tells the computer to print the words "Hello world!" to the computer screen. These high-level, English-like instructions are the "source code." Computer programs are made up of many lines of source code and the process of writing these lines of code is called programming. Eventually these lines of source code are turned into instructions that a computer

understands, consisting of sequences of electronic ones and zeroes. The process of turning human-readable source code into a file containing computer instructions is called "compiling" and is performed by a special computer program called a "compiler." In some cases, source code is run directly by a computer, without creating any file of computer instructions.

24. Source code comes in a variety of programming languages, some of which are called "low level" programming languages, and others which are called "high level" programming languages. PHP, Perl, Java, JavaScript, and SQL all are examples of high level programming languages. Other popular examples of high level source code programming languages are ones called C, C++, C#, Smalltalk, APL, AppleScript, Ruby and Python.

## IV.    SCOPE OF REPORT

25. Based on our background and experience, we have been asked to provide our opinions and conclusions related to (1) whether Defendants' source code contained evidence of attempts by Defendants to access Facebook, scrape Facebook, download data from Facebook, contact Facebook, and/or use information scraped/and or downloaded from Facebook to "proxy" the Facebook website;  (2) whether Defendants' source code reflects evidence that Defendants used their software to establish Facebook Events and/or wall messages inviting Facebook witnesses to automatically receive electronic mail messages or email messages inviting them to join the Power website;  (3) whether Defendants developed technology to circumvent any attempted block by Facebook of the IP addresses used by Power.com to connect with Facebook;  and (4) whether there is evidence that Defendants ever included information related to their Power100 (or 100x100x100) marketing campaign in their Power_Logger or Async databases. We have reviewed literally hundreds of thousands of lines of code to reach our opinions.  In addition, in reaching the opinions and conclusions discussed herein, we received, considered, and/or relied upon the following materials, copies of which are not attached but can be provided upon request:

CONFIDENTIAL                                                                                    10

SER127

- Power Source Code Documents, which now include 5,743,505 lines of code.

- Sixty-nine SQL Server database backup files.

- We used Understand by Scientific Toolworks, Inc. to help analyze the software.

- Microsoft SQL Server 2008 to extract the databases from the backup files and to review the database contents.

- Fifty-five PowerScript Source files extracted from the PowerScript_bkp_full.bak database backup file.

- Numerous source code files provided as exhibits to this report.

- The transcript and Exhibits from the July 20, 2011 deposition of Defendant Steve Vachani, and the testimony from, and Exhibits used at, the December 14, 2011 deposition of Zak Mandhro.

- The December 12, 2011, Declaration of Steve Vachani in Support of Defendants' Oppositions to Facebook's motions for summary judgment.

- Facebook's source code for "Create an Event."

- Emails, technical documents and marketing documents produced by Defendants and third-party witnesses in discovery in this litigation, which are referenced in this Report.

26. We have been retained to review and analyze the source code and databases produced by Defendants in this action.  We reviewed code and databases produced by Defendants on August 25-26, 29-30, September 6-7, October 19 and 25, 2011, November 1-4, 7-9, 11, 16, and 19-21,  December 12-13 and December 15-16.  Copies of our "Power Source Code Inspection Logs" maintained in accordance with the Protective Order entered in this case are attached hereto and combined as Exhibit C.

## V.    COMPENSATION

For the work of Lawrence Melling on this matter Zeidman Consulting is being compensated at a

rate of $200 per hour.  For the work of Bob Zeidman, Zeidman Consulting is being compensated
at a rate of $750 per hour

## VI.    ANALYSIS

Our analysis is broken into five sections:

- We analyze how Defendants' software was used to connect to the Facebook website,
  spider the Facebook website, scrape Facebook user content and user information from
  the Facebook website, download Facebook user information and user content to the
  Power website, and to emulate or "proxy" Facebook as part of the Power website's
  social aggregation services.

- We analyze how Defendants' software was used to initiate spam emails via the
  PowerScripts developed to create content on Facebook.  We provide a detailed
  analysis of the CREATE_EVENT_FACEBOOK and
  PN_SEND_SCRAP_FACEBOOK scripts that were used to create Facebook Events
  for the Power 100x100x100 campaign, and which were also used to post Power
  invitations on Facebook users' Walls.

- We discuss how the Power databases identify Facebook information stored in the
  databases.  We also show why we were unable to determine how many Power.com
  transactions occurred with Facebook users, because the relevant information was
  deleted some time after it was originally stored.

- We analyze Defendants' efforts to circumvent Facebook's IP Blocks: The Power
  proxy system developed to manage and control a pool of proxy servers used to access
  sites like Facebook in order to circumvent IP blocks like the ones put in place by
  Facebook.

CONFIDENTIAL                                                                         12

- We have also included a short section providing a review of the technical accuracy of certain arguments made by Defendant Steve Vachani in his December 12, 2001 declaration.

**A.    DEFENDANT'S SOFTWARE USED TO CONNECT TO THE FACEBOOK WEBSITE, SPIDER THE FACEBOOK WEBSITE, SCRAPE FACEBOOK USER INFORMATION FROM THE FACEBOOK WEBSITE, DOWNLOAD FACEBOOK USER INFORMATION TO THE POWER WEBSITE, AND TO "PROXY" FACEBOOK**

27. In analyzing the Defendants' source code, we determined that there were two core software components developed to retrieve information and post information to social network sites like Facebook. The two components are the PowerScript system and the PowerProxy system. The PowerScript system is best described as a web scraping system. A web scraper is software that can programmatically access web sites and perform operations intended to be done by a person, such as filling out forms, sending messages, and reading content. Web scrapers are also referred to as webbots, or simply "bots." Web scraping is generally not allowed under most websites' terms of use, and is considered a form of pirating by those websites. Also, because programmed transactions with a website can occur much faster than human transactions, a website's access can be slowed down or halted through a rapid succession of programmed transactions. Web sites that do allow other sites to programmatically access information would typically offer these services through a web service interface or an API (application program interface), as Facebook does with its Facebook Connect service, in order to manage and control these programmed transactions and maintain a reliable website.

28. Because web scraping is prohibited by most websites, one challenge to creating a web scraper is to avoid detection. One of the easiest ways to detect a web scraper is to look at the number of transactions coming from a specific Internet Protocol Address (IP address). To avoid detection it is common for sophisticated web scrapers to use proxy servers to scrape information. A proxy server is a machine that acts as a relay, so the website sees the IP address of the proxy server, and not of the actual machine running the scraper. By using a

CONFIDENTIAL                                                                                                13

pool of proxy servers it is possible to reduce a website's ability to detect the scraper by dispersing the transactions across the pool of proxy servers. Additionally, if one of the proxy servers is detected, the other servers can continue to maintain access even if the website blocked access for the detected server.

29. Our analysis shows that the Defendants developed the PowerScript system and PowerProxy system to scrape information from Facebook, proxy the Facebook website and avoid detection when engaged in such activities. In addition, our analysis shows how Defendants' programmed access initiated actions that resulted in unwanted commercial "spam" messages being sent to Facebook users soliciting them to join Power.com.

30. We analyzed 33 out of 55 PowerScripts written to perform transactions with Facebook's website. PowerScript is a scripting language developed by Power to programmatically obtain information from web pages, and write or post information, to web pages without requiring user interaction. Table 1 categorizes the scripts we reviewed.  Of those, scripts use HTTP GET to read information from the Facebook website, and others use HTTP POST to post information on the Facebook website. These scripts were developed by Defendants for performing transactions on the Facebook site, are specific to Facebook, and would not work if targeted to another site. The developers writing these scripts would have been required to access Facebook via a Facebook user account to examine the HTML source in order to write a script to get or post Facebook information.

| PowerScript Name | Function |
| --- | --- |
| PN_LOGIN_FACEBOOK | Post to login to Facebook |
| PN_VALID_CONTEXT_FACEBOOK | Get logout link to verify login is active |
| accept_friend_invitation_FACEBOOK | Post to accept Facebook friend invitation |
| CREATE_EVENT_FACEBOOK | Post to create Facebook Event and invite list of friends or all friends if no list is provided |
| JOIN_COMMUNITY_FACEBOOK | Post to join a Facebook group |
| PN_SEND_SCRAP_FACEBOOK | Post message to Facebook friend Wall |
| PHOTO_CREATE_ALBUM_FACEBOOK | Post  a new Facebook photo album |
| PN_SEND_PRIVATE_MESSAGE_FACEBOOK | Post send private Facebook message to a Facebook friend |
| TUBESPREE.PutQuickEmbedInFacebook | Post new video link to Facebook |

| PN_SET_STATUS_FACEBOOK | Posts Facebook status update |
|---|---|
| PN_GET_FRIEND_PICKER_FACEBOOK | Get Facebook friend id and name |
| PN_GET_BIRTHDAYS_FACEBOOK | Get Facebook friends' birthdays |
| PN_GET_COMMUNITIES_FACEBOOK | Get Facebook group information (id, name, description, photo link, number of members) |
| PN_GET_PRIVATE_MESSAGE_FACEBOOK | Get Facebook messages for subject, message, friend Id, name, photo and message link, reply link, PrivateLock |
| PN_GET_ALBUM_LIST_FACEBOOK | Get Facebook photos for album id, name, date, dateorder, image, link |
| PN_GET_ALL_SCRAP_MESSAGE_FACEBOOK | Get Facebook Wall posts and messages - messages same as PN_GET_PRIVATE_MESSAGE_FACEBOOK and wall posts the same as PN_GET_SCRAP_FACEBOOK |
| PN_GET_FRIENDS_INVITATIONS_FACEBOOK | Get friend invitations for friend id, photo, name, and link |
| PN_GET_FRIENDSUPDATES_FACEBOOK | Get friend update, name, id,fullname, and update link |
| PHOTO_GET_ALBUM_LIST_FACEBOOK | Get list of photo albums |
| GET_HTML_PAGE | Get an entire HTML page |
| GETALBUMLIST_FACEBOOK | Get photo album list |
| OBTERIMAGEMFACEBOOK | Get photo page |
| GET_PROFILE_FACEBOOK | Get profile information (id, name,photo link, gender,birthday, email, phone, mobile phone,website link, city, country, relationship status, interests, favorite music, favorite TV shows) |
| PN_GET_SCRAP_FACEBOOK | Get Wall for friends photo, ID, Name, Date of post, content, encoded content, post id, post link, subject and showPrivateLock |
| PN_GET_AMOUNT_COMMUNITIES_FACEBOOK | Get/counts number of groups |
| DELETEALBUMPHOTO_FACEBOOK | Post to remove a Facebook photo album |
| PN_DELETE_SELECTED_PRIVATE_MESSAGE_FACEBOOK | Post to remove Facebook message |
| UNJOIN_COMMUNITY_FACEBOOK | Post to remove user from Facebook group |
| PN_DELETE_SELECTED_SCRAP_FACEBOOK | Post to remove Wall message |
| PHOTO_DELETE_PHOTO_FACEBOOK | Post to remove a Facebook photo |
| GET_VIDEO_FACEBOOK | Get a Facebook video (name, id, url, thumbnail, width, height) |
| PN_GET_FRIENDS_FACEBOOK | Get a list of friends(ids, names,and photo urls) |
| PN_LOAD_ATTRIBUTES_FACEBOOK | Gets name, id, photo url, gender, country |

**Table 1: PowerScripts analysis summary**



**Figure 1: Power.com Screenshot including a Facebook friend**

31. The Power.com screenshot (found on page 2 of the toolbar_en.ppt presentation in directory SVN\apresentacoes\20081210 – toolbar) shown in Figure 1 is an example of how information from Facebook, gathered using PowerScripts, including the ones analyzed in Table 1, was included and framed inside the Power.com web page. In this example the scraped information includes a Facebook friend's photo (see red circle).

32. Defendants sometimes misleadingly call their Power.com website a "browser." For instance, Mr. Vachani referred to Power.com as a browser both at his deposition and in his December 12, 2011 Declaration. We don't believe that is an accurate description of Power.com's functionality. From our examination of Defendants' source code, and as further discussed below in conjunction with our discussion of Mr. Vachani's December 12, 2011 Declaration, Defendants developed software called Power Navigator which supported a browser style interface where the Facebook website could be displayed within Power.com, as shown in

Figure 2.



**Figure 2: Screenshot of Facebook webpage embedded in Power.com web page**

However, as we noted, the majority of PowerScript scripts directed to Facebook were not directed to browsing functions, but instead were written to programmatically obtain and post information to Facebook without user interaction. Such functionality cannot rationally be called browsing..

**B.      DEFENDANTS' SOFTWARE USED TO INITIATE SPAM EMAILS**

33. We also examined two of the PowerScripts (`CREATE_EVENT_FACEBOOK` and `PN_SEND_SCRAP_FACEBOOK`) in more detail and found that each was responsible for initiating a sequence of programmed transactions to create a Facebook Event and post

SER134

Facebook Wall messages. These PowerScripts require Power's software and infrastructure to execute and, once executed, resulted in SPAM electronic messages being sent to Facebook users. These scripts were developed for a specific purpose, and that was to automate the creation of Facebook Events and posting of Facebook Wall messages.

34. The `CREATE_EVENT_FACEBOOK` script automatically set Power as the host of the event, and identified Power as the "location" for the event in Facebook's Event tool (see Exhibit D, `CREATE_EVENT_FACEBOOK.xml`, at lines 37 and 41).

35. The script also generated a guest list if one was not provided. To generate the guest list, Defendants' software accesses the user's Facebook "friendsList" and extracts the user ID of each friend to create the guest list. See Exhibit D, at lines 46-51. The PowerScript executes this code, if no guest list is provided, to automatically create a guest list from the user's list of friends on Facebook. Specifically, the PowerScript application checks a "variable" (a named element to store information) called the Guestlist ("`listaConvidados`"), and then executes a sequence of programming commands inside a "rule block," identified by the beginning tag "`<rule>`" and terminated by the ending tag "`</rule>`," if it is empty. Through this process, the PowerScript software creates a new variable called "`friendsList`," and another variable called "`ids`," which combine to create the Event guest list made from one Facebook user's list of Facebook "friends."

36. The script also automatically sends Facebook Event invitations to each Facebook user in the guest list on behalf of the Power website (see Exhibit D, at lines 58-74), and these Event invitations initiate spam messages being sent to the Facebook invitees.

37. We also looked to determine if Defendants, or the user, caused the Facebook "Events" to be initiated. From the code that has been provided to date, we could not locate any code in `CREATE_EVENT_FACEBOOK` that requested the user's approval to send the "Event" invitations. We also were unable to find any other code requesting that the user accept or approve sending the Facebook Event invitations on behalf of the Power.com website.

38. The PowerScript software also created the text used to invite Facebook friends to

participate in the "100x100x100" campaign.  The message contents were stored in resource

files, which are files used by Microsoft Visual Studio development tools to store

information for access by a program.  Notably, in this example there were three resource

files found with the same content in three different languages: English, Spanish, and

Portuguese (*see* Exhibit E, `PowerCallBack.aspx.en.resx`, found in directory

`SVN\power.com\Power.Com\Pub\Http\App_LocalResources`, at lines 132-

137).

```
132 <data name="CAMPAIGNMESSAGE" xml:space="preserve">
133  <value>#BREAK##BREAK#I am competing for the $100
prize in the 100x100x100 promotion and recommend you to
participate too!#BREAK#Learn more at:</value>
134  </data>
135  <data name="CAMPAIGNMESSAGE2" xml:space="preserve">
136  <value>First 100 people who bring 100 new friends to
Power.com earn $100. Come and participate too:</value>
137  </data>
```

These messages were created and authored by  Defendants to promote joining Power.com.

When used with the `CREATE_EVENT_FACEBOOK` script, the messages would result in all

of a Power.com user's Facebook friends being automatically invited to join Power.com,

and the friends then receiving spam emails as a result.

39. These strings include the actual language that was sent to Facebook users as a result of the

Power.com website's execution of the "`CREATE_EVENT_FACEBOOK`" script.  The excerpt

above shows that the text string stored for `CAMPAIGNMESSAGE` and another for

`CAMPAIGNMESSAGE2` are both human-readable messages used in promoting the

100x100x100 campaign to Facebook users.

40. The html code for the Power.com web page that would initiate the creation of Facebook

Events for this campaign was not found in the software sources provided.  We believe this

omission arises from the fact the Power 100 campaign was from an earlier date than the

source provided.  Since the source repository that would allow us to return to earlier software

releases was corrupted when we received it from Defendants, we were unable to find the html code that initiated these campaign events. However, we know from other sources, such as Mr. Vachani's deposition and the PowerScript source code that we reviewed, that such initiation of Facebook Events by the Power.com web page did, in fact, occur. For instance, in Figure 3, we offer a screenshot that shows a Power 100x100x100 campaign message posted on a Facebook user's Wall. This screen capture image produced by Defendants corroborates the occurrence of the Facebook Event and Wall posting transactions. See facebook.jpg found in directory `SVN\apresentacoes\20090120 - Intersite Connect\Source\ícones` image file:



**Figure 3:** Facebook Wall screenshot showing Power 100x100x100 campaign invitation

41. Additionally, we were able to examine some of the actual email messages sent when a wall

message was posted in response to Defendants creating an Event to invite a user to the Power100 or 100x100x100 campaign. The messages shown in Figure 4 are actual emails sent to Defendant Steve Vachani when his friends used the Power.com site to execute the PowerScript software made available through the html code to create Power 100 Events, and to thereby invite their Facebook friends to participate in the campaign.

CONFIDENTIAL                                                        21





Andrew Maciver wrote on your event's Wall... - Message (Plain Text)

From: Facebook [wallmaster+m~w~iid_@facebookmail.com] Sent: Sat 12/13/2008 7:41 PM
To: Steven Vachani
Cc:
Subject: Andrew Maciver wrote on your event's Wall...

Andrew wrote something on the Wall for the event "Bring 100 friends and win 100 bucks!".

To see what Andrew wrote, follow the link below:
http://www.facebook.com/n/?event.php&eid=44763165162#wall_posts

Thanks,
The Facebook Team

___
Want to control which emails you receive from Facebook? Go to:
http://www.facebook.com/editaccount.php?notifications&md=ZXZlbnRfd2FsbDtlaWQ9NDQ3NjMxNjUxNjI7ZnJvbT01Nzg0MjUxMDc7dG89NjYwMDQwNTMx

Ghostday Leandro Abreu invited you to the event "Bring 100 friends and win 100 bucks!"... - Mess...

From: Facebook [eventmaster+m~w~iid_@facebookmail.com] Sent: Thu 3/12/2009 10:45 AM
To: Steven Vachani
Cc:
Subject: Ghostday Leandro Abreu invited you to the event "Bring 100 friends and win 100 bucks!"...

Ghostday invited you to "Bring 100 friends and win 100 bucks!" on Friday, March 20 at 1:00am.

Ghostday says, "Bring 100 friends and win 100 bucks!".

Event: Bring 100 friends and win 100 bucks!
What: Reunion
Host: Power
Start Time: Friday, March 20 at 1:00am
End Time: Friday, March 20 at 11:55pm
Where: Power

To see more details and RSVP, follow the link below:
http://www.facebook.com/n/?event.php&eid=56465892150&mid=234766G27576b53G3fcc0c8G7

Thanks,
The Facebook Team

___
Want to control which emails you receive from Facebook? Go to:
http://www.facebook.com/editaccount.php?

**Figure 4: Screenshots of emails sent as a result of creating a Facebook Wall post and Facebook Event to invite friends to join Power 100 campaign**

42. We also found another promotional message authored by the Defendants in the same resource file referenced above that was also used to invite Facebook friends to Power. *See* Exhibit E, at lines 147-149.

```
147  <data name="INVITEMESSAGE" xml:space="preserve">
148  <value>Hi ##friendname##,#BREAK#How would you
like all your friends in just one place?#BREAK#Login
to Power.com to discover all of its advantages and
enhance your Internet experience.</value>
149  </data>
```

43. This message includes a placeholder to insert a `friendname.` In this case, we were able to find the Power.com software that would initiate sending these messages. The function that uses this "`INVITEMESSAGE`" string is named "`SendMessageInviteToPower().`" See Exhibit F, `PowerCallBack.aspx.cs`, found in the directory `SVN\power.com\Power.Com\Pub\Http`, at line 2623. The code excerpt below shows that the "`INVITEMESSAGE`" is used to form the body of the message to be sent as part of the invitation (see Exhibit F, at line 2681):

```
dataMessage.BodyMessage = Translate("INVITEMESSAGE")
.Replace("##name##", name)
.Replace("##friendname##", friendName)
```

44. This line of code retrieves the appropriate language translation for the "`INVITEMESSAGE`" (English, Spanish, or Portuguese) message, and then replaces the "friendname" placeholder in the text of the message that is sent with the actual friend's name in order to complete the content of the invitation to join Power.com. See Exhibit F, at line 2716, it calls the following function to send the message:

```
PowerMessageManager.SendMessage(dataMessage);
```

45. How the invitation is sent depends upon the network (e.g. Facebook) to which the invited friend belongs. The `PowerMessageManager.SendMessage()` method, which can be used to send invitations to users on Facebook, can be found starting at line 24 in the

`PowerMessageManager.cs` file found in the directory

`SVN\power.com\Power.Message.Core`, which is attached hereto as Exhibit G.  The

related `SendMessage()` code is responsible for calling the

`PowerMessageFactory.CreatePowerMessage()`, see Exhibit G, at line 42.

Further, a `CreatePowerMessage()` method that appears in the code uses the relevant

network name (*e.g.* "Facebook") to determine how and where to send the electronic invitation.

For the case where the network is Facebook, the following code would be executed (see Exhibit

H, `PowerMessageFactory.cs`, found in the directory

`SVN\power.com\Power.Message.Core`, at lines 45-50).  This code shows Defendants

would actually send an electronic message to someone from Facebook inviting them to join the

Power.com website.  The code to send the message uses a PowerScript which posts the message

to the Facebook Wall of the friend to be invited.  The code to retrieve and execute the

PowerScript can be found in Exhibit I, `Write.cs`, found in the directory

`SVN\power.com\Power.Message.Core\Engines`, at lines 87-94.

46. The code identifies the name of the PowerScript `PN_SEND_SCRAP_FACEBOOK` as that

   which was used for initiating the electronic invitations to join Power.com.  The code was

   retrieved from a database where it was added by using the following SQL command (see

   Exhibit J, file `InsertMessageScript.sql`, found in directory

   `SVN\power.com\Power.Message.Core\Database`, at line 7).  The

   `PN_SEND_SCRAP_FACEBOOK` script itself was retrieved from the PowerScript database

   (see Exhibit K, file `PN_SEND_SCRAP_FACEBOOK.xml`, at lines 1-23).

47. The PowerScript automatically posts the message content from the `INVITEMESSAGE` string

   to the Wall of a Facebook friend.  Using these automatically generated messages, Defendants

   initiated electronic invitations for Facebook users to join the Power.com website.

## C.    POWER DATABASES

48. In addition to the code analysis, we also examined the related databases provided in an effort

to determine how many Facebook Event or Wall electronic mail messages were initiated by the PowerScript software.  We determined that while certain of the databases were the ones of interest in which we would have expected to locate information about the numbers of electronic invitations that were sent by Power.com to Facebook, the databases produced by Defendants that should contain logs of the number of Events and Power.com invitations sent actually do not contain the information for the time period in question.

49. For instance, the Power.com database named Async is a log of PowerScript jobs run.  The Async log would contain the information related to the number of electronic messages sent by the PowerScript software.  The Async database found on the SQL 7 DVD only logged jobs from 2/19/2011 to 4/1/2011, and the Async database in SQL 6 DVD was corrupted. However, the disk that was provided that fixed the corrupted version only included logs from 08/03/2007 to 11/23/2008 – which does not cover the December 2008 period when the Facebook activity was seen.  We understand that, according to information received from Mr. Timothy Fisher, Defendants stopped logging the PowerScript transactions into the database in November of 2008 as a result of migration of the company's servers to amazon.com as a host for the website.  Whether true or not, the loss of information is prejudicial to Facebook, as only Defendants ever maintained such database logs.

50. In addition, we reviewed the content of the Power_Logger database in the expectation that it might include the information about the number of Facebook Events and Wall messages that the PowerScript software initiated.  We did so because this database appears to include tables to log information about messages sent, including 10 MessageLog tables, a MessageLogHistory table, 10 Scraplog tables, and a ScraplogHistory table.  Nonetheless, all of these tables were empty except for the ScrapLoghistory, which only had 141 entries from 12/6/2009 to 11/9/2010, all on the Orkut network.

51. Again, we understand that based on information received from Mr. Fisher, Defendants ceased daily operations sometime in April of 2011, at which time Defendants transferred all files onto a separate backup service.  We further understand that, according to Mr. Fisher, the

Power_Logger database was supposedly too large to transfer, and therefore was removed.  In our opinion, by deleting the Power_Logger database, Defendants effectively erased arguably the most relevant and useful information concerning the number of electronic mail messages that Defendants initiated through execution of their PowerScirpt software associated with the 100x100x100 campaign.

52. Because the information about Events and Wall messages sent to Facebook during December of 2008 was not included in the databases we received from Power, we were unable to determine precisely how many wall messages were posted and how many "Power 100" campaign Event notifications actually were sent to Facebook users.

53. However, we also examined the Power database of the Power website's users, and we were able to determine that there were at least 39,137 Power.com users with Facebook accounts in the database.  These database records include the stored email addresses used by the Power.com users in order to login on Facebook, and the stored passwords for their Facebook accounts.

## D.    DEFENDANTS' EFFORTS TO CIRCUMVENT IP BLOCKS

54. We have found that the Power.com website utilized a pool of proxy servers to connect with social network sites, including Facebook, through different IP addresses. The Power software allowed the Defendants to configure a list of proxy servers for each social network site (see Exhibit L, file `HttpProxyConfig.cs`, found in the directory `SVN\powerinfra\Projectos\Power.PowerNetwork.Core\bll`, lines 107-141).

55. In one of the databases provided by  Defendants, we were able to find an entry for the proxy server used to access Facebook. The IP address for the server was `174.129.224.81`, and a reverse directory lookup of this IP address identifies the host as `ec2-174-129-224-81.compute-1.amazonaws.com`. This IP address is associated with Amazon Web Services (see Exhibit M, file `AsyncSetup AsyncHttpProxy.csv`, extracted from the

CONFIDENTIAL                                                                    26

database `SQL 7\AsyncSetup_full_bkp.bak`, database AsyncSetup, table: `AsyncHttpProxy`, row: 1). However, since the database only included a single IP address, and we understand that there were other IP addresses that Facebook attempted to block in December of 2008, it is clear this is not a complete list of the IP addresses that Defendants used to access Facebook. Additionally, the database did not include any history of which IP addresses were used for the critical time period of December of 2008 prior to when Defendants switched to Amazon Web Services. Based upon the proxy system software, it is clear that the Defendants could remove servers from service and replace servers both manually and automatically to circumvent IP blocks, such as those employed by Facebook.

56. The Defendants' software includes a command processing system to manage the server pool (see Exhibit N, `ServerManager.java` found in the directory `SVN\powerinfra\trunk\Java\powerproxy\com\powerscrap\proxy\manager`, lines 43-84). This command processing system is used to check status and make changes to any of the servers in the pool which may be blocked by a website such as Facebook, ("`BLOCK SERVER`") and to obtain a new server IP address when such a block is detected ("`GETNEXTIP`"). The commands can be issued either programmatically or manually. The command processing system effectively permitted Defendants to circumvent any attempts by websites like Facebook to block access by Defendants to those websites.

57. We also uncovered further evidence that Defendants implemented technology to circumvent Facebook's efforts to block the Power.com website by tracing the execution of the software used to create Facebook Events. Specifically, the latest delivery included the source code files that run the `CREATE_EVENT_FACEBOOK` script (see Exhibit O, `CreateCampaignEvent.cs` from directory `SVN\power.com\Power.Com.Core\Campaign100x100x100`, at lines 25-40. In this code, the PowerScript retrieved and executed the "`CREATE_EVENT_FACEBOOK`" script from one of Defendants' servers. Significantly, the IP address of the relevant server that

executes the "`CREATE_EVENT_FACEBOOK`" script is set by the Defendants' proxy server software.  This functionality shows that the PowerScript software is intentionally monitored by the Power.com system to ensure that it is not being blocked by Facebook as a result of the software creating Facebook Events.

58. Additionally, we investigated certain routines in Defendants' source code to determine whether Defendants employed tools that allowed Defendants to circumvent technical barriers – such as blocks of IP addresses – that Facebook or other websites put in place to block Power's access to their own websites.  Certain ones of these routines create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by a website like Facebook. We have been able to identify connection-type methods in the source code that allow Defendants to use a proxy server to change the IP addresses used by the Power.com website that are visible to and are detected by third parties like Facebook.  By tracing the execution of a PowerScript, we found that part of the process was to use `ConfigurationPowerProxy` to get a proxy server to use for connecting with Facebook. The code found shows how an array of proxy servers is created from a list provided by the proxy manager and then the server is selected randomly from that list.  See Exhibit P, `ConfigurationPowerProxy.cs` found in the directory, `SVN\powerinfra\trunk\Projetos\src\configuration`, at lines 20-26.

59. The Defendants' source code includes routines we have identified that create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by Facebook. The `updateServerListThread` shows the server list is updated on a regular interval stored in the `timeToUpdate` property (see Exhibit Q, `UpdateServerListManager.java`, found in the directory `SVN\powerinfra\trunk\Java\PowerInfra\powerproxy\com\powerscrap\proxy\manager`, at lines 107-118).

60. While the previous routine is used to update the server list on regular intervals, there are two other methods that are used to update the server list.  The `definirServidor` method is

used to add a server to the list.  The `removerServidor` method is used to remove a server from the list (see Exhibit R, `PowerProxy.java`, found in the directory `SVN\powerinfra\trunk\Java\PowerInfra\powerproxy\com\powerscrap\proxy`, at lines 82-108 and lines112-135, respectively). Finally the listen method at Exhibit R, lines 144-165 monitors each proxy server and calls the `removerServidor` routine if it detects a block of the Power.com website.  The IP address of the Power.com website can then be replaced with another IP address from the Power Proxy Manager.  In this way, Defendants ensure that they can circumvent deliberate blocks of its services by entities such as Facebook.

61. Based on the code examined it is clear that significant effort went into the design and development of the proxy system, and that one of the objectives of the system was to reconfigure IP connections if one of Defendants' proxy server's IP addresses used to connect to a website like Facebook was blocked.  From our own understanding of the technology, we know that it is common for entities like Power.com to employ proxy pools to circumvent the blocking of IP addresses, especially when such entities are also employing scraping programs to obtain web content. As shown in our analysis above, the PowerScript scripts used by Power to create Facebook Events and write on Facebook friends' Walls are such web scraping programs.  Moreover, Defendants' proxy pool infrastructure was designed to support these scraping activities.

62. Starting with the random selection of a proxy server to run each PowerScript, through the server list maintenance software described above, to the pool management command software and proxy server monitoring code also discussed above; Defendants' proxy system clearly was specifically designed to circumvent IP address blocking by entities such as Facebook.

**E.      DEFENDANTS HAVE DELETED IMPORTANT DATA**

63. Since first getting access to some code on August 23, 2011, we have continually found

deficiencies in the scope of code produced by Defendants.  For instance, as noted, despite
repeated and diligent requests, we still have not received all of the Power database
information associated with how many invitations were sent by Power.  From
correspondence from Mr. Fisher, we now believe this highly important information was
deleted after this litigation was underway.

**F.      TECHNICAL ANALYSIS OF DECLARATION OF MR. VACHANI**

64. Finally, we offer some observations about the obvious technical errors contained in
statements by Defendant Steve Vachani in his December 12, 2011 Declaration.  For instance,
in paragraph 3 of Mr. Vachani's declaration, he states:

> Specifically, Power created a browser that allowed users to
> login and access all of their various social networking
> accounts at once. Users could update their photos,
> messages, music, and videos, and these updates would be
> portable across various social networking sites.

65. We believe Mr. Vachani's statements reflect his lack of technical acuity and programming
skills to functionality understand the functionality of the PowerScript software. From our



Figure 5: Screenshot of Facebook Wall page included on a Power.com webpage

examination of the code, we did find that Defendants' software included a function that does resemble a browser – but only slightly. That software is contained in one of the many software directory trees and is named `"Navigator."` The software provided the user with the ability to open another web page and display it inside a Power.com web page. In Figure 5, a screenshot of the Power.com web page with a Facebook page embedded is shown (*see* FBPOWER00099). The screenshot, we believe reflects the functionality Mr. Vachani is referring to in his statement. However, while one function of this software was to allow the user to enter a message, the description of it as a "browser" does not capture the software's programmed crawling and scraping of websites. The Power software that provides this functionality is the "PowerScript" software, scripts, and infrastructure. As we have shown in our analysis above, PowerScripts were written to programmatically perform all the functions required to get and save photos, get and send messages, and get and save video, so as to "proxy" a website like Facebook. This functionality is directly related to a web scraper or webbot, and not a browser. That is so because the program or scripts perform the operation, rather than a user.

66. Also in paragraph 22 of his December 12, 2011 Declaration, Mr. Vachani states:

> Power did not access any nonpublic portion of Facebook's website. Power merely offered users a different and potentially superior browser through which they could access their Facebook accounts to copy, update, and/or port their own "User Content." And users did so by entering their own valid usernames and passwords, which Power never copied or stored for any purpose. Power did not obtain any software, data, or other content of value from Facebook. The only data accessed through Power's utilities were user's own "User Content," over which Facebook has disclaimed any ownership.

67. Again this statement is misleading because it represents that the user was controlling the access to public portions of Facebook's website. What actually occurred is that Defendants' software programmatically created Facebook Events. Unlike a browser, Defendants' software can programmatically create an Event, creates the list of friends to invite, and execute or send the Event invitations, without requiring any user interaction.

CONFIDENTIAL                                    31

68. In addition, Mr. Vachani incorrectly states that Power never copied or stored Facebook usernames and passwords, whereas our examination of the "`power`" database found 39,137 Facebook login names and passwords stored there. An example of three network connections for one Power.com user is shown in Table 2. As can be seen from the table headings, this user belonged to three social networks: Facebook, LinkedIn, and Orkut. It also shows the username and password for each was stored within Defendants' databases.  See power database, `dbo.account` table.

| id | iduser | Nameaccountnetwork | username | idnetwork | password |
|---|---|---|---|---|---|
| 17243056 | 977586 | FACEBOOK | luiz.grecco@gmail.com | NULL | giF9I6JMQK8= |
| 17134637 | 977586 | LINKEDIN | luizg@sebraesp.com.br | 1288243 | q5HQ0dzE0bo= |
| 906629 | 977586 | ORKUT | luiz.grecco@gmail.com | 1.35E+19 | giF9I6JMQK8= |

**Table 2: List of three social network accounts, usernames and passwords stored in power database**

69. In the same "`power`" database, we also found that friend lists were also stored. We found 225 records of Facebook friend lists that totaled 31,515 Facebook friends. An example of one of the 225 Facebook friend lists can be found in Exhibit S, friendlist2.xml from the power database, `dbo.FriendsAccount` table. This example friend list contains data for 253 Facebook friends and stores their Facebook IDs, Names and links to their Facebook profile photos.

70. Finally, in paragraph 11 of Mr. Vachani's December 12, 2011 declaration, he states:

> Power did not undertake any effort to circumvent that block, and did not provide users with any tools designed to circumvent it. Nevertheless, Facebook's IP block was ineffective because it blocked only one outdated IP address Power had used, and did not block other IPs that Power was using in the normal course of business.

71. From our analysis of the Power Proxy infrastructure, Defendants developed a flexible system for operating, managing, and maintaining a pool of proxy servers that could be assigned and removed from use easily. Because Defendants fundamentally relied on their software's ability to scrape information from other sites, the Power Proxy infrastructure limited the number of transactions coming from any one proxy server to reduce the likelihood of

detection by the websites being scraped. Defendants also put in place monitors to detect when errors occurred on one of the proxy servers, which included the ability to remove a failed proxy server from the list of servers. This type of proxy pool is not commonly used by websites, but is commonly used by web scraping services.

## G.     CONCLUSION

72. Based upon the review of Defendants' source code for various code projects named PowerScript, PowerNavigtor, PowerProxy, and spider, as well as other documentation produced to date, we have concluded the following:

(a) Defendants developed proprietary software named PowerScript and spider in order to crawl various social network websites, including particularly www.facebook .com , to extract or "scrape" website user information such as Facebook photo images, wall content, friends' lists, and the like, and to then reformat that user information on Defendants' own website, www.power.com, in order to "proxy" Facebook and permit Defendants' own website users to log into Facebook through Defendants' own Graphical User Interface, rather than through Facebook's interface.

(b) Defendants designed their proprietary PowerScript and spider software to automatically post on the Facebook website new Events soliciting Facebook users to join Power.com as part of what Defendants called the "Power 100" or "100x100x100" Campaign. Defendants likewise designed their software to automatically post Power Invitations on Facebook users' Walls soliciting them to join Power.com.

(c) Based upon available information from Defendants' databases, at least 39,137 users of the Power website also had Facebook accounts. Because of missing information from those databases that is solely in the control of Defendants, we were unable to quantify exactly how many Facebook Event or wall posting transactions took place between the Power website and Facebook in which Facebook users were solicited to join Power.com.  We are able to state that both kinds of solicitations did occur, however, and were initiated by

CONFIDENTIAL                                                                     33

Defendants' proprietary software.

      (d) In addition to the electronic mail communications that Defendants' software automatically posted on the Facebook websites when it created Facebook Events and when it posted Facebook wall messages, the same proprietary software that Defendants used to automatically create Event notifications and post Facebook Wall messages also would initiate automated "spam" email messages being sent on Defendants' behalf to Facebook.

73. It is our understanding that discovery in this case is ongoing. Accordingly, we reserve the right to supplement or amend our opinions in light of any additional evidence, testimony, or information that may be provided to us after the date of this report. We also reserve the right to supplement or amend our opinions in response to any expert reports served by any other party in the lawsuit.

Dated:  19-Dec-2011

_____

Robert Zeidman

_____

Lawrence Melling

CONFIDENTIAL

34

SER151

Defendants' proprietary software.

(d) In addition to the electronic mail communications that Defendants' software automatically posted on the Facebook websites when it created Facebook Events and when it posted Facebook wall messages, the same proprietary software that Defendants used to automatically create Event notifications and post Facebook Wall messages also would initiate automated "spam" email messages being sent on Defendants' behalf to Facebook.

73. It is our understanding that discovery in this case is ongoing. Accordingly, we reserve the right to supplement or amend our opinions in light of any additional evidence, testimony, or information that may be provided to us after the date of this report. We also reserve the right to supplement or amend our opinions in response to any expert reports served by any other party in the lawsuit.

Dated:  19-Dec-2011

_____

Robert Zeidman

Lawrence Melling

CONFIDENTIAL                                                      34

**Exhibit A: Resume of Robert Zeidman**

**Exhibit B: Larry Melling Resume**

**Exhibit C: Expert Report Source Code Inspection Log 2011-12-19**

**Exhibit D: CREATE_EVENT_FACEBOOK.xml**

**Exhibit E: PowerCallBack.aspx.en.resx**

**Exhibit F: PowerCallBack.aspx.cs**

**Exhibit G: PowerMessageManager.cs**

**Exhibit H: PowerMessageFactory.cs**

**Exhibit I: Write.cs**

**Exhibit J: InsertMessageScript.sql**

**Exhibit K: PN_SEND_SCRAP_FACEBOOK.xml**

**Exhibit L: HttpProxyConfig.cs**

**Exhibit M: AsyncSetup AsyncHttpProxy.csv**

**Exhibit N: ServerManager.java**

**Exhibit O: CreateCampaignEvent.cs**

**Exhibit P: ConfigurationPowerProxy.cs**

**Exhibit Q: UpdateServerListManager.java**

**Exhibit R: PowerProxy.java**

**Exhibit S: friendList2.xml**

CONFIDENTIAL

1

# EXHIBIT 5

**From:**      Andre Fernandes
**To:**        Elmo Cruz; Juliane Conceicao
**Cc:**        Lucas Araujo
**Subject:**   FW: Bloqueio do Facebook
**Date:**      Monday, December 29, 2008 9:59:42 AM

Elmo,

Poderia ver com alguém da sua equipe para fazer um Diagnostic só com o Facebook? Dessa forma receberíamos por e-mail quando não conseguisse logar e saberíamos que o Facebook bloqueou novamente. Quem poderia fazer isso era Tyago, mas como ele não está aqui, temos que ver um outra pessoa. Estou vendo uma forma de estarmos sempre mudando o servidor de Proxy de forma mais otimizada.



Att.:

André Fernandes



**From:** Eric Santos [mailto:eric.santos@corp.power.com]
**Sent:** domingo, 28 de dezembro de 2008 15:05
**To:** Juliane Conceicao; SteveVachani; Steve Vachani; Patrick Amorim; Andre Fernandes
**Cc:** Elmo Cruz; operacao; Tyago Valenca; Danilo Delgado; Leandro Mascarenhas
**Subject:** RE: Bloqueio do Facebook

Oi Elmo e André,

Precisamos já desenvolvermos uma solução para ficar criando servidores de proxy automaticamente a cada 6 horas, algo do tipo. Tenho certeza que eles continuarão bloquear o nosso serviço.

Atc,

Eric

--- On Sun, 12/28/08, Andre Fernandes *andre.fernandes@corp.power.com* wrote:

> From: Andre Fernandes <andre.fernandes@corp.power.com>
> Subject: RE: Bloqueio do Facebook
> To: "Juliane Conceicao" <juliane.conceicao@corp.power.com>, "SteveVachani"
> <steve@stevevachani.com>, "Steve Vachani" <steve@corp.power.com>, "Eric
> Santos" <eric.santos@corp.power.com>, "Patrick Amorim"
> <patrick.amorim@corp.power.com>
> Cc: "Elmo Cruz" <elmo.cruz@corp.power.com>, "operacao"
> <operacao@corp.power.com>, "Tyago Valenca" <tyago.valenca@corp.power.com>,
> "Danilo Delgado" <danilo.delgado@corp.power.com>, "Leandro Mascarenhas"

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00846

<leandro.mascarenhas@corp.power.com>
Date: Sunday, December 28, 2008, 10:10 AM

Mais uma vez fomos bloqueados pelo Facebook. Configurei um servidor na Amazon para
servir como Proxy e no momento o Facebook está logando normalmente.

Att.:

André Fernandes

**From:** Andre Fernandes
**Sent:** terça-feira, 23 de dezembro de 2008 19:52
**To:** Juliane Conceicao; SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick
Amorim
**Cc:** Elmo Cruz
**Subject:** RE: Bloqueio do Facebook

O Facebook está funcionando novamente na Power.com. Estamos utilizando uma solução de proxy
que permite acessar o Facebook através de IPs diferentes dos nossos servidores web.


Att.:

André Fernandes

**From:** Juliane Conceicao
**Sent:** Tuesday, December 23, 2008 4:03 PM
**To:** SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick Amorim
**Cc:** Andre Fernandes; Elmo Cruz
**Subject:** Bloqueio do Facebook

Caros,

Nesse momento o PowerSite Facebook está desabilitado porque o Facebook bloqueou o acesso
pelos nossos servidores WEB. André está realizando uma configuração para utilização de novos IP
(solução de contorno 1).

Att.
Juliane
Internal Virus Database is out of date. Checked by AVG - http://www.avg.com Version:
8.0.138 / Virus Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11

Internal Virus Database is out of date.
Checked by AVG - http://www.avg.com
Version: 8.0.138 / Virus Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00847

From: Andre Fernandes [IMCEAEX-ANDRE+2EFERNANDES@orrick.com]
Sent: Mon 12/29/2008 1:01 PM
To: Elmo Cruz; Juliane Conceicao
Cc: Lucas Araujo
Subject: FW: Facebook Blockage

Elmo,

Could you please ask someone in your team to run a Diagnostic exclusively with Facebook? This way we would receive a notification via e-mail when login is not possible, and would know when Facebook was blocked again. Tyago could do this, but since he is not here, we have to find someone else. I'm checking a way to always change the Proxy server in a more optimized manner.

Regards,

André Fernandes

**From:** Eric Santos [mailto:eric.santos@corp.power.com]
**Sent:** Sunday, December 28, 2008 3:05 PM
**To:** Juliane Conceicao; SteveVachani; Steve Vachani; Patrick Amorim; Andre Fernandes
**Cc:** Elmo Cruz; operacao; Tyago Valenca; Danilo Delgado; Leandro Mascarenhas
**Subject:** RE: Facebook Blockage

Hi Elmo and André,

We need to develop a solution to create proxy servers every six hours automatically or something similar. I am sure they will continue blocking our service.

Sincerely yours,

Eric

— On Sun, 12/28/2008, Andre Fernandes <*andre.fernandes@corp.power.com*> wrote:

From: Andre Fernandes <andre.fernandes@corp.power.com>
Subject: RE: Facebook Blockage
To: "Juliane Conceicao" <juliane.conceicao@corp.power.com>, "SteveVachani"
<steve@stevevachani.com>, "Steve Vachani" <steve@corp.power.com>, "Eric Santos"
<eric.santos@corp.power.com>, "Patrick Amorim" <patrick.amorim@corp.power.com>
Cc: "Elmo Cruz" <elmo.cruz@corp.power.com>, "operacao" <operacao@corp.power.com>, "Tyago
Valenca" <tyago.valenca@corp.power.com>, "Danilo Delgado" <danilo.delgado@corp.power.com>,
"Leandro Mascarenhas" <leandro.mascarenhas@corp.power.com>
Date: Sunday, December 28, 2008, 10:10 AM
We have been blocked by Facebook yet again. I have configured a server at Amazon to serve as Proxy and Facebook is logging in normally at the moment.

Regards,

André Fernandes

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00848

**From:** Andre Fernandes
**Sent:** Tuesday, December 23, 2008 7:52 PM
**To:** Juliane Conceicao; SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick Amorim
**Cc:** Elmo Cruz
**Subject:** RE: Facebook Blockage

Facebook is working in Power.com again. We are using a proxy solution that allows access to Facebook through different IPs from our web servers.


Regards,

André Fernandes


**From:** Juliane Conceicao
**Sent:** Tuesday, December 23, 2008 4:03 PM
**To:** SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick Amorim
**Cc:** Andre Fernandes; Elmo Cruz
**Subject:** Facebook Blockage
Dear All,

PowerSite Facebook is disabled at the moment because Facebook has blocked our access through our WEB servers. André is running a configuration to use new IPs (workaround solution 1).

Regards,
Juliane
Internal Virus Database is out of date. Checked by AVG - http://www.avg.com Version: 8.0.138 / Virus
        Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11
Internal Virus Database is out of date.
Checked by AVG - http://www.avg.com
Version: 8.0.138 / Virus Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00849



**TRANSPERFECT**

CERTIFICATION OF TRANSLATION

I, Matthew Orr, hereby certify that the attached Portuguese to English translation has been translated by a qualified translator competent in both languages, and verified to be an accurate and complete rendering of the content of the original document to the best of our ability. The following document is included in this certification:

"FW Bloqueio do Facebook"

Matthew Orr

Sworn to before me this

March 7, 2012

Signature, Notary Public
**CASEY WARNER**
NOTARY PUBLIC-STATE OF NEW YORK
No. 01WA6285670
Qualified in New York County
My Commission Expires February 06, 2016
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NY, NY 10016 l T 212.689.5555 l F 212.689.1059 l WWW.TRANSPERFECT.COM
OFFICES IN 75 CITIES WORLDWIDE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00850

# EXHIBIT 8

SER160



Power.com

## Power.com Introduces Social Inter-networking to the World

### Stealth Brazilian company quietly registers over 5,000,000 for site that lets users bring together their own presence on major social networks and messaging services

**FOR IMMEDIATE RELEASE**

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

**San Francisco, CA ––Dec 1, 2008** -- Today Power.com ushers in the era of Social Inter-networking with its global launch. Now, for the first time, social network users don't have to jump from site to site to synchronize their logins, content, messages and friends across Facebook, Hi5, LinkedIn, MSN, MySpace and Google's Orkut.

"Today many people have multiple social network, email and IM accounts," said Steve Vachani, CEO of Power.com. "Power synchronizes their friends, messages, photos, updates, and everything they care about. We're taking down the boundaries between social sites, so users can keep in touch, and even synchronize friends and photos automatically. We call this Social Inter-networking."

"Social is about people, not about place," Vachani continued, "So we're making the virtual 'where' irrelevant. Social Inter-networking is the basis for our vision of the future of the Internet."

**Stealth roll-outs: five million registered users and counting**
Power.com, based in Rio de Janeiro, Brazil, held "stealth roll-outs" in Latin America and India in the past year. The company quietly let over 5 million people register themselves –¬ about the population of Sweden. These users arrived organically after seeing their friends using Power.com; no one either blogged about the company or wrote about it in the press, no websites linked to Power.com, and the company sent out no invitations, yet 5 million people joined.

**No Vested Interests: unlike Facebook, Google or Microsoft**
"Power.com works because it doesn't require the big websites to get together and break down their walls," Vachani stated. "Instead, millions of Power users are breaking down these walls on their own, and experiencing the benefits of Social Inter-networking without waiting for Yahoo, Microsoft, Google, Facebook, and MySpace to all agree. This independence contrasts with all previous efforts to bring social networks together, including Facebook Connect, Google Friend Connect, Microsoft Passport, OpenID and OpenSocial.

"There is currently an industry wide trend among all sites and consumers to break up and atomize the web with widgets, applications, feeds, and mashup tools," Vachani explained. "Although Power is significantly accelerating this imminent evolution toward a borderless







Power.com

internet, we are preserving the essence of these sites' terms of use by giving users rightful control of their own content and friends. We are focused on delivering applications which increase user's usage of and add new value to their existing sites. Soon, we will provide tools for sites themselves to add the most popular Social Inter-networking applications directly into their entire sites.

"These previous efforts assume the problem to be 'interoperability,' a technology issue," Vachani continued. "We are the first to address Social Inter-networking as a consumer proposition. Power.com is well-positioned to deliver our vision of an ecosystem in which individuals, websites and even large social networks can create new ways to satisfy customers and build businesses in a socially inter-networked world."

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

**How Power.com works**
Users join by registering their social networks at Power.com. Their Power start page shows them all of their friends, messages, and content -- from all their social networks, instant messengers, and email accounts -- in one place. Updates, pictures of friends, messages that they'd see on Facebook show up next to ones they have on MySpace, LinkedIn, etc. Communities, birthdays, any social network features they choose, are all arranged by people -- not by website -- on their Power.com start page.

Once users log on to Power.com, they are automatically logged on everywhere that matters to them. They go from Power.com to their page on any one of their social networks with one click. Another click brings them to their page on another social network. One click also brings them back to Power.com, where they can simultaneously update the content of all their social pages. For example, they can browse for their latest photos or videos, pick the ones they want, and -- click -- make the pictures appear on any or all of their personal pages at the same time.

Messaging is especially nimble with Power.com: all their friends and messages from all sites show up in one place. Users can write one message and just choose recipients, without regard to what social network or messaging provider actually reaches each friend. Power sorts it out and sends the message off to each friend via the appropriate system. If any one friend has multiple ways to exchange messages, Power lets the user choose which one to use.

Today, Power.com now supports users on Facebook, MySpace, Hi5, MSN Messenger, Orkut, and YouTube. In the near future, Power will support them on LinkedIn, Twitter, Flickr, Hotmail, Yahoo, Gmail, AOL, Skype and other email and communication accounts.

**Virality -- how Power got 5 million registered users so quickly**
Messaging is a prime driver of Power.com's virality. Users communicate with all their friends on all of their sites, email, and instant messengers, using Power Messaging. The historic analogy is Hotmail, which grew to be the world's largest Internet service with over 500 million users by promoting itself at the bottom of each email its users sent. Power users are sending millions of inter-networked messages every day, across all social networks, email, and instant messengers. Like Hotmail, each Power Messenger message promotes Power.com.



Power.com

Furthermore, millions of Power users have already added Power widgets, links, and watermarks to their social network profile pages, photos, and messages, so when friends visit these enhanced pages, they click to learn more about Power.com. Power also encourages users to invite their friends. At Power's current growth rates, the company expects to have over 30 million registered users by the end of 2009.

**The Brazilian advantage**

"To me the important issue is that users are driving Power themselves," said **Esther Dyson**, one of the technology industry's preeminent global trend spotters and a seed investor in Power.com. "And it excites me that these users are not just in the US. Nor are the software's creators: Latin America has impressive software design and engineering talent. Silicon Valley is not the only place to find great talent to build a world-class company."

Media Inquiries:

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

Vachani, a self-proclaimed "global adventurer" arrived in Brazil 5 years ago to take a break from the Silicon Valley. A UC Berkeley graduate, and a serial entrepreneur, Vachani, who lives in Rio de Janeiro, said, "I came to Brazil with a smile, a backpack and a passion for Brazilian dance and music. I just wanted to get my mind off of technology, and I thought I would go back to the US and start a new project after a year or so. Little did I know..."

Vachani soon recognized Latin America's hidden treasure: undiscovered great minds. Vachani stated, "I quickly realized that Latin America was like India 30 years ago, before Silicon Valley discovered it. Back then, most of India's brilliant minds were trapped in academia or working as bureaucrats in the government, with no entrepreneurial opportunities. Today, thousands of brilliant minds in Latin America are likewise underutilized and undervalued, with their biggest dreams being jobs as government bureaucrats and academics. Little capital and few role models are available to young entrepreneurs. If I could create a project that truly pushed the limits of innovation, and that had capital, I knew I would be able to attract hundreds of Brazil's and Latin America's brightest minds. Together we have built Latin America's first global technology company built upon the Silicon Valley adage to first bring the brilliant minds together and then they will create a brilliant product and company."

Vachani did just that. As founder and CEO of Power.com, he attracted the world renowned Silicon Valley venture capital firm Draper Fisher Jurvetson, famous for investing in Skype, Baidu, and Hotmail, to invest $6 million in Power and complete DFJ's first ever investment in Latin America. A group of private investors -- including Esther Dyson -- added another $2 million. Power has attracted over 70 of Brazil's brightest minds, including self-made entrepreneurs, professors, PhD's and top graduates from Brazil's most prestigious universities.

Igor Barenboim, Power's Director of Business Development, PhD graduate from Harvard University and former Global Economist for Latin America's largest hedge fund, stated, "I joined Power when it was just an idea on paper because I truly believed that Steve's vision would help jumpstart Latin America's transformation into an economy which truly values its intellectual capital. As a Brazilian with great dreams for the future of Latin America, I knew I needed to join this adventure"



**Vision -- People, not websites, at core of Power's Social Inter-networking platform**
Eric Santos, a Brazilian native and the company's Chief Technology Officer, stated, "We visualize a social world that centers around people, not websites. People have grown to love sharing their lives. They love to stay in touch, share their pictures, their relationships and everything they care about. The boundaries between different websites and different providers are irrelevant to these relationships. Power removes these boundaries, creating a much more natural and open social experience. We are creating a borderless Internet."

Power.com is now building an open platform for developers to create thousands of new Social Inter-networking applications. Today, thousands of developers are creating Facebook and Google applications. Soon these developers, and anyone creating social applications, will be able to add Social Inter-networking functionality on top of their existing Facebook and Google applications and dream up new Social Inter-networking applications which will help Power.com realize its vision of a borderless internet powered by the users, not corporations.

**About Power**
Power.com is the world's leading Social Inter-networking company, with 5 million registered users. Headquartered in Rio de Janeiro Brazil, Power.com is a privately held company with 70 people. This month, Power.com is opening new offices in San Francisco, California and Hyderabad, India. The company received an $8 million Series A investment led by Draper Fisher Jurvetson of Menlo Park, California and notable investors including Esther Dyson. For more information visit www.Power.com.

Contact:  Myles Weissleder, o 415-332-3205, m 415-990-0970 mw@mylermedia.com
          Ed Niehaus, Power.com,  m 650-255-9976, edniehaus@gmail.com
          Steve Vachani, Power.com, m 646-554-7773, Steve@power.com

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

#30#



Power.com

## Power.com Product Overview

### Ten Key Social Inter-networking Features

1. Enjoy all your friends from your Facebook, Myspace, Google, MSN, and other sites, brought together in Power.com

2. Read and respond to your messages from all your sites in one place at Power.com

3. Enter and browse all your social network, email, and IM accounts simultaneously with one login at Power.com

4. Use MSN Messenger inside your Facebook, Myspace, Hi5, and Orkut at Power.com (Yahoo Messenger, Gtalk, and AOL Buddy coming soon)

5. Send messages, photos, and videos to multiple friends simultaneously on all your sites, email, and IM from Power.com

6. Access Facebook, Orkut, Hi5, or Myspace from blocked computers at work or school through Power.com

7. Interact with with users from all social networks around the world in Power.com Chat rooms

8. Use Hotmail, Gmail, Yahoo Mail, Facebook Mail, and work email together in one place at Power.com (coming soon)

9. Synchronize and manage all your photos, music, applications, blogs, and videos on all sites at Power.com (coming soon)

10. Add LinkedIn, Twitter, Flickr, Yahoo, Hotmail, Gmail, AOL, Blogger, and Skype to your Power.com start page (coming soon)

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com



Power.com

# Power.com Executive Team

**Steve Vachani, CEO** - Experienced startup CEO, serial entrepreneur, board member, viral/ loyalty/user experience marketing innovator. From age 16 to 20, started 3 small businesses generating over $4 million in combined revenues while simultaneously completing multiple degrees at UC Berkeley. Founded pioneering e-commerce site in 1994 putting campus food delivery business online. During the past 13 years, launched 5 major Internet sites through grass roots and viral marketing campaigns that generated over 70 million combined registered users. CEO of leading loyalty and Internet marketing company Qool Media for 8 years. Oversaw creation of over 50 online marketing and loyalty building campaigns for fortune 500 and leading internet startups. Undergraduate degrees in Political Science and Business from UC Berkeley

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

**Eric Santos, Director of Product and Engineering** - Product Manager overseeing an elite team of framework engineers and specialists at Latin America and Brazil's largest technology services firm – CPM International/Braxis/Unitech. As an entrepreneur, Eric managed from concept to launch the creation of approximately 20 outside client's projects. With no outside resources in his spare, he individually incubated, executed, and obtained more than 500k registered members marketing a set of social network, viral marketing, and user generated media tools. Masters in Engineering from prestigious Federal University – Salvador, Brazil.

**Igor Barenboim, Director of Global Business Development** – Global economist, lead analyst, and founding team member of Gavea Investimentos, Latin America's largest hedge fund. PhD in Economics from Harvard University.

**Michael Ross, Director of Business Development – North America** - President of New York-based investment bank, Joseph Capital LLC.  Served in the Investment Banking Division of Salomon Smith Barney and as Vice President at Bank of America and at Lehman Brothers. Served as lead analyst to hedge fund, Vision Capital, and as buy-side analyst at Sanford C. Bernstein. PhD in Finance from UC Berkeley.

**Cornelius Conboy, Director of Administration** – Senior operational and engineering executive on founding management team of Ifilm (sold to Viacom). Was with Ifilm.com from startup to maturity. Previously, he served as VP technology for industry leading news portal. MBA at Pepperdine University where he emphasized entrepreneurship and marketing. Launched the Brazilian offices for another US global technology company gaining significant startup and operations experience in Brazil.

**Ed Niehaus,  Director of Marketing & Global Communications** – Experienced entrepreneur, venture capitalist, global marketing professional, and CEO. Cofounder & CEO of the Internet's top public relations agency in the 1990's, helping drive the market entry of 45 leading Internet companies. Launched Yahoo's market entry when they had 3 employees, no CEO and no VP Marketing; oversaw Yahoo's public relations for the following five years as Niehaus Ryan helped



Power.com

Yahoo build one of the largest global brands ever built with PR. Drove Apple's turn around PR efforts from Steve Job's return, through the development of the Think Different campaign, the launch of the iMac and beyond. Former General Partner in VC firm Cypress Ventures. Currently Chairman of Collaborative Drug Discovery which raised investment from top VC firms, Founders Fund and Omidyar Network. B.S.E. in Mechanical Engineering from Duke University.

**Felipe Herrera, Director of Legal and Corporate Affairs** – Worked for top Brazilian law firm, Levy & Salomão Advogados as a legal consultant, dealing with Mergers and Acquisitions, Antitrust Law, Banking, Corporate and International Commerce.  International Law experience working with Administrative Tribunal for the Organization of American States (OEA) in Washington, D.C. Analyst at the Bear Stearns Investment Bank in New York. Bachelors International Relations from USA and Law School at prestigious State University of Rio De Janeiro.

***Cleomar Rocha, Product Marketing Manager*** – Professor in Design and Communications at prestigious University of Salvador, Brazil. Nationally respected product marketing & product management consultant. Post Doctorate from prestigious PUC University specializing in Visual Communications and Technology Product Communications. Masters and PhD degrees in Digital Communications from prestigious Federal University of Bahia.

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

# EXHIBIT 14

1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4


5
FACEBOOK, INC.,                 )
6                               )
          Plaintiff,            )
7                               ) Case No.
vs.                             ) 5:08-cv-05780 JW (JCS)
8                               )
POWER VENTURES, INC., a         )
9   Cayman Island Corporation;  )
STEVE VACHANI, an individual; )
10  DOE 1, d/b/a POWER.COM,      )
DOES 2-25, inclusive,           )
11                              )
          Defendants.           )
12  _____)

13

14

15                    CONFIDENTIAL

16

17          VIDEOTAPED DEPOSITION of POWER VENTURES,

18  INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf

19  of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405

20  Howard Street, 10th Floor, San Francisco, California

21  beginning at 9:13 a.m., Monday, January 9, 2012, before

22  CHERREE P. PETERSON, RPR, CRR, Certified Shorthand

23  Reporter No. 11108.

24

25

                            2

1    -- he's not available.  So I haven't talked to him.

2    He's not -- we have no intention right now to try to,

3    you know, locate him to be in at trial.

4            MR. CHATTERJEE:  What number are we on, 193?

10:56  5            THE REPORTER:  193.

6            (Plaintiff's Exhibit No. 193 marked for

7             identification.)

8    Q.    BY MR. CHATTERJEE:  Unlike some of the other

9    ones, we have a certified translation.

10:56  10   A.    Yeah, this is the e-mail I was just referring

11   to.

12   Q.    Okay.  So let me just ask you so the record's

13   clear.  Document number 193, what is this?

14   A.    So this -- on April 24th, 2011, as you know,

10:57  15   that was -- that was the month when we were -- we had

16   made the decision to remove Power.com, you know, off --

17   take it offline.  And at that -- you know, it was a

18   cost-cutting measure.  And we also had -- were not in a

19   position to make payments on our servers and we were --

10:57  20   we didn't know how many days -- it was already past the

21   date to be removed so -- to be shut off.  And so we had

22   went to a -- we were going through a process of trying

23   -- of backing up everything on another server.  And the

24   way -- the only way to back it up was had to be

10:57  25   transferred so -- through the internet.  So it was a

79

 1   -- it was inside of -- it was an Orkut app.  So it had

 2   nothing to do -- it was completely unrelated.  It was

 3   launched about a year earlier I think or six months.

 4       Q.    But there was a functionality that Power

11:01  5   Ventures had that worked not only on Orkut but was used

 6   to work on other web sites as well?

 7       A.    Yeah.  Well, worked on many sites.  Orkut was

 8   our largest -- user base was on Orkut.  So that's why we

 9   refer to -- a lot of our biggest innovations were on

11:01  10   Orkut just because that's where our largest user base

 11   was.

 12       Q.    Right.  So here it says is the basis of the

 13   Orkut app PowerFriends.

 14       A.    Correct.

11:01  15       Q.    Is it your testimony that that Orkut app was

 16   only used on Orkut?

 17       A.    Yes.  That -- that app was only used on Orkut

 18   and it was a much earlier time than even -- we're not

 19   even involved in Facebook.  So the -- the PowerFriends

11:01  20   app is completely irrelevant to any discussions

 21   whatsoever, you know, I think, relating to Facebook.

 22   It's a --

 23       Q.    As of April 17th, 2011, the logger database

 24   existed?

11:02  25       A.    It existed on the -- yeah, on the server.  It

83

1   was available and accessed in whatever -- if anything,

2   it was referenced in any questions.  If -- I don't know

3   if that was specifically where -- but it was -- it was

4   -- it existed until that date, that's correct.

11:02  5        Q.    Okay.  And then following that you made the

6   decision to delete that database?

7        A.    Yeah.  As you can see, the dialogue there we

8   didn't have the time with -- to transfer it before our

9   servers would be shut off.  So they -- the decision was

11:02 10   transfer all the most valuable stuff and if we have time

11   and they're not shut off, do these two last.

12        Q.    Other than what's stated in this e-mail, do

13   you know specifically what was in the logger database?

14        A.    I do not know specifically.  This was why I

11:02 15   asked that question right there.

16        Q.    But other than what's stated here?

17        A.    I -- I do not know.

18        Q.    So as you sit here today, you don't know, for

19   example, if the logger database would track event

11:03 20   invitations sent through links to -- to Facebook users?

21             MR. FISHER:  Objection.  Vague.  Assumes facts

22   be in evidence.

23             THE WITNESS:  What I do --

24             MR. FISHER:  Lacks foundation.  Incomplete

11:03 25   hypothetical.

84

1    always believed that and we were exploring in those ways

2    what would -- what we do if a user wants to get their

3    data.  And -- and this was a -- an exploration.

4        Q.    Let me establish some foundation around this,

12:07 5    Mr. Vachani.  You said in this instant message "we also

6    need to do some planning to make sure that we do it in a

7    way where we are not really detected," correct?

8        A.    That's correct.

9        Q.    And the reason that you said that was because

12:07 10   you didn't want web sites like Orkut to detect what you

11   were doing, right?

12       A.    Not to detect.  If -- if they attempted to

13   block, block the -- the sites, we wanted to understand

14   what are the issues.

12:07 15       Q.    And you wanted to be able to interfere with

16   their ability to block you, right?

17            MR. FISHER:  Objection.  Vague.

18   Argumentative.

19            THE WITNESS:  To interfere with their ability

12:07 20   to block, no.  I'm saying -- we -- this -- exactly what

21   it says here.  We had a -- we had a hypothetical

22   conversation about -- about the issues relating to data

23   extraction where users wanted to access their own data.

24       Q.    BY MR. CHATTERJEE:  And you knew that the web

12:07 25   sites that were housing that data wouldn't like what you

                            121

```
 1   were doing.
 2      A.    We didn't know --
 3            MR. FISHER:  Objection.  Calls for speculation
 4   --
 5            THE WITNESS:  We didn't know if they would
 6   like --
 7            THE REPORTER:  Okay.  Whoa.  I'm sorry.
 8   Please restate your --
 9            THE WITNESS:  We didn't know if they would
10   like it or not --
11            THE REPORTER:  I'm sorry.  Hold on.  Please.
12            MR. FISHER:  Vague.  Assumes facts not in
13   evidence.  Lacks foundation.  Incomplete hypothetical.
14   Argumentative.
15            THE WITNESS:  Okay.  We didn't -- we have no
16   idea what they were -- this is 2005.  But we know that
17   if -- if a user is -- obviously some sites and it turns
18   out Facebook that, you know, in the future was -- was
19   not Orkut.  It was -- you know, Facebook does not -- did
20   not want users to export their own data.  And while --
21   and we have always stated very publicly and clearly that
22   we believe that users, you know, do have rights to
23   access their data.  So we were exploring and
24   understanding what are the potential reactions that
25   sites could have.  This was a -- this was a hypothetical
```

122

1   something that while it's a right and something that's

2   been established that users have the right to do, not

3   every site -- not every site wants users to -- to be

4   able to get their own -- access their data.  Obviously

12:11  5   Facebook being one of the greatest, you know, companies

6   that have traditionally been against -- been against

7   this publicly.  You know, users trying to access their

8   own data.  This is -- this is something that we -- we

9   always understood that, you know, just because it's --

12:11  10   it's correct and it's okay for users to access their own

11   data doesn't mean that every site will -- will allow

12   users to access their own data.

13       Q.   So you knew that the web sites may not like

14   having users access and export data?

12:11  15       A.   Historically importing data has never been --

16   has never -- many sites have always objected to it and

17   it -- and despite that fact, it has been going on for

18   ten years and been a commonly-accepted practice.

19       Q.   I understand that.  But you -- you understand

12:12  20   that even at the time you wrote this instant -- or the

21   portions of this instant message chat log that web sites

22   were often against exporting data from their web site to

23   another place?

24           MR. FISHER:  Objection.  Vague.  Calls for

12:12  25   speculation.

125

1       THE WITNESS:  I understood that.  And I also

2   understood that -- that's correct.

3       Q.   BY MR. CHATTERJEE:  Okay.  That's correct.

4   And so one of the things that you wanted to do was to

12:12  5   have multiple IP addresses to allow for the extraction

6   of data without the ability of those web sites to block

7   you; isn't that fair?

8       A.   If a user authorized that -- that, correct.

9   That's something we've -- we've always said.

12:12 10       Q.   Okay.  And -- and you said in -- in this chat

11   log "since we will only have one chance to do it."

12       What did you mean by "we will only have one

13   chance to do it"?

14       A.   I believe that we were -- we were just sharing

12:13 15   -- conversation that -- that accessing -- importing

16   data, you know, we wanted -- we wanted to do it right.

17   You know, we wanted to make sure that if a user wanted

18   to access their own data that they would be able to do

19   it.  That's basically that -- we understood that import

12:13 20   -- importing data is a sensitive -- is a sensitive

21   subject, despite the fact that we strongly believe its

22   the user's right.  And that's basically what this

23   discuss -- discussion was about.

24       Q.   Okay.  Farther down you say "lets" "plan on

12:13 25   getting the data grab done as soon as possible."

126

```
 1    not necessary as we....
 2        Q.    So when this lawsuit was filed, did you e-mail
 3    the various power.com members and ask them to preserve
 4    documents?
```
13:54
```
 5        A.    Did I e-mail?  I mean, you have my e-mails,
 6    so.  I mean, I don't -- I don't think there was a --
 7    there was no law -- there was no law -- there was a -- I
 8    mean, I -- I don't know what -- what -- what we said to
 9    them, but it would be -- it would be my -- everything is
```
13:54
```
10    in my e-mail.
11        Q.    Do you recall ever instructing the power.com
12    employees not to -- not to destroy documents?
13        A.    It's our standard policy no one -- not to
14    destroy documents.  No one's -- as far as I know, no
```
13:55
```
15    one's -- no one's taken any direct effort to destroy
16    documents.
17        Q.    Did -- but my question's really precise.  When
18    the litigation was filed did you send out a reminder or
19    tell anyone not to destroy documents?
```
13:55
```
20        A.    Which?  You mean the Facebook litigation?
21        Q.    Yeah.
22        A.    No, I didn't.
23        Q.    Okay.  And was there any particular reason why
24    you didn't do that?
```
13:55
```
25        A.    There was no -- it was just a standard --
```

<div align="center">168</div>

1    Q.    I'm going to ask you the question one more

2    time.

3    A.    But I --

4    Q.    No.  Mr. Vachani, you can either answer it or

15:27   5    you can't.  If you can't answer it, tell me you can't

6    answer it.

7          You knew that the Facebook terms of service

8    did not allow Power users to access the Facebook web

9    site in the way Power wanted to do it; isn't that right?

15:28   10          MR. FISHER:  Objection.  Assumes facts not in

11    evidence.  Lacks foundation.  Argumentative.  Vague.

12          THE WITNESS:  And I would like to -- once

13    again, I would like to ask you the previous question,

14    can you repeat my answer?  I -- I'm not answering your

15:28   15    question yet.  I'm asking her to repeat the answer I

16    made to your previous question which was similar.

17          MR. CHATTERJEE:  Okay.  Let's take a break.

18    Tim, we're doing our meet and confer right now.

19          THE VIDEOGRAPHER:  We are going off the

15:28   20    record.  The time is 3:28 p.m.

21          (Whereupon a break was taken from 3:28 to

22           3:37.)

23          THE VIDEOGRAPHER:  We are back on the record.

24    The time is 3:37 p.m.

15:37   25          THE WITNESS:  So I previously wanted -- I

236

1  similar process where almost -- where -- where almost,

2  for example, Google has a clause that states in their

3  things that users cannot do it, but Facebook has

4  continued to do it.  And -- and I'll ignore these

15:40  5  things.

6          And I said about five minutes ago -- let me

7  finish, please.

8      Q.   BY MR. CHATTERJEE:  Finish.

9      A.   I said five minutes ago that terms and

15:40  10  conditions are created by -- by a site.  And the

11  decision -- the decision on -- on interpreting those

12  terms and conditions and how companies choose to respond

13  to their users have been and continue to be very

14  subjective.  Facebook has been very subjective, Power

15:40  15  has been very subjective, and there is no legal

16  precedent.  So we can have a discussion all day on this

17  issue.  But I've answered the question to you that I --

18  we are very familiar and have read Facebook terms and

19  conditions.

15:41  20  Q.   Okay.  Let's step back.  You said you've read

21  Facebook's terms and conditions.  That was prior to

22  accessing the Facebook web site as pursuant to the

23  December 2008 launch, correct?

24  A.   Yes.

15:41  25  Q.   Did you believe under your reading of the

239

1    looked at the industry as a whole, and we saw no -- no

2    precedent for -- you know, on these issues and therefore

3    felt that if it was an issue, this is something that

4    would be determined -- and it has been determined by the

15:42  5    courts.  Finally, I -- I believe --

6        Q.    BY MR. CHATTERJEE:  Okay.  There -- there

7    might be some confusion in my question.

8        A.    Okay.

9        Q.    I'm not asking about anything other than the

15:42  10   terms of service.  Just that standing alone.

11       A.    Okay.

12       Q.    Was there any concern in your mind when you

13   read that terms of service that the way Power wanted to

14   access the Facebook web site would be a violation of

15:43  15   Facebook's terms of service?

16            MR. FISHER:  Objection.  Vague.  Calls for a

17   legal conclusion.

18            THE WITNESS:  I would agree calls -- you're

19   asking for a legal conclusion that I'm not able to --

15:43  20       Q.    BY MR. CHATTERJEE:  I'm just asking you for

21   whether there was any concern in your mind, not whether

22   there's a legal violation.

23       A.    Concern is irrelevant.  You know, this is --

24   you're asking me --

15:43  25       Q.    Mr. Vachani, it is not a matter of you to

241

1    determine relevance or not.

2           Was there a concern in your mind or not?

3    A.    Was there a concern?

4           MR. FISHER:  Same objections.  Argumentative.

15:43  5           THE WITNESS:  I think our company's actions

6    speak for themselves.  Because, you know, I'm -- I was

7    the CEO of the company.  And the company -- the company

8    made a -- made a -- made a decision which I've already

9    articulated, testified, and -- and I've also -- we've

15:43  10   also had years -- we've had years of discussions on this

11   issue, we've had court rulings on this issue, and you

12   continue to ask the same question which I think we're --

13   we're -- you know --

14   Q.    BY MR. CHATTERJEE:  It's because you're not

15:43  15   listening to my question.  I'm going to move on.

16   A.    I am listening to my question.

17   Q.    You aren't.  We're going -- Mr. Vachani --

18          MR. FISHER:  There's no point to arguing about

19   this.  Go to the next question.

15:43  20   Q.    BY MR. CHATTERJEE:  -- we're going to go to

21   court over this.  We're going to have these questions

22   answered.

23   A.    Do you mind asking the question one more time?

24   Q.    You're not answering them now.  No.  I'm --

15:44  25   I'm done.  I've asked it ten times.  You don't want to

242

```
 1   not mistaken.  I don't even know the issue.  But the

 2   main thing is we -- we -- we didn't know what -- we

 3   didn't really know what Facebook's reaction would be.

 4       Q.    All right.  So if I understand you correctly,

 5   by this point in time you had reviewed Facebook's terms

 6   of service and you may have received a cease and desist

 7   letter from Facebook?

 8       A.    I think it was either this day or the day

 9   after.  I'm not a hundred percent sure what day it was.

10       Q.    And around that time frame Mr. Santos stated

11   he'll prepare for a possible block by Facebook?

12       A.    Oh, he was -- he was trying to evaluate the

13   systems if -- if our -- if our system is unable to

14   access Facebook.

15       Q.    Was there any doubt in your mind when he said

16   that that Facebook was considering or may block Power

17   from accessing the Facebook web site in the way that it

18   did?

19            MR. FISHER:  Objection.  Vague.

20            THE WITNESS:  Obviously -- obviously they --

21   they had sent a -- a legal -- a legal threat.  They had

22   sent a legal threat.  So, I mean, there -- there --

23   there were definitely, you know, possibilities.

24       Q.    BY MR. CHATTERJEE:  So you knew that they

25   didn't feel that Power was authorized to be accessing
```

16:23 5
16:23 10
16:23 15
16:24 20
16:24 25

279

```
  1    Facebook in the way that Power was doing?
  2         A.    We knew that Facebook had -- Facebook had
  3    expressed, you know, their opinion that they -- that's
  4    correct.
16:24  5              MR. CHATTERJEE:  We're getting to an easier
  6    part for a little while.  218.
  7              (Plaintiff's Exhibit No. 218 marked for
  8               identification.)
  9              THE WITNESS:  Okay.
16:25 10         Q.    BY MR. CHATTERJEE:  Okay.  The document I've
 11    given you as Exhibit 218, what -- what is this document,
 12    Mr. Vachani?
 13         A.    What is this document?  This is a -- looks
 14    like -- this looks like an e-mail from Facebook.
16:25 15         Q.    This is an e-mail that you received?
 16         A.    This e-mail that I received.  I don't know if
 17    this was a test e-mail or if this was from -- you know,
 18    from Facebook.  I don't know that.  But it looks like it
 19    was from Facebook.
16:25 20         Q.    And it was to you?
 21         A.    Yep.
 22         Q.    And then the subject line has "Ghostday
 23    Leandro Abreu," A-b-r-e-u.
 24         A.    Yeah.  This is an e-mail from Facebook.
16:26 25         Q.    And Leandro Abreu was -- we -- we talked about
```

<div align="center">280</div>

```
 1   30(f)(1)).

 2        Before completion of the deposition, review of

 3   the transcript (XX) was (  ) was not requested.  If

 4   requested, any changes made by the deponent (and

 5   provided to the reporter) during the period allowed, are

 6   appended hereto.  (Fed. R. Civ. P. 30(e)).

 7

 8   Dated: JANUARY 13, 2012

 9

10

11                    Cherrie P. Peterson

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

360

# EXHIBIT 20

| From: | Felipe Herrera |
| To: | SteveVachaniMail |
| Cc: | Eric.santos |
| Subject: | STEVE, PLEASE READ UNTIL THE END AND RESPOND QUICKLY |
| Date: | Thursday, December 04, 2008 11:52:05 AM |
| Importance: | High |

CEASE AND DESIST LETTER FROM FACEBOOK

Steve,

The letter from Facebook's lawyers claims the following:

1) We are scraping content from their website;

2) We are directly violating their TOS, which prohibits the following:



  - Soliciting of Facebook's user login information;
  - Using a person's Facebook account without Facebook's authorization;
  - Using automated scripts to collect information from their site;
  - Sending spam;
  - Using Facebook's site for commercial purposes;
  - Incorporating Facebook's site in another database

3) According to the letter, we are in violation of at least 5 Federal laws, in addition to state laws prohibiting "interference with Facebook's business expectations and interests.";

4) We are using Facebook's logo without their authorization, which may cause users to believe we are somehow affiliated with Facebook;

5) We are violating users' privacy;

6) Facebook has an open platform that allows third parties to develop applications that integrate with Facebook, subject to their TOS. They have "Facebook Connect", which allows Facebook users to connect their Facebook identity, friends and privacy to any site. They say we can use these resourses to integrate with Facebook in an authorized manner;

They had given us a deadline of Wednesday, December 3rd, 2008, to answer. I did not have time to look at this until today, so we would have missed the deadline by a day. However, they sent us a direct email today saying we have until Friday, December 5th, 2008, to respond given they had previously notified Leigh instead of us.

In our written response, they want us to:

a) Cease and desist in soliciting Facebook user login information;

b) Cease adn desist om sending unsolicited commercial messages to Facebook users;

c) Remove the compatibility with Facebook from our site;

d) Remove references to Facebook from our site and other promotional material;

e) Cease using or displaying Facebook's trademark on our website;

f) Promise that in the future we will strictly comply with Facebook's TOS.

In light of the above, please see my comments below:

1) I agree that what we are doing may be considered web scraping according to the definition below:

**"Web scraping** (sometimes called **harvesting**) generically describes any of various means to extract content from a website over HTTP for the purpose of transforming that content into another format suitable for use in another context."

If it is indeed considered to be web scraping, we can be liable for **"trespass to chattels"**. In order to success in this claim, they must demonstrate that we intentionally and without authorization interfered with their possessory interest in the computer system and that the **our unauthorized use caused damage to the plaintiff**.

Their main challenge would be proving the damage to their site, but I can think of a few ways they can try to prove this. The main problem here I believe is the loss of traffic and consequent loss of revenues on their site. They could also lose positions in alexa.com.

I remember in the past we did not use to change these site's advertising, but I took a quick look at our site and compared with Facebook's site and saw that we are in fact showing only our ads and not theirs. Can we stop doing this and at least show both their and our ads??

2) They seem to be correct in relation to the following prohibited activities:

    - Using a person's Facebook account without Facebook's authorization;
    - Using automated scripts to collect information from their site;
    - Incorporating Facebook's site in another database.
    - Using Facebook's site for commercial purposes;

However, we can probably contend that we do not perform any of the following activites:

    - Soliciting of Facebook's user login information [since it is the user's choice to give us their information];
    - Sending spam [since we only send emails to people's friends and we comply with email regulations, providing an unsubscribe button, etc.];

3) As I said, we would need the legal advice from a U.S. attorney on the matter given that these are U.S. statutes. I suggest contacting Cooley Godward LLP since they are one of the top firms in the U.S. for Internet related matters. Simon Olson highly recommended them and I believe he used to work for them in San Francisco.

From my quick research, I believe we may also be accused of violating the safe harbor provisions of the DMCA in addition of all of the laws mentioned in their letter (including the CA Penal Code).

4) We should DEFINITELY remove other websites' trademarks or request their authorization to use them. I remember when we had the problem with Google's watchdog (RCA RYotta) last year we inserted text on the start page of powerscrap.com saying explicitly that we are not affiliated to any of those sites. I am not sure why this was not done for power.com, but we should definitely put this disclaimer back up and make it very visible to avoid problems;

5) We can probably dismiss the claim of violating user's privacy (or at least defend ourselves) by saying they agreed to our TOS and were informed of everything;

6) We should definitely have someone (maybe Bruno) take a look at this "Facebook Connect" and other platforms they talk about in the letter and see if there is a way to keep doing what we are doing in an authorized manner.  If there is a way of complying with their rules without compromising our Power Login or virality too much (without including additional pages), we should do it!

Guys, it is extremely important that we answer them quickly, so I need your imput ASAP. Please let me know if you agree with my comments above or if you have any additional ideas or suggestions on how to respond to this.  If we do not respond quickly they can sue us and this can turn into something much more serious.  Perhaps we can avoid it.

Thanks,
Felipe.

SER188

Pages 1 - 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

```
FACEBOOK, INC.,                    )
                                   )
              Plaintiff,           )
                                   )
  VS.                              ) NO. C 08-5780 JW (JCS)
                                   )
POWER VENTURES, INC.,              )
                                   )San Francisco, California
              Defendant.          )  Friday
                                   )  February 24, 2012
_____)  9:30 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Orrick, Herrington & Sutcliffe
                            1000 Marsh Road
                            Menlo Park, California  94025
                     **BY:  MORVARID METANAT, ESQ.**
                            **MONTE COOPER ESQ.**


**For Defendant:**          Bursor & Fisher, P.A.
                            1900 North California Boulevard
                            Suite 940
                            Walnut Creek, California 94596
                     **BY:  LAWRENCE TIMOTHY FISHER, ESQ.**
                            - appeared telephonically




*Reported By:  Debra L. Pas, CSR 11916, CRR, RMR, RPR*

          *Official Reporter - US District Court*
          *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER189

1 the plaintiffs won't voice the time that I would give them to

2 go into, but for the most part there still substantial issues

3 to be resolved; isn't that right?

4      MR. FISHER:  I think the issues are very narrow at

5 this point and are outside the scope of the subjects listed in

6 the 30(b)6 notice.

7      THE COURT:  I'm sorry.  They didn't want -- I mean, I

8 read the deposition.  They were trying to figure out how the

9 program operated, how many times it invaded Facebook's space

10 and that sort of thing.  And the knowledge of Mr. Vachani's on

11 that subject and others on that subject, those things all seem

12 relevant to damages to me.  Aren't they?

13      MR. FISHER:  And I think he's already testified about

14 those subjects and I think the Court has already determined the

15 number of times that emails were sent.

16      THE COURT:  Number of times?  The Court made a

17 finding on number of times?

18      MR. FISHER:  That was submitted by Mr. Mehling,

19 Facebook's expert, who determined there were 60,000 emails that

20 were sent and defendants have not disputed that.

21      THE COURT:  Well, that's -- that's different.  I

22 mean, they want to say it's many more than that.  That's what

23 they know from what they got.  Now they want to do an

24 investigation that they thought they should have been able to

25 do before and say, well, that -- that's the minimum number that

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER190

1  we have been able to account for, but, at least as I understand

2  the argument, there will be -- there are many more.

3        Although, I don't know.  It's hard to know where this

4  is going.  When you multiply 60,000 times statutory damages,

5  you get such a humongous number that nobody is ever going to be

6  able to pay for it, but that's not my -- certainly not my

7  bailiwick.

8        Well, you know, I mean, I certainly would restrict

9  the deposition to the issues that are remaining in the case to

10  be resolved, but I would not like to see -- and we'll set the

11  parameters for this deposition when we get to the next letter

12  or letter after that.  But I would not like to see some big

13  fight about whether or not any particular question was within

14  the scope of that restriction, because it's a difficult

15  restriction to apply given that damages in these cases and the

16  personal liability of Mr. Vachani, you know, overlap a lot of

17  the issues that -- you know, the facts regarding those issues

18  overlaps the facts of the issues on which the Court has reached

19  conclusions.  So I'm not -- I don't think it's worth getting

20  into a big fight about when we get to the deposition.

21        So I'll order the defendant -- obviously, to the

22  extent that they haven't -- to produce forthwith the responsive

23  emails that were not copied to Vachani.

24        I will order the defendant to sit for a 30(b)6 --

25  renewed 30(b)6 depo regarding the newly-produced emails limited

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER191

1  to the subjects, to the issues that were still unresolved by

2  the Court's summary judgment order.

3  　　　　And I'll order the defendant to pay the cost, the

4  reasonable cost, including attorney's fees, for the renewed

5  30(b)6 depo.  And I'll just expect that to be worked out

6  between counsel.  If it's not, you can submit a letter to me on

7  what your reasonable costs were, et cetera, and I'll get it

8  resolved that way.

9  　　　　**MS. METANAT:**  Your Honor, if I may just for a moment?

10  We also requested that the deposition be supervised.

11  　　　　**THE COURT:**  We'll get to that.  That's the next

12  question.

13  　　　　**MS. METANAT:**  Oh.

14  　　　　**THE COURT:**  So you want to do the whole 30(b)6

15  deposition over and have court supervision, and that's the next

16  letter.  I want to set some parameters for how we do this, but

17  let me give you my thoughts on that motion.

18  　　　　I think it's clear from the deposition that the

19  witness did not accurately prepare for the deposition.

20  Contrary to the way counsel described it, it is not sufficient

21  that you just got somebody who you thought knew every aspect of

22  the business, because it was clear in the questioning that

23  there were aspects of the business on which and for which and

24  with respect to which the deposition was noticed that the

25  witness did not have knowledge and would have had to have asked

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER192

1    somebody, but didn't.

2         There is an obligation in the law, the way that the

3    30(b)6 jurisprudence has developed over the last 15 years, to

4    speak with including employees and former employees and provide

5    all the information that is reasonably available.  It's clear

6    that Mr. Vachani has been in contact with one or more former

7    employees and, in fact, made statements during the deposition

8    about various subjects on which he would have to make inquiry.

9    So he was not properly prepared for the deposition.  Spending

10   an hour and just showing up just doesn't do it.  This is not

11   just a fact witness.  It's a 30(b)6 witness.  Number one.

12        Number two is, the conduct by the witness was

13   inexcusable.  He thought it was a game.  He was argumentative

14   and he was evasive.  He refused to give straightforward answers

15   to straightforward questions that were put to him.  He

16   improperly just read answers out of his declaration, and that

17   certainly was an obstruction of the deposition process.

18        So I would allow the 30(b)6 motion, the deposition to

19   be on any topic that is remaining in the case to be renewed; a

20   renewed deposition on any topic remaining in the case that's in

21   the list of topics on which the 30(b)6 was noticed, and that

22   the witness is ordered to -- of course, if there are questions

23   that you've already asked on which you've gotten a clear

24   answer, you can't ask them again.  So no repeating questions on

25   which you've got a clear answer.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER193

# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5  FACEBOOK, INC.              :

 6              Plaintiff,      :

 7                              :

 8        v.                    :

 9                    :

10  POWER VENTURES, INC. d/b/a:

11  POWER.COM, a California   :

12  corporation; POWER        :       Case No.

13  VENTURES, INC. a Cayman   :     5:08-CV-05780

14  Island Corporation, STEVE :       JW (HRL)

15  VACHANI, an individual;   :

16  DOE 1, d/b/a POWER.COM, an:

17  individual and/or business:

18  entity of unknown nature; :

19  DOES 2 through 25,        :

20  inclusive, individuals    :

21  and/or business entities  :

22  of unknown nature,        :

23              Defendants.   :

24  _____

25         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

1

04:42  1   thing.  It's initiated by the user, that's what we

04:42  2   know.

04:42  3         Q.      The automated script, though, is

04:42  4   operated by power.com?

04:42  5         A.      It's a -- An automated script for

04:42  6   PowerScript, are initiated by users and executed by

04:42  7   power.com in the same way that an exporter is

04:43  8   initiated by user and managed by the site that's

04:43  9   doing it on behalf of the user.  Did you get that?

04:43 10   Yes.

04:43 11            (Whereupon, Exhibit 107 is marked

04:43 12   for identification by the reporter.)

04:43 13         Q.      Mr. Vachani, Exhibit 107 is

04:43 14   Exhibit A to the first amended complaint that was

04:43 15   106.  Have you seen this document before today?

04:43 16         A.      What is this document I'm looking

04:43 17   at?

04:43 18         Q.      Exhibit A to the first amended

04:43 19   complaint.

04:43 20         A.      Is this the Facebook Terms and

04:43 21   Conditions?

04:43 22         Q.      Yes.

04:44 23         A.      I have -- Vaguely -- I've seen

04:44 24   this before, yes.  I don't know if I've seen this

04:44 25   specific version.  I've read the Facebook Terms and

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters
SER196

04:44  1    Conditions previously.

04:44  2         Q.       As of December 1st, 2008, had you

04:44  3    read the Terms and Conditions that were available

04:44  4    on the Facebook Web site?

04:44  5         A.       I didn't read it all a hundred

04:44  6    percent, but we had read -- people in our company

04:44  7    had read it.

04:44  8         Q.       So who in your company had read it

04:44  9    -- if anybody?

04:44  10        A.       It would have been myself -- I

04:44  11   believe -- I do remember reading it.  Filipe would

04:44  12   have also read it.

04:44  13        Q.       Mr. Herrera?

04:44  14        A.       Yes.  I would have asked was there

04:44  15   anything relevant in the terms.  He would have been

04:44  16   the person I talked to.

04:44  17        Q.       Could you turn to Page 4?

04:44  18        A.       Sure.

04:44  19             MR. BURSOR:  Are you using the

04:44  20   page numbers at the top?

04:44  21             MR. COOPER:  Yes.  I'm sorry if

04:44  22   that wasn't clear.

04:44  23        Q.       Mr. Vachani, your counsel made a

04:45  24   good point.  I'm referring to the page numbers in

04:45  25   the upper right-hand corner.  You see the one that

275

04:45   1    says Page 415?

04:45   2              A.        Yes.

04:45   3              Q.        Can you read the first bullet

04:45   4    point to yourself and tell me when you've finished?

04:45   5              A.        The first bullet point?  Yes.

04:45   6                        Okay.

04:45   7              Q.        As of December 1st, 2008, do you

04:45   8    know one way or another whether anybody at Power

04:45   9    had read that particular provision in the Facebook

04:45  10    Terms of Service?

04:45  11              A.        Yes.

04:45  12              Q.        Had you read it?

04:45  13              A.        Yes.

04:45  14              Q.        All right.  Did you have an

04:46  15    understanding whether power.com enabled users to

04:46  16    registered users to violate the Terms of Service?

04:46  17              A.        I don't understand how a message

04:46  18    that a user wants to send to another friend --

04:46  19    First of all, it's an unsolicited message; and

04:46  20    second, I don't understand what this Terms and

04:46  21    Conditions has anything to do with -- with -- I

04:46  22    don't understand how the relevance to the

04:46  23    questions.

04:46  24              Q.        Did you have an understanding

04:46  25    whether or not power.com to enabled its registered

276

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

SER198

04:49  1   2008, have an understanding whether it was

04:49  2   permitting registered users of Facebook to violate

04:49  3   the Terms of Service of Facebook?

04:49  4          A.       I don't know -- I'm not at liberty

04:49  5   to say what -- what's a violation of Facebook's

04:49  6   terms and we -- As I already stated, we did not

04:49  7   participate in sending any kind of unsolicited

04:49  8   users and our users were sending messages to their

04:49  9   own friends, so I don't understand if a user sends

04:49  10  a message to their friend how that's unsolicited

04:49  11  and how that has anything to do with this

04:49  12  terminology.

04:49  13         Q.       Would you look at the third bullet

04:49  14  point?

04:49  15         A.       Yeah.

04:49  16         Q.       You see where it says -- if you

04:49  17  read the -- It starts with, "In addition, you agree

04:49  18  not to use the service or site to," and then the

04:49  19  third bullet point is, "use automated scripts to

04:49  20  collect information from or otherwise interact with

04:50  21  the service or the site."

04:50  22              THE WITNESS:  Scott, is this even

04:50  23  relevant to the conversation?  I don't -- I don't

04:50  24  understand.

04:50  25              MR. BURSOR:  Why don't we just get

279

04:50 1    the question read back and then just answer the

04:50 2    question.

04:50 3              A.        So what's the question?

04:50 4                        (Whereupon, the last question is

04:50 5    read back by the reporter.)

04:50 6                        MR. BURSOR:  Is the question:

04:50 7    Does he see that in the agreement?

8                        MR. COOPER:  Yeah, that's all I

9    asked.

10                       MR. BURSOR:  Yeah, so do you see

04:50 11   that -- do you see that --

04:50 12             A.        I see that in the agreement.

04:50 13                       MR. BURSOR:  Yeah, so then you've

04:50 14   answered the question.

15             A.        Okay.  Yeah, I see that in your

04:50 16   agreement.

04:50 17             Q.        Have you read that language as of

04:50 18   December 1st, 2008?

04:50 19             A.        Yes.  I had read it many times.

04:50 20             Q.        Had anybody else at power.com read

04:50 21   that language as of December 1st, 2008?

04:50 22             A.        I don't know if they read it.  It

04:51 23   was my job to read it and I think Filipe probably

04:51 24   read it.  Those are the two people that I know.

04:51 25             Q.        As of December 1st, 2008, had you

280

BARKLEY
Court Reporters

05:38  1    remember any substantial conversation.

05:38  2           Q.        All right.  Do you know -- The

05:38  3    second sentence of Exhibit 109 says, "Eric we need

05:38  4    to be prepare for Facebook to try and to block us

05:38  5    and the turn this into a national battle that gets

05:39  6    us huge attention"?

05:39  7           A.        Yes.

05:39  8           Q.        Why did you think Facebook was

05:39  9    going to block you?

05:39  10          A.        Obviously, they sent this letter

05:39  11   to us saying very clearly it was -- I thought it

05:39  12   was absurd, but that -- nonetheless that they were

05:39  13   trying to do this, but it was clear that that's

05:39  14   what they would do.

05:39  15          Q.        By what the way, do you remember

05:39  16   the name of the Facebook individual that Nevo

05:39  17   suggested you talk to?

05:39  18          A.        I do not recall it right mow.

05:39  19          Q.        Do you know if it was the same Sam

05:39  20   O'Rourke?

05:39  21          A.        That name sounds familiar, but I

05:39  22   don't -- I know I've heard that name.

05:39  23          Q.        Why did you -- The third sentence

05:39  24   says, "We need to address the scraping argument and

05:39  25   the soliciting log in credentials"?

                                   313

05:50   1            A.       Yes.  We were -- We were live all

05:50   2    the way until we voluntarily took it down once --

05:50   3    once the communications once it broke down we made

05:50   4    a decision that we'll voluntarily take it down and

05:50   5    we'll implement Facebook Connect anyway, even

05:50   6    though Facebook was being very, you know, difficult

05:50   7    to work with we said -- we made the decision that

05:50   8    we'll go ahead and implement Facebook Connect.  It

05:50   9    was not going to happen -- it was not a simple --

05:50  10    We realized that it was not going to happen in a

05:50  11    simple way, but we did take it down and we launched

05:50  12    Facebook Connect which you're probably aware of

05:50  13    that we did turn on Facebook Connect.

05:50  14            Q.       Did fate Facebook block access to

05:51  15    its site?

05:51  16            A.       To what?

05:51  17            Q.       At any point, did you become aware

05:51  18    that Facebook was attempting to block access from

05:51  19    Power to the site?

05:51  20            A.       I don't know if they were --

05:51  21    Obviously, we expected that they would but he we

05:51  22    also know that our system doesn't get blocked

05:51  23    because there's nothing -- there's nothing it's

05:51  24    technically doing.  It's just users accessing the

05:51  25    site so that it can't really be blocked.  The

                              323

05:51  1   system can't be -- you can't -- Unless you want to

05:51  2   block your users from entering your site, Power's

05:51  3   technology is just implementing -- just emulating

05:51  4   what users are wanting to do, so there was no

05:51  5   really conversation about whether they were going

05:51  6   to be blocked.  We know that they would try, but we

05:51  7   also know that it was built to -- it would not be

05:51  8   blockable.

05:51  9           Q.       You see in the final page there's

05:51  10  a reference, second page, "We did study Digsby and

       11  others and saw the changes they made to their UI to

05:52  12  implement Facebook Connect"?

05:52  13          A.       Yes.

05:52  14          Q.       Do you know what Digsby is?

05:52  15          A.       Digsby was a company that Facebook

05:52  16  was aggressively threatening legally that was

05:52  17  aggregating accounts.

05:52  18          Q.       Do you know if -- When you say "we

05:52  19  did study Digsby" what study was made of Digsby?

05:52  20          A.       We evaluated what they -- what

05:52  21  they originally did and then how they implemented

05:52  22  Facebook Connect and just to -- because we knew at

05:52  23  that time it was a -- one of the many, many, sites

05:52  24  that Facebook was threatening.

05:52  25          Q.       Is there any document reflecting

324

C E R T I F I C A T I O N

I, PATRICIA MULLIGAN CARRUTHERS, a
Certified Shorthand Reporter and Notary Public of
the State of New Jersey and a Notary Public of the
State of New York, do hereby certify that prior to
the commencement of the examination the witness was
sworn by me to testify as to the truth, the whole
truth, and nothing but the truth.

I do further certify that the foregoing is
a true and accurate transcript of the testimony as
taken stenographically by and before me at the
time, place, and on the date hereinbefore set
forth.

I do further certify that I am neither of
counsel nor attorney for any party in this action
and that I am not interested in the event nor
outcome of this litigation.

_____
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated:  JULY 27, 2011

My commission expires October 28, 2015    (N.J.)
My commission expires December 21, 2013    (N.Y.)
361

EXHIBIT 100

SER204

# EXHIBIT 4

1  LAW OFFICES OF SCOTT A. BURSOR
   Scott A. Bursor (*pro hac vice*)
2  369 Lexington Avenue, 10th Floor
   New York, NY 10017
3  Telephone: (212) 989-9113
   Facsimile: (212) 989-9163
4
   BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
5  Alan R. Plutzik (State Bar No. 077785)
   L. Timothy Fisher (State Bar No. 191626)
6  2125 Oak Grove Road, Suite 120
   Walnut Creek, CA 94598
7  Telephone: (925) 945-0200
   Facsimile: (925) 945-8792
8
   Attorneys for Defendants Power
9  Ventures, Inc. and Steve Vachani

10                 UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13

14  FACEBOOK, INC.,

15                          Plaintiff,        Case No. 5:08-cv-05780 JF (RS)

16  -against-                                 **DEFENDANT POWER VENTURES,**
                                              **INC.'S RESPONSES TO**
17  POWER VENTURES, INC. d/b/a POWER.COM, a   **FACEBOOK, INC.'S FIRST SET OF**
    California corporation; POWER VENTURES, INC. **REQUESTS FOR ADMISSIONS**
18  a Cayman Island Corporation, STEVE VACHANI,
    an individual; DOE 1, d/b/a POWER.COM, an
19  individual and/or business entity of unknown nature;
    DOES 2 through 25, inclusive, individuals and/or
20  business entities of unknown nature,

21                          Defendants.

22

23

24

25

26

27

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

**REQUEST FOR ADMISSION NO. 13:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU provided POWER USERS with the means to access the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Admitted.

**REQUEST FOR ADMISSION NO. 14:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU solicited FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 15:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU stored FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Admitted.

**REQUEST FOR ADMISSION NO. 16:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used the FACEBOOK WEBSITE for commercial purposes.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Denied.

/        /        /

/        /        /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

6

SER207

**REQUEST FOR ADMISSION NO. 17:**

Admit that YOU have never entered into a formal advertising agreement with FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that YOU developed OR created programming scripts OR language that would provide POWER with an automated mechanism to extract data from the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Admitted.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU copied OR made use of at least some part, excerpt, OR portion of FACEBOOK's source code to develop, test implement, use OR provide POWER's aggregating services.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 20:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU incorporated FACEBOOK WEBSITE content, DATA, or information into the POWER WEBSIT OR that services located thereon.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

/       /       /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF  (RS)

7

SER208

**REQUEST FOR ADMISSION NO. 21:**

Admit that in or about December 2008, YOU agreed to access the FACEBOOK WEBSITE OR cause others to access the FACEBOOK WEBSITE through means permitted by FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Admitted.

**REQUEST FOR ADMISSION NO. 22:**

Admit that after receiving notice that YOUR use of or access to FACEBOOK was not permitted by FACEBOOK, YOU took, copied, OR made use of DATA from the FACEBOOK WEBSITE without FACEBOOK'S permission to do so.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Admitted.

**REQUEST FOR ADMISSION NO. 23:**

Admit that FACEBOOK implemented technical measures to block YOU from accessing the FACEBOOK WEBSITE through the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Admitted.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, in or about December 2008,  FACEBOOK blocked YOUR IP address(es) from accessing the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

/       /       /

/       /       /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

8

SER209

**REQUEST FOR ADMISSION NO. 36:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used or attempted to another person's FACEBOOK WEBSITE account information without authorization from FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 37:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used automated scripts or COMPUTER CODE to collect information from, or otherwise interact with, the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Admitted.

**REQUEST FOR ADMISSION NO. 38:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU uploaded, posted, OR made available promotional materials OR solicitations on the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 39:**

Admit that on December 26, 2008, Steve Vachani sent an e-mail to Facebook stating YOUR "business decision" to continue accessing or using the FACEBOOK WEBSITE without implementing the Facebook Connect platform.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Objection vague and ambiguous.  Subject to and without waiving these objections, Power admits that Mr. Vachani sent an email to Facebook's counsel on December 26, 2008 stating:

> Dear Joseph,
> I am writing to follow up to our discussions regarding Power.com's
> integration of Facebook connect, your requests for us to take down

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

12

1  **REQUEST FOR ADMISSION NO. 54:**

2      Admit that, between December 1, 2008 and February 1, 2008, YOU did not delete the

3  "Facebook friend information" in YOUR possession.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

5      Admitted.

6  **REQUEST FOR ADMISSION NO. 55:**

7      Admit that, to present date, you have not deleted, purged or destroyed all data that YOU

8  obtained from the FACEBOOK network.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

10     Admitted.

11 **REQUEST FOR ADMISSION NO. 56:**

12     Admit that, to present date, you have not deleted, purged or destroyed all FACEBOOK

13 login information obtained from POWER users, including, but not limited to, FACEBOOK user

14 names and/or passwords.

15 **RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

16     Admitted.

17 Dated:  December 15, 2010                    BRAMSON, PLUTZIK, MAHLER &
18                                              BIRKHAEUSER, LLP

19

20                                             By_____/s/_____
                                                        L. Timothy Fisher

21                                             Alan R. Plutzik (State Bar No. 77785)
22                                             L. Timothy Fisher (State Bar No. 191626)
                                               2125 Oak Grove Road, Suite 120
23                                             Walnut Creek, CA  94598
                                               Telephone:  (925) 945-0200
24                                             Facsimile:  (925) 945-8792

25                                             LAW OFFICES OF SCOTT A. BURSOR
                                               Scott A. Bursor (*pro hac vice*)
26                                             369 Lexington Avenue, 10th Floor
                                               New York, NY  10017-6531
27                                             Telephone:  (212) 989-9113
                                               Facsimile:   (212) 989-9163

28

---

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR        20
ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

21

SER212

# EXHIBIT 6

SER213

Law Offices Of Scott A. Bursor Mail - Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content

**SAB**

Scott A. Bursor <scott@bursor.com>

## Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content

1 message

steve@stevevachani.com <steve@stevevachani.com>                                    Mon, Feb 9, 2009 at 12:12 PM
Reply-To: steve@stevevachani.com
To: scott@bursor.com
Cc: felipe.herrera@corp.power.com

--- On **Mon, 12/1/08,** steve@stevevachani.com <*steve@stevevachani.com*> wrote:

From: steve@stevevachani.com <steve@stevevachani.com>
Subject: Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content
To: "Felipe Herrera" <felipe.herrera@powerinc.net>, "Eric Santos" <eric.santos@powerinc.net>
Date: Monday, December 1, 2008, 8:01 PM

We need to prepare and think carefully how to transform this into an opportunity for Power. I will talk to my friends at Meebo and also see the best response.

Eric, we need to be prepared for Facebook to try to block us and the turn this into a national battle that gets us huge attention. But before we do that, we need to be prepared to address their arguments.

We need to address the scraping argument and the soliciting login credentials. Soliciting login credentials should be something with A LOT of precedent. Everybody has been soliciting login credentials for years. Scraping is also something we should be able to address.

Let's discuss this. This is exciting. :)

Keep this letter confidential.

Thanks.
Steve

--- On **Mon, 12/1/08,** hostmaster1@poweremail.org <*hostmaster1@poweremail.org*> wrote:

From: hostmaster1@poweremail.org <hostmaster1@poweremail.org>
Subject: Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content
To: "Steven Vachani" <steve@stevevachani.com>
Cc: "Felipe Herrera" <felipe.herrera@powerinc.net>
Date: Monday, December 1, 2008, 7:54 PM

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

POWER 2011.02.03.0000089

SER214

Law Offices Of Scott A. Bursor Mail - Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content

```
Steve,

This looks serious.  They want a response by Wednesday in writing.
If I can help, let me know.

Leigh Power

--
Power Assist, Inc.
Coupeville, WA  98239
--

----- Forwarded message from JCutler@perkinscoie.com -----
    Date: Mon, 1 Dec 2008 19:30:08 -0800
    From: "Cutler, Joseph P. (Perkins Coie)"
<JCutler@perkinscoie.com>
Reply-To: "Cutler, Joseph P. (Perkins Coie)"
<JCutler@perkinscoie.com>
 Subject: Cease and Desist Soliciting Login Credentials and Scraping Facebook
Content
        To: hostmaster1@poweremail.org

I misspelled your email address when I sent this earlier this evening.  Please
see below.

Sincerely,

Joe

Joseph P. Cutler
Attorney at Law
Perkins Coie, LLP
206. 359. 6104 (Office)
206. 359. 7104 (Fax)
jcutler@perkinscoie.com

-----Original Message-----
From: Cutler, Joseph P. (Perkins Coie)
To: 'hostmaster1@poeremail.org' <hostmaster1@poeremail.org>
CC: McCullagh, James R. (Perkins Coie); Demetrescu, Nicole  (Perkins Coie)
Sent: Mon Dec 01 18:51:00 2008
Subject: Cease and Desist Soliciting Login Credentials and Scraping Facebook
Content

  <<C&D power.com.pdf>>
Please open, review and respond to the attached correspondence as directed
therein.



Sincerely,



Joe



Joseph P. Cutler | Perkins Coie LLP

Attorney at Law
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
jcutler@perkinscoie.com <mailto:jcutler@perkinscoie.com>

206.359.6104 (office) | 206.359.7104 (fax)

Professional Biography
<http://www.perkinscoie.com/professionals/professionals_detail.aspx?professional=139>

NOTICE: This communication may contain privileged or other confidential
information. If you have received it in error, please advise the sender by reply
email and immediately delete the message and any attachments without copying or
disclosing the contents. Thank you.

IMPORTANT TAX INFORMATION: This communication is not intended or written by
Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose
of avoiding penalties that may be imposed on the taxpayer under the Internal
Revenue Code of 1986, as amended.




----- End forwarded message -----
```

---

**3 attachments**

📄 **ATT142348.txt**
2K

🌐 **ATT142351.htm**
3K

📕 **C&D power.com.pdf**
173K

---

HIGHLY CONFIDENTIAL          POWER 2011.02.03.0000090
ATTORNEYS' EYES ONLY

SER215

# EXHIBIT 7

**From:** Eric Santos <eric.santos@corp.power.com>
**Sent time:** Thursday, December 18, 2008 2:30:29 AM
**To:** SteveVachani <steve@stevevachani.com>
**Subject:** RES: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT

---

Ok.
Lembrando que a prioridade número 1 é a correção de bugs e melhorias na infra-estrutura (inclusive ficar pronto para bloqueios).  A número 2 é a melhoria na campanha e comunicação para maximizar a ação. A 3ª prioridade está em desenvolver a solução do Facebook Connect e a solução de Integração de Redes (evitar que a gente fique com o usuário e senha).

Abraço

Eric

---

**De:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Enviada em:** quinta-feira, 18 de dezembro de 2008 05:22
**Para:** Eric Santos
**Assunto:** Re: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT


Ok. Hopefully Facebook will give us an extension to keep Facebook working while we work on this new solution. I will need to present a presentation to Facebook with our product plan and progress on this. Hopefully we will be able to keep the site working while we do this and keep improving Facebook.


Also, during this time, we can make sure that our Amazon solution is working to distribute IP's through Amazon and other places.


Thanks,

Steve

--- On **Wed, 12/17/08, Eric Santos <*eric.santos@corp.power.com*>** wrote:

> From: Eric Santos <eric.santos@corp.power.com>
> Subject: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT
> To: "SteveVachani" <steve@stevevachani.com>
> Date: Wednesday, December 17, 2008, 11:09 PM
>
> Bruno não está envolvido nessa atividade, somente a Carol. Para que se comece a especificação vou precisar que o Carlos Bacelar termine o estudo. Como te falei vamos ter que tirar o facebook e manter o site por enquanto sem facebook ...  já vou solicitar que eles trabalharem para que a Power.com fique pronta para estar sem o Facebook e aguardarei a sua confirmação.
>
>
> Atc,
>
>
> Eric

---

**De:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Enviada em:** quinta-feira, 18 de dezembro de 2008 04:31
**Para:** Eric Santos; Felipe Herrera; Bruno Carvalho; Eric Santos
**Cc:** Cornelius Conboy
**Assunto:** Re: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT


Eric, after Carole and Bruno finish the initial specifications and designs, please provide me a Power point showing visually how everything will work with this new version. I will take this to Facebook to show them our progress and work for them to provide additional time.

Please keep me updated.

Thanks,
Steve

--- On **Wed, 12/17/08, steve@stevevachani.com <*steve@stevevachani.com*>** wrote:

From: steve@stevevachani.com [mailto:steve@stevevachani.com]
Subject: Re: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT
To: "Eric Santos" <eric@power.com>, "Felipe Herrera" <felipe.herrera@corp.power.com>, "Bruno Carvalho" <bruno.carvalho@corp.power.com>, "Eric Santos" <eric.santos@corp.power.com>
Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>
Date: Wednesday, December 17, 2008, 10:22 PM

Eric, if we make a lot of progress on the presentation and other parts of the implementation, I will return to Facebook and make a presentation with our product plan and implementation and ask them if they can give us an extra week. Do not REMOVE it without talking to me. Please be ready to remove it if necessary.

Please let me know after Carol and Bruno finish the full product presentation of how it will work.

Thanks,
Steve

--- On **Wed, 12/17/08, Eric Santos *<eric.santos@corp.power.com>*** wrote:

From: Eric Santos <eric.santos@corp.power.com>
Subject: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT
To: "SteveVachani" <steve@stevevachani.com>, "Eric Santos" <eric@power.com>, "Felipe Herrera" <felipe.herrera@corp.power.com>, "Bruno Carvalho" <bruno.carvalho@corp.power.com>
Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>
Date: Wednesday, December 17, 2008, 8:07 AM

Steve,


Realisticamente NÃO conseguiremos implantar a Facebook Connect na Power.com até o dia 24. Só posso garantir até essa data a retirada do PowerSite Facebook da Power.com.  Além disso, não temos equipe com esse conhecimento específico. Estou colocando dedicado 100% do tempo nessa atividade o Carlos Bacelar, mesmo assim não vai ser suficiente para que a gente tenha alguma solução pronta antes do ano que vem.


Temos os seguintes etapas que devemos passar para fazer algo com Facebook Connect:

1-  Estudar o Facebook Connect e realizar um estudo comparativo com a nossa tecnologia. Verificar o que poderemos fazer e o que não poderemos.  [Carlos Bacelar]

2-  Desenvolver projeto do novo powersite do Facebook com Facebook Connect na Power.com. [Carolina Fialho]

3-  Desenvolver infra-estrutura para acessar o Facebook Connect. [Carlos Bacelar]

4-  Desenvolver a integração do powersite do Facebook Connect na Power.com. [Elmo – Tyago e Leandro]

   *Ainda temos o esforço de retirada da atual solução.


Ou seja, se contente se essa solução estiver no ar antes do dia 15 de janeiro. Infelizmente não acho indicado parar as atividades de correção de bug e melhoria de perfomance.


Posso tentar te confirmar a retirada do facebook da Power.com no dia 24. Perderemos aproximadamente 30k usuários. Ok?


Atc,


Eric


De: steve@stevevachani.com [mailto:steve@stevevachani.com]
Enviada em: quarta-feira, 17 de dezembro de 2008 09:28
Para: Eric Santos; Felipe Herrera; Bruno Carvalho
Cc: Cornelius Conboy
Assunto: Integrating new changes regarding Facebook, Facebook Connect - URGENT


Eric,

As we discussed, we will proceed to make changes to implement Facebook connect for the initial login and our start page.

Please see www.joost.com, www.digsby.com, and some other sites that have integrated Facebook connect.

On the first page, we will put a Login Using Facebook approved logo. Please see the approved logos. When a person clicks that, it will popup the Facebook connect login.

We can customize the text and graphics. Please see how Joost implemented this.

After the person logs in, We can use their Facebook photo with the Facebook logo inside (see Joost). We can also access the Facebook IM inside our Facebook messenger.

Please confirm if we can access updates, Facebook mail, birthdays, and other information on the start page.

Facebook allows the option for a user to remain logged in to a site with their Facebook account.

So if a Power Facebook user returns, we can go automatically to their logged in start page. We can also let Facebook users automatically have a Power account and we can store all their other accounts inside of Power.

We might need to create a separate window for Facebook inside of the Power Start page, but lets see if we can integrate the information more naturally inside.

In the short term, lets be Facebook's most INNOVATIVE partner and then when we are ready, I will request for them to give us more flexibility and allow us to create extensions to Facebook connect.

I don't like to do this, but I think in the short term, we should try. We are not strong enough right now.

Also, if a user enters Facebook, for now, we should just keep a Power Frame open and then past them into Facebook. The user will need to login. If they have a Facebook cookie, they will not need to login. Let's try to keep the Power Frame.

Maybe we can still use the Power Proxy also if Facebook allows us to stay logged in. Let's try to to see if we can use the proxy.

I realize that this is a big change, but it is important that we try our best. Diplomatically, this will allow us to have more flexibiliy to try new things with Facebook,

Facebook has given us a deadline to have EVERYTHING installed and working by next week. We need to complete everything by December 24th.

Let me be clear. THIS IS VERY URGENT.

Let's determine the best possible user experience.

We will not let users login right now directly.

In the short term, we will integrate Facebook Connect inside our Power Login API also.

We will need to follow Facebook connects policies regarding displaying their logo on our site. They have approved logos and other stuff at this link

1. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
2. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.

Eric, please study Facebook connect carefully and please look at Joost, Digsby, and other Facebook connect partners to see how they have implemented. More importantly, lets' try to be Facebook's most innovative partner so they will then work with us on new ideas.

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1853 - Release Date: 17/12/2008 08:31

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1853 - Release Date: 17/12/2008 08:31

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

**From:** Eric Santos <eric.santos@corp.power.com>
**Sent time:** Thursday, December 18, 2008 2:30:29 a.m.
**To:** SteveVachani <steve@stevevachani.com>
**Subject:** RES: RES: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT

---

Ok.
Remember that the number 1 priority is the correction of bugs and the improvement of the infrastructure (including being ready for blocks). Number 2 is the improvement of the campaign and communication to maximize the action. The 3rd priority is to develop the Facebook Connect solution and the solution for the Integration of Networks (to keep us from having the username and password).

Hug

Eric

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent date:** Thursday, December 18, 2008 5:22 a.m.
**To:** Eric Santos
**Subject:** Re: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT

Ok.

Hopefully Facebook will give us an extension to keep Facebook working while we work on this new solution. I will need to present a presentation to Facebook with our product plan and progress on this. Hopefully we will be able to keep the site working while we do this and keep improving Facebook.

Also, during this time, we can make sure that our Amazon solution is working to distribute IP's through Amazon and other places.

Thanks,

Steve

---On **Wed, 12/17/08, Eric Santos *<eric.santos@corp.power.com>* wrote:**

> From: Eric Santos <eric.santos@corp.power.com>
> Subject: RES: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT
> To: "SteveVachani" <steve@stevevachani.com>
> Date: Wednesday, December 17, 2008, 11:09 p.m.
>
> Bruno is not involved in this activity; only Carol. In order to begin the specification, I will need Carlos Bacelar to finish the study. As I already told you, we are going to have to remove Facebook and maintain the site without Facebook for now…I will request that they work so that Power.com is ready to be without Facebook, and I will await your confirmation.
>
> Regards,
>
> Eric

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent on:** Thursday, December 18, 2008 4:31a.m.
**To:** Eric Santos; Felipe Herrera; Bruno Carvalho; Eric Santos
**Cc:** Cornelius Conboy
**Subject:** Re: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT

Eric, after Carole and Bruno finish the initial specifications and designs, please provide me a Power point showing visually how everything will work with this new version. I will take this to Facebook to show them our progress and work for them to provide additional time.

Please keep me updated.

Thanks,
Steve

---On **Wed, 12/17/08, steve@stevevachani.com *<steve@stevevachani.com>* wrote:**

From: steve@stevevachani.com <steve@stevevachani.com>
Subject: Re: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT
To: "Eric Santos" <eric@power.com>, "Felipe Herrera" <felipe.herrera@corp.power.com>, "Bruno Carvalho"
<bruno.carvalho@corp.power.com>, "Eric Santos" <eric.santos@corp.power.com>
Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>
Date: Wednesday, December 17, 2008, 10:22 p.m.

Eric, if we make a lot of progress on the presentation and other parts of the implementation, I will return to Facebook and make a
presentation with our product plan and implementation and ask them if they can give us an extra week. Do not REMOVE it without
talking to me. Please be ready to remove it if necessary.

Please let me know after Carol and Bruno finish the full product presentation of how it will work.

Thanks,
Steve

----On **Wed, 12/17/08, Eric Santos <_eric.santos@corp.power.com_>** wrote:

From: Eric Santos <eric.santos@corp.power.com>
Subject: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT
To: "SteveVachani" <steve@stevevachani.com>, "Eric Santos" <eric@power.com>, "Felipe Herrera"
<felipe.herrera@corp.power.com>, "Bruno Carvalho"
<bruno.carvalho@corp.power.com>
Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>
Date: Wednesday, December 17, 2008, 8:07 a.m.

Steve,


Realistically we will NOT be able to implement Facebook Connect on Power.com until the 24th. Until that date, I can only guarantee the
removal of the PowerSite Facebook from Power.com. In addition, we do not have a team with this specific knowledge. I am putting Carlos
Bacelar to dedicate 100% time to this activity, even though it is not going to be sufficient for us to have a solution ready before next year.


We have the following stages that we need to go through to do something with Facebook Connect:

1 – Study Facebook Connect and realize a comparative study with our technology. Verify what we can and can't do. [Carlos Bacelar]

2 – Develop project of new powersite of Facebook with Facebook Connect on Power.com. [Carolina Fialho]

3 – Develop infrastructure to access Facebook Connect. [Carlos Bacelar]

4 – Develop the integration of the Facebook Connect powersite on Power.com. [Elmo – Tyago and Leandro]

*We still have the effort to remove the current solution.

Or, rather, is it OK if this solution is live before January 15. Unfortunately I do not think it's appropriate to stop the bug correction activities
and performance improvement.

I can try to confirm with you the removal of Facebook from Power.com on the 24th. We will lose approximately 30k users. OK?

Regards,


Eric

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent on:** Wednesday, December 17, 2008, 9:28 a.m.
**To:** Eric Santos; Felipe Herrera; Bruno Carvalho
**Cc:** Cornelius Conboy
**Subject:** Integrating new changes regarding Facebook, Facebook Connect URGENT

Eric,

SER222

As we discussed, we will proceed to make changes to implement Facebook connect for the initial login and our start page.

Please see www.joost.com, www.digsby.com, and some other sites that have integrated Facebook connect.

On the first page, we will put a Login Using Facebook approved logo. Please see the approved logos. When a person clicks that, it will popup the Facebook connect login.

We can customize the text and graphics. Please see how Joost implemented this.

After the person logs in, we can use their Facebook photo with the Facebook logo inside (see Joost). We can also access the Facebook IM inside our Facebook messenger.

Please confirm if we can access updates, Facebook mail, birthdays, and other information on the start page.

Facebook allows the option for a user to remain logged in to a site with their Facebook account.

So if a Power Facebook user returns, we can go automatically to their logged in start page. We can also let Facebook users automatically have a Power account and we can store all their other accounts inside of Power.

We might need to create a separate window for Facebook inside of the Power Start page, but lets see if we can integrate the information more naturally inside.

In the short term, lets be Facebook's most INNOVATIVE partner and then when we are ready, I will request for them to give us more flexibility and allow us to create extensions to Facebook connect.

I don't like to do this, but I think in the short term, we should try. We are not strong enough right now.

Also, if a user enters Facebook, for now, we should just keep a Power Frame open and then past them into Facebook. The user will need to login. If they have a Facebook cookie, they will not need to login. Let's try to keep the Power Frame.

Maybe we can still use the Power Proxy also if Facebook allows us to stay logged in. Let's try to see if we can use the proxy.

I realize that this is a big change, but it is important that we try our best. Diplomatically, this will allow us to have more flexibility to try new things with Facebook,

Facebook has given us a deadline to have EVERYTHING installed and working by next week. We need to complete everything by December 24th.

Let me be clear. THIS IS VERY URGENT.

Let's determine the best possible user experience.

We will not let users login right now directly.

In the short term, we will integrate Facebook Connect inside our Power Login API also.

We will need to follow Facebook connects policies regarding displaying their logo on our site. They have approved logos and other stuff at this link

1. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).

2. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.

Eric, please study Facebook connect carefully and please look at Joost, Digsby, and other Facebook connect partners to see how they have implemented. More importantly, lets' try to be Facebook's most innovative partner so they will then work with us on new ideas.

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1853 Release Date: 17/12/2008 08:31

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1853 Release Date: 17/12/2008 08:31

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21



**TRANSPERFECT**

AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTÁ
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
CLEVELAND
COLUMBUS
DALLAS
DENVER
DUBAI
DUBLIN
DÜSSELDORF
FRANKFURT
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SEOUL
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TEL AVIV
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Casey Dianni, hereby certify that the document:

- RES  RES  RES  Integrating new changes regarding Facebook, Facebook
  Connect - URGENT - Eric Santos (eric.santos@corp.power.com) - 2008-12-18
  0230

is, to the best of my knowledge and belief, a true and accurate translation from
Portuguese to English.

*Casey M. Dianni*
Casey Dianni

Sworn to before me this
November 14, 2011

*Sarah E. Mullen*
Signature, Notary Public

SARAH E MULLEN
Notary Public - State of New York
No. 01MU6245919
Qualified in New York County
Commission Expires Aug 08, 20 /5

Stamp, Notary Public

THREE PARK AVENUE, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM

# EXHIBIT A



1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

December 1, 2008

**SENT VIA EMAIL**

Power Assist, Inc.
Attn: Leigh Power
210 Kineth Point Place
Coupeville, Washington 98239-9569

hostmaster1@poweremail.org

**Re:    Cease and Desist Soliciting Login Credentials and Scraping Facebook Content**

Dear Ms. Power:

We represent Facebook Inc., based in Palo Alto, California.  It has come to Facebook's attention that your company is soliciting and storing Facebook user login information, scraping content from Facebook, and sending unsolicited commercial messages to Facebook users through your website: http://www.power.com.  These activities violated Facebook's Terms of Use, which specifically prohibit:

- Solicitation of Facebook user login information;

- Using or attempting to use another person's Facebook account without authorization from the Company;

- Use of automated scripts to collect information from, or otherwise interact with, the Facebook website;

- Uploading, posting, transmitting, sharing or otherwise making available any unsolicited or unauthorized advertising, solicitations, promotional materials, "junk mail," "spam," "chain letters," "pyramid schemes," or any other form of solicitation;

- Using the Facebook service or site for commercial purposes, except under formal advertising programs offered by Facebook; and

LEGAL14988339. 1
ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES · MENLO PARK
OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.
Perkins Coie LLP and Affiliates

Power.com
December 1, 2008
Page 2

- Incorporating any Facebook site content or information in any other database or compilation.

*See* http://www.facebook.com/terms.php.

In addition to breaching Facebook's Terms of Use, your website's functionality may violate the California Comprehensive Computer Data Access and Fraud Act, CA Penal Code § 502(c); the California Anti-Phishing Act of 2005, CA Bus. and Prof. Code § 22948, *et. seq.*; the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.*; and state laws prohibiting interference with Facebook's business expectations and interests.

You are also displaying the Facebook trademark on your website without Facebook's authorization, which likely causes visitors to your website to incorrectly believe that your website is approved by or in some way affiliated with Facebook.

Facebook takes the protection of its users' privacy very seriously and is committed to keeping Facebook a safe place for users to interact and share information. Facebook has developed Terms of Use to protect its users and to facilitate these goals. As set forth above, your website violates Facebook's Terms of Use.

Facebook offers an open development platform that allows third parties to develop applications that integrate with Facebook, subject to Facebook's Developer Terms of Service. *See* http://developers.facebook.com/terms.php and http://developers.facebook.com/guidelines.php. You may also wish to familiarize yourself with "Facebook Connect," which allows Facebook users to connect their Facebook identity, friends and privacy to any site. For more information on Facebook Connect, please visit http://developers.facebook.com. These resources may allow you to integrate existing functionality with Facebook in an authorized manner.

Please respond to me in writing no later than close of business on Wednesday, December 3, 2008, confirming that you: (1) have ceased and desisted in, and will refrain from, soliciting, using and/or retaining Facebook user login information, or any other Facebook Site Content as defined by the Facebook Terms of Use, (2) ceased and desisted in, and will refrain from, sending any manner of unsolicited commercial messages to Facebook users; (3) removed compatibility with Facebook from your website, (4) removed references to Facebook from your website and other promotional material, (5) ceased using/and or displaying Facebook's trademark on your website and/or other promotional material, and (6) that in the future you and your company will strictly comply with Facebook's Terms of Use.

Power.com
December 1, 2008
Page 3

Very truly yours,

Joseph P. Cutler

JPC:jpc

# EXHIBIT B

**Dalton, Amy**

| | |
|---|---|
| **From:** | steve@stevevachani.com |
| **Sent:** | Friday, December 26, 2008 9:50 PM |
| **To:** | felipe.herrera@powerinc.net; Cutler, Joseph P. (Perkins Coie) |
| **Cc:** | Demetrescu, Nicole  (Perkins Coie); McCullagh, James R.  (Perkins Coie); steve@power.com |
| **Subject:** | Power.com Update - sent December 26th, 2008 |

Dear Joseph,

I am writing to follow up to our discussions regarding Power.com's integration of Facebook connect, your requests for us to take down our current Power browser compatability with Facebook, and your complaints regarding our users storing their Facebook login information inside the Power Browser. I hope you will pass this letter on to Sam and other appropriate parties inside of Facebook to communicate our sincere desire to diplomaticaly resolve our current disagreement and help you reduce these disagreements with well intentioned companies like Power.

Power.com is very committed to working with Facebook and we sincerely hope that this message of diplomacy and good intention is very clear in this letter. We would like to reiterate that we have made the decision to make every diplomatic effort possible to cooperate with Facebook to integrate your Facebook Connect solution on our login page. We had originally expected that it would take us 2 weeks to complete this integration, but with the holidays and the amount of work necessary to complete this integration, we realistically don't expect have this new solution fully integrated until January 30th. as we had previously discussed. After careful consideration and after previously thinking that it would better to take Facebook comptability down while we implemented this new solution, we have made the business decision to not prevent the interruption of service to our millions of users while working closely to make these changes to address Facebook's concerns. We sincerely hope that while this is not your desired action, you will respect our reasons for doing this and keep the door open and approve Power.com inside of Facebook connect when we go live in one month. Furthermore, we would like to work with Facebook to offer our complete browser tools to users with Facebook's consent and input into the user experience.

The Power.com browser provides our users value added features across their Internet experience.  Like most browsers, we have little interest to cause harm to Facebook or reduce Facebook's revenues. On the contrary, we are taking proactive steps to pass all Facebook ads through to the user inside our browser. Similar to Firefox, Internet Explorer, Flock, and other browsers and browser add-ons, we provide our users a browser to navigate and continue to use their existing sites and do not in any way attempt to obstruct users from using the sites they are accustomed to using every day. Like most browsers, we do offer our users the option to either start their experience on our home page or start on their default social network.

Furthermore, we are about to launch a new solution which will pass Facebook ads inside of all Facebook content which is displayed outside of Facebook. This is something we can have ready by the end of January and which we can also enable for you to offer to other develpment partners whose only desire is to create positive applications for Facebook users. We are committed to working with the entire industry to responsibly create a borderless web where all parties interests are respected when widgets, apps, messages, and other content are distributed outside of Facebook or outside the host site of any other web publisher.

Power strives for complete transparency with our users by providing them explicit statements on our front page in two different places about the nature of our application, the fact that we are a value added browser with no endorsement by other sites, and we also require a user before using our service to read

1

SER231

through and proactively accept our terms and conditions where we for the third time clarify the users consent and understanding that we are in no way affiliated with or endorsed by Facebook.

We completely understand Facebook's position to not begin any business discussions with Power.com until we have become compliant with Facebook requests. We request that you please reconsider this decision and enable us to meet with Facebook as early as possible to diplomatically resolve this issue in a way that will allow us to keep creating new applications for Facebook and also help Facebook better accommodate other innovators and application developers like Power.com who only want to enrich your user's experiences. We are working to implement this complete solution with Facebook's cooperation by January 30th and sincerely hope that you will not misinterpret this delay and our decision to not interrupt the user experience of our mutual users as our lack of desire to work together with Facebook.

If you maintain that you cannot faciliate a direct meeting, we will happily use our own contacts to start these discussions with Facebook, but it is difficult to start these discussions until after the holidays are over. We have no problem using our own contacts to get to the appropriate people at Facebook engaged in discussions in January to resolve this, but naturally prefer your assistance to speed things up.

We believe that it would be a serious strategic mistake to disrupt the experience of the millions of Power.com users while we are actively working to complete the integration of Facebook connect. We believe that this would create unnecessary attention and disruption among users, the media, and the industry around what we believe is a discussion that can be handled maturely and quietly between our companies.

I believe that Facebook understands the current challenges as Meebo and soon thousands of other sites that will connect to Facebook using open source technology solutions and other user driven solutions that are not endorsed by Facebook. We respect Facebook's objectives to create an open Internet which respects and protects users and enables developers to create new innovations to serve Facebook users. We think that it is important that we all diplomatically work together to achieve these goals for the best interests of users. The borderless web is inevitable and we all need to work together to define the best practices for this new and exciting Internet which Facebook has already played such a pivotal role in helping create over the past years.

Power.com is very interested in sitting down with Facebook to discuss together the future of the borderless internet and work to address all of Facebook's concerns. I am willing to fly to San Francisco as early as possible to proactively present our solutions or we are happy to wait until after January 30th when we complete our integration of Facebook connect on our initial login page.

We believe that that your number one concern of protecting a users username and password will be resolved by our implemention of Facebook connect or by Facebook using an extension to Facebook connect that we would like to present to you which would allow Power and other outside developers maximum flexibility to innovate on top of Facebook while keeping the users username and password locked securely and safely outside the reach of Power.com or any other developer. We are currently supporting and helping introduce a new industry wide solution that will ensure that sites like Power.com, Meebo, eBuddy, and thousands of others will never have access or store Facebook usernames and passwords, but still have the maximum flexibility to innovate new applications on top of Facebook and all other sites on the Internet. We all share similar investors and partners and we are all striving for the same objectives.

We believe that Facebook's second concern is the potential loss of revenues when Facebook content is accessed outside of Facebook. This coming month, Power.com will be introducing a solution which will pass all Facebook advertising through with your content that is displayed outside of Facebook. We are proceeding with this without being asked in order to further demonstrate our desire to diplomatically and responsibly address the issues of distributed content inside of mashed up websites. Power.com has no interest to

SER232

interfere or to prevent Facebook from receiving revenue from all its content and will go out of its way to showcase to the industry how to responsibly solve this problem. We would welcome the opportunity to work with you to define these standards together with the leading sites on the web and introduce these standards together to the industry and inside of Facebook connect.

Finally, as a browser, most of our users experience is actually inside of Facebook and other destination sites and we do not in any way prevent users from viewing the entire Facebook experience with all ads and revenues streams intact.

While we understand your current requests to take down the current Facebook compatibility with the Power Browser today, we strongly believe that it is a mistake to disrupt the user experience of our millions of users and create attention around our private discussions.

Unlike some other sites that you are dealing with that may truly be causing harm to Facebook, Power.com's only goal is to enable new applications which enhance Facebook's users experience inside your site.

Therefore, we diplomatically request that you please grant us an extension until January 30th to work to achieve compliance with Facebook's request and to have time to diplomatically sit down with Facebook to present solutions that will assist you in dealing with these core issues not only with Power.com, but with the hundreds of other well intentioned developers who are only looking to create new innovations for Facebook, but who do not yet have the flexibility from Facebook to support their innovations. The floodgates are about to open and we would love to work proactively to solve these challenges together.

We sincerely hope you respect our decision on this and look forward to building a healthy and diplomatic dialogue with Facebook to address your true concerns of protecting your users. And we apologize for the lack of clarity on our position until today and for any confusion we may have created from this lack of clarity. Facebook's initial strong reaction did catch us off guard and after careful consideration, we have crafted this letter to make clear our position and desire and commitment to work together.


Best Regards,

Steve Vachani

CEO, Power.com


--- On **Tue, 12/16/08, Cutler, Joseph P. (Perkins Coie) <*JCutler@perkinscoie.com*>** wrote:

From: Cutler, Joseph P. (Perkins Coie) <JCutler@perkinscoie.com>
Subject: RE: Power.com
To: steve@stevevachani.com, felipe.herrera@powerinc.net
Cc: "Demetrescu, Nicole (Perkins Coie)" <NDemetrescu@perkinscoie.com>, "McCullagh, James R. (Perkins Coie)" <JMcCullagh@perkinscoie.com>
Date: Tuesday, December 16, 2008, 10:41 AM

Steve,


I imagine you are in the air right now, but upon landing – could you confirm whether you are still available

SER233

at 12:00 Pacific Time?  My schedule moved a bit today – and I now have either 12-12:30 or after 2:00 available.  I'd like to talk at noon as you originally proposed.  Will that work?

If I haven't heard from you then, I'll call you at noon.

Thanks,

Joe

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent:** Monday, December 15, 2008 6:05 PM
**To:** Cutler, Joseph P. (Perkins Coie); filipe.herrera@powerinc.net
**Cc:** Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie)
**Subject:** Re: Power.com

I will be free to go over these terms tomorrow. I am on a flight all morning, but should be free to talk around noon.

Thanks,
Steve

Thanks,
Steve

Sent via BlackBerry by AT&T

---

**From**: "Cutler, Joseph P. (Perkins Coie)"
**Date**: Mon, 15 Dec 2008 17:00:53 -0800
**To**: <steve@stevevachani.com>; <filipe.herrera@powerinc.net>
**Subject**: RE: Power.com

Steve and Felipe,

I am sorry that we were not able to match schedules on Friday.  Facebook has reviewed this letter, and is willing to accept your offer to have Facebook Connect implemented by EOD December 26 – which is two weeks from the date you sent the letter.

SER234

Meanwhile, as you may know, Facebook has taken technical measures to limit the interaction between Power.com and its network at this time. In order to fully initialize your integrated Facebook Connect status, and to lift those technical measures, Facebook requires written confirmation of the following:

1. That Power.com has purged and destroyed all data that it obtained from the Facebook network or from Facebook users prior to implementation of Facebook Connect, including all login information and/or any other data obtained or scraped from Facebook's site.
2. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
3. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.
4. That Power.com has removed all compatibility with Facebook's site that does not comply with Facebook's Terms of Use, Developer Terms of Service and/or Connect Policies.
5. That Power.com will in the future adhere to all of Facebook's Terms of Use, Developer Terms of Service, Connect Policies.

While Facebook does not object to Power.com's efforts to interact with Facebook's developer teams via normal channels, it will not set up any special developer meetings for Power.com.

Lastly, regarding your proposed notice to Facebook users: your Connect interaction must strictly comply with Facebook's applicable Terms and Policies. Posting a notice that casts Facebook's Connect system in a negative light will likely become counterproductive to your stated goals of working together with Facebook's developers. Facebook reserves its right to deny approval for any Facebook Connect application for any reason.

I would still like to go over these items together on the phone. Are you available for a call tomorrow (Tuesday)? If so, what time?

Please confirm that you agree with these terms, and that you will commit to integrating Facebook Connect by EOD, December 26, 2008. Please also confirm that you intend to provide the written confirmation as described above by that time.

Thanks,

Joe

SER235

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent:** Friday, December 12, 2008 1:24 PM
**To:** Cutler, Joseph P. (Perkins Coie)
**Cc:** felipe.herrera@corp.power.com; Eric Santos
**Subject:** Power.com

Thank you for patience to allow us to clarify our plan of action on Power in regards to our discussion on Wednesday.

We decided to move forward with the following steps

1) We will implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site. Instead of a login for Facebook, users will have a button which then opens the Facebook connect window and allows them to login through Facebook connect. We will say that Facebook connects current capabilities are extremely limited and we would love the opportunity to provide a Facebook connect extension to Facebook that would allow us to enrich the experience for Facebook users. We will show that to the bus dev guys when we have a chance to meet with them.

2) We will delete any Facebook friend information we currently have.

3) We will move forward and use the Facebook features to utilize Facebook's IM, updates, and some other functionality that is already available. After we finish the implementation, we would like the opportunity to get Facebook's feedback. We have some simple innovative ideas that will follow Facebook connects system, but allow for better usability and integration. As stated earlier, we do believe that the user experience of Facebook connect is extremely limited at this stage and we hope to have an open and friendly relationship with the Facebook team to share ideas and complete solutions to allowing partners to do greater integration while addressing Facebook's concerns.

4) We are finishing a solution that we have already been discussing with other sites that is an extension to Facebook connect that Facebook could enable that will allow us to provide more functionality to Facebook users while protecting all the concerns of Facebook.

5) We do understand that there is no guarantee that Facebook will accept this solution, but our only request is

6

SER236

that


6) We estimate that it will take us 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users.


7) While have made the decision today to do this, we would request only one thing. We would like to meet with the business dev and guys involved on the product for thinking about solution for providing more flexibility with partners and at least present our simple code that Facebook could add that would allow us to provide a richer experience to our users and at the same time do it in a way that Facebook finds compatible with you they are envisioning their partners working with them in the future.


I believed that this email addresses everything we discussed.


The two requests we have and hope you will faciliate.


1) Can we get an email introduction to the correct people inside Facebook. We only ask for the introduction and we will follow up and see their interest to meet.


2) Provide us 2 (instead of one you offered) to implement this new solution.


We did study Digsby and others and saw the changes they made in their UI to implement Facebook connect.


Please call me now and we can discuss this further. I am heading to a flight shortly.


NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

SER237

SER238

# EXHIBIT 6

1

LAW OFFICES OF SCOTT A. BURSOR
Scott A. Bursor (*pro hac vice*)

2

369 Lexington Avenue, 10th Floor
New York, NY 10017

3

Telephone: (212) 989-9113
Facsimile: (212) 989-9163

4

5

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (State Bar No. 077785)

6

L. Timothy Fisher (State Bar No. 191626)
2125 Oak Grove Road, Suite 120

7

Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792

8

9

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

13

14

FACEBOOK, INC.,

15

                                        Plaintiff,          Case No. 5:08-cv-05780 JF (RS)

16

-against-                                              **DEFENDANT POWER VENTURES,**
                                                       **INC.'S RESPONSES TO**

17

POWER VENTURES, INC. d/b/a POWER.COM, a                **FACEBOOK, INC.'S FIRST SET OF**
California corporation; POWER VENTURES, INC.            **REQUESTS FOR ADMISSIONS**

18

a Cayman Island Corporation, STEVE VACHANI,

19

an individual; DOE 1, d/b/a POWER.COM, an
individual and/or business entity of unknown nature;

20

DOES 2 through 25, inclusive, individuals and/or
business entities of unknown nature,

21

22

                                        Defendants.

23

24

25

26

27

28

1

**REQUESTS FOR ADMISSIONS**

2

**REQUEST FOR ADMISSION NO. 1:**

3

4

Admit that in a letter dated December 1, 2008, FACEBOOK requested confirmation that

5

YOU "have ceased and desisted in…soliciting, using and/or retaining Facebook user login

information"

6

7

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

8

Admitted.

9

**REQUEST FOR ADMISSION NO. 2:**

10

11

Admit that in a letter dated December 1, 2008, FACEBOOK requested confirmation that

12

YOU "ceased and desisted in …sending any manner of unsolicited commercial messages to

Facebook users."

13

14

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

15

Admitted.

16

**REQUEST FOR ADMISSION NO. 3:**

17

18

Admit that in a letter dated December 1, 2008, FACEBOOK requested confirmation that

19

YOU "removed compatibility with Facebook from your website."

20

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

21

Admitted.

22

**REQUEST FOR ADMISSION NO. 4:**

23

24

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that "scraping

25

content from Facebook" violated FACEBOOK's Terms of Use.

26

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

27

Admitted.

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF  (RS)                                                                                                3

SER241

**REQUEST FOR ADMISSION NO. 5:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[s]olicitation of Facebook user login information."

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Admitted.

**REQUEST FOR ADMISSION NO. 6:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]sing or attempting to use another person's Facebook account without authorization from the Company," i.e., FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Admitted.

**REQUEST FOR ADMISSION NO. 7:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]se of automated scripts to collect information from, or otherwise interact with, the Facebook website."

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Admitted.

**REQUEST FOR ADMISSION NO. 8:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]ploading, posting, transmitting, sharing or otherwise making available any unsolicited or unauthorized advertising, solicitations, promotional materials, 'junk mail,' 'spam,' 'chain letters,' 'pyramid schemes,' or any other form of solicitation."

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Admitted.

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

4

**REQUEST FOR ADMISSION NO. 9:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]sing the Facebook service or site for commercial purposes, except under formal advertising programs offered by Facebook."

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admitted.

**REQUEST FOR ADMISSION NO. 10:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[i]ncorporating any Facebook site content or information in any other database or compilation."

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Admitted.

**REQUEST FOR ADMISSION NO. 11:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, you continued to access the FACEBOOK WEBSITE through the services available at the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 12:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU allowed OR provided POWER USERS with the means to access the FACEBOOK WEBSITE through the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Admitted.

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

5

**REQUEST FOR ADMISSION NO. 13:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU provided POWER USERS with the means to access the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Admitted.

**REQUEST FOR ADMISSION NO. 14:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU solicited FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 15:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU stored FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Admitted.

**REQUEST FOR ADMISSION NO. 16:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used the FACEBOOK WEBSITE for commercial purposes.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Denied.

/       /       /

/       /       /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

6

**REQUEST FOR ADMISSION NO. 17:**

Admit that YOU have never entered into a formal advertising agreement with FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that YOU developed OR created programming scripts OR language that would provide POWER with an automated mechanism to extract data from the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Admitted.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU copied OR made use of at least some part, excerpt, OR portion of FACEBOOK's source code to develop, test implement, use OR provide POWER's aggregating services.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 20:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU incorporated FACEBOOK WEBSITE content, DATA, or information into the POWER WEBSIT OR that services located thereon.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

/      /      /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

7

SER245

**REQUEST FOR ADMISSION NO. 21:**

Admit that in or about December 2008, YOU agreed to access the FACEBOOK WEBSITE OR cause others to access the FACEBOOK WEBSITE through means permitted by FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Admitted.

**REQUEST FOR ADMISSION NO. 22:**

Admit that after receiving notice that YOUR use of or access to FACEBOOK was not permitted by FACEBOOK, YOU took, copied, OR made use of DATA from the FACEBOOK WEBSITE without FACEBOOK'S permission to do so.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Admitted.

**REQUEST FOR ADMISSION NO. 23:**

Admit that FACEBOOK implemented technical measures to block YOU from accessing the FACEBOOK WEBSITE through the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Admitted.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, in or about December 2008,  FACEBOOK blocked YOUR IP address(es) from accessing the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

/      /      /

/      /      /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
 CASE NO.  5:08-CV-05780 JF  (RS)

8

SER246

1    **REQUEST FOR ADMISSION NO. 36:**

2         Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used or attempted

3    to another person's FACEBOOK WEBSITE account information without authorization from

4    FACEBOOK.

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

6         Objection compound, vague and ambiguous. Subject to and without waiving these

7    objections, denied.

8    **REQUEST FOR ADMISSION NO. 37:**

9         Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used automated

10   scripts or COMPUTER CODE to collect information from, or otherwise interact with, the

11   FACEBOOK WEBSITE.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

13        Admitted.

14   **REQUEST FOR ADMISSION NO. 38:**

15        Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU uploaded, posted,

16   OR made available promotional materials OR solicitations on the FACEBOOK WEBSITE.

17   **RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

18        Objection compound, vague and ambiguous. Subject to and without waiving these

19   objections, denied.

20   **REQUEST FOR ADMISSION NO. 39:**

21        Admit that on December 26, 2008, Steve Vachani sent an e-mail to Facebook stating

22   YOUR "business decision" to continue accessing or using the FACEBOOK WEBSITE without

23   implementing the Facebook Connect platform.

24   **RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

25        Objection vague and ambiguous.  Subject to and without waiving these objections, Power

26   admits that Mr. Vachani sent an email to Facebook's counsel on December 26, 2008 stating:

27             Dear Joseph,
               I am writing to follow up to our discussions regarding Power.com's
28             integration of Facebook connect, your requests for us to take down

---

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR         12
ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

1

**REQUEST FOR ADMISSION NO. 41:**

2

Admit that, between January 1, 2008 and present date, YOU displayed the FACEBOOK

3

name OR logo on the POWER WEBSITE.

4

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

5

Objection compound vague and ambiguous.  Subject to and without waiving these

6

objections, Power admits that it used the word Facebook on its website.

7

**REQUEST FOR ADMISSION NO. 42:**

8

Admit that on or before December 26, 2008, YOU began a "Launch Promotion" that

9

promised POWER USERS the chance to win one hundred dollars if they successfully invited AND

10

signed up new POWER USERS.

11

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

12

Admitted.

13

**REQUEST FOR ADMISSION NO. 43:**

14

Admit that as part of the "Launch Promotion" described in Request for Admission No. 42,

15

YOU provided POWER USERS with a list of their FACEBOOK friends that might be solicited to

16

take part in the "Launch Promotion."

17

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

18

Admitted.

19

**REQUEST FOR ADMISSION NO. 44:**

20

Admit that as part of the "Launch Promotion" described in Request for Admission No. 42,

21

YOU requested that POWER USERS' select which of their FACEBOOK friends should receive an

22

invitation to the "Launch Promotion" event.

23

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

24

Admitted.

25

**REQUEST FOR ADMISSION NO. 45:**

26

Admit that as part of the "Launch Promotion" described in Request for Admission No. 42,

27

YOU created a FACEBOOK event titled, "Bring 100 friends and win 100 bucks!" scheduled for

28

March 20, 2009 at 1 a.m.

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

17

**REQUEST FOR ADMISSION NO. 50:**

Admit that the "Launch Promotion" invitation described in Paragraphs 65 through 70 of Facebook's First Amended Complaint against YOU (Dkt. No. 9) does not contain a valid e-mail address, by which recipients of the invitation could contact YOU.

**RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

Admitted.

**REQUEST FOR ADMISSION NO. 51:**

Admit that between January 1, 2008 and present date, YOU stored, saved, or otherwise retained FACEBOOK user log-in information, such as user names and/or passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

Admitted.

**REQUEST FOR ADMISSION NO. 52:**

Admit that in an e-mail dated December 12, 2008, 1:24 p.m., YOU wrote that YOU "will delete any Facebook friend information we currently have."

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Admitted.

**REQUEST FOR ADMISSION NO. 53:**

Admit that in an e-mail dated December 15, 2008, 5:01 p.m., FACEBOOK, by and through its counsel, wrote to YOU: "Meanwhile as you may know, Facebook has taken technical measure to limit the interaction between Power.com and its network at this time. In order to fully initialize your integrated Facebook Connect status, and to lift those technical measures, Facebook requires written confirmation of the following: 1. That Power has purged and destroyed all data that it obtained from the Facebook network or from Facebook users prior to implementation of Facebook Connect including all login information and/or any other data obtained or scraped from Facebook's website."

**RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

Admitted.

/     /     /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

19

**REQUEST FOR ADMISSION NO. 54:**

Admit that, between December 1, 2008 and February 1, 2008, YOU did not delete the "Facebook friend information" in YOUR possession.

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

Admitted.

**REQUEST FOR ADMISSION NO. 55:**

Admit that, to present date, you have not deleted, purged or destroyed all data that YOU obtained from the FACEBOOK network.

**RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

Admitted.

**REQUEST FOR ADMISSION NO. 56:**

Admit that, to present date, you have not deleted, purged or destroyed all FACEBOOK login information obtained from POWER users, including, but not limited to, FACEBOOK user names and/or passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

Admitted.

Dated:  December 15, 2010            BRAMSON, PLUTZIK, MAHLER &
                                     BIRKHAEUSER, LLP


                                     By_____/s/_____
                                                L. Timothy Fisher

                                     Alan R. Plutzik (State Bar No. 77785)
                                     L. Timothy Fisher (State Bar No. 191626)
                                     2125 Oak Grove Road, Suite 120
                                     Walnut Creek, CA  94598
                                     Telephone:  (925) 945-0200
                                     Facsimile:  (925) 945-8792

                                     LAW OFFICES OF SCOTT A. BURSOR
                                     Scott A. Bursor (*pro hac vice*)
                                     369 Lexington Avenue, 10th Floor
                                     New York, NY  10017-6531
                                     Telephone:  (212) 989-9113
                                     Facsimile:   (212) 989-9163

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)                                                    20

SER250

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

21

# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5   FACEBOOK, INC.              :

 6              Plaintiff,       :

 7                               :

 8        v.                     :

 9                    :

10   POWER VENTURES, INC. d/b/a:

11   POWER.COM, a California    :

12   corporation; POWER        :        Case No.

13   VENTURES, INC. a Cayman    :     5:08-CV-05780

14   Island Corporation, STEVE :        JW (HRL)

15   VACHANI, an individual;    :

16   DOE 1, d/b/a POWER.COM, an:

17   individual and/or business:

18   entity of unknown nature; :

19   DOES 2 through 25,         :

20   inclusive, individuals     :

21   and/or business entities   :

22   of unknown nature,         :

23              Defendants.      :

24   _____

25        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

1

09:57 1    having worked as a product manager, but I could not

09:57 2    code in any of this.

09:57 3            Q.        And how about Perl?

09:57 4            A.        I'm familiar -- familiar with it

09:57 5    again, but no -- no programming experience.

09:57 6            Q.        Are you familiar with the term

09:57 7    "script" as it's used in computer programming?

09:57 8            A.        Yes.

09:57 9            Q.        All right.  What would your

09:57 10   understanding of a script be?

09:57 11           A.        A script is a -- an auto -- it's

09:58 12   something that you instruct a -- a computer to do

09:58 13   something.

09:58 14           Q.        Have you ever been involved in the

09:58 15   development of any types of scripts?

09:58 16           A.        Personally?

09:58 17           Q.        Yes.

09:58 18           A.        I mean, I've been involved as a

09:58 19   product manager.  Not as a programmer or coder.

09:58 20           Q.        Okay.  In the level --

09:58 21           A.        Project manager -- as a CEO

09:58 22   leading products.

09:58 23           Q.        As a CEO or as a project manager --

09:58 24           A.        Yes.  That's correct.

09:58 25           Q.        -- working with scripts, what

15

10:04  1          A.        Legally, no.  As I mentioned at

10:04  2     the moment, any new activities that I'm pursuing,

10:04  3     I'm pursuing under this entity, so I'm currently

10:04  4     engaged in conversations with -- with people.

10:04  5          Q.        And when did you join Power?

10:04  6          A.        Power was founded in -- It was

10:04  7     2006 is when our -- our primary activities started.

10:04  8     We incorporated Power, I believe it was, if I'm not

10:04  9     mistaken, late 2006 and -- but the activities

10:05 10     started previously as a start-up, we started

10:05 11     working on it.

10:05 12          Q.        Were you one of the creators of

10:05 13     Power?

10:05 14          A.        I was the founder of the company.

10:05 15          Q.        Now, when you say it was

10:05 16     incorporated in 2006 but started before then, was

10:05 17     it started under the Web site title www.power.com?

10:05 18          A.        No.  It was originally -- When we

10:05 19     originally started it, there was no Web site.  It

10:05 20     was a -- Like many startups we were -- we were

10:05 21     working on a core, you know, product idea, and

10:05 22     later the name power.com came about in 2007.  I

10:05 23     believe we acquired the domain in 2007.

10:05 24          Q.        Who helped -- Besides yourself,

10:05 25     who helped create Power.com.  You used the --

                                21

BARKLEY
Court Reporters

02:33   1           Q.        Do you know if there were

02:33   2    documents reflecting Power's ideas being bantered

02:33   3    about describing how they could get new members?

02:33   4           A.        Yes.  I believe we provided those

02:33   5    to you.

02:33   6           Q.        Do you know -- How many documents

02:33   7    do you believe you provided to Facebook

02:34   8    approximately?

02:34   9           A.        I think it was -- not -- less -- I

02:34  10    don't know.  It was less than ten, I believe.

02:34  11           Q.        The -- And how often were

02:34  12    marketing schemes discussed internally at Power, if

02:34  13    you know?

02:34  14           A.        How often?  They would be in

02:34  15    conversations, like, we'd have -- we -- meetings.

02:34  16    There would be conversations if anything became

02:34  17    relevant or useful.  There would be -- Most of them

02:34  18    were e-mail discussions, so e-mail discussions

02:34  19    would be where most of conversations took place,

02:34  20    but obviously they were also verbal conversations.

02:34  21           Q.        Do you know if any particular

02:34  22    discussions ever occurred relating to soliciting

02:34  23    members from Facebook?

02:34  24           A.        Soliciting members from Facebook?

02:34  25    What do you mean?

181

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters
SER256

02:34  1          Q.          To join -- To join Power.

02:34  2          A.          We didn't have access to -- The

02:35  3    users could invite their friends.  So that was a

02:35  4    feature that -- One of our promotions in our

02:35  5    features was that you could invite your friends to

02:35  6    join, invite your friends on Facebook to join, and

02:35  7    so people could -- they could make promotions so

02:35  8    they could create events around -- around a power

02:35  9    creativity around Power.  So we gave our user -- We

02:35  10   encourage our users, in fact, to bring their

02:35  11   friends in the same way that Facebook encourages

02:35  12   its users to bring their friends from other sites.

02:35  13   But we employed same tactics that are used by --

02:35  14   similar tactics where you invite your friends, so

02:35  15   we did use invite friends features and promotions.

02:35  16         Q.          If you go back to Exhibit 103, you

02:35  17   see various -- "Displayed a Launch Promotion" in

02:35  18   the upper left-hand corner?

02:35  19         A.          Yup.

02:35  20         Q.          It says, "First 100 people who

02:35  21   bring 100 new friends to power.com earn $100?

02:36  22         A.          Yes.

02:36  23         Q.          Is that an example of a pop-up

02:36  24   that was made available on the site that was

02:36  25   designed to encourage new users to the site?

182

BARKLEY
Court Reporters

02:36  1          A.      I don't know if this was a pop-up.

02:36  2    You can see it was prominently displayed on the

02:36  3    front page.  That's not more than that, it's not a

02:36  4    pop-up.  I think the terminology is not pop-up it's

02:36  5    an ad -- In fact, it's a prime-placed ad on the

02:36  6    home page.

02:36  7          Q.      Do you know whose idea it was for

02:36  8    this particular promotion?

02:36  9          A.      That was mine.

02:36 10          Q.      Do you know when you came up with

02:36 11    it?

02:36 12          A.      While I was sleeping.  I just

02:36 13    thought a hundred, hundred, hundred was a good

02:36 14    idea.

02:36 15          Q.      All right.  And when you clicked

02:36 16    on the Number 100, what would happen?

02:36 17          A.      It gave you a chance to -- to

02:36 18    select which friends you wanted to -- to, I guess,

02:36 19    invite to -- to join -- to join Power.

02:36 20          Q.      All right.  And was that -- Would

02:36 21    you agree that, as reflected on Exhibit 103, that

02:37 22    particular promotion was made available at the time

02:37 23    that you were connected to Facebook?

02:37 24          A.      Yes.  It was.

02:37 25          Q.      And if you clicked on 100 people,

183

BARKLEY
Court Reporters
SER258

02:37  1    you would be invited to ask your friends to join

02:37  2    power.com?

02:37  3          A.        No.  You would have the option to

02:37  4    invite your friends to join just like you have the

02:37  5    option on Facebook to invite your friends to join

02:37  6    Facebook and every other site on the Internet, and

02:37  7    if they did, if they reach a hundred friends that

02:37  8    joined, they would earn $100.

02:37  9          Q.        And if you accepted the feature

02:37 10    that came up saying would you -- it said something

02:37 11    like, "Would you like to invite your friends to

02:37 12    Power"?

02:37 13          A.        Yes.

02:37 14          Q.        If you hit "yes" or "I agree" --

02:37 15          A.        Yes.

02:37 16          Q.        -- how -- what -- what

02:37 17    automation would occur at that point?

02:37 18          A.        So first of all, you have to

02:38 19    remember that 99 percent of our users were not --

02:38 20    were not using -- were not using Facebook.  They

02:38 21    were users on other sites, so we actually -- I

02:38 22    guess you could say we were actually a big source

02:38 23    of providing users to Facebook in Brazil.  In fact,

02:38 24    as -- I guess you could say it was a gift, but we

02:38 25    -- we brought a large amount of Orkut users to

                           184

**BARKLEY**
*Court Reporters*

02:38  1   Facebook, so that's where a lot of our promotions

02:38  2   were -- Because our users already, as you know,

02:38  3   have -- Prior to having Facebook, we had millions

02:38  4   of users who have hundreds of friends already in

02:38  5   the system, and that represented 99 percent of our

02:38  6   contacts in our system. Facebook was a very small

02:38  7   part of this world. At that time, obviously it's a

02:38  8   much larger site today but in our world, in our

02:38  9   growth it was -- it was introduced later. So we

02:38 10  were encouraging our friends -- our users to go and

02:38 11  register at Facebook and become Facebook users.

02:38 12  Because in our -- in our view, the more social

02:39 13  networks that users were using, the more value it

02:39 14  would be to, you know, to aggregate different

02:39 15  sites. So we encouraged users to sign up for

02:39 16  Facebook. In fact, we're giving free marketing to

02:39 17  Facebook. So to answer your question, a lot of

02:39 18  these users -- You could see all your friends from

02:39 19  all your sites and say, "Hey. Join Facebook when

02:39 20  you're at Facebook." That was a big part of our

02:39 21  promotions. That was the largest part of our

02:39 22  promotions. And then, of course, if they have

02:39 23  friends that are already using Facebook -- Facebook

02:39 24  and they wanted to invite their friends to come use

02:39 25  Power, that's the smaller part. But the biggest

185

BARKLEY
Court Reporters

02:39  1    one were obviously the friends that the user had

02:39  2    already put in the system.

02:39  3            Q.        The promotion itself had to have

02:39  4    an attribute created for it in the MSQL database.

02:39  5    Correct?

02:39  6            A.        Yes.   That's correct.

02:39  7            Q.        And that attribute would then be

02:40  8    assigned to anybody who clicked on the promotion.

02:40  9    Correct?

02:40  10           A.        What do you mean "the attribute"?

02:40  11           Q.        Well, if someone clicked on the

02:40  12   promotion, their user name would then be assigned

02:40  13   to the attribute associated with the promotion.

02:40  14   Correct?

02:40  15           A.        If they selected to invite a

02:40  16   friend, they could send an invitation to that

02:40  17   friend.

02:40  18           Q.        That's not what I'm talking about.

02:40  19   The minute that -- Let's say I'm Ms. Almeirda who's

02:40  20   being shown on the screen shot.

       21           A.        Okay.

02:40  22           Q.        If Ms. Almeirda clicks on the

02:40  23   launch promotion --

02:40  24           A.        Yes.

02:40  25           Q.           -- she would have received a --

                                186

BARKLEY
Court Reporters

02:42  1   technically it was -- it was much easier just to

02:42  2   manually look and I believe -- We can see how many

02:42  3   friends people invited so -- and then we just

02:42  4   manually took those people out.  I think they were

02:42  5   -- When we provided it, I think there might have

02:42  6   been 30 or 40 people that achieved it, so it was

02:42  7   literally just looked on the list of people who

02:42  8   invited friends to Power who had more than a

02:43  9   hundred.

02:43  10          Q.        All right.  But when say, "looked

02:43  11  on the list" you were looking in a database table.

02:43  12  Correct?

02:43  13          A.        Yeah.  We went to our database.

02:43  14  Importing friends is a -- is a feature.  It's a --

02:43  15  It's a -- As I mentioned many times, it's one of

02:43  16  our features on our site.

02:43  17          Q.        And in order to see how the

02:43  18  promotion was set up in terms of identification of

02:43  19  those who were participating in it, I'd need to see

02:43  20  the database.  Correct?

02:43  21          A.        To see the -- Every single user on

02:43  22  our site has the option to invite friends.  Who

02:43  23  achieved a hundred, I can tell you.  I don't know

02:43  24  the number but it was 30 something people that

02:43  25  received -- that reached a hundred friends, so I

189

BARKLEY
Court Reporters

02:44  1    looked in the database.  Correct?

02:44  2              A.         We looked in our database,

02:44  3    correct.  And we provided the numbers, I believe,

02:44  4    on that promotion to you guys.

02:45  5              Q.         When somebody clicked on the

02:45  6    launch promotion and they were given, like you to

02:45  7    invite your friend" --

02:45  8              A.         That's correct.

02:45  9              Q.         -- and they hit yes, at that

02:45  10   point the importer, as we've been calling it, would

02:45  11   automatically contact all friends on Facebook to

02:45  12   invite them to --

02:45  13             A.         Let's be clear.  We don't have

02:45  14   access to any friends' e-mail addresses, so there

02:45  15   was not a single E mail sent by Face -- by Power

02:45  16   for -- We have e-mail addresses for friends on

02:45  17   other sites, but on -- so we -- If they wanted to

02:45  18   invite, as I said 99 -- well over 90 percent of our

02:45  19   users were Orkut users and Orkut friends and had

02:45  20   friends from other sites where they -- on sites

02:45  21   that allowed their E mails, but Facebook didn't --

02:45  22   didn't allow E mails, otherwise, we would have been

02:45  23   happy to send an invitation to those friends to

02:45  24   invite them; so that was not available for us for

02:46  25   Facebook.

191

02:46  1          Q.          At this point, I haven't even

02:46  2    talked about E mail.  All I meant is at the point

02:46  3    at which someone said yes they'd like to invite

02:46  4    their friends, the database would then recognize,

02:46  5    using its importer function and the idea of the

02:46  6    registered user Power, who the friends were.

02:46  7    Correct?

02:46  8          A.          It would show you a list of all

02:46  9    your friends, yes, from your friends list.

02:46  10         Q.          And the invitation to join was

02:46  11   then automatically forwarded to those friends

02:46  12   whether through E mail if you're on Orkut or some

02:46  13   other way on Facebook.  Correct?

02:46  14         A.          A user had to say, "I want to

02:46  15   invite this friend," so it's -- An authorized user

02:46  16   said, "Yes, these are my friends, and these are the

02:46  17   friends I want to invite to this site."  That is

02:46  18   correct.

02:46  19         Q.          All right.  And at that point, an

02:46  20   automated script would contact whatever friends

02:46  21   were identified.  Correct?

02:46  22         A.          Depends on -- So if the friend was

02:46  23   a non-- Facebook did not provide E mails.  If the

02:47  24   friend was, like, on another site and they had the

02:47  25   E mail, they could -- they could send on E mail

<div align="center">192</div>

02:51  1   copy their friends and say, "Sign up with this

02:51  2   link."  They were unlimited ways that people can

02:51  3   communicate with their friends.

02:51  4          Q.        All right.  But the link was

02:51  5   provided in the communication by Power.  Correct?

02:51  6          A.        The link was given -- Power

02:51  7   provided a link to our users to encourage them to

02:51  8   invite their friends.

02:51  9          Q.        And did Power also prepare the

02:51  10  script that was included with that invitation?

02:51  11         A.        I think, yeah, we provided them --

02:51  12  we provided them a script, yeah.  As every single

02:51  13  -- As Facebook does and everybody else does.

02:51  14         Q.        Now, in the case of Facebook, you

02:51  15  say that Facebook didn't permit you to contact

02:51  16  through E mails?

02:51  17         A.        What do you mean "Facebook doesn't

02:51  18  permit"?  Facebook did -- It has nothing to do with

02:51  19  permitting it.  We wanted -- If we wanted to -- We

02:51  20  just didn't have access to the E mails because

02:52  21  Facebook -- If we wanted to, we could have -- We

02:52  22  didn't get to that, but we would be happy to build

02:52  23  a feature that imported your E mail contacts, but

02:52  24  we didn't -- we didn't do that.  We never got to

02:52  25  that point.

197

BARKLEY
Court Reporters
SER265

02:53  1   that you could determine how many Facebook

02:53  2   registered users were contacted as part of this

02:53  3   promotion?

02:53  4          A.      Facebook registered users?

02:53  5   Meaning if they were contacted -- In what manner?

02:53  6   If they happened -- If they were contacted at Orkut

02:53  7   and they happened to have an account on Facebook

02:53  8   but were not contacted through -- through the help

02:53  9   of Facebook?

02:53  10         Q.      No.  I'm talking about were there

02:53  11  individuals at Facebook contacted on the Facebook

02:53  12  -- through the Facebook system --

02:53  13         A.      Yes.

02:53  14         Q.       -- as a result of this promotion?

02:53  15         A.      Yes.  Of course.

02:53  16         Q.      Is there a way to determine how

02:53  17  many were contacted?

02:54  18         A.      Well, we could do -- If you take a

02:54  19  few minutes, we can probably figure out -- It's

02:54  20  obviously very small, but -- Because the Facebook

02:54  21  users were so small, but let's think about -- So

02:54  22  people created events on Facebook, so promoting it,

02:54  23  because our users were -- You know, some of them

02:54  24  created events saying, "Come on Facebook," about

02:54  25  come and joining, they created messages.  They

199

BARKLEY
Court Reporters

SER266

| | | |
|---|---|---|
| 02:57 | 1 | at that time, but I know it's usually standard, you |
| 02:58 | 2 | know, more common to have a default to invite all |
| 02:58 | 3 | your friends.  I think Facebook does that, in fact. |
| 02:58 | 4 | Q.        Setting aside what the default |
| 02:58 | 5 | was, as part of the invitation, would list the |
| 02:58 | 6 | friends that could be contacted? |
| 02:58 | 7 | A.        That's correct. |
| 02:58 | 8 | Q.        And that would list the friends |
| 02:58 | 9 | who were available as friends on Facebook. |
| 02:58 | 10 | Correct? |
| 02:58 | 11 | A.        I believe so, yes. |
| 02:58 | 12 | Q.        And for the friends who were |
| 02:58 | 13 | contacted on Facebook, an invitation to join Power |
| 02:58 | 14 | would then be set if the person had that person |
| 02:58 | 15 | selected as, "Yes.  I would like them to be |
| 02:58 | 16 | invited"? |
| 02:58 | 17 | A.        Yeah.  If they could communicate |
| 02:58 | 18 | to invite them, they would be invited. |
| 02:58 | 19 | Q.        And earlier you said that however |
| 02:58 | 20 | the mechanism was, whether it was events or E mails |
| 02:58 | 21 | for other Web sites or whatever -- setting aside |
| 02:58 | 22 | the telephone call, if it was in a text-based |
| 02:58 | 23 | communication -- |
| 02:58 | 24 | A.        Yes. |
| 02:58 | 25 | Q.        -- Power would provide the text |

<div align="center">203</div>

BARKLEY
Court Reporters

SER267

02:58  1   and the URL link to Power as part of that

02:58  2   communication so --

02:58  3          A.        Yes.

02:59  4          Q.            -- so the friends would know

02:59  5   where to go to be invited.  Correct?

02:59  6          A.        We would provide them text that

02:59  7   they could use.  Correct.  Of course.

02:59  8          Q.        And the list of friends was

02:59  9   recovered from the database and the variables that

02:59 10   were associated with friends with that user ID?

02:59 11          A.        Every -- I think -- Every user --

02:59 12   One of our core features is you can access all your

02:59 13   friends and create a friends list.  So, yes, I

02:59 14   mean, you have a friends list and you can select

02:59 15   from your aggregated friends list who you want to

02:59 16   invite.

02:59 17          Q.        Now, earlier you said while most

02:59 18   people contacted their Web site dynamically inside

02:59 19   the browser, the functionality existed to have the

02:59 20   automation available on through the PowerScript

02:59 21   also contact the Web sites.  Correct?

02:59 22          A.        What do you mean?

02:59 23          Q.        In other words, you -- In order to

02:59 24   obtain -- user content, for instance, from Web

02:59 25   sites, you could use the automated script available

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters
SER268

02:59  1   through PowerScript to download --

02:59  2          A.        That's what any importer does.

03:00  3   When you use an importer, you're -- you're

03:00  4   basically authorizing a script to go to another

03:00  5   site and access certain data.  So, like, when

03:00  6   Facebook -- as your Facebook import you authorize a

03:00  7   script written by Facebook to go to another site,

03:00  8   take that data, bring it back, and then Facebook

03:00  9   sends an invitation on behalf of the user.  That's

03:00 10   the same process that we go through.  That is

03:00 11   correct.

03:00 12          Q.        And in the invitation that was

03:00 13   then sent as part of the launch promotion to a

03:00 14   Facebook user, how would the Power site know what

03:00 15   function or what feature on Facebook to populate

03:00 16   the invitation to?  In other words, how would it

03:00 17   know to send it to an event or say an instant

03:00 18   message or whatever medium of communication?

03:00 19          A.        Well, Facebook doesn't have

03:00 20   instant message.  You know, a user can go and -- If

03:00 21   a user wanted to manually click on a friend and

03:01 22   say, "Hey," I don't believe even they had Facebook

03:01 23   chat at that time, so there wasn't even -- I don't

03:01 24   think it was a feature, so we didn't even interact

03:01 25   with that.  They could write a message to their

                        205

BARKLEY
Court Reporters
SER269

03:01  1   friend.  They could create an event or they could

03:01  2   go and, I guess, take that link up and paste it and

03:01  3   write an E mail to their friend.

03:01  4            Q.        Was one of the ways that Power was

03:01  5   able to make the invitation available to Facebook

03:01  6   users is that the PowerScript would set up an event

03:01  7   on Facebook on behalf of the user who had clicked

03:01  8   on --

03:01  9            A.        If the user authorized for the

03:01 10   creation of the event, yes.

03:01 11            Q.        And if the -- How did the -- How

03:01 12   did Power know it was to set up an event as opposed

03:01 13   to any other way of communicating --

03:01 14            A.        Because the user said, "Create an

03:01 15   event for me," so user authorized the creation of

03:01 16   an event.

03:01 17            Q.        Was that made available on the

03:01 18   promotion -- on the pop-up that made -- would come

03:02 19   up --

03:02 20            A.        That was -- As I said, if you

03:02 21   clicked that, that was one of the options that the

03:02 22   user had an option to create an event.

03:02 23            Q.        What other options did the user

03:02 24   have?  We can take a break here.

03:02 25                      THE VIDEOGRAPHER:  It's 3:01.  Off

                                    206

03:02  1    the record, Tape 4.

03:02  2                    (Whereupon, a recess is taken.)

03:14  3                    THE VIDEOGRAPHER:  3:13, on the

03:14  4    record.  Beginning of Tape 5.

03:14  5         Q.         Mr. Vachani, just before the break

03:14  6    you indicated that in the instance of Facebook

03:14  7    being contacted by Power --

03:14  8                    MR. COOPER:  Strike that.

03:14  9         Q.         That in the instance in which a

03:14 10    friend of somebody who had indicated their interest

03:14 11    in participating in the launch promotion, the

03:14 12    friend was on Facebook, that one option that was

03:14 13    available to contact that friend was events.  Do

03:14 14    you recall that before the break saying?

03:15 15         A.         I believe creating a event.

03:15 16         Q.         Do you recall what the other

03:15 17    options were?

03:15 18         A.         I don't offhand, but I think they

03:15 19    provided a link where they could -- So everyone was

03:15 20    given a unique link so they could go do whatever

03:15 21    they want with that link, write E mails to friends,

03:15 22    call on the phone, whatever so that was -- When

03:15 23    they clicked, they were made available a link, and

03:15 24    I think that maybe send in a message so Facebook --

03:15 25    While they can't send an E mail, they can send a

207

03:15  1   message to friends on Facebook, so they could

03:15  2   message their friend.  So if the user said, "I want

03:15  3   to send a message, private message," they could

03:15  4   send a private message to their friend, if I'm not

03:15  5   mistaken.

03:15  6          Q.       Let me -- Any other options?

03:15  7          A.        I don't remember offhand, but

03:15  8   those are the -- I think the primary ones, but

03:15  9   obviously they had -- they had a link that they

03:15 10   could use whatever way they wanted to.  They could

03:15 11   create an event -- create an event, send a message.

03:16 12   Those are the ones I could think of off hand, but I

03:16 13   believe whatever details on this were also provided

03:16 14   in the past in the previous declarations.

03:16 15          Q.       In the case of providing a link,

03:16 16   in what way was the link displayed on Facebook?

03:16 17          A.       When the user is provided a link

03:16 18   on Power, and they can copy and paste and do

03:16 19   whatever they want to -- to go promote that link.

03:16 20          Q.       I see.

03:16 21          A.       So just as any invitation process

03:16 22   on sites.  You give a unique link which has your

03:17 23   unique identifier in it, so if someone signs up

03:17 24   from that link you -- you get credit for it.

03:17 25          Q.       And that link would be the URL to

208

BARKLEY
Court Reporters

03:20  1    that was sent to Facebook --

03:20  2            A.      Usually --

03:20  3                    MR. BURSOR:  Objection.  Vague and

03:20  4    ambiguous.

03:20  5            Q.      Do you know who created the text

03:20  6    that was prepared through the automated script that

03:20  7    was sent by Power to Facebook users?

03:20  8                    MR. BURSOR:  Objection.  Vague and

03:20  9    ambiguous.  Assumes facts not in evidence.  Lacks

03:20  10   foundation.  You can answer.

03:20  11           A.      I'm repeating what he said.

03:20  12   Objecting.  It's vague and ambiguous.

03:21  13                   MR. BURSOR:  I objected.  If you

03:21  14   can understand it, you can answer it.

03:21  15           Q.      Mr. Vachani, as I said at the

03:21  16   beginning, your attorney has the right to interject

03:21  17   actions unless he instructs you not to answer --

03:21  18           A.      Okay.

03:21  19           Q.      Let me -- One of the ways that you

03:21  20   said that Facebook users would be contacted for

03:21  21   this promotion was the Power user could say they

03:21  22   wanted to participate and contact friends to create

03:21  23   an event?

03:21  24           A.      Correct.

03:21  25           Q.      And you said the automatic script

                            212

03:21  1   -- the automated script created by Power would, in

03:21  2   fact, create an event on Facebook?

03:21  3          A.       If the user authorized it and

03:21  4   indicated they wanted to do that.  That's correct.

03:21  5          Q.       As part of the creation of that

03:21  6   event, was text included as part of event set up --

03:21  7          A.       They were shown texts just like

03:21  8   standard practice.  They were shown it and

03:21  9   authorized it.

03:21  10         Q.       And that text included the same

03:22  11  link to the URL to Power?

03:22  12         A.       I would assume it has the link in

03:22  13  it, yes.

03:22  14         Q.       The E mails that you said were

03:22  15  sent to users of, like, Orkut that had e-mail

03:22  16  addresses available on your site --

03:22  17         A.       Correct.

03:22  18         Q.       To the best of your knowledge --

03:22  19  And you said the link itself was one way that you

03:22  20  would be allowed to contact users.  Correct?

03:22  21         A.       Well, you could take the link and

03:22  22  pass the link.  It's -- You provide them a unique

03:22  23  link and they can go to messenger and copy that

03:22  24  link and say, "Hey, go sign up for -- for Power."

03:22  25         Q.       Do you know if that URL had an ID

213

BARKLEY
Court Reporters

04:14  1    create an event as part of $100 promotion use the

04:14  2    language, "Bring 100 friends and 100 bucks"?

04:14  3                MR. BURSOR:  Hold on a second.

04:14  4    Objection.  Vague, ambiguous.  Assumes facts not in

04:14  5    evidence.  Lacks foundation.  If you could clarify

04:14  6    whether you're referring to PowerScript or Facebook

04:14  7    script, that might help clear up some of the --

04:14  8                MR. COOPER:  I asked specific -- I

04:14  9    will say it again.  Was the language, "Bring 100

04:14  10   friends and win 100 bucks," language that was used

04:14  11   in the Power automated script when it set up the

04:14  12   event on Facebook?

04:14  13               MR. BURSOR:  Objection.  Vague,

04:14  14   ambiguous.  Assumes facts not in evidence.  Lacks

04:15  15   foundation.  Listen to the question carefully, and

04:15  16   if you can understand it, you can answer it.

04:15  17         A.        Bring 100 friends and 100 bucks

04:15  18   was our -- our tag line, so -- but I don't --

04:15  19   whether the user entered that in on their own or

04:15  20   whether they -- they put this.  I cannot say from

04:15  21   this -- from looking at this, but that was the

04:15  22   language that we suggested to users to use.  But

04:15  23   many users changed the language, too, and put other

04:15  24   language in those events, so I can't -- This is one

04:15  25   example of a user creating an event.  I cannot say

                              256

BARKLEY
Court Reporters
SER275

04:15  1    what -- you know, how this was specifically created

04:15  2    because they -- they had -- they could have created

04:15  3    this event and the language was -- That was the tag

04:15  4    line we were promoting, but I do not know if this

04:15  5    was specifically -- this specific E mail or if they

04:16  6    copied and pasted it if they did whatever.  But

04:16  7    what I do know is, this was an event where the user

04:16  8    specifically authorized us and said -- either

04:16  9    created this event manual or specifically

04:16  10   authorized us to create this event.

04:16  11                 MR. COOPER:  We've got to go off

04:16  12   the record.

04:16  13                 THE VIDEOGRAPHER:  It's 4:15.  Off

04:16  14   the record.  End of Tape 5.

04:16  15                 (Whereupon, a recess is taken.)

04:23  16                 THE VIDEOGRAPHER:  4:22, on the

04:23  17   record.  Beginning of Tape 6.

04:23  18         Q.      Before the break you indicated

04:23  19   that, "Bring 100 friends and win 100 bucks" was the

04:23  20   tag line but you couldn't say for sure how the --

04:23  21                 MR. COOPER:  Strike that.

04:23  22         Q.      Before the break, you indicated

04:23  23   that "Bring 100 friends and win 100 bucks" was the

04:23  24   tag line employed by Power.  Correct?

04:23  25         A.      That was the tag line of the

                                257

BARKLEY
Court Reporters

04:23  1    campaign and the suggested text and promotion that

04:23  2    we encourage our users to promote in any kind of

04:23  3    promotion they made in the acquisition of and

04:23  4    invitation of friends.

04:23  5          Q.      Where would I find documentation

04:23  6    reflecting precisely what language was suggested

04:23  7    that users use with Facebook events?

04:23  8          A.      That would have been on the -- the

04:23  9    power -- on this page.  On the page after they

04:24 10    clicked on this promotion, so it came up with a

04:24 11    page --

04:24 12          Q.      Talking about Exhibit 103?

04:24 13          A.      I don't know if that page -- Does

14    it exist?

04:24 15          Q.      I'm asking if you're talking about

16    Exhibit 103.

04:24 17          A.      I'm talking about this page.  I

04:24 18    don't know if there's an exhibit.

04:24 19          Q.      You're pointing to Exhibit 103?

04:24 20          A.      Exhibit 103, I'm sorry.  So if

04:24 21    they clicked on that, there was a page that they

04:24 22    went to.

04:24 23          Q.      And --

04:24 24          A.      Gave them those options.

04:24 25          Q.      Where, if at all, does that

258

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



259



260



261

04:28   1    application PowerScript application?

04:28   2             A.        The actual language?

04:28   3             Q.        Yes.

04:28   4             A.        Was -- That was -- That phrase

04:28   5    "Bring 100 friends, 100 bucks" was created by me.

04:28   6             Q.        Do you know if the remainder of

04:28   7    any text that was employed in suggested text in

04:28   8    private messages that were used on Facebook as a

04:29   9    result of automated script were prepared by you?

04:29  10             MR. BURSOR:  Could you read that

04:29  11    back, please?

04:29  12                       (Whereupon, the last question is

04:29  13    read back by the reporter.)

04:29  14             MR. BURSOR:  Objection.  Vague,

04:29  15    ambiguous.  Assumes facts not in evidence.  Lacks

04:29  16    foundation.  You can answer.

04:29  17             A.        Repeat the question one more time.

04:29  18             Q.        You earlier indicated private

04:29  19    messages were one of the ways that the automated

04:29  20    script would permit somebody using this campaign to

04:29  21    contact friends on Facebook.

04:29  22             A.        Okay.  So to be clear --

04:29  23             Q.        Yes or no.

04:29  24             A.        I want to clarify.  Earlier I said

04:29  25    that could be one of the ways that someone could

262

BARKLEY
Court Reporters

04:29  1   send it.  I honestly don't know if we actually ever

04:29  2   used private messages.  It was a long time ago.  To

04:29  3   my recollection, I don't -- I don't remember us

04:29  4   sending private messages, but it was definitely

04:30  5   something we -- we discussed, but I don't know if

04:30  6   we actually ever got to employing that method.

04:30  7   It's been a long time since that happened.  It's

04:30  8   possible that users took suggested text and wrote

04:30  9   messages to friends and if -- I don't remember if

04:30 10   we actually employed that technique, but it's

04:30 11   something we obviously would have been happy to do

04:30 12   because if the user authorized us to do it, I just

04:30 13   don't remember if we actually did it.

04:30 14          Q.       Looking at Exhibit 103, the launch

04:30 15   promotion --

04:30 16          A.       Yup.

04:30 17          Q.         -- who prepared the PowerScript

04:30 18   that is reflected in that launch promotion?

04:30 19          A.       It could have been Carlos or

04:30 20   Danilo.

04:30 21          Q.       What documentation shows how that

04:30 22   launch promotion was implemented on power.com?

04:30 23          A.       It was either -- It was either a

04:30 24   verbal, "Hey, use this text," in a meeting, said,

04:31 25   "Hey, this is the text you should use," and they

263

BARKLEY
Court Reporters

04:31  1    took it or there was an E mail.  I don't know.

04:31  2          Q.        But you see the box, "Launch

04:31  3    Promotion."  Correct?

04:31  4          A.        Yes.

04:31  5          Q.        That is a feature that is made

04:31  6    available to the power.com user through the

04:31  7    power.com Web site.  Right?

04:31  8          A.        Yes.

04:31  9          Q.        None of the aggregated social

04:31  10   networks prepared the contents shown in that

04:31  11   promotional box.  Correct?

04:31  12         A.        Right.

04:31  13         Q.        Where would I find documentation

04:31  14   showing me how that launch promotion was

04:31  15   implemented on power.com?

04:31  16         A.        So it either was in a meeting that

04:31  17   we had where I said, "Hey, this is the text you

04:31  18   want to use for this promotion," and they would

04:31  19   have noted it down, or it would have been an E mail

04:31  20   that was sent saying, "Use this text."  One of

04:31  21   those two.  I don't know which one it was because

04:31  22   we had weekly meetings where we discussed ideas and

04:31  23   this was -- this was an idea that I had come up

04:32  24   with.  So many times I would share my idea.  I

04:32  25   would say, "Eric, use this text.  This is a

                              264

BARKLEY
Court Reporters



266

04:41 1         Q.     And it was sued, in part, because

04:41 2  of Facebook's allegations relating to how this

04:41 3  launch promotion was employed.  Correct?

04:41 4         A.     I don't know what Facebook made

04:41 5  allegations to is right there.

04:41 6         Q.     Earlier you said that Facebook is

04:41 7  responsible for sending the E mail notification

04:41 8  about the invite.

04:41 9         A.     Yeah.  That was sent by Facebook

04:42 10  servers.

04:42 11         Q.     But Facebook's E mail servers

04:42 12  would not send the invite, but for the initiation

04:42 13  of the event.  Correct?

04:42 14         A.     A user has to authorize -- A user

04:42 15  has to create an event for Facebook to do that and

04:42 16  a user has to log in with their user name and

04:42 17  password and do this, so Facebook authorizes its

04:42 18  users to create events as part of their -- That's

04:42 19  the relationship Facebook has with its users.

04:42 20         Q.     You indicated some of the events

04:42 21  are set up through the automated scripted?

04:42 22         A.     No.  What I indicated is that

04:42 23  users -- users created these events.  Whether the

04:42 24  user authorized -- whether they authorized an agent

04:42 25  to go do it for them or they did it, it's the same

<div align="center">273</div>

04:42  1    thing.  It's initiated by the user, that's what we

04:42  2    know.

04:42  3           Q.        The automated script, though, is

04:42  4    operated by power.com?

04:42  5           A.        It's a -- An automated script for

04:42  6    PowerScript, are initiated by users and executed by

04:42  7    power.com in the same way that an exporter is

04:43  8    initiated by user and managed by the site that's

04:43  9    doing it on behalf of the user.  Did you get that?

04:43  10   Yes.

04:43  11                    (Whereupon, Exhibit 107 is marked

04:43  12   for identification by the reporter.)

04:43  13          Q.        Mr. Vachani, Exhibit 107 is

04:43  14   Exhibit A to the first amended complaint that was

04:43  15   106.  Have you seen this document before today?

04:43  16          A.        What is this document I'm looking

04:43  17   at?

04:43  18          Q.        Exhibit A to the first amended

04:43  19   complaint.

04:43  20          A.        Is this the Facebook Terms and

04:43  21   Conditions?

04:43  22          Q.        Yes.

04:44  23          A.        I have -- Vaguely -- I've seen

04:44  24   this before, yes.  I don't know if I've seen this

04:44  25   specific version.  I've read the Facebook Terms and

274

04:45  1    says Page 415?

04:45  2              A.        Yes.

04:45  3              Q.        Can you read the first bullet

04:45  4    point to yourself and tell me when you've finished?

04:45  5              A.        The first bullet point?  Yes.

04:45  6                        Okay.

04:45  7              Q.        As of December 1st, 2008, do you

04:45  8    know one way or another whether anybody at Power

04:45  9    had read that particular provision in the Facebook

04:45 10    Terms of Service?

04:45 11              A.        Yes.

04:45 12              Q.        Had you read it?

04:45 13              A.        Yes.

04:45 14              Q.        All right.  Did you have an

04:46 15    understanding whether power.com enabled users to

04:46 16    registered users to violate the Terms of Service?

04:46 17              A.        I don't understand how a message

04:46 18    that a user wants to send to another friend --

04:46 19    First of all, it's an unsolicited message; and

04:46 20    second, I don't understand what this Terms and

04:46 21    Conditions has anything to do with -- with -- I

04:46 22    don't understand how the relevance to the

04:46 23    questions.

04:46 24              Q.        Did you have an understanding

04:46 25    whether or not power.com to enabled its registered

                               276

04:47 1   and not only Facebook but the entire Internet, that

04:47 2   what we were doing definitely has a pretty strong

04:48 3   grounds to be value.  Obviously, there's no legal

04:48 4   precedent whatsoever anywhere that exists relating

04:48 5   to this issue, so that's why I don't understand

04:48 6   what this discussion is about.

04:48 7          Q.      Mr. Vachani, whether you

04:48 8   understand what it's about, my question is simply

04:48 9   did Power have an understanding whether it was

04:48 10  enabling registered users of Power to violate the

04:48 11  Terms of Service of Facebook?

04:48 12         A.      Let me be clear.  You specifically

04:48 13  asked about unsolicited communications and we did

04:48 14  not send any unsolicited E mails or communications.

04:48 15  Neither did our users.  If our users wanted to send

04:48 16  a message to their friend, they have the right to

04:48 17  send a message or authorize the sending of a

04:48 18  message.  This is a -- This is something that it's

04:48 19  commonplace and used by every site including

04:48 20  Facebook as a core part of their business.  That's

04:48 21  why I don't understand why we're talking about

04:48 22  unsolicited communications.

04:48 23         Q.      Mr. Vachani, again, I asked simply

04:49 24  -- you don't need to even look at the any of the

04:49 25  bullet points.  Did power.com, as of December 1st,

278

BARKLEY
Court Reporters

04:50  1   the question read back and then just answer the

04:50  2   question.

04:50  3          A.        So what's the question?

04:50  4                    (Whereupon, the last question is

04:50  5   read back by the reporter.)

04:50  6                    MR. BURSOR:  Is the question:

04:50  7   Does he see that in the agreement?

       8                    MR. COOPER:  Yeah, that's all I

       9   asked.

      10                    MR. BURSOR:  Yeah, so do you see

04:50 11   that -- do you see that --

04:50 12          A.        I see that in the agreement.

04:50 13                    MR. BURSOR:  Yeah, so then you've

04:50 14   answered the question.

      15          A.        Okay.  Yeah, I see that in your

04:50 16   agreement.

04:50 17          Q.        Have you read that language as of

04:50 18   December 1st, 2008?

04:50 19          A.        Yes.  I had read it many times.

04:50 20          Q.        Had anybody else at power.com read

04:50 21   that language as of December 1st, 2008?

04:50 22          A.        I don't know if they read it.  It

04:51 23   was my job to read it and I think Filipe probably

04:51 24   read it.  Those are the two people that I know.

04:51 25          Q.        As of December 1st, 2008, had you

                              280

BARKLEY
Court Reporters

04:56  1    I think she was one of the lawyers, but I could --
04:56  2    Yeah.
04:56  3           Q.        All right.  All I'm just asking if
04:56  4    you can recall the name of lawyers who handle --
04:56  5    I'm not even asking any specific legal matter --
04:56  6           A.        We did have counsel in the United
04:56  7    States, and at a later point Wilson Sonsini was our
04:56  8    lawyer after we moved from Skadden to Wilson
04:56  9    Sonsini.
04:56 10           Q.        Who at Wilson Sonsini?
04:56 11           A.        I apologize.  It was -- The
04:56 12    interactions were not extensive with those
04:56 13    companies.
04:56 14           Q.        Besides Mr. Herrera, did you ever
04:57 15    have any discussions with anybody at Power about
04:57 16    Facebook's Terms of Service?
04:57 17           A.        It would be with Eric.
04:57 18           Q.        Eric Santos?
04:57 19           A.        Eric and Filipe were the two
      20    primary people that I would consult on these
      21    issues.
      22           Q.        Okay.  So Filipe --
04:57 23           A.        Not on -- Primarily Filipe.
04:57 24           Q.        Mr. Herrera, my understanding --
04:57 25    Was he listed as general counsel by Power?

                              286

05:00  1          A.        No.  From Facebook.  I received an

05:01  2   E mail from Mr. Cutler.

05:01  3          Q.        Did you receive the E mail or the

05:01  4   letter from Facebook first?

05:01  5          A.        The E mail.

05:01  6          Q.        Did the E mail include this

05:01  7   letter?

05:01  8          A.        Yes.  This was sent on December

05:01  9   1st, if I remember correctly.

05:01  10         Q.        All right.  Going back to Exhibit

05:01  11  107, could you turn to Page 9 of 107.  Do you see

05:01  12  the bottom of Page 9 there's a discussion of

05:01  13  Facebook Connect?

05:01  14         A.        Yes.

05:01  15         Q.        As of December 1st, 2008, had

05:01  16  Power ever evaluated whether they could use

05:01  17  Facebook Connect to connect the Power site or

05:01  18  integrate the Power site with Facebook?

05:02  19         A.        Extensively.

05:02  20         Q.        All right.  And do you recall how

05:02  21  long that evaluation lasted?

05:02  22         A.        I don't remember, but we

05:02  23  definitely talked about it, looked at it, and I

05:02  24  made a conclusion that it did not in any way.  It

05:02  25  would not in any way enable the functionality that

290

05:02  1    our users were expecting from us.

05:02  2            Q.        When did these -- How were these

05:02  3    -- First of all, who were you referring to that we

05:02  4    discussed this when you --

05:02  5            A.        Typically, it would be in a weekly

05:02  6    meeting.  It would probably come up on the agenda,

05:02  7    Facebook Connect, and Eric would usually lead this.

05:02  8    He probably would have looked at -- with his team

05:02  9    he would have evaluated and played with Facebook

05:02  10   Connect to see what they could do and what its

05:02  11   capable in evaluating stuff and would have reported

05:02  12   on this at a meeting, at a weekly meeting.

05:02  13           Q.        Who participated in these weekly

05:02  14   meetings?

05:02  15           A.        It would be members of program --

05:02  16   members of the -- Typically, it would be management

05:03  17   but if there was a specific person other than

05:03  18   management that was necessary such as a member of

05:03  19   the team, we would -- they would come in and

05:03  20   consult on an issue.

05:03  21           Q.        Let me be clear.  Did you

05:03  22   participate in these weekly meetings?

05:03  23           A.        In many of them.  Not all of them.

05:03  24           Q.        Who do you recall besides yourself

05:03  25   and Mr. Santos?

291

CERTIFICATION

I, PATRICIA MULLIGAN CARRUTHERS, a
Certified Shorthand Reporter and Notary Public of
the State of New Jersey and a Notary Public of the
State of New York, do hereby certify that prior to
the commencement of the examination the witness was
sworn by me to testify as to the truth, the whole
truth, and nothing but the truth.

I do further certify that the foregoing is
a true and accurate transcript of the testimony as
taken stenographically by and before me at the
time, place, and on the date hereinbefore set
forth.

I do further certify that I am neither of
counsel nor attorney for any party in this action
and that I am not interested in the event nor
outcome of this litigation.

Patricia M Carruthers
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated: JULY 27, 2011

My commission expires October 28, 2015    (N.J.)
My commission expires December 21, 2013   (N.Y.)
                    361

EXHIBIT 100

1  I. NEEL CHATTERJEE (STATE BAR NO. 173985)
   nchatterjee@orrick.com
2  MONTE M.F. COOPER (STATE BAR NO. 196746)
   mcooper@orrick.com
3  THERESA A. SUTTON (STATE BAR NO. 211857)
   tsutton@orrick.com
4  MORVARID METANAT (STATE BAR NO. 268228)
   mmetanat@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
6  Menlo Park, CA 94025
   Telephone:    650-614-7400
7  Facsimile:    650-614-7401

8  Attorneys for Plaintiff
   FACEBOOK, INC.

9

                    UNITED STATES DISTRICT COURT

10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                     SAN FRANCISCO DIVISION
12

13
   FACEBOOK, INC.,                    Case No. 5:08-cv-05780 JW
14
               Plaintiff,             **DECLARATION OF LAWRENCE
15                                     MELLING IN SUPPORT OF
          v.                           FACEBOOK, INC.'S MOTION FOR
16                                     PARTIAL SUMMARY JUDGMENT
   POWER VENTURES, INC. a Cayman Island ON COUNT 1 OF THE CAN-SPAM
17 Corporation; STEVE VACHANI, an      ACT**
   individual; DOE 1, d/b/a POWER.COM,
18 DOES 2-25, inclusive,              Date:      December 19, 2011
                                      Time:      9:00 A.M.
19             Defendants.            Courtroom: 9, 19th Floor
                                      Judge:     Honorable James Ware
20

21              **CONFIDENTIAL - FILED UNDER SEAL**

22

23

24

25

26

27

28

I, Lawrence Melling, declare as follows:

**I.     SUMMARY OF FINDINGS**

1.     I am a research engineer at Zeidman Consulting.  I make this declaration in support of Facebook, Inc.'s Motion for Partial Summary Judgment On Count 1 Of The CAN-SPAM Act.  I have personal knowledge of the matters stated herein, and if called as a witness could and would testify competently thereto.  For my work on this matter, Zeidman Consulting is being compensated at a rate of $200 per hour.

2.     I have been retained to review and analyze the source code and databases produced by Defendants in this action.  I reviewed code and databases produced by Defendants on August 25-26, 29-30, September 6-7, and October 19 and 25, 2011.  Copies of my "Power Source Code Inspection Log" maintained in accordance with the Protective Order entered in this case are attached hereto as **Exhibit B**.

3.     Based upon the source code produced by Power to date, I have concluded the following:  (a) Defendants developed software to extract user information including friends' lists from Facebook.  Defendants designed their software to automatically send Facebook Event Invitations and post Power Invitations on Facebook users' Walls; (b) 39,137 Power users had Facebook accounts. Because of missing information, I was unable to quantify how many transactions took place between Power and Facebook;  (c) The software that Power used to automatically create Event notifications and post Facebook Wall messages was used to create content on Facebook's website that would result in automated "spam" email messages being sent on Defendants' behalf to Facebook users; (d) Defendants' software initiated the sequence of events that resulted in these spam emails being sent to Facebook users; and (e) Defendants had built mechanisms designed to circumvent technical barriers – such as blocks of IP addresses – that Facebook put in place to block Power's access.  Defendants' source code includes routines that create a list of proxy servers.  These proxy servers are continuously monitored to determine if they are blocked by a website like Facebook.

**II.     BACKGROUND**

4.     This introductory section of my Declaration gives information about my

- 1 -

1   qualifications, as well as offers explanations of technical terms that are needed to understand this

2   Declaration.

3        **A.**    <u>**Personal experience and background of Lawrence Melling**</u>

4        5.    I am a research engineer at Zeidman Consulting.  I have over 30 years of executive

5   management and engineering experience in developing new hardware and software technologies

6   and bringing them to market.  I have been engaged in applications engineering and marketing of

7   electronic design automation (EDA) tools at major companies and small startups.  I have also been

8   involved in the development of sophisticated tools for source code and object code analysis for

9   finding intellectual property infringement.  My resume is attached as **Exhibit A** to this Declaration.

10       **B.**    <u>**Website**</u>

11       6.    A "website" is a location on the World Wide Web that contains a group of web

12  pages typically created using a popular programming language called the Hypertext Markup

13  Language (HTML).  Websites are usually connected to each other using "hyperlinks," and are made

14  available to the public by an individual, company, educational institution, government body, or

15  other organization.  These web pages are hosted on one or more computers called "web servers"

16  and are viewed by users on "client computers" that are connected to the web servers via the

17  Internet.  The web pages are viewed using an Internet browser, such as Microsoft's Internet

18  Explorer.  In conjunction with this Declaration, I make extensive reference to two websites located

19  at the Uniform Resource Locators ("URLs") http://www.facebook.com (the "Facebook website")

20  and http://www.power.com (the "Power website").

21       **C.**    <u>**Internet Browser**</u>

22       7.    An "Internet browser" or web browser is a typical client application used to navigate

23  the Internet.  The browser accesses information such as web pages, images, videos, and games from

24  Internet servers.  The URL is the "address" through which online information is located and

25  retrieved by the user from her client computer.  Servers may provide static information to an

26  Internet browser or may dynamically generate the information that is transmitted to an Internet

27  browser based on input from the user and the internal state of the server.  The browser provides the

28  graphical user interface (GUI) to the web pages on the server.  However, some websites make use

DECLARATION OF LAWRENCE MELLING

of client-side software to offload processing from the server to use the client's computer. This is important because the browsers include functionality to execute client-side "web scripts," which concept I discuss below. Three popular Internet browsers in use today are: Microsoft's Internet Explorer, Mozilla's Firefox, and Google's Chrome.

**D.** **Client**

8. A "client" is a computer that makes a service request to a server (defined below); the server fulfills the request. Computer interactions using the client/server model are very common. For example, when an individual checks a bank account from his or her computer, a client program on the individual's computer forwards the request to a server program at the bank. The bank's program may respond, or it may in turn forward the request to its own client program that makes a request to another bank computer. With regard to the World Wide Web, the browser on an individual's computer is a client program. The client program can be used to access and control the data from a server-side database via the individual user's client computer. A client application can also be referred to as the "front-end" and the server application is often called the "back-end."

**E.** **Server**

9. A "server" is a computer on a network (such as an internal corporate network or the Internet) that is dedicated to a particular purpose; it stores information and performs critical functions. For example, a "database server" could store all of an organization's data on a single machine, while providing database services to multiple users anywhere in the office, or even the world, while also allowing access and control over the data. A typical "database server" will allow users to access their data through custom applications designed to meet their specific needs. Server software refers to software running on the server computer that "serves up" information to a client computer. With regard to the World Wide Web, a web server responds to web client requests to view web pages. These pages can be static (content does not change) or dynamic (content is determined when requested).

**F.** **Web Scripts**

10. "Web scripts" are written to generate dynamic web pages; that is, web pages with rapidly changing content and imagery or content that must be calculated for example to display the

- 3 -

DECLARATION OF LAWRENCE MELLING

SER297

total visitor count to a web site. Such scripts are written in a variety of scripting languages such as .

PHP, CGI, Perl, and JavaScript. Some scripts run on the web server (server-side) while other

scripts run on the user's machine (client-side). Of the languages mentioned, JavaScript is the

language of choice for client-side scripting and is supported by all the Internet browsers popularly

in use, while PHP, CGI, and Perl are popular for server-side scripting.

### G.      Web Crawler or Spider

11.      A "web crawler" or "spider" is a computer program used to browse the Internet in a

systematic, comprehensive way. Web crawlers are typically associated with search engines and are

used to collect website information for search engine indexing. Nonetheless, spiders and web

crawlers are now commonly being used to collect or "harvest" web page information for non-search

related applications such as web scraping. Web scraping can be used to locate input fields and

variable fields allow a program to automatically fill out forms to login, send messages, request

information, or any other website activity initiated by filling out a form. Because web scraping

often is employed by entities for unwanted or unlawful purposes (like Power's harvesting of user

information such as "friends' lists," and similar data from Facebook in order to later use that

information to send "spam" email and electronic mail messages), many website operators

(including Facebook) publish Terms of Use provisions that prohibit the use of web scrapers on their

websites by their registered users-.

### H.      Computer Database

12.      A "computer database" consists not only of data, such as user names and addresses,

but also consists of schema and procedures represented by source code. The term "schema" refers

to the structure of the database including where to place the data, how to organize the data, and the

relationships between the data. For example, customer names may be placed in a field called

"Name" and that name may be in a table called "Customers." A table is like a spreadsheet and a

field in that table corresponds to a particular column in the spreadsheet. In a database there are

many different tables. Each customer name may have an associated table with fields that contain

the customer's address, credit card number, account balance, and comments about the customer.

The table names, field names, types of data in the fields, and relationships between different tables

- 4 -

and different fields constitute the schema of the database which is generated using special programming language such as the Structured Query Language, also known as SQL.

13. Procedures for manipulating the data may also be stored in the database. These procedures are also utilized in conjunction with a special programming language such as SQL. These "stored procedures" can be used by programs that access the database to manipulate the data in the database. For example, a stored procedure may exist to compute the average outstanding balance for a list of bank customers. A program that is written to access the database could also access the stored procedure in order to calculate this average.

## I. **Source Code**

14. In computer science, "source code" is a kind of text that is written using the format and syntax of the programming language that it is being written in, and typically is the only format that is readable by humans. Computer programs can be written using complex instructions that look like English. For example, the instruction $a = b*c+2$ tells the computer to take the number stored in memory and represented by variable b, multiply that by the number stored in memory and represented by the variable c, add 2 and store the result in memory represented by the variable a. Similarly, the statement printf("Hello world!") tells the computer to print the words "Hello world!" to the computer screen. These high-level, English-like instructions are the "source code." Computer programs are made up of many lines of source code and the process of writing these lines of code is called programming. Eventually these lines of source code are turned into instructions that a computer understands, consisting of sequences of electronic ones and zeroes. The process of turning human-readable source code into a file containing computer instructions is called "compiling" and is performed by a special computer program called a "compiler." In some cases, source code is run directly by a computer, without creating any file of computer instructions.

## III. **SCOPE OF OPINIONS**

15. Based on my background and experience and inspection to date of the source code produced by Defendants, I have been asked to provide my opinions and conclusions related to (1) whether Defendants' source code contained evidence of attempts to access Facebook, download data from Facebook, contact Facebook, and/or establish invitations to events whereby Facebook

DECLARATION OF LAWRENCE MELLING

1  users would automatically receive email messages procured by Defendants can be ascertained at

2  this time from an initial review of the source code; and (2) whether Defendants developed

3  technology to circumvent blocks by Facebook and others of the IP addresses associated with the

4  Power website.

5  16.  I have reviewed literally hundreds of thousands of lines of code to reach my

6  opinions.  In addition,  in reaching the opinions and conclusions discussed herein, I received,

7  considered, and/or relied upon the following materials, copies of which are not attached but can be

8  provided upon request:

9
- Power Source Code Documents which includes 299,763 lines of code,
10
- Four SQL Server database backup files.
- I used Understand by Scientific Toolworks, Inc. to help analyze the software.
11
- Microsoft SQL Server 2008 Express to extract the databases from the backup files and to review the database contents.
12
- Two PowerScript Source files extracted from the PowerScript_bkp_full.bak database backup file: PN_SEND_PRIVATE_MESSAGE_FACEBOOK and CREATE_EVENT_FACEBOOK
13
- Projetos\Power.PowerNetwork.Core\dal\AccountNetworkDAL.cs
14
- Projetos\src\configuration\ConfigurationPowerProxy.cs
- Java\PowerInfra\powerproxy\com\powerscrap\proxy\manager\UpdateServerListManager.java
15
- Java\PowerInfra\powerproxy\com\powerscrap\proxy\PowerProxy.java
16
- The transcript of the July 20, 2011 deposition of Steve Vachani.
- Facebook's source code for "Create and Event"
17
- Additional source code documents delivered on October 25, 2011.
- Additional databases delivered on October 19, 2011 and October 25, 2011.
18

19  **IV.  ANALYSIS**

20  17.  Power's software, operated by Defendants, was responsible for initiating the

21  sequence of events that resulted in these spam electronic mail messages being sent to Facebook

22  users.  Specifically, I have found that Defendants created software and expected to automatically

23  create Event notifications and post Facebook Wall messages was used to create content on

24  Facebook's website that resulted in automated "spam" electronic mail messages being sent on

25  Power's behalf to Facebook users.

26  18.  For instance, one script in Defendants' code is called

27  CREATE_EVENT_FACEBOOK.  This script created an Event on Facebook that promulgated

28  invitations to Facebook users by Defendants.  That script automatically set Power as the host of the

DECLARATION OF LAWRENCE MELLING

1    event, and identified Power as the "location" for the event in Facebook's Event tool. *See* **Exhibit**

2    **C,** CREATE_EVENT_FACEBOOK.xml, at lines 37 and 41.

3        19.    The script also generated a guest list if one was not provided. To generate the guest

4    list, Defendants' software accesses the user's Facebook "friendsList" and extracts the user ID of

5    each friend to create the guest list. *See id.* at lines 46-51. The PowerScript executes this code, if no

6    guest list is provided, to automatically create a guest list from the user's list of friends on Facebook.

7    Specifically, the PowerScript application checks a "variable" (a named element to store

8    information) called the Guestlist ("listaConvidados"), and then executes a sequence of

9    programming commands inside a "rule block," identified by the beginning tag "<rule>" and

10   terminated by the ending tag "</rule>," if it is empty. Through this process, the PowerScript

11   software creates a new variable called "friendsList," and another variable called "ids," which

12   combine to create the Event guest list made from one Facebook user's list of Facebook "friends."

13       20.    The script also automatically sends Facebook Event invitations to each Facebook

14   user in the guest list on behalf of Power. *See id.* at lines 58-74.

15       21.    I also looked to determine if Defendants, or the user, caused the "events" to be

16   initiated. From the code that has been provided to date, I could not locate any code in

17   CREATE_EVENT_FACEBOOK that requested the user's approval to send the "event" invitations.

18   I also was unable to find any other code requesting that the user accept or approve sending the

19   Facebook Event invitations on behalf of Power.

20       22.    The PowerScript software also created the text used to invite Facebook friends to

21   participate in the "100x100x100" campaign. The message contents were stored in resource files,

22   which are files used by Microsoft Visual Studio development tools to store information for access

23   by a program. Notably, in this example there were three resource files found with the same content

24   in three different languages: English, Spanish, and Portuguese. *See* **Exhibit D**,

25   PowerCallBack.aspx.en.resx, found in

26   SVN\power.com\Power.Com\Pub\Http\App_LocalResources directory, at lines 132-137.

27          132 <data name="CAMPAIGNMESSAGE" xml:space="preserve">

28          133  <value>#BREAK##BREAK#I am competing for the $100 prize in the

          - 7 -        DECLARATION OF LAWRENCE MELLING

100x100x100 promotion and recommend you to participate
too!#BREAK#Learn more at:</value>
134 </data>
135 <data name="CAMPAIGNMESSAGE2" xml:space="preserve">
136 <value>First 100 people who bring 100 new friends to Power.com
earn $100. Come and participate too:</value>
137 </data>

These files would only be here if the authors of the text created and authored it.

23.     These strings include the actual language that was sent to Facebook users as a result of the Power.com website's execution of the "CREATE_EVENT_FACEBOOK" script.  This excerpt shows the text string stored for CAMPAIGNMESSAGE and another for CAMPAIGNMESSAGE2 are both human-readable messages used in promoting the 100x100x100 campaign to Facebook users.

24.     In the same resource file listed above, an additional human-readable messages generated by the PowerScript software also were used to invite Facebook friends to Power.  *See* **Exhibit D** at lines 147-149.  For example, I found the following code:

147 <data name="INVITEMESSAGE" xml:space="preserve">
148 <value>Hi ##friendname##,#BREAK#How would you like all your
friends in just one place?#BREAK#Login to Power.com to
discover all of its advantages and enhance your
Internet experience.</value>
149 </data>

25.     This excerpt shows a message string that includes a placeholder to insert a "friendname."  This message was used in other electronic messages to registered Power users' Facebook friends through the Facebook system.

26.     The alternative function that uses this "INVITEMESSAGE" string is named "SendMessageInviteToPower()."  *See* **Exhibit D** at line 2623.  The code excerpt below shows that the script "INVITEMESSAGE" is used to form the body of the message to be sent as part of the invitation.  *See id.,* found in the SVN\power.com\Power.Com\Pub\Http directory, at line 2681.

- 8 -

DECLARATION OF LAWRENCE MELLING

```
2681 dataMessage.BodyMessage = Translate("INVITEMESSAGE")
     .Replace("##name##", name)
     .Replace("##friendname##", friendName)
```

This line of code retrieves the appropriate language translation for the "INVITEMESSAGE" (English, Spanish, or Portuguese) message, and then replaces the "friendname" placeholder in the text of the message that is sent with the actual friend's name in order to complete the content of the invitation to join Power. Then at *id.*, line 2716, it calls the following function to send the message:

PowerMessageManager.SendMessage(dataMessage);

27.     How the invitation is sent depends upon the network (*e.g.* Facebook) to which the invited friend belongs. The PowerMessageManager.SendMessage() method, which can be used to send invitations to users on Facebook, can be found starting at line 24 in the PowerMessageManager.cs file found in the SVN\power.com\Power.Message.Core directory, which is attached hereto as **Exhibit E**.  The related SendMessage() code is responsible for calling the PowerMessageFactory.CreatePowerMessage(), attached hereto as **Exhibit F**, at line 42, and between the two scripts can ensure that Facebook users receive electronic mail invitations initiated by the Power website.

28.     Further, a CreatePowerMessage() method that appears in the PowerScript code uses the relevant network name (*e.g.* "Facebook") to determine how and where to send the electronic invitation.  For the case where the network is Facebook, the following PowerScript code would be executed when PowerScript created Event invitations.  *See id.*, PowerMessageFactory.cs, found in the SVN\power.com\Power.Message.Core directory, at lines 45-50.  This code shows Power would actually send an electronic message to someone from Facebook inviting them to join the Power website, but would use the Power user's email instead of Power.  The code to send the message uses a PowerScript which posts the message to the Facebook Wall of the friend.  The code to retrieve and execute the PowerScript can be found in Write.cs, found in the SVN\power.com\Power.Message.Core\Engines directory, which is attached hereto as **Exhibit G**, at

DECLARATION OF LAWRENCE MELLING

1    lines 87-94.

2        29.    The code identifies the name of the PowerScript PN_SEND_SCRAP_FACEBOOK

3    as that which was used for  initiating the electronic invitations to join Power.  The code was

4    retrieved from a database where it was added by using the following SQL command.  *See* **Exhibit**

5    **H**, InsertMessageScript.sql, found in SVN\power.com\Power.Message.Core\Database, at line 7.

6    The PN_SEND_SCRAP_FACEBOOK script itself was retrieved from the PowerScript database.

7    *See* **Exhibit I**, PN_SEND_SCRAP_FACEBOOK.pdf, at lines 1-23.

8        30.    The PowerScript automatically posts the message content from the

9    INVITEMESSAGE string to the Wall of a Facebook friend.  Using these automatically generated

10   messages, Power initiated electronic mail invitations for Facebook users to join the Power website.

11       31.    In addition to the code analysis, I also examined the related databases provided in an

12   effort to determine how many Facebook Event or Wall electronic mail messages were initiated by

13   the PowerScript software.  I determined that while certain of the databases were the ones of interest

14   in which I would have expected to locate information about the numbers of electronic invitations

15   that were sent by Power to Facebook, the databases produced by Power that should contain logs of

16   the number of Events and Power invitations sent actually do not contain the information for the

17   time period in question.

18       32.    For instance, the Power database named Async is a log of PowerScript jobs run.

19   The Async log would contain the information related to the number of electronic messages sent by

20   the PowerScript software.  The Async database found on the SQL 7 DVD only logged jobs from

21   2/19/2011 to 4/1/2011, and the Async database in SQL 6 DVD was corrupted.  However, the DVD

22   that was provided that fixed the corrupted version only included logs from 08/03/2007 to

23   11/23/2008 – which does not cover the December 2008 period when the Facebook activity was

24   seen.  Power has not offered a reason for why the data was missing after 11/23/2008.

25       33.    In addition, I reviewed the content of the Power_Logger database in the expectation

26   that it might include the information about how many Facebook Events and Wall messages that the

27   PowerScript software initiated.  I did so because this database appears to include tables to log

28   information about messages sent, including 10 MessageLog tables, a MessageLogHistory table, 10

- 10 -                  Declaration of Lawrence Melling

Scraplog tables, and a ScraplogHistory table.  Nonetheless, all these tables were empty except for the ScrapLoghistory, which only had 141 entries from 12/6/2009 to 11/9/2010, all on the Orkut network.  Again, Power has not offered a reason for why the Facebook Event and Wall message database information does not appear in the databases I reviewed.

34.     Because the information about Events and Wall messages sent to Facebook during December 2008 was not included in the databases I received from Power, I was unable to determine precisely how many wall messages were posted and how many "Power 100" campaign event notifications actually were sent to Facebook users.  Besides the data missing from the time period of interest, I also still don't have the source code repository files so that I could examine the exact revisions of the code used during the December 2008 time frame.  I am aware such files have been requested from Defendants.  I myself made oral requests for them as early as August of 2011.  I have yet to be told where they are, or why they remain missing.

35.     However, I also examined the Power database of the Power users, and I was able to determine that there were at least 39,137 Power users with Facebook accounts in the database.

## I.     **DEFENDANTS' EFFORTS TO CIRCUMVENT IP BLOCKS**

36.     I also uncovered evidence that Defendants implemented technology to circumvent Facebook's efforts to block the Power website.  Specifically, the latest delivery included the source code files that run the CREATE_EVENT_FACEBOOK script.  *See* **Exhibit J**, CreateCampaignEvent.cs from SVN\power.com\Power.Com.Core\Campaign100x100x100 directory, at lines 25-40.  In this code, the PowerScript retrieved and executed the "CREATE_EVENT_FACEBOOK" script from one of Defendants' servers.  Significantly, the IP address of the relevant server that executes the "CREATE_EVENT_FACEBOOK" script is set by the Defendants' proxy server software.  This shows that the PowerScript software is monitored by the Power.com system to ensure that it is not being blocked by Facebook as a result of creating these Events.

37.     Additionally, I investigated certain routines in the Power source code to determine whether Defendants employed tools that allowed Power to circumvent technical barriers – such as

DECLARATION OF LAWRENCE MELLING

blocks of IP addresses – that Facebook or other websites put in place to block Power's access to their own websites.  Certain ones that create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by a website like Facebook. I have been able to identify connection-type methods in the source code that allow Defendants to use a proxy server to change the IP addresses by the Power website that are visible to and are detected by third parties like Facebook.  By tracing the execution of a PowerScript, I found that part of the process was to use ConfigurationPowerProxy to get a proxy server to use for connecting with Facebook, in this example. The code found shows how an array of proxy servers is created from a list provided by the proxy manager and then the server is selected randomly from that list. *See* **Exhibit K**, ConfigurationPowerProxy.cs found in the SVN\powerinfra\trunk\Projetos\src\configuration directory, at lines 20-26.

38.     The Defendants' source code includes routines I have identified that create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by Facebook. The updateServerListThread shows the server list is updated on a regular interval stored in the timeToUpdate property.  *See* **Exhibit L**, UpdateServerListManager.java, at lines 107-118.

39.     While the previous routine is used to update the server list on regular intervals, there are two other methods that are used to update the server list.  The definirServidor method is used to add a server to the list.  The removerServidor method is used to remove a server from the list.  *See* **Exhibit M**, PowerProxy.java, at lines 82-108 and lines112-135, respectively.

40.      Finally the listen method at *id.* lines 144-165 monitors each proxy server and calls the removerServidor routine if it detects a block of the Power website.  The IP address of the Power website can then be replaced with another IP address from the Power Proxy Manager.  In this way, Power can ensure that it can circumvent deliberate blocks of its services by entities such as Facebook.

## V.      DEFENDANTS HAVE DELETED IMPORTANT DATA

41.     Since first getting access to some code on August 23, 2011, I have continually found deficiencies in the scope of code produced by Defendants.  Despite repeated and diligent requests, I

DECLARATION OF LAWRENCE MELLING

1   still have not received all of the Power database information associated with how many invitations

2   were sent by Power. From correspondence from Mr. Fisher, I now believe this highly important

3   information was deleted after this litigation was underway.

4   **VI.**    **CONCLUSION**

5       42.    Based on my analysis to date, Power developed software to extract information from

6   Facebook which it used to automatically send Facebook Event Invitations and post Power

7   Invitations on Facebook users' Walls. The software that Power used to automatically create Event

8   notifications and post Facebook Wall messages could be used, and was used, to create content on

9   Facebook's website that would result in automated "spam" email messages being sent on Power's

10  behalf to Facebook users. It was Power's software that initiated the sequence of events that

11  resulted in these spam emails being sent to Facebook users.

12      43.    It is my understanding that discovery in this case is ongoing. Accordingly, I reserve

13  the right to supplement or amend my opinions in light of any additional evidence, testimony, or

14  information that may be provided to me after the date of this report. I also reserve the right to

15  supplement or amend my opinions in response to any expert reports served by any other party in the

16  lawsuit.

17      I declare under the penalty of perjury under the laws of the United States of America that

18  the foregoing is true and correct. This Declaration is executed on this 14th day of November,

19  2011, at Cupertino, California.

20

21                              Lawrence Melling

22

23

24

25

26

27

28

- 13 -

SER307

1  I. NEEL CHATTERJEE (STATE BAR NO. 173985)
   nchatterjee@orrick.com
2  MONTE M.F. COOPER (STATE BAR NO. 196746)
   mcooper@orrick.com
3  THERESA A. SUTTON (STATE BAR NO. 211857)
   tsutton@orrick.com
4  MORVARID METANAT (STATE BAR NO. 268228)
   mmetanat@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
6  Menlo Park, CA  94025
   Telephone:     650-614-7400
7  Facsimile:     650-614-7401

8  Attorneys for Plaintiff
   FACEBOOK, INC.

9
                      UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11
                        SAN FRANCISCO DIVISION
12

13
   FACEBOOK, INC.,                        Case No.  5:08-cv-05780 JW
14
                    Plaintiff,            **DECLARATION OF JOSEPH
15                                        CUTLER IN SUPPORT OF
            v.                            FACEBOOK, INC.'S MOTION FOR
16                                        PARTIAL SUMMARY JUDGMENT
   POWER VENTURES, INC. a Cayman Island   FOR LIABILITY UNDER THE CAN-
17 Corporation; STEVE VACHANI, an         SPAM ACT**
   individual; DOE 1, d/b/a POWER.COM,
18 DOES 2-25, inclusive,                  Date:      December 19, 2011
                                          Time:      9:00 a.m.
19                  Defendants.           Judge:     Hon. James Ware
                                          Courtroom: 9, 19th Floor
20
                       CONFIDENTIAL – FILED UNDER SEAL
21

22

23

24

25

26

27

28

I, Joseph Cutler, declare as follows:

1.    I make this declaration in support of Facebook, Inc.'s Motion for Partial Summary Judgment For Liability Under the CAN-SPAM Act.  I have personal knowledge of the matters stated herein, and if called as a witness could and would testify competently thereto.

2.    I am an associate at the Seattle, Washington office of the law firm Perkins Coie LLP.  I am a member of the firm's litigation group.  In that role, I have in the past been engaged by the Plaintiff in this case, Facebook, Inc, ("Facebook"), to help it take legal action against illegal spamming, phishing, and other forms of malicious Internet behavior.

3.    Along with Facebook's in house counsel (Sam O'Rourke) and Facebook's internal technical team (such as Ryan McGeehan), I was involved in the original investigation of the activities related to the commercial website located at www.power.com.

4.    On or about December 1, 2008, I investigated the activities related to a website located at the IP address 70.38.96.7.  The commercial website located at that address had the URL http://www.power.com ("Power's website").

5.    When I was first engaged, I visited the Power.com website.  I found that the Power website asked for my usernames and passwords, including my Facebook username and password. I also found that the Power website displayed Facebook user data and Facebook's trademarked logo.

6.    Based upon my investigation, on December 1, 2008, I prepared a Cease and Desist letter.  I sent the letter to the apparent owners of the Power website advising them of their legal violations.  A true and accurate copy of that Cease and Desist letter is attached hereto as **Exhibit A**.

7.    Following my sending the cease and desist letter, I was contacted by Power Ventures' CEO, Steve Vachani.  Mr. Vachani said he was the owner of Power Ventures, that he operated the Power website, and that he had the ability to continue or cease Power's activities.

8.    In December 2008 through early 2009, I had numerous discussions with Mr. Vachani about the functionality of the Power website.  Through our discussions and additional investigation, I learned of numerous other activities by Defendants, and I also asked that those

DECLARATION OF JOSEPH CUTLER
5:08-CV-05780 JW

1  activities stop.  In nearly all of our discussions, I continued to demand that Defendants cease their

2  unlawful activities.  Our discussions occurred via email as well as on the telephone.

3       9.       During our discussions, Mr. Vachani repeatedly assured me that the functionality

4  of the Power website would be changed to comply with Facebook's requests and that the Power

5  website's connection to Facebook would use Facebook's authorized "Facebook Connect" service.

6  Despite his repeated assurances, Mr. Vachani failed to make the changes to the Power website

7  that he had committed to make.  One example is described below.

8       10.      On or about December 12, 2008, Facebook implemented technical measures to

9  limit access from Power's website to Facebook by blocking the IP address that the Power website

10  used to connect to Facebook.  On the same day, I received an email from Mr. Vachani wherein he

11  agreed that the Power website would be modified to connect to Facebook using the authorized

12  "Facebook Connect" technology and that all user data gathered from Facebook to date would be

13  deleted and purged from their systems.  In that email, Mr. Vachani estimated that it would take

14  two weeks to complete the change to Facebook Connect.

15       11.      On December 15, 2008, I sent an email to Mr. Vachani responding to his

16  December 12, 2008 email.  In that message, I reconfirmed that Facebook expected the Power

17  website to delete all user data and to fully comply with the Facebook Connect policies and all

18  other applicable Facebook Terms of Use and guidelines within two weeks, or by December 26,

19  2008.

20       12.      On or about December 26, 2008, instead of finding that the Power website had

21  been changed to comply with Facebook's terms as Mr. Vachani had promised me it would, I

22  learned that the Power website had purposely circumvented Facebook's latest IP blocking

23  measures to continue its unauthorized access to Facebook by moving the services used to access

24  Facebook to a shared IP address owned by Amazon.com.

25       13.      On December 27, 2008, I received an email from Mr. Vachani informing me that

26  he and Power Ventures would not honor his earlier promises to me.  Instead, the email notified

27  Facebook that the Power website would not remove any Facebook content, would not use the

28  authorized Facebook Connect implementation, and would not discontinue its spam campaign

DECLARATION OF JOSEPH CUTLER
5:08-CV-05780 JW

1   aimed at soliciting Facebook users to join the Power Website. A true and correct copy of the

2   email I received from Mr. Vachani informing me of this decision is attached hereto as **Exhibit B**.

3         14.     Left with no recourse, Facebook filed the present suit on December 30, 2008. I

4   prepared a chronology of the events that led to this action, including an accurate characterization

5   of my discussions with Mr. Vachani, which is attached hereto as **Exhibit C**. After Facebook filed

6   suit, it continued its attempts to reach an agreement with the owners of the Power website to stop

7   its violations of the company's Terms of Use. Those efforts are also reflected in the attached

8   chronology.

9         15.     From the late fall of 2008 until early 2009, I estimate that Facebook spent

10   approximately \$75,000 on my firm related to Defendants' actions. In December alone, Facebook

11   incurred approximately \$5,059 for my time associated with Defendants activities. I also know

12   that Mr. O'Rourke and Mr. McGeehan dedicated substantial additional time to address

13   Defendants' actions.

14        I declare under the penalty of perjury under the laws of the United States of America that

15   the foregoing is true and correct. This Declaration is executed on this 14th day of November,

16   2011, at Seattle, Washington.

17

18

19                                   Joseph Cutler

20

21

22

23

24

25

26

27

28

        DECLARATION OF JOSEPH CUTLER
5:08-CV-05780 JW

1  I. NEEL CHATTERJEE (STATE BAR NO. 173985)
   nchatterjee@orrick.com
2  MONTE M.F. COOPER (STATE BAR NO. 196746)
   mcooper@orrick.com
3  THERESA A. SUTTON (STATE BAR NO. 211857)
   tsutton@orrick.com
4  MORVARID METANAT (STATE BAR NO. 268228)
   mmetanat@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
6  Menlo Park, CA  94025
   Telephone:     650-614-7400
7  Facsimile:     650-614-7401

8  Attorneys for Plaintiff
   FACEBOOK, INC.

9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                     SAN FRANCISCO DIVISION
12

13
   FACEBOOK, INC.,                        Case No.  5:08-cv-05780 JW
14
              Plaintiff,                  **DECLARATION OF RYAN
15                                        MCGEEHAN IN SUPPORT OF
       v.                                 FACEBOOK'S MOTION FOR
16                                        PARTIAL SUMMARY JUDGMENT
   POWER VENTURES, INC. a Cayman Island   ON COUNT 1 UNDER THE CAN-
17 Corporation; STEVE VACHANI, an         SPAM ACT**
   individual; DOE 1, d/b/a POWER.COM,
18 DOES 2-25, inclusive,                  Date:      December 19, 2011
                                          Time:      9:00 a.m.
19            Defendants.                 Judge:     Hon. James Ware
                                          Courtroom: 9, 19th Floor
20

21               CONFIDENTIAL – FILED UNDER SEAL

22

23

24

25

26

27

28

I, Ryan McGeehan, declare as follows:

1.      I make this declaration in support of Facebook, Inc.'s Motion for Partial Summary Judgment pursuant to the CAN-SPAM Act, 15 U.S.C. § 7701 et seq. I am the Security Manager at Facebook in Facebook's Security Incident Response team ("SIR"). I have personal knowledge of the matters stated herein, and if called as a witness could and would testify competently thereto.

**A.      Facebook Services and Users**

2.      Facebook owns and operates the popular social networking website located at the universal resource locator ("url") http://www.facebook.com.  In 2008, Facebook had approximately 132 million active users.  This user base has grown significantly during the last few years.  Presently, Facebook has over 800 million monthly active users.

3.      Facebook users are offered a number of different kinds of online messaging tools, such as private messaging, posting of messages on another user's Facebook "wall" or "timeline," status updates, and "Event" invitation messages.  Facebook's "Events" are one of the many messaging tools provided by Facebook.  Facebook "Events" are entries on an electronic calendar that reside on the Facebook website, and to which Facebook assigns a unique Event identification number ("eid") that appears in the url associated with the Event.  A user can create a calendar entry and then send his or her friends invitations through the website to attend the Event.  If the user has notifications enabled, the invitation to the Event also generates an electronic mail message sent to the Facebook user's email address notifying the recipient of the invitation to the Event.

**B.      Business Enterprises Target Facebook And Its User Base**

4.      Facebook takes great measures to protect its user experience.  Facebook's popularity and immense user base attracts many outside business enterprises that seek to interact with Facebook's ever-growing user population.  Some of the business enterprises send messages that are unauthorized by Facebook and interfere with the user experience.  We refer to such messages as "spam."  "Spam" messages often contain false and misleading header information –

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

1    whether in the electronic messages sent through Facebook, such as Event messages, or in the

2    email notifications automatically generated by Facebook triggered by the spam message.  As

3    Facebook has grown, Facebook has also seen a concomitant increase in activity by entities that

4    improperly use Facebook to send spam messages to Facebook users.  These spam messages tax

5    Facebook's system because there is a finite volume of mail that Facebook can handle without

6    further investment in infrastructure.

7        5.    These spam messages detract from the overall Facebook experience and are

8    sometimes a source of complaints by Facebook users.  For instance, in the fourth quarter of 2008,

9    Facebook received 71,256 "tickets" (*i.e.*, complaints by users) that used the word "spam" in them.

10   **C.    Facebook Invests Resources To Protect Its User Experience**

11       6.    Facebook has committed substantial resources to ensure a positive Facebook

12   experience.  Some of the efforts taken by Facebook are described below.

13           a.    **Human Resources.**  In late 2007 or early 2008, Facebook created SIR.

14   SIR is responsible for protecting the user experience from security attacks.  Part of SIR's job is to

15   deal with problems associated with spam attacks on Facebook.  Our responsibilities include

16   identifying the source of spam, analyzing the complexity of spam attacks, and determining the

17   best method to prevent and contain spam attacks.  Based upon this information, we stop spam

18   manually and through implementation of new technologies.

19           b.    **Technical Development.**  Facebook also uses technical measures to

20   prevent spammers from accessing the Facebook website and services.  Facebook develops and

21   employs software designed to block access to links identified as abusive from the IP address or

22   addresses where it determines the spam has originated.  This system is called the "Facebook

23   Immune System" ("FIS").  Thanks to FIS and other systems, Facebook currently has been able to

24   limit the amount of spam reaching the website's users to approximately less than one percent of

25   the site's population.

26           c.    **Terms of Use and Cease and Desist Letters.**  Facebook also relies on its

27   terms of use and cease and desist letters to protect the Facebook user experience.  For example,

28   Facebook publishes and enforces policies prohibiting spam by its users.  A copy of the version of

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

Facebook's Terms of Use in effect on December 1, 2008 is attached hereto as Exhibit 1. At all times during 2008, Facebook's Terms of Use were posted on its website and prohibited the transmission of spam. Facebook also regularly sends out cease and desist letters to those spamming its users, notifying them that their conduct is unauthorized and unlawful. Facebook also asks its users to report "spam or scams" or any suspicious looking activity on Facebook.

d. **Court Intervention**. Where Facebook is unable to stop the spammer via cease and desist letters and other efforts, it often turns to the court system. Facebook has filed numerous lawsuits alleging violations of the CAN-SPAM Act, the Computer Fraud and Abuse Act ("CFAA"), and California Penal Code Section 502 in its effort to enjoin the conduct, deter further activity by others, and prevent damage to its systems, disruption of the users' experience and reduce harm to Facebook's goodwill.

**D.**     **Defendants' Efforts To Access Facebook And Send SPAM To Users**

7.     On or around December 1, 2008, following an initial half-day investigation, SIR determined that the website located at the url http://www.power.com ("the Power website") was running an automated scripting routine to crawl and scrape the Facebook website to harvest and download user data to the Power website. We believed that the purpose of the scripting routine was to "proxy" Facebook – that is, we believed that Power sought to enable users to log into Facebook through an IP address belonging to the Power website. I observed that the Power website also displayed the Facebook logo as part of such proxying. Such conduct violates Facebook's terms of use. As a result of this initial investigation, Facebook began a more detailed investigation of the harvesting and use of Facebook user data by the operators of the Power website.

8.     In the course of investigating the Power website's harvesting of Facebook user data and proxying of the Facebook website, Facebook learned that communications from the Power website initiated a marketing campaign whereby the scripting routine running on the Power website automatically created Facebook Events that resulted in the Power website spamming Facebook users. Normally, when a user creates an Event, they select a name, date, time, location, provide a title and select invitees from their friends. The invitees then receive a

Declaration of Ryan McGeehan
5:08-cv-05780 JW

1   message that they have been invited to the Event and, if they have notifications enabled, they

2   receive an email with the Event details. My understanding is that Power used automated software

3   to complete these steps and invite all of the user's friends to an arbitrary Event requesting they

4   register as users of the Power website. I also understand that this marketing scheme used other

5   forms of Facebook electronic messaging to solicit Facebook users to join the Power website, such

6   as direct Facebook messaging solicitations.

7         9.     I had occasion to review an example of electronic messages Power caused to be

8   sent via its marketing promotion. The electronic messages came from Facebook as they included

9   the term "Facebook" in the "from" lines. Moreover, "@facebookmail.com" addresses were

10   included both with the Event eid and the eventmaster emails sent to users, and the phrase "The

11   Facebook Team" showed up in the signature lines of these messages. These messages would not

12   have been sent except for Power's actions accessing users' accounts, generating all the content

13   contained in the messages, placing them on the Facebook system, and automatically causing them

14   to be sent through their proxying activities.

15   **E.**    **Facebook Tried To Stop Defendants' Spamming Activities**

16         10.     The Power website's activities had the potential to harm Facebook's goodwill, and

17   likewise the activity was violating Facebook's Terms of Use. I immediately consulted

18   Facebook's in-house legal department to notify them of my findings. I then also met with

19   Facebook's "Site Integrity" team to determine the best methods by which to stop the Power

20   website's attack, and to prevent further attacks. The Site Integrity team is responsible for

21   ensuring the integrity of Facebook by employing various measures to end and prevent incursions,

22   spam, scraping, fake account creation, malware distribution, and other harmful activities. I was

23   part of a weekly meeting of engineers that included members of the Site Integrity team, and

24   which regularly discussed throughout the month of December 2008 the Power website's activities

25   aimed at Facebook, including the spamming of Facebook users. Those discussions also included

26   how we could stop the Power website from proxying Facebook and block its unauthorized access

27   to Facebook.

28

Declaration of Ryan McGeehan
5:08-CV-05780 JW

11. I am aware that on or after December 1, 2008, Facebook's outside counsel sent to the individuals associated with operating the Power website a Cease and Desist letter demanding that they cease connecting to Facebook without Facebook's permission and without compliance with Facebook's Terms of Use. In conjunction with that act, I personally was asked to investigate the source of the spam.

**F.     Facebook Suffered Harm**

12. Stopping the activity originating from Power.com was a substantial effort taking a considerable amount of time. My investigation included analyzing the complexity of the attack was, and involved a substantial amount of my time being spent determining how much effort was needed to contain the spamming. Part of that effort required SIR to determine how many IP addresses were being used to send spam, and also if other spam was coming from those IP addresses. Due to the numerous methods used by the Power website to connect to and spam the site in conjunction with its marketing scheme, Facebook is not certain exactly how many electronic messages were generated by the Power website's automated software. However, we determined that at least 60,627 Event invitations appear to have been sent to Facebook users through the Facebook system due to the Power website's spamming activities and adversely affected Facebook. Notably, this number does not include Events created by the Power website that were deleted by affected users. Because the use of Event electronic messages was not the exclusive way that the Power website solicited Facebook users, it is likely significantly more electronic messages were sent, however, and both taxed and adversely affected the Facebook network.

13. Because the Power website did not stop connecting to Facebook even after Facebook's counsel sent its owners and operators the cease and desist letter, on or about December 12, 2008, Facebook decided to block the Power website's access to Facebook by blocking what appeared to be the Power website's primary IP address of 70.38.96.7. Following this block, however, Facebook determined that the Power website was circumventing the block by changing its primary IP address to other IP addresses. Facebook tried to block these IP addresses too in a game of "cat and mouse."

Declaration of Ryan McGeehan
5:08-CV-05780 JW

14. On or about December 22, 2008, my own further investigations revealed that the Power website had again circumvented Facebook's blocks and resumed establishing connections to Facebook through new IP addresses associated with a shared amazon.com server. Due to Amazon's configuration, the new IP addresses that Power utilized were shared with numerous innocent third parties, some of whom could be Facebook users and/or application developers. We could not block these IP addresses without also blocking the innocent third parties. Facebook therefore elected not to block these IP addresses.

15. On or about December 31, 2008, I learned that Power supposedly had removed "compatibility" with Facebook, and ceased to connect to the site via the IP address associated with the amazon.com hosted servers. However, on January 5, 2009, SIR was able to determine that there continued to be hundreds of instances of login activity from IP addresses associated with Power.com. I attach hereto as Exhibits 2 and 3 a copy of my records (FBPOWER0007 & FBPOWER0008-26) ) reflecting that continued login activity.

16. In early 2009 Facebook blacklisted the term "power.com," which prevented the term from appearing anywhere on the Facebook website. That block remains in use.

17. In addition to the many hours of time I spent investigating and discussing with Facebook personnel the problems associated with the Power website's proxying of Facebook, I estimate I spent at least three to four days of my own engineering time addressing other security issues Power presented for Facebook and its users. I attach hereto as Exhibit 4 a true and correct copy of the "ticket" called "Power.com contact importer" (FBPOWER0001-4) that I generated between December 1, 2008 and March 23, 2009 from my activities aimed at stopping the Power website's proxying of Facebook and spamming of Facebook users, including Facebook's attempts to block Power's access to Facebook's website.

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

**G.  Facebook Commenced Litigation**

18.     I am aware that Facebook filed this lawsuit on December 30, 2008, after having made numerous attempts to stop Power from accessing Facebook's website and sending spam messages to its users and to integrate with Facebook in a manner consistent with Facebook's term of use.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this |3 th day of November 2011 at Palo Alto, California.

**Ryan McGeehan**

Pages 1 - 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

| | |
|---|---|
| FACEBOOK, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) NO. C 08-5780 JW (JCS) |
| | ) |
| POWER VENTURES, INC., | ) |
| | )San Francisco, California |
| Defendant. | ) Friday |
| | ) November 4, 2011 |
| _____ | ) 1:30 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**      Orrick, Herrington & Sutcliffe
                         1000 Marsh Road
                         Menlo Park, California  94025
               BY:  **INDRA NEEL CHATTERJEE, ESQ.**
                    **MORVARID METANAT, ESQ.**


**For Defendant:**      Bursor & Fisher, P.A.
                         1900 North California Boulevard
                         Suite 940
                         Walnut Creek, California 94596
               BY:  **LAWRENCE TIMOTHY FISHER, ESQ.**


Also Present:           Steven Vachani


*Reported By:  Debra L. Pas, CSR 11916, CRR, RMR, RPR*
           Official Reporter - US District Court
           Computerized Transcription By Eclipse

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER320

```
 1              P R O C E E D I N G S
 2  NOVEMBER 4, 2011                              1:36 p.m.
 3
 4          THE CLERK:  Calling Case No. C08-5780, FaceBook
 5  versus Power Ventures.
 6          MR. FISHER:  Good afternoon, your Honor.  Timothy
 7  Fisher for the defendants.
 8          THE COURT:  Mr. Fisher, welcome.
 9          MS. METANAT:  Your Honor, Morvarid Metanat and Neel
10  Chatterjee for plaintiff Facebook.
11          THE COURT:  Welcome, welcome.  So you probably caught
12  the gist of where I'm going from our last discussion.  I
13  don't -- having reviewed the papers, I think the search was
14  transparently inadequate, both in the sense of figuring out
15  what the scope ought to be in terms of what computers, email
16  accounts, et cetera are to be searched and the rigor with which
17  they were searched, and -- and the rigor with which they were
18  searched.
19          I also think that it's clear that all the
20  interrogatories that were done, were answered, were inadequate.
21          So what I want to do is order additional production
22  and additional interrogatories as sought, but I want to figure
23  out what that means.  So what I was going to do -- and I know
24  that your client is showing up soon, but I want you to start
25  thinking about it now -- is order you all to go into the jury
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER321

1  room and start working out a protocol.  The protocol must have

2  what's going to be searched, where, by whom and how.  In other

3  words, who is going to do it, under what supervision, with what

4  search terms, et cetera, so that we have a true search for

5  electronics because it's pretty clear to me that this was

6  inadequate both from the way it was done and described by the

7  defendant, by the individual who runs the defendant, and by the

8  fact that so many other things are showing up in other email

9  accounts, et cetera, et cetera.

10          So that's what I propose to do.  I'm happy to hear

11  some discussion of that, if you want, or you can just go in

12  there and work it out.

13          **MR. FISHER:**  Sure, your Honor.  Following the

14  telephonic conference last week, we contacted our client and he

15  began immediately searching for additional documents.  And this

16  week we've produced a substantial amount of additional

17  documents, several hundred.  I think about 700 emails were

18  produced, 50 PowerPoint presentations, internal software

19  manuals and a variety of other things like that.  More than

20  five gigabytes of documents were turned over to Facebook on

21  Tuesday or Wednesday of this week, because we wanted to produce

22  them in advance of the hearing today so they would have some

23  time to review it.

24          We're happy to sit and talk with them about

25  additional things that they would like.  As I indicated to the

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER322

1  clerk, my client is on his way from Brazil to be here so that

2  he can participate in the discussions.

3          THE COURT:  Excellent.  As soon as he comes in, we'll

4  send him in to talk to you.

5          MR. FISHER:  All right.  Wonderful.

6          THE COURT:  You understand why the fact that you have

7  produced five gigabytes of material in the last two weeks might

8  make me less comfortable, not more comfortable.

9          MR. FISHER:  I understand, your Honor.

10         THE COURT:  Right?  So let's talk about protocol as

11  well.

12         Okay?  So don't leave without talking to me.  You're

13  welcome to go into my jury room.  It's very comfortable.  There

14  are probably some jury snacks in there, some stale cookies.  Is

15  it unlocked?

16         THE CLERK:  Yes.

17         THE COURT:  See you later.

18         MS. METANAT:  Your Honor, if I could make one

19  request?  There is another matter coming on for case

20  management.  If somebody could just get me for it when the need

21  arises?

22         THE COURT:  Sure, yes.

23         MS. METANAT:  Thank you, your Honor.

24         (Whereupon there was a recess in the proceedings

25          from 2:40 p.m. until 3:35 p.m.)

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER323

```
 1              (Mr. Steven Vachani present.)

 2              THE CLERK:  We're back on the record.  Recalling case

 3   No. C08-5780, Facebook versus Power Ventures.

 4              Counsel, state your appearances please.

 5              MR. CHATTERJEE:  Neel Chatterjee and Morvarid Metanat

 6   for Facebook.

 7              MR. FISHER:  Good afternoon your Honor.  Timothy

 8   Fisher for defendants.  And my client Mr. Vachani is here in

 9   the courtroom.

10              THE COURT:  Excellent.  So what did you on come up

11   with.

12              MR. CHATTERJEE:  Okay, your Honor.  So I think what

13   I'll do is I'll kind of go through what we've agreed to and

14   then what I'd like -- I'll make a couple requests that are

15   pretty straightforward at the end.

16              THE COURT:  I need to be upstairs with Judge Breyer

17   in seven minutes.

18              MR. CHATTERJEE:  I will finish in seven minutes.

19              So Mr. Vachani has represented to us that there are

20   two places where electronic documents and evidence will be

21   located.  One is an on-line backup drive called the ASA Drive,

22   and then the other is -- he says all of the emails that he

23   receives are forwarded to his Yahoo email account.

24              He has said that he has changed laptops about 10

25   times over the past several years, so his current laptop is
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER324

 1  only about a week old and does not have any documents related

 2  to this dispute.

 3          What Mr. Vachani and Power has agreed to do is give

 4  us access to the ASA Drive and the email account, and he'll

 5  give us the passwords and whatever access information we need

 6  to evaluate it by next Wednesday.

 7          There is also one remaining issue on some code

 8  production that was ordered.  We sent them an email today about

 9  that, and they will give us a response to what the status of

10  the things we believe are missing is by next Wednesday.

11          The one thing that we request is that Mr. Vachani

12  somehow affirm to your Honor that those two places, the Yahoo

13  email account and the ASA Drive, are the only places where

14  documents may be maintained that are related to this lawsuit.

15  Mainly because if we find out that that's untrue, we want to

16  have some vehicle to hold him accountable.

17          **THE COURT:**  Okay.  Is that all right?

18          **MR. FISHER:**  That's fine, your Honor.

19          **THE COURT:**  All right.  Mr. Vachani, why don't you

20  come up here?

21          **MR. VACHANI:**  Sure.

22          **THE CLERK:**  Raise your right hand, please.

23          (Whereupon, Defendant Steven Vachani was

24          placed under oath.)

25          **MR. VACHANI:**  I do.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter -  U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER325

1              **THE COURT:**  All right.  I understand that you've

2      represented to the defendants that the only places --

3              **MR. FISHER:**  Plaintiffs, your Honor.

4              **THE COURT:**  Plaintiffs, sorry.  Thank you.

5              **MR. CHATTERJEE:**  I know.  I'm normally on the other

6      side of the room.

7              **THE COURT:**  I'm confused.

8              I understand that you have represented to counsel for

9      the plaintiffs that the only place where electronic information

10     is stored that might have any conceivable relevance to this

11     dispute with Facebook is on the ASA Drive, which I understand

12     is online?

13             **MR. VACHANI:**  It's an on-line backup of all of our

14     servers.

15             **THE COURT:**  Online backup drive.  Or on your Yahoo

16     email account.

17             **MR. VACHANI:**  It's where all emails that I've sent or

18     received in the last five years for all accounts are all there.

19             **THE COURT:**  So there wouldn't be any -- all existent

20     electronic information that might have any relevance to this

21     dispute that exists in the world, there would -- the

22     only place, if it exists, it can be found on one of those two

23     sources.

24             **MR. VACHANI:**  That pertains to me.  Something that I

25     have sent or received.  They have already gone through the

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER326

1   process with every other relevant person.  So anything that

2   relates to me.

3           MR. CHATTERJEE:  Or Power.

4           MR. VACHANI:  Well, I can't speak for every single

5   employee of Power, 150 employees.

6           MR. CHATTERJEE:  So...

7           So, your Honor, the issue here is the employees are

8   gone.  The representation is that everything that would be

9   within Power Venture's control, custody or control, are those

10  two things.

11          MR. VACHANI:  Yes.  This is what is in Power Ventures

12  control, correct.

13          THE COURT:  Let me do it again.

14          MR. CHATTERJEE:  Thanks.

15          THE COURT:  Is it true that everything, every bit or

16  byte of electronic information that is in any way related to

17  this dispute that is either within your control or within the

18  control, custody and control of Power Ventures, Inc., copies of

19  all that electronic information, to the extent exists anywhere

20  in the world, would be on one of these two sources, the ASA

21  Drive or use who email account, is that correct?

22          MR. VACHANI:  That's correct.

23          THE COURT:  Okay.

24          MR. CHATTERJEE:  Thank you, your Honor.

25          THE COURT:  So I will order -- I'm granting the

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER327

 1  motion.  You'll see it's reflected and I'll order the protocol

 2  that's been suggested; that the defendants are given access to

 3  the ASA Drive and to the Yahoo email account with passwords and

 4  anything you need to get into them by next Wednesday and

 5  respond -- and, also, respond regarding the code issue so that

 6  that can be worked out by next Wednesday as well.

 7          MR. VACHANI:  Can I make one statement?

 8          I believe between now and Wednesday when we provide

 9  anything, I'm going to obviously -- to the best of my

10  knowledge, these are the two places.  I'm going to -- if there

11  are any other changes between now and Wednesday, I'll let you

12  know.

13          THE COURT:  I'll let them know.

14          MR. VACHANI:  I'll let them know so you can document

15  the record, but if there is no other thing, then you can take

16  his statement.

17          MR. CHATTERJEE:  And, your Honor, just to make sure

18  it's clear.  Once we get access, we can also get information,

19  like produce the documents and --

20          THE COURT:  You get access so that you can search

21  them and examine them and take copies.

22          MR. CHATTERJEE:  Thank you, your Honor.

23          MR. FISHER:  Your Honor, just for the record, also,

24  we're not waiving -- Mr. Vachani's email does include a number

25  of privileged communications.  So we're not waiving privilege

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER328

1   or ability to designate under the protective order.

2           **THE COURT:**  Designate appropriately under the

3   protective order to preserve the privilege so there's no issue.

4   Okay.

5           **MR. CHATTERJEE:**  Thank you, your Honor.

6           **MR. FISHER:**  Thank you.

7           **THE COURT:**  Thank you.

8           (Whereupon, further proceedings in the

9            above matter were adjourned.)

10

11                              --oo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter -  U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER329

### <u>CERTIFICATE OF REPORTER</u>

     I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 08-5780 JW (JCS), FACEBOOK, INC. vs POWER VENTURES, et al were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

     The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

               /s/ Debra L. Pas
            Debra L. Pas, CSR 11916, CRR, RMR, RPR

             Monday, November 21, 2011

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER330

1   LAW OFFICES OF SCOTT A. BURSOR
    Scott A. Bursor
2   369 Lexington Avenue, 10th Floor
    New York, NY 10017
3   Telephone: (212) 989-9113
    Facsimile: (212) 989-9163
4
    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
5   Alan R. Plutzik (State Bar No. 077785)
    Michael S. Strimling (State Bar No. 96135)
6   L. Timothy Fisher (State Bar No. 191626)
    2125 Oak Grove Road, Suite 120
7   Walnut Creek, CA 94598
    Telephone: (925) 945-0200
8   Facsimile: (925) 945-8792

9   Attorneys for Defendants Power
    Ventures, Inc. and Steve Vachani
10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14
15   FACEBOOK, INC.,

16                              Plaintiff,      Case No. 5:08-cv-05780

17   -against-

18   POWER VENTURES, INC. d/b/a POWER.COM, a     **AMENDED ANSWER AND**
     California corporation; POWER VENTURES, INC.  **COUNTERCLAIMS OF**
19   a Cayman Island Corporation, STEVE VACHANI,   **DEFENDANTS POWER**
     an individual; DOE 1, d/b/a POWER.COM, an     **VENTURES, INC. AND STEVE**
20   individual and/or business entity of unknown nature;  **VACHANI**
     DOES 2 through 25, inclusive, individuals and/or
21   business entities of unknown nature,

22                              Defendants.
23

24

25

26

27

28

     AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND
     STEVE VACHANI

Defendants Power Ventures, Inc. and Steve Vachani (hereafter collectively referred to as "Defendants" or "Power") hereby answer the First Amended Complaint ("Complaint") filed by Plaintiff Facebook, Inc. ("Facebook").

## I.  INTRODUCTION AND BACKGROUND

Power believes in a borderless Internet where users have the right to own and control their own data.  Indeed, Power recently published an Internet User Bill of Rights detailing three fundamental rights of Internet users that must be protected – rights to ownership, control and privacy.  Power's Internet User Bill of Rights details these three fundamental rights as follows:

> **Ownership**
> The right to complete and total ownership of their content—including profiles, messages, media, contacts and all other data.
>
> **Control**
> The right to access, disseminate, transfer or aggregate their content on any platform, or to authorize third-parties to do so for them.
>
> **Privacy**
> The right to protect their content and personal information from other users and corporate entities alike.

Power's core mission is to protect and to defend these rights and to provide users with the tools they need to exercise them.  Facebook, on the other hand, has attempted to thwart its users' ability to exercise these rights with respect to their own data.

The bulk of the Facebook site is comprised of "User Content."  This "User Content" includes "photos, profiles, messages, notes, text, information, music, video, advertisements, listings, and other content that [users] upload, publish or display" on the Facebook site.  This data is not owned by Facebook.  It is owned by the user.  Although users' ownership of their own data seems self-evident, and it has been one of our core principles since Power was founded, Facebook historically has been criticized for not respecting its users' rights to ownership of their own content – and that is the crux of the dispute.  Facebook is attempting to prevent Power from providing tools to Internet users that allow those users to exercise ownership and control over their own data.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Facebook is also attempting to stifle the development of Power's innovative new technologies that will liberate Internet users from proprietary restrictions that prevent them from controlling access to their own data.

      A.      **Facebook's Allegation That Power.com Has Made "Unauthorized" Use Of Users' Login Passwords Is False And Frivolous**

      One example of Facebook improperly restricting their users' ownership and control of their own data is Facebook's purported "security measure" of prohibiting users from providing their own username and password to third parties, such as Power. This purported "security measure" is discussed at paragraph 3 of Facebook's complaint. But this is not a "security measure" at all. The entry of usernames and passwords to access a website through a third-party site poses no threat to security. On the contrary, it is commonplace in the industry. Indeed, it is a practice that Facebook itself employs on its own site to allow its users to access other websites through Facebook. For example, below is a screen capture from http://www.facebook.com/gettingstarted.php?

On this page, Facebook solicits users to enter their account names and passwords for users' email accounts at Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites. Facebook then uses the account information to allow the user to access those accounts through Facebook, and to import information – *i.e.*, to "scrape" data – from those third-party sites into Facebook. This practice fueled Facebook's growth by allowing Facebook to add millions of new users, and to provide users with convenient tools to encourage their friends and contacts to join Facebook as well.

Facebook seeks to stifle competitors from using the same type of utility. Facebook's purported "security measure" – prohibiting Facebook users from logging into Facebook through third-party sites, such as Power.com – unduly restricts users' ability to access their own data. It thwarts the development of innovative technologies, platforms, and applications that users might wish to use, such as those offered by Power.com.

In this lawsuit Facebook alleges that Power has made "unauthorized" use of Facebook users' login credentials (usernames and passwords). *See* Complaint ¶ 50 ("In order for a visitor to integrate a Facebook account into Power.com's website, Power.com requires that users provide it with their Facebook username and password."). Power permits users to enter their account information to access the Facebook site through Power.com, just as Facebook does with respect to other sites. This is a common industry practice. Is not "unauthorized." It is clearly authorized by the user who enters his own account information. Facebook's complaint does not identify a single instance of "unauthorized" use of a username or password. Nor does Facebook's complaint identify a single instance in which anyone's account security was compromised by Power in any way. As we point out above, users' right to security of their data is one of the three fundamental principles underlying Power's Internet User Bill of Rights. Power has taken every appropriate measure to protect that security.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

3

**B.      Facebook's Allegation That Power.com Has Sent Unsolicited Commercial Messages To Facebook's Users Is False; In Fact, Facebook Itself Sent The "Unsolicited Message" Referenced In The Complaint**

Facebook's complaint alleges that Power sent "unsolicited" email messages to Facebook users which were "deceptive and misleading." *See* Complaint ¶ 65-73.  That allegation is false. Power did not send the email message referenced in the complaint.  Facebook did.

Facebook allows users to create "events," which Facebook then invites friends to attend. The screen captures from www.facebook.com below illustrates the event creation process.





After the user has created the event and selected the friends to be invited, Facebook then sends the invitations by email:



This email is sent by Facebook.  Facebook determines the address that appears in the "From:" field  *See* Complaint ¶ 68 ("From:  Facebook<eventmaster+zOs9a6jc@facebookmail.com>").  Facebook also adds the closing signature from "The Facebook Team."  *See* Complaint ¶ 69 ("The message … is signed by "The Facebook Team," which is both misleading and false.").  Neither the user nor Power has any control over these elements of the email message.  All content in these email messages that Facebook alleges to be misleading and false was written and appended to the message by Facebook itself.

Notably, Facebook's complaint is devoid of any allegation that any user was actually misled by any of these messages.  Facebook's pleading is also devoid of any allegation that any user, or any recipient of such messages, has complained about the contact or about the message being unsolicited.  Facebook's allegations concerning these "unsolicited" emails are trumped-up and frivolous.  As Facebook well knows, Facebook itself was the source of these messages.  And Facebook was the source of every element that Facebook contends is false or misleading.  Every email referenced in Complaint ¶ 65-73 was generated and transmitted by Facebook as a result of a conscious action taken by users.

> ## C.   Facebook's Allegations That Power.com Has Violated Facebook's Intellectual Property Rights Are Frivolous

Power.com believes strongly in intellectual property rights, including the right of users to own and to control their own data.  That is the intellectual property of the user.  Facebook does not own that intellectual property.  The users do.

Facebook's complaint broadly alleges that Power.com has violated Facebook's rights by copying the Facebook website.  But the complaint does not identify either the copyrighted work or the allegedly infringing work.  It refers generically to 'Facebook's website,' but does not identify any portion of the website, any graphics or text, or any computer program that is alleged to have been copied 'and/or' the source for a derivative work.  *See* Complaint ¶ 125.  The complaint also refers generically to "copies and/or derivative works created by Defendants," *id.* ¶ 127, but it does not identify the "copies and/or derivative works" in any intelligible way.  This is probably the most vague allegation of copyright infringement that has ever been filed.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Facebook website is massive.  It includes many different elements – some of which are subject to copyrights owned by Facebook and some of which clearly are not.  The bulk of the Facebook site is comprised of "User Content."  This "User Content" includes "photos, profiles, messages, notes, text, information, music, video, advertisements, listings, and other content that [users] upload, publish or display" on the Facebook site.  *See* Facebook Terms of Use (rev. Sept. 23, 2008), available at http://www.facebook.com/terms.php.  Facebook owns no copyright to such User Content.  Indeed, Facebook's own Terms of Use expressly state that "Facebook does not assert any ownership over your User Content."  *Id.*  The Facebook site also contains "articles, photographs, text, graphics, pictures, designs, music, sound, video, information applications, software and other content or items belonging to or originating from third parties."  *Id.* (section headed "Third Party Websites and Content").  Facebook does not own the copyrights to these third party materials.

Power.com provides users with utilities that allow them to copy their own User Content for purposes of updating it and making it portable to other sites – without copying other elements of the Facebook website.  The Complaint does not allege that Power.com has copied any element of the Facebook site that is subject to a copyright owned by Facebook.

The applicable copyright statute, 17 U.S.C. § 512, requires a notification of copyright infringement to include "[i]dentification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site."  17 U.S.C. § 512(c)(3)(A)(ii).  It also requires "[i]dentification of the material that is claimed to be infringing or the subject of infringing activity."  *Id.* § 512(c)(3)(A)(iii).  Indeed, even Facebook's own DMCA Notice of Copyright Infringement, which it uses to address reports of potential copyright infringement on its own site, *requires* this information.  *See* Facebook DMCA Notice of Copyright Infringement, available at http://www.facebook.com/copyright.php?copyright_notice=1 ("Identify the copyrighted work that you claim has been infringed.  … Identify the content on our site that you claim infringes your copyright.  …  Where does the infringing content appear on our site?  In almost all instances the

best way to help us locate the content you are reporting is to provide us with the URL."). Facebook's complaint does not include even the most basic information that it requires from its own users in order to report copyright infringement.

Unable to identify any actual infringement of a copyright-protected element of its website, Facebook has resorted to arguing that Power "created cached copies of the [Facebook] website." *See* Facebook's 4/17/09 Opposition to Power's Motion to Dismiss at 9:13-15. What that means is that Facebook alleges that every time the Facebook website is displayed on a computer it is "copied," albeit momentarily, in the computer's cached memory. This allegation of copying is akin to charging the Dell company with copyright infringement whenever a user accesses the Facebook website through a Dell computer; or charging the Lexmark company with copyright infringement every time a user prints a page from the Facebook website on a Lexmark printer. Furthermore, even if Facebook could premise a copyright claim on the ephemeral and momentary copying of a website in a computer's cached memory, such temporary and intermediate copying in order to extract non-copyrighted elements – such as the User Content at issue here – falls squarely within the fair use doctrine.

## II.  GENERAL DENIAL

Pursuant to Fed. R. Civ. P. 8(b)(3), Defendants generally deny all allegations in the complaint except those specifically admitted herein.

## III.  SPECIFIC DENIALS

1.      Defendants deny the allegations in paragraph 1.

2.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in ¶ 2, except that Defendants admit that Facebook operates a social networking site.

3.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in ¶ 3, except that Defendants deny that Facebook's attempt to prohibit users from sharing their login information is a "security measure." Facebook solicits login information

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.   8
AND STEVE VACHANI

for third-party sites.  This is a common industry practice.  Facebook's attempt to prohibit others from doing the same is an illegal and anticompetitive practice.

4.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in ¶ 4.

5.    Defendants deny the allegations in ¶ 5, except that Defendants admit that they operate a website, www.power.com, which offers to integrate multiple social networking accounts into a single experience on Power.com.

6.    Defendants deny the allegations in ¶ 6.

7.    Defendants deny the allegations in ¶ 7.

8.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 8.

9.    Defendants deny the allegations in ¶ 9.

10.    Defendants deny the allegations in ¶ 10, except that Defendants admit that Power Ventures, Inc. is a corporation incorporated in the Cayman Islands, doing business in the State of California.

11.    Defendants deny the allegations in ¶ 11, except that Defendants admit that Vachani is CEO of Power.com.

12.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 12.

13.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 13.

14.    No response needed.

15.    The allegations of ¶ 15 state conclusions of law to which no response is required.

16.    The allegations of ¶ 16 state conclusions of law to which no response is required.

17.    The allegations of ¶ 17 state conclusions of law to which no response is required.

18.     Defendants deny the allegations in ¶ 18, except that Defendants admit that Power permits users to enter their account information to access the Facebook site through Power.com, just as Facebook does with respect to other sites.  This is a practice common in the industry.

19.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 19.

20.     Defendants admit the allegations in ¶ 20.

21.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 21, except that Defendants admit that Facebook users register with a unique user name and password.

22.     Defendants admit the allegations in ¶ 22.

23.     Defendants admit the allegations in ¶ 23.

24.     Defendants admit the allegations in ¶ 24.

25.     Defendants admit the allegations in ¶ 25.

26.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 26.

27.     Defendants deny the allegations in ¶ 27.

28.     Defendants deny the allegations in ¶ 28, except that Defendants admit that Facebook permits limited integration with third party websites through Facebook Connect.

29.     Defendants admit the allegations in ¶ 29, except that Defendants deny that the Terms of Use attached as Exhibit A are current.  Defendants also deny that certain of the terms of use are legally enforceable.

30.     Defendants admit that the allegations in ¶ 30, except that Defendants deny that certain of the terms of use are legally enforceable.

31.     The allegations of ¶ 31 state conclusions of law to which no response is required.

32.     Defendants deny the allegations in ¶ 32.

33.     Defendants deny the allegations in ¶ 33.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

10

34.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 34.

35.     Defendants deny the allegations in ¶ 35.

36.     Defendants deny the allegations in ¶ 36.

37.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 37.

38.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 38.

39.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 39.

40.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 40.

41.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 41.

42.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 42.

43.     Defendants admit the allegations in ¶ 43.

44.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 44.

45.     Defendants deny the allegations in ¶ 45, except that Defendants admit that Power permits users to enter their account information to access the Facebook site through Power.com, just as Facebook does with respect to other sites.  This is a practice common in the industry.

46.     Defendants deny the allegations in ¶ 46, except that Defendants admit that Vachani and other Power employees have registered for personal Facebook accounts.

47.     Defendants deny the allegations in ¶ 47.

48.     Defendants deny the allegations in ¶ 48.

49.     Defendants admit the allegations in ¶ 49.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

11

1

2

3       50.     Defendants deny the allegations in ¶ 50, except that Defendants admit that Power

4    permits users to enter their account information to access the Facebook site through Power.com,

5    just as Facebook does with respect to other sites.  This is a practice common in the industry.

6       51.     Defendants deny the allegations in ¶ 51.

7       52.     Defendants deny the allegations in ¶ 52.

8       53.     Defendants admit the allegations in ¶ 53.

9       54.     Defendants deny the allegations in ¶ 54.

10      55.     Defendants deny the allegations in ¶ 55.

11      56.     Defendants deny the allegations in ¶ 56.

12      57.     Defendants deny the allegations in ¶ 57, except that Defendants admit that Facebook

13   has communicated such claims to Mr. Vachani.

14      58.     Defendants deny the allegations in ¶ 58, except that Defendants admit that Vachani

15   offered to attempt to integrate Power.com with Facebook Connect.

16      59.     Defendants deny knowledge sufficient to form a belief as to the truth of the

17   allegations in ¶ 59.

18      60.     Defendants deny the allegations in ¶ 59, except that Defendants admit that Vachani

19   communicated concerns about Power's ability to integrate Power.com with Facebook Connect on

20   the schedule that Facebook was demanding.

21      61.     Defendants deny the allegations in ¶ 61.

22      62.     Defendants deny the allegations in ¶ 62.

23      63.     Defendants deny the allegations in ¶ 63, except that Defendants admit that Facebook

24   implemented technical measures to block users from accessing Facebook through Power.com.

25      64.     Defendants deny the allegations in ¶ 64, except that Defendants admit that Power

26   provided users with tools necessary to access Facebook through Power.com.

27      65.     Defendants admit the allegations in ¶ 65.

28

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.          12
AND STEVE VACHANI

66.     Defendants admit the allegations in ¶ 66, except that Defendants deny that Power.com sent unsolicited commercial emails, and Defendants deny that any of their conduct was "unauthorized."  All of Defendants conduct was fully authorized by the users.

67.     Defendants deny the allegations in ¶ 67.

68.     Defendants admit the allegations in ¶ 68.  In fact, Facebook sent the referenced message, and it was Facebook that designated the message with an "@facebookmail.com" address.

69.     Defendants deny the allegations in ¶ 69, except that Defendants admit that the email message purports to be "signed by 'The Facebook Team.'"  In fact, Facebook appended that signature to the message.

70.     Defendants admit the allegations in ¶ 70, except that Defendants deny that the message was "unsolicited."

71.     Defendants deny the allegations in ¶ 71.

72.     Defendants deny the allegations in ¶ 72, except that Defendants admit that Power.com's offer of potential monetary compensation may have induced some Facebook users to participate in Power's launch program.

73.     Defendants deny the allegations in ¶ 73.

74.     Defendants admit the allegations in ¶ 74.  Facebook has also "developed computer software and other automated devices and programs to access and obtain information" from other websites, as detailed above, for example.  This is a common industry practice.

75.     Defendants deny the allegations in ¶ 75, except that Defendants admit that Power creates temporary cached copies of the Facebook website in order to display it through the Power browser.  This is a standard practice used by all browsers.  For example, the Microsoft company also creates "cached copies" every time a user views the Facebook site through the Internet Explorer browser.  Similarly Google creates and stores "cached copies" of nearly every website on the internet, including Facebook.com.  (Other search engines do the same.)  Power does not store or retain these cached copies.  Facebook has also accessed and copied third party websites

(including but not limited to, creation of cached copies of the website) to develop, test, implement, use and provide" Facebook's services.  This too is a common industry practice.

76.  Defendants deny the allegations in ¶ 76.

77.  Defendants deny the allegations in ¶ 77.

78.  Defendants deny the allegations in ¶ 78.

79.  Defendants deny the allegations in ¶ 79.

80.  Defendants deny the allegations in ¶ 80.

81.  Defendants deny the allegations in ¶ 81.

82.  Defendants deny the allegations in ¶ 82.

83.  Defendants deny the allegations in ¶ 83.

84.  Defendants deny the allegations in ¶ 84.

85.  Defendants deny the allegations in ¶ 85.

86.  Defendants deny the allegations in ¶ 86.

**First Claim For Relief**

**Violation of Controlling The Assault of Non-Solicited
Pornography And Marketing ("CAN-SPAM"), 15 U.S.C. § 7701,
*et seq.***

87.  Paragraph 87 simply refers back to the allegations of prior paragraphs.  No further response is required.

88.  Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 88.

89.  The allegations of ¶ 89 state conclusions of law to which no response is required.

90.  The allegations of ¶ 90 state conclusions of law to which no response is required.

91.  Defendants deny the allegations in ¶ 91.

92.  Defendants deny the allegations in ¶ 92.

93.  Defendants deny the allegations in ¶ 93.

94.  Defendants deny the allegations in ¶ 94.

95.  Defendants deny the allegations in ¶ 95.

96.     Defendants deny the allegations in ¶ 96.

97.     Defendants deny the allegations in ¶ 97.

98.     Defendants deny the allegations in ¶ 98.

99.     Defendants deny the allegations in ¶ 99.

100.    Defendants deny the allegations in ¶ 100.

101.    Defendants deny the allegations in ¶ 101.

102.    Defendants deny the allegations in ¶ 102.

**Second Claim For Relief**

**Violation of The Computer Fraud And Abuse Act, 18 U.S.C.
§ 1030, *et seq.***

103.    Paragraph 103 simply refers back to the allegations of prior paragraphs.  No further response is required.

104.    The allegations of ¶ 104 state conclusions of law to which no response is required.

105.    Defendants deny the allegations in ¶ 105.

106.    Defendants deny the allegations in ¶ 106.

107.    Defendants deny the allegations in ¶ 107.

108.    Defendants deny the allegations in ¶ 108.

109.    Defendants deny the allegations in ¶ 109.

110.    Defendants deny the allegations in ¶ 110.

111.    Defendants deny the allegations in ¶ 111.

**Third Claim For Relief**

**California Comprehensive Computer Data Access And Fraud
Act, California Penal Code § 502**

112.    Paragraph 112 simply refers back to the allegations of prior paragraphs.  No further response is required.

113.    Defendants deny the allegations in ¶ 113.

114.    Defendants deny the allegations in ¶ 114.

115.    Defendants deny the allegations in ¶ 115.

116.    Defendants deny the allegations in ¶ 116.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

15

117.    Defendants deny the allegations in ¶ 117.

118.    Defendants deny the allegations in ¶ 118.

119.    Defendants deny the allegations in ¶ 119.

120.    Defendants deny the allegations in ¶ 120.

121.    Defendants deny the allegations in ¶ 121.

**Fourth Claim For Relief**

**Copyright Infringement (Direct Vicarious And Contributory)**
**17 U.S.C. § 101, *et seq.***

122.    Paragraph 122 simply refers back to the allegations of prior paragraphs.  No further response is required.

123.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 123.

124.    Defendants admit the allegations in ¶ 124.

125.    Defendants deny the allegations in ¶ 125.

126.    Defendants deny the allegations in ¶ 126.

127.    Defendants deny the allegations in ¶ 127.

128.    Defendants deny the allegations in ¶ 128.

129.    Defendants deny the allegations in ¶ 129.

130.    Defendants deny the allegations in ¶ 130.

131.    Defendants deny the allegations in ¶ 131.

132.    Defendants deny the allegations in ¶ 132.

133.    Defendants deny the allegations in ¶ 133.

**Fifth Claim For Relief**

**Violation Of The Digital Millennium Copyright Act ("DMCA"),**
**17 U.S.C. § 1201, *et seq.***

134.    Paragraph 134 simply refers back to the allegations of prior paragraphs.  No further response is required.

135.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 135.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

16

136.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 136.

137.    Defendants deny the allegations in ¶ 137.

138.    Defendants deny the allegations in ¶ 138.

139.    Defendants deny the allegations in ¶ 139.

140.    Defendants deny the allegations in ¶ 140.

141.    Defendants deny the allegations in ¶ 141.

142.    Defendants deny the allegations in ¶ 142.

143.    Defendants deny the allegations in ¶ 143.

144.    Defendants deny the allegations in ¶ 144.

**Sixth Claim For Relief**

**Trademark Infringement, 15 U.S.C. §§ 1114 and 1125(a)**

145.    Paragraph 145 simply refers back to the allegations of prior paragraphs.  No further response is required.

146.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 146.

147.    Defendants deny the allegations in ¶ 147.

148.    Defendants deny the allegations in ¶ 148.

149.    Defendants deny the allegations in ¶ 149.

150.    Defendants deny the allegations in ¶ 150.

151.    Defendants deny the allegations in ¶ 151.

152.    Defendants deny the allegations in ¶ 152.

153.    Defendants deny the allegations in ¶ 153.

**Seventh Claim For Relief**

**Trademark Infringement Under California Law**

154.    Paragraph 154 simply refers back to the allegations of prior paragraphs.  No further response is required.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

17

155.   Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 155.

156.   Defendants deny the allegations in ¶ 156.

**Eighth Claim For Relief**

**Unlawful, Unfair, And Fraudulent Competition Under California
Business & Professions Code § 17,200,** *et seq.*

157.   Paragraph 157 simply refers back to the allegations of prior paragraphs.  No further response is required.

158.   Defendants deny the allegations in ¶ 158.

159.   Defendants deny the allegations in ¶ 159.

## IV.  AFFIRMATIVE DEFENSES

### First Affirmative Defense

**Fair Use, 17 U.S.C. § 107**

161.   Power.com provides users with utilities that allow them to copy their own User Content for purposes of updating it and making it portable to other sites – without copying other elements of the Facebook website.

162.   The only allegation of copying by Facebook is the allegation that third parties – Internet users – utilizing Power's utilities have "created cached copies of the [Facebook] website." *See* Facebook's 4/17/09 Opposition to Power's Motion to Dismiss at 9:13-15.  What that means is that Facebook alleges that every time the Facebook website is displayed on a computer it is "copied," albeit momentarily, in the computer's cached memory.  That allegation of copying is akin to charging the Dell company with copyright infringement whenever a user accesses the Facebook website through a Dell computer; or charging the Lexmark company with copyright infringement every time a user prints a page from the Facebook website on a Lexmark printer. The Microsoft company also creates "cached copies" of the Facebook website every time a user views the Facebook site through the Internet Explorer browser.  Similarly Google creates and stores "cached copies" of nearly every website on the internet, including Facebook.com.  (Other search engines do the same.)

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

18

163.    Even if Facebook could premise a copyright claim on the ephemeral and momentary copying of a website in a computer's cached memory, such temporary and intermediate copying in order to extract non-copyrighted elements – such as the User Content at issue here – falls squarely within the fair use doctrine.

164.    The "copying," if any, constituted fair use under 17 U.S.C. § 107, and thus is not copyright infringement.  *See, e.g., Sega v. Accolade*, 977 F.2d 1510, 1514 (9th Cir. 1992) (holding intermediate copying of copyrighted computer work to gain understanding of unprotected functional elements was fair use); *Sony v. Connectix*, 203 F.3d 596, 608 (9th Cir. 2000) (holding intermediate copying of BIOS that was necessary to access unprotected functional elements constituted fair use).

<u>**Second Affirmative Defense**</u>
**Copyright Misuse**

165.    Copyright misuse is a defense to copyright infringement.  The copyright misuse doctrine "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant."  *Altera Corp. v. Clear Logic, Inc.,* 424 F.3d 1079, 1090 (9th Cir.2005).  "The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly."  *A & M Records v. Napster, Inc.,* 239 F.3d 1004, 1026 (9th Cir.2001).

166.    The Facebook website is massive.  It includes many different elements – some of which are subject to copyrights owned by Facebook and some of which clearly are not.  The bulk of the Facebook site is comprised of "User Content."  This "User Content" includes "photos, profiles, messages, notes, text, information, music, video, advertisements, listings, and other content that [users] upload, publish or display" on the Facebook site.  *See* Facebook Terms of Use (rev. Sept. 23, 2008), available at http://www.facebook.com/terms.php.  Facebook owns no copyright to such User Content.  Indeed, Facebook's own Terms of Use expressly state that "Facebook does not assert any ownership over your User Content."  *Id.*  The Facebook site also contains "articles, photographs, text, graphics, pictures, designs, music, sound, video, information

applications, software and other content or items belonging to or originating from third parties."
*Id.* (section headed "Third Party Websites and Content").  Facebook does not own the copyrights to
these third party materials.

167.     Power.com provides users with utilities that allow them to copy their own User
Content for purposes of updating it and making it portable to other sites – without copying other
elements of the Facebook website.  The Complaint does not allege that Power.com has copied any
element of the Facebook site that is subject to a copyright owned by Facebook.

168.     Facebook has committed copyright misuse by attempting to use its copyright in the
Facebook website control areas outside of their copyright monopoly, such as by restricting users'
ability to access their own User Content, which is not within the limited monopoly granted by
Facebook's copyright to the Facebook website.

### Third Affirmative Defense
### Additional Defenses

166.     Defendants reserve the right to allege additional defenses as they become known
during discovery and to amend this Answer accordingly.

## V.  COUNTERCLAIMS

### First Counterclaim
**Unfair Competition In Violation Of
California Business & Professions Code §§ 17200 *Et Seq.*
(Unfair Business Practices)**

167.     Defendants incorporate by reference all allegations of all prior paragraphs as though
fully set forth herein.

168.     Facebook is subject to the Unfair Competition Law, Sections 17200 *et seq*. of the
California Business & Professions Code (the "UCL").  The UCL provides, in pertinent part:
"Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and
unfair, deceptive, untrue or misleading advertising…"

169.     Facebook violated the unfair business practices prong of the UCL (i) by committing
copyright misuse systematically and on a massive scale as described in ¶¶ 165-168, (ii) by
soliciting internet users to provide their account names and passwords for users' email and social

networking accounts, such as Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites, and running automated scripts on those third-party websites while simultaneously prohibiting users from utilizing the same type of utilities to access their own user data when it is stored on the Facebook site, and (iii) by engaging in a campaign of threats and intimidation against competitors, including by threatening dozens of new entrants since 2006 with baseless intellectual property claims to discourage market entry and to stifle competition from new entrants.

## Second Counterclaim
### Monopolization, 15 U.S.C. § 2

170.   Defendants incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

171.   Facebook possesses market power in the market for social networking websites.

172.   The relevant market for social networking websites includes websites that allow users to create personal profiles, manage contacts, and provide a variety of ways for users to interact with contacts.  The relevant geographic market is the United States.  As of September 2009, the market share of the five largest social networking websites in the United States, ranked by market share of U.S. visits, as reported by Experian Hitwise, was as follows:

| Rank | Name | Domain | Market Share |
|------|------|--------|--------------|
| 1 | Facebook | www.facebook.com | 58.59% |
| 2 | MySpace | www.myspace.com | 30.26% |
| 3 | Tagged | www.tagged.com | 2.38% |
| 4 | Twitter | www.twitter.com | 1.84% |
| 5 | myYearbook | www.myYearbook.com | 1.05% |

See http://www.hitwise.com/us/press-center/press-releases/social-networking-sept-09/.  In addition to holding a dominant share of the U.S. market, "Facebook … is well on its way to establishing dominance in several parts of the world."  *See* Alex Salkever, "Facebook, aiming for global domination, is gaining quickly in Asia," Daily Finance (Nov. 16, 2009), available at

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

21

http://www.dailyfinance.com/2009/11/16/facebook-aiming-for-global-domination-is-gaining-quickly-in-as/print/.

173.    Power.com is a competitor in the market for social networking websites.

174.    Facebook has acquired and maintained market power through two devices:

(1)    Facebook solicited (and continues to solicit) internet users to provide their account names and passwords for users' email and social networking accounts, such as Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites.  Facebook then uses the account information to allow the user to access those accounts through Facebook, and to run automated scripts to import their lists of friends and other contacts – *i.e.*, to "scrape" data – from those third-party sites into Facebook.  This practice fueled Facebook's growth by allowing Facebook to add millions of new users, and to provide users with convenient tools to encourage their friends and contacts to join Facebook as well.  On information and belief it is estimated that at least approximately 35% to 50% of Facebook's "132 million active users" (Facebook Amended Complaint, ¶ 2, Docket Entry No. 9), registered with Facebook as a result of an invitation generated using this device.

(2)    Facebook simultaneously prohibited (and prohibits) users from using the same type of utility to access their own user data when it is stored on the Facebook site.  Thus, Facebook prohibits users from logging into Facebook through third-party sites, such as Power.com, and also restricts users from running automated scripts to retrieve their own user data from the Facebook site.

175.    Device (1) is commonplace in the industry.  Many social networking web sites, and other types of websites, permit users to access their accounts through third-party websites.  For example, as noted above, Google's Gmail, AOL, Yahoo, Hotmail, MySpace, and many other websites allow for such access.  Device (2) is unique to Facebook.  Defendant is aware of no comparable website that at the same time solicits access to user accounts on third-party sites while attempting to prohibit such access to user data stored on its own site.

176.    Facebook has also maintained its monopoly power by systematically threatening new entrants, such as Power.com and others, who seek to attract users through the same device (Device (1) described in ¶ 174, above) that Facebook itself used to fuel its own growth.  On information and belief, for approximately the past 36 months, Facebook has threatened dozens of new entrants since 2006 with baseless intellectual property claims, and has engaged in systematic and widespread copyright misuse as described in ¶¶ 165-168, above, to discourage market entry and to stifle competition from new entrants.

177.    Facebook's efforts in this regard have been highly successful.  Since Facebook embarked on this campaign of intimidation, no new entrant has amassed a market share of more than 2.38%.  The only competitor with more than a 2.38% market share is MySpace, which was an established market leader for years before Facebook rose to dominance.  Through the predatory conduct described herein, Facebook has reduced MySpace's market share by more than half in the past year, and has prevented any other entrant from garnering more than 2.38% of the market.

178.    Facebook's conduct constitutes monopolization of the market for social networking website services in violation of Section 2 of the Sherman Act.

### Third Counterclaim
### Attempted Monopolization, 15 U.S.C. § 2

179.    Defendants incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

180.    The relevant market for social networking websites includes websites that allow users to create personal profiles, manage contacts, and provide a variety of ways for users to interact with contacts.  The relevant geographic market is the United States.  As of September 2009, the market share of the five largest social networking websites in the United States, ranked by market share of U.S. visits, as reported by Experian Hitwise, was as follows:

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

23

| Rank | Name | Domain | Market Share |
|------|------|--------|--------------|
| 1 | Facebook | www.facebook.com | 58.59% |
| 2 | MySpace | www.myspace.com | 30.26% |
| 3 | Tagged | www.tagged.com | 2.38% |
| 4 | Twitter | www.twitter.com | 1.84% |
| 5 | myYearbook | www.myYearbook.com | 1.05% |

See http://www.hitwise.com/us/press-center/press-releases/social-networking-sept-09/. In addition to holding a dominant share of the U.S. market, "Facebook … is well on its way to establishing dominance in several parts of the world." *See* Alex Salkever, "Facebook, aiming for global domination, is gaining quickly in Asia," Nov. 16, 2009 Daily Finance, available at http://www.dailyfinance.com/2009/11/16/facebook-aiming-for-global-domination-is-gaining-quickly-in-as/print/.

181.   Power.com is a competitor in the market for social networking websites.

182.   Facebook has engaged in predatory and anticompetitive conduct, as follows:

(1)   Facebook solicited (and continues to solicit) internet users to provide their account names and passwords for users' email and social networking accounts, such as Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites. Facebook then uses the account information to allow the user to access those accounts through Facebook, and to run automated scripts to import their lists of friends and other contacts – *i.e.*, to "scrape" data – from those third-party sites into Facebook. This practice fueled Facebook's growth by allowing Facebook to add millions of new users, and to provide users with convenient tools to encourage their friends and contacts to join Facebook as well. On information and belief it is estimated that at least approximately 35% to 50% of Facebook's "132 million active users" (Facebook Amended Complaint, ¶ 2, Docket Entry No. 9), registered with Facebook as a result of an invitation generated using this device.

(2)   Facebook simultaneously prohibited (and prohibits) users from using the same type of utility to access their own user data when it is stored on the Facebook site. Thus,

Facebook prohibits users from logging into Facebook through third-party sites, such as Power.com, and also restricts users from running automated scripts to retrieve their own user data from the Facebook site.  Device (1) is commonplace in the industry.  Many social networking web sites, and other types of websites, permit users to access their accounts through third-party websites.  For example, as noted above, Google's Gmail, AOL, Yahoo, Hotmail, MySpace, and many other websites allow for such access.  Device (2) is unique to Facebook.  Defendant is aware of no comparable website that at the same time solicits access to user accounts on third-party sites while attempting to prohibit such access to user data stored on its own site.

(3)     Facebook has threatened dozens of new entrants since 2006 with baseless intellectual property claims, and has engaged in systematic and widespread copyright misuse as described in ¶¶ 165-168, above, to discourage market entry and to stifle competition from new entrants.

183.    Facebook engaged in the conduct described at ¶¶ 183(1)-(3) with a specific intent to monopolize the market for social networking websites.

184.    Facebook has already achieved monopoly power, and/or there is a dangerous probability that Facebook will achieve monopoly power, if the conduct described in ¶ 183 continues unabated.  Within a single year, from September 2008 through September 2009, Facebook increased its market share nearly three-fold, from 19.94% to 58.59%, while no other entrant has been able to garner more than a 2.38% share.

185.    Facebook's conduct constitutes an unlawful attempt to monopolize the market for social networking website services in violation of Section 2 of the Sherman Act.

### VI.  PRAYER FOR RELIEF

WHEREFORE, Defendants Power and Vachani pray for judgment as follows:

1.      That plaintiffs take nothing by the Complaint, and that judgment be entered against Plaintiffs and in favor of Power and Vachani;

2.      That Power and Vachani be awarded costs of suit incurred in defending this action, including reasonable attorneys' fees;

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

25

3. That Facebook be permanently enjoined from the unlawful and anticompetitive practices identified herein;

4. That Power and Vachani be awarded monetary damages for the injuries caused by Facebook's unlawful and anticompetitive practices;

5. That such damages be tripled under 15 U.S.C. § 15(a);

6. That Power and Vachani be awarded reasonable attorneys' fees, expenses and costs associated with prosecuting their claims; and

7. For such further relief as this Court deems necessary, just or proper.

## DEMAND FOR JURY TRIAL

Defendants demand a trial by jury.

Respectfully submitted,

Dated: November 23, 2009

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP


By_____/s/_____
            Alan R. Plutzik

Alan R. Plutzik (State Bar No. 77785)
Michael S. Strimling (State Bar No. 96135)
L. Timothy Fisher (State Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA  94598
Telephone:  (925) 945-0200
Facsimile:  (925) 945-8792


LAW OFFICES OF SCOTT A. BURSOR
Scott A. Bursor
369 Lexington Avenue, 10th Floor
New York, NY  10017-6531
Telephone:  (212) 989-9113
Facsimile:   (212) 989-9163

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

26

SER357

David Chiappetta, State Bar No. 172099
dchiappetta@perkinscoie.com
Kaycie Wall, State Bar No. 226027
kwall@perkinscoie.com
PERKINS COIE LLP
101 Jefferson Drive
Menlo Park, California  94025
Telephone:  650.838.4300 / Facsimile:  650.838.4350

James McCullagh, *pro hac vice application to follow*
jmccullagh@perkinscoie.com
Joseph Cutler, *pro hac vice application to follow*
jcutler@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101
Telephone:  206.359.8000 / Facsimile:  206.359.9000

Attorneys for Plaintiff
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>                Plaintiff,<br><br>    v.<br><br>POWER VENTURES, INC. d/b/a POWER.COM, a California corporation; POWER VENTURES, INC.  a Cayman Island Corporation; STEVEN VACHANI, an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature,<br><br>                Defendants. | Case No. C-08-05780-JF<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1) VIOLATION OF CONTROLLING THE ASSAULT OF NON-SOLICITED PORNOGRAPHY AND MARKETING ACT OF 2003, 15 U.S.C. § 7701,** *et seq.***;**<br><br>**2) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030,** *et seq.***;**<br><br>**3) VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, CALIFORNIA PENAL CODE SECTION 502;**<br><br>**4) COPYRIGHT INFRINGEMENT, 17 U.S.C. § 101,** *et seq.***;**<br><br>**5) VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT, 17 U.S.C. § 1201,** *et seq.***;**<br><br>**6) TRADEMARK INFRINGEMENT, 15 U.S.C. §§ 1114 and 1125(a);**<br><br>**7) TRADEMARK INFRINGEMENT UNDER CALIFORNIA LAW;**<br><br>**8) UNLAWFUL, UNFAIR, AND FRAUDULENT COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200**<br><br>**DEMAND FOR JURY TRIAL** |

1    For its complaint, Facebook, Inc. ("Facebook") alleges as follows:

2                    **I.    INTRODUCTION**

3    1.    This action arises from Defendants' infringement of Facebook's trademarks and

4    copyrights, their unauthorized solicitation, storage and use of Facebook users' login information

5    to gain unauthorized access to Facebook's protected computer network and the unauthorized use

6    of Facebook user accounts to send unsolicited commercial messages to other Facebook users.

7    2.    Facebook developed and operates one of the most popular social networking sites

8    on the Internet that connects people with their friends, family and coworkers. Facebook allows

9    users to join networks and to "friend" other users and thereby creates online communities of users

10   with shared interests and connections. Facebook's widespread popularity, which now includes

11   more than 132 million active users worldwide, is at least partially the result of the sophisticated

12   methods of communication available on Facebook's website.

13   3.    In addition to providing users with great flexibility in ways to communicate with

14   their friends, Facebook is dedicated to protecting the privacy and security of its users. Facebook

15   tightly controls access to its network, and implements a variety of features in order to protect the

16   privacy and security of its users' personal information. One such security measure is the

17   prohibition of soliciting or sharing user login information (i.e. username and password).

18   4.    Facebook operates an "open development" platform called "Facebook Connect"

19   that permits third party software developers to create applications that run on Facebook's website.

20   Facebook grants developers interested in integrating their applications with Facebook a limited

21   license to access Facebook's website. This limited license is conditioned on developers'

22   compliance with specified development protocols and procedures for implementing Facebook

23   Connect and accessing information stored on Facebook computers. The development protocols

24   and procedures, including the requirement that third parties never solicit, collect, or store

25   Facebook usernames or passwords, are intended to ensure the integrity of the Facebook website

26   and interoperability of all Facebook applications.

27   5.    Defendants operate a website accessible at http://power.com, which offers to

28   integrate multiple social networking accounts into a single experience on Defendants' website.

                                                - 2 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

SER359

1  Defendants have knowingly and willfully disregarded Facebook's protocols and procedures for

2  accessing information stored on Facebook computers and are offering a product that solicits,

3  stores, and uses Facebook login information to access information stored on Facebook computers

4  without authorization and to display Facebook copyrighted material without permission.

5  Defendants are also infringing upon Facebook's trademark by displaying and using the Facebook

6  trademark without authorization in a manner that is likely to confuse consumers into wrongly

7  believing that Defendants' services are affiliated with, sponsored by, or endorsed by Facebook.

8  In addition to these injurious activities, Defendants are also inducing Facebook users to provide

9  them with email addresses of their Facebook contacts ("Friends") for the purpose of sending

10 unsolicited commercial messages that purposefully and falsely state that they come from "The

11 Facebook Team."

12       6.    Defendants have ignored Facebook's requests to respect its intellectual property

13 rights, to cease its unauthorized access of Facebook's computer system and to stop interfering

14 with its relationships with its users.  In fact, Defendants essentially admit that their activities

15 violate Facebook's rights, and they have informed Facebook that they made a "business decision"

16 to continue these malicious activities.

17       7.    Facebook, through this lawsuit, seeks to immediately stop Defendants from their

18 continuing injurious actions, from which Facebook has suffered irreparable and incalculable

19 harm, and which will continue unless Defendants are enjoined from further abuse of Facebook's

20 trademarks and copyrighted material and unauthorized access to Facebook's protected computers.

21                   **II.    PARTIES**

22       8.    Plaintiff Facebook is a Delaware corporation with its principal place of business in

23 Palo Alto, California.

24       9.    Defendant Power Ventures, Inc. d/b/a Power.com is a corporation incorporated in

25 California, doing business in the State of California.

26       10.    Defendant Power Ventures, Inc. is a corporation incorporated in the Cayman

27 Islands, doing business in the State of California.  Facebook is informed and believes, and based

28

- 3 -

SER360

1   thereon, alleges that Power Ventures, Inc. directed, conducted, participated in, ratified, endorsed,

2   or was otherwise involved in the acts complained of and has liability for such acts.

3       11.    Defendant Steven Vachani ("Vachani") is an individual who conducts business in

4   the State of California and, on information and belief, is domiciled in this judicial district.

5   Vachani purports to be the CEO of Power.com.  Facebook is informed and believes, and based

6   thereon, alleges that Vachani directed, conducted, participated in, ratified, endorsed, or was

7   otherwise involved in the acts complained of and that he has liability for such acts.

8       12.    Defendant Doe 1 d/b/a Power.com is an individual or entity that operates and/or

9   controls the website located at http://power.com and does business as Power.com.  Doe 1 engaged

10  in and is responsible in whole or in part for the wrongdoing alleged herein.  Facebook is ignorant

11  of the true name of Doe 1, which is a fictitious name.  Facebook will amend this First Amended

12  Complaint if and when the identity of Doe 1 becomes known.

13      13.    Does 2-25 are persons or entities responsible in whole or in part for the

14  wrongdoing alleged herein.  Facebook is informed and believes, and based thereon, alleges that

15  Does 2 -5 individually directed, conducted, participated in, ratified, endorsed, or were otherwise

16  involved in the acts complained of, and that they have liability for such acts.  Facebook is

17  ignorant of the true names of Does 2-25, which are fictitious names.  Facebook will amend this

18  First Amended Complaint if and when the identities of such persons or entities and/or the scope

19  of their actions become known.

20      14.    Defendants Power Ventures, Inc. d/b/a Power.com, Power Ventures, Inc., Vachani

21  and the Doe Defendants are referred to collectively in this First Amended Complaint as

22  "Defendants."

23              **III.    JURISDICTION AND VENUE**

24      15.    This Court has federal question jurisdiction of this action under 28 U.S.C. § 1331

25  because this action alleges violations of federal statutes, including the Computer Fraud and Abuse

26  Act (18 U.S.C. § 1030), the Copyright Act (17 U.S.C. 101), the Digital Millennium Copyright

27  Act (17 U.S.C. 1201); and the Lanham Act (15 U.S.C. 1114 and 1125(a)).  The Court has

28  supplemental jurisdiction over the remaining claims under 29 U.S.C. § 1367.

- 4 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

1    16.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial

2    part of the events giving rise to the claims raised in this lawsuit occurred in this District.

3    17.    Jurisdiction and venue are also proper in this Court under California Penal Code

4    § 520(j), which states: "For purposes of bringing a civil or a criminal action under this section, a

5    person who causes, by any means, the access of a computer, computer system, or computer

6    network in one jurisdiction from another jurisdiction is deemed to have personally accessed the

7    computer, computer system, or computer network in each jurisdiction."

8    18.    During all relevant times, Defendants have repeatedly, knowingly, and

9    intentionally solicited Facebook usernames and passwords from Facebook users, and accessed or

10   permitted access to Facebook servers located in this judicial district without Facebook's

11   authorization.  While accessing Facebook servers, Defendants made systematic and continuous

12   contacts with this judicial district, and has targeted its wrongful acts at Facebook, which is

13   headquartered in this judicial district.

14              **IV.    INTRADISTRICT ASSIGNMENT**

15   19.    Assignment to the San Jose Division of this Court is appropriate under Civil L.R.

16   3-2, in that the claims asserted herein arose in the county of Santa Clara.  Facebook is

17   headquartered in the county of Santa Clara, and it has servers located at several locations in this

18   county.

19              **V.    FACTS AND BACKGROUND**

20   **A.    Facebook Background**

21   20.    Facebook owns and operates the widely popular social networking website located

22   at http://www.facebook.com.  Facebook currently has more than 132 million active users.

23   21.    To access its computer network and social networking website, Facebook requires

24   each user to register with a unique username and password.  Only registered users may access

25   Facebook user profiles or use the Facebook service and/or applications.

26   22.    Registered users customize their user profile by adding content such as personal

27   information, content related to their interests, and photographs, which can then be shared with

28   other Facebook users with whom the user has a Facebook connection.

- 5 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

23.    Facebook user profiles are available for viewing and Facebook users may be contacted only by Facebook or other registered Facebook users.

24.    Users increase the number of Facebook connections by joining networks of users with shared interests, by inviting other Facebook users to be their "friends" or by accepting "friend" invitations from other users.   A Facebook user cannot add a "friend" to his or her profile until the friend consents to being added to the user's friend list.  In this manner, Facebook's website creates a virtual social network of interconnected profiles.

25.    Facebook permits users to control access to different portions of their profile to the user's friends, friends of friends, the user's networks, or a subset of these groups.  The ability to control access to certain parts of a user's profile, including messaging options, minimizes unwanted communications and increases the security of Facebook communications.

26.    Secure communication between Facebook users is vital to the integrity of Facebook's proprietary computer network as well as to the level of confidence that users have in using Facebook.  Facebook does not tolerate or permit the use of its service or site for sending unsolicited commercial messages ("spam").

27.    Facebook grants third parties a limited license to create applications that interact with Facebook's proprietary network, provided that these applications adhere to a standardized set of protocols and procedures and that the third party developers agree to Facebook's Developer Terms of Service, Facebook Terms of Use, and all other applicable Facebook Terms and Policies. Among the reasonable limitations that Facebook places on developers is the prohibition of applications that:

a.    request, collect, solicit or otherwise obtain access to usernames, passwords or other authentication credentials from any Facebook Users, or [] proxy authentication credentials for any Facebook Users for the purposes of automating logins to the Facebook Site;

b.    interfere or attempt to interfere in any manner with the functionality or proper working of the Facebook Site or Facebook Platform, or any portion or feature of either; and

- 6 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

SER363

1        c.     engage in spamming or other advertising or marketing activities that

2  violate any applicable laws, regulations or generally-accepted advertising industry guidelines.

3        28.     Facebook permits integration with third party websites, and even permits exchange

4  of proprietary data with third party websites, provided that the third party website uses

5  Facebook's "Connect" service, which allows users to "connect" their Facebook identity, friends

6  and privacy to any site using a trusted authentication interface.  This interface ensures that

7  Facebook users only provide their login information to Facebook, and that this sensitive

8  information is stored only on Facebook's secure servers – not the servers of the third party

9  websites.  By offering Facebook Connect, Facebook enables users to integrate with other sites

10  without compromising Facebook's commitment to safeguard its users' privacy and security.

11  Facebook does not permit third party access to Facebook user profile data unless such third

12  parties use Facebook Connect.

13  **B.**     **Facebook's Terms of Use**

14        29.     Before Facebook activates a username and permits a user access to certain features

15  of the Facebook website, the user must agree to Facebook's Terms of Use, which set forth the

16  acceptable terms of use of its computer network and prohibit users from conducting certain

17  activities.  These Terms of Use are attached as Exhibit A and can also be found at:

18  http://www.facebook.com/terms.php?ref=pf.

19        30.     Facebook's Terms of Use require Facebook users to abide by certain rules of user

20  conduct, in which among other things, users agree that in their use of Facebook's Service or Site,

21  they will refrain from:

22        a.     soliciting personal information from anyone under 18 or soliciting

23  passwords or personally identifying information for commercial or unlawful purposes;

24        b.     using or attempting to use another's account, service or system without

25  authorization from Facebook, or creating a false identity on Facebook;

26        c.     using automated scripts to collect information from or otherwise interact

27  with the Facebook website;

28

- 7 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

SER364

1            d.     impersonating any person or entity, or falsely stating or otherwise

2 misrepresenting oneself;

3            e.     uploading, posting, transmitting, sharing or otherwise making available any

4 unsolicited or unauthorized advertising, solicitations, promotional materials, junk mail, spam,

5 chain letters, pyramid schemes or any other form of solicitation;

6            f.     harvesting or collecting email addresses or other contact information of

7 other users from Facebook by electronic or other means for purposes of sending unsolicited

8 emails or other unsolicited communications;

9            g.     registering for more than one User account or falsely stating or otherwise

10 misrepresenting oneself; and

11            h.     using Facebook's website for commercial use without the express

12 permission of Facebook.

13     31.     Facebook users who agree to Facebook's Terms of Use enjoy a limited license to

14 access and use Facebook's website and services.  However, "[a]ny use of the Site or the Site

15 Content other than as specifically authorized herein, without the prior written permission of

16 Company, is strictly prohibited and will terminate the license granted herein."  Thus,

17 unauthorized use of Facebook's website terminates a user's license to access the site.

18 **C.     Facebook's Copyrights**

19     32.     Facebook's website is, by design, uniquely distinctive in its creative composition

20 and its comprehensive and user friendly interfaces.  Among the significant unique elements of the

21 Facebook website is the distinctive account registration and login page.

22     33.     Facebook's website embodies its promise to provide an easy to use, highly

23 interactive service that encourages individual expression and allows users to disseminate personal

24 information to a controlled group of friends through varying methods including news feeds, direct

25 messaging, status updates, wall-posts and forums.  The website, including its innovative, yet

26 accessible interfaces is fundamental to Facebook's reputation and garners substantial and valuable

27 goodwill with its users.

28

- 8 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

SER365

1    34.    As an online venture, the intellectual property related to the Facebook website is a

2    vital asset to Facebook.

3    35.    Facebook's website is a work of authorship protected by copyright law.

4    36.    Facebook owns all right, title and interest, including copyrights, in and to its

5    website.  The Facebook website is copyright protected under Registration No. VA-0001409016,

6    dated November 7, 2006, and entitled "Facebook homepage."

7    **D.    Facebook's Trademarks**

8    37.    Facebook also carefully protects its trademarks.

9    38.    Facebook owns all common law rights in the FACEBOOK mark.

10   39.    Facebook is also the owner of U.S. federal registrations: 3041791, 3122052 for the

11   FACEBOOK mark, covering, *inter alia,* "providing an online directory information service

12   featuring information regarding, and in the nature of, collegiate life, general interest, classifieds,

13   virtual community, social networking, photo sharing, and transmission of photographic images,

14   advertising and information distribution services…; providing on-line computer databases and

15   on-line searchable databases in the field of collegiate life, general interest, classifieds, virtual

16   community, social networking, photosharing, videosharing and transmission of photographic

17   images;" "providing online chat rooms and electronic bulletin boards for registered users for

18   transmission of messages concerning collegiate life, general interest, classifieds, virtual

19   community, social networking, photo sharing, and transmission of photographic images;"

20   "computer services, namely, hosting online web facilities for others for organizing and

21   conducting online meetings, gatherings, and interactive discussions;" and "internet based

22   introduction and social networking services."

23   40.    FACEBOOK has been used in commerce by Facebook since 2004.  Facebook's

24   use has been continuous and exclusive.

25   41.    Facebook has attained strong name recognition in the FACEBOOK mark.  The

26   mark has come to be associated with Facebook and identifies Facebook as the source of

27   advertising, information, online directory information, internet based introduction, online chat

28

- 9 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

1  rooms, bulletin boards, hosting online web facilities and social networking services offered in

2  connection with the mark.

3       42.     Facebook has also developed substantial goodwill in the FACEBOOK mark.

4       43.     Facebook's website is currently the leading social networking site based on the

5  number of unique visitors that visit its site each month.  In fact, it is one of the most visited

6  websites in the world, attracting over 132 million unique visitors in a month.

7       44.     The Facebook mark is among Facebook's most important and valuable assets.

8  **E.**     **Defendants' Unauthorized Activities**

9       45.     Power.com's website, located at http://power.com, induces visitors to surrender

10  their Facebook usernames and passwords in order to "integrate" their Facebook account into

11  Power.com's website.

12       46.     On information and belief, Defendants or individuals acting in concert with

13  Defendants, in developing and testing Power.com's website, registered for at least one Facebook

14  account and during all relevant times agreed to abide by Facebook's Terms of Use.

15       47.     At no time have Defendants received permission from Facebook to conduct any

16  commercial activity on Facebook's website.

17       48.     At no time have Defendants received permission from Facebook to use other

18  users' accounts to access Facebook's computer systems.

19       49.     On or before December 1, 2008, Power.com began advertising and offering

20  integration with Facebook's site.

21       50.     In order for a visitor to integrate a Facebook account into Power.com's website,

22  Power.com requires that users provide it with their Facebook username and password.

23       51.     Power.com stores these passwords outside of Facebook's network, and outside the

24  control of Facebook's security staff.

25       52.     Upon information and belief, on or before December 1, 2008, Power.com began to

26  "scrape" proprietary data from Facebook users who had given their login credentials as part of its

27  integration services.  This data was copied from Facebook's site and re-purposed and re-displayed

28  on Power.com's website.

- 10 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

SER367

53.    At no time have Defendants received permission from Facebook to represent that solicitation of Facebook username and passwords was authorized or endorsed by Facebook.

54.    At no time have Defendants received permission from Facebook to use automated scripts to collect information from or otherwise interact with the Facebook's website or to access Facebook's computers for the purpose of scraping user data from Facebook and displaying it on Power.com's website.

55.    Defendants' actions are knowing, intentional, willful, malicious and fraudulent.

56.    Upon information and belief, Defendants do not disclose to their customers that their services are unlawful and violate the Facebook Terms of Use.  Indeed, Defendants knowingly, willfully, intentionally, fraudulently and maliciously induce, encourage and assist Facebook users in abusing the Facebook system and violating Facebook's Terms of Use.

**1.    Facebook Notified Power.com of Its Unauthorized and Unlawful Activity**

57.    Facebook notified Defendant Vachani on December 1, 2008, that Power.com's access of Facebook's website and servers was unauthorized and violated Facebook's rights, including Facebook's trademark, copyrights, and business expectations with its users.

58.    On December 12, 2008, Defendant Vachani responded to Facebook's notice by promising that Power.com would "implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site."  He also promised that Power.com would "delete any Facebook friend information we currently have."  He "estimate[d] that it [would] take 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users."

59.    On December 15, 2008, Facebook communicated its acknowledgement of Defendant Vachani's promise to have Facebook Connect integrated into Power.com's website within two weeks (by December 26), and to purge and delete any Facebook information that Power.com already had.

60.    On December 17, 2008, Defendant Vachani for the first time communicated his concern that Power.com might not be able to integrate Facebook Connect fully by the December 26, 2008 deadline, and asked for an extension of time to integrate Facebook Connect.

- 11 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

61.    On December 22, 2008, Defendant Vachani further responded to Facebook that Power.com intended to comply with the December 26, 2008 deadline to take down all integration services with Facebook.com, remove all Facebook trademarks from Power.com's website, and purge and destroy any ill-gotten data, including user login information, even if it had not fully integrated Facebook Connect as a replacement solution.

62.    However, despite his earlier promises, after close of business on Friday December 26, 2008, Defendant Vachani sent an email to Facebook's counsel expressing for the first time Power.com's "business decision" to continue its website's unauthorized use of Facebook user login credentials and unauthorized access to Facebook's computers until it was able to fully implement Facebook's Connect service.  Defendant Vachani estimated that this would take more than five additional weeks to complete.

63.    Upon learning of Power.com's intent to continue accessing Facebook's computers without authorization, Facebook implemented technical measures to block access to the Facebook Site by Power.com.

64.    Upon information and belief, Defendants deliberately circumvented Facebook's technological security measures in order to continue Power.com's unlawful practice of accessing Facebook's computers systems without authorization and to thereby obtain proprietary information from Facebook.

**2.    Defendants Are Sending Unsolicited Commercial Messages to Facebook Users**

65.    On or before December 26, 2008, Power.com began a "Launch Promotion" that promises Power.com's website's users the chance to win one hundred dollars if they successfully invite and sign up the most new Power.com users.

66.    As part of this promotion, Power.com provides participants with a list of their Facebook friends, obtained without authorization by Power.com from Facebook, and asks the participant to select which of those friends should receive a Power.com invitation.  Power.com then sends unsolicited commercial emails to those friends.

67.    These unsolicited commercial emails are deceptive and misleading.

- 12 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

1    68.    The "from" line of the emailed messages purports to come from "Facebook" and

2  uses an "@facebookmail.com" address, not Power.com.

3    69.    The message, drafted by Power.com, is signed by "The Facebook Team," which is

4  both misleading and false.

5    70.    An example of one of these unsolicited messages is included here:

6  **From: Facebook <eventmaster+z0s9a6jc@facebookmail.com>**

7    **To:** [Redacted]

8  **Subject:** Nik [Redacted] invited you to the event "Bring 100 friends and win 100 bucks!"...
   **Date:** Tue, Dec 30, 2008 at 11:44 AM

9
   ```
10 Nik invited you to "Bring 100 friends and win 100 bucks!" on Friday, March 20
   at 1:00am.
11
   Nik says, "Bring 100 friends and win 100 bucks!".
12
   Event: Bring 100 friends and win 100 bucks!
   What: Reunion
13 Host: Power
   Start Time: Friday, March 20 at 1:00am
14 End Time: Friday, March 20 at 11:55pm
   Where: Power
15
   To see more details and RSVP, follow the link below:
16 http://www.facebook.com/n/?event.php&eid=[redacted]

17 Thanks,
   The Facebook Team
   ___
18
   Want to control which emails you receive from Facebook? Go to:
19
   http://www.facebook.com/editaccount.php?notifications&md=ZXZlbnRRfaW52aXRlO2Zyb
20 209MTEzNTM3MDM4NztlaWQ9NDc0NjIwODYxODk7dG89MTEwNzc2ODMyOA==
   ```

21    71.    The unsolicited commercial messages do not properly identify the initiators of the

22 messages, nor do they provide clear or conspicuous notice that the messages are advertisements

23 for Power.com, information on how recipients can opt-out of future messages, or a valid address

24 that recipients can use to contact the Defendants.

25    72.    Power.com's offer of potential monetary compensation induces Facebook users to

26 participate in Power.com's "Launch Promotion."  Power.com then sends these unsolicited

27 messages to the user's Facebook friends.

28

- 13 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

73.    Defendants' use of a Facebook address to send these messages and deceptive sender and signature information is likely to confuse recipients and lead to the false impression that Facebook is affiliated with, endorses, or sponsors these messages.

**3.    Defendants Are Violating Facebook's Intellectual Property Rights**

74.    Upon information and belief, Defendants developed computer software and other automated devices and programs to access and obtain information from the Facebook website for aggregating services.

75.    Upon information and belief, Defendants accessed and copied the Facebook website (including but not limited to, creation of cached copies of the website) to develop, test, implement, use and provide Defendants' aggregating services.

76.    Defendants without authorization have used the famous FACEBOOK mark in commerce to advertise Defendants' services on the Internet in a manner likely to confuse consumers as to its association, affiliation, endorsement or sponsorship with or by Facebook

77.    Defendants' unauthorized use of the FACEBOOK mark includes, but is not limited to, use of the mark on Power.com's website to advertise its services and in unsolicited promotional emails sent to current Facebook users.

78.    Defendants' use of the FACEBOOK mark causes confusion and mistake and is likely to deceive customers and potential customers regarding the origin, affiliation, association, connection, and/or endorsement of Defendants' services and website with or by Facebook.

79.    At no time has Facebook authorized or consented to Defendants' use of the FACEBOOK mark or any other Facebook intellectual property.

80.    At no time has Facebook had any association, affiliation or connection with, or endorsed Defendants' services, Power.com's website or Defendants.  Specifically, Defendants' services are not authorized, approved, endorsed or sponsored by, or associated, affiliated or connected with Facebook, and Defendants and Power.com's website is not authorized, approved, endorsed, or sponsored by, or associated, affiliated or connected with Facebook.

81.    In using the FACEBOOK mark, Defendants have willfully and deliberately sought to profit from Facebook's pre-established goodwill and reputation.

- 14 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

82.    Facebook has suffered significant harm to its reputation and goodwill due to Defendants' actions and will continue to suffer irreparable harm to its reputation and goodwill if Defendants' conduct is not enjoined.

83.    Facebook has suffered economic damages in excess of $5,000, including effort and resources used to investigate and combat Defendants' unauthorized access to Facebook computers and sending of unsolicited commercial messages, to prevent further attacks and to locate and identify the Defendants.

84.    Upon information and belief, Defendants willfully and maliciously engaged in unauthorized access to and appropriation of Facebook computers, servers, systems, networks and data, including network information, Facebook user information, and Facebook user login information.

85.    Upon information and belief, Defendants willfully and maliciously sent deceptive and unsolicited commercial messages in order to trick Facebook users into believing that Facebook authorized Defendants' solicitation of their login credentials and to thereby profit from Defendants' unlawful spamming scheme.

86.    Defendants benefited financially from their behavior while at the same time harming Facebook and its users.

### VI.    CLAIMS FOR RELIEF

#### FIRST CLAIM FOR RELIEF
#### VIOLATION OF CONTROLLING THE ASSAULT OF NON-SOLICITED PORNOGRAPHY AND MARKETING ("CAN-SPAM"), 15 U.S.C. § 7701, *et seq.*

87.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in all the preceding paragraphs.

88.    Facebook is a provider of Internet access service as defined in 15 U.S.C. § 7702(11) because it provides a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package to consumers.

89.    Facebook's website and computers operate in interstate and foreign commerce and communication and are therefore protected computers under 15 U.S.C. § 7702(13).

- 15 -

90.     Facebook's computers that operate the website are involved in interstate and foreign commerce and communication and are therefore protected computers under 15 U.S.C. § 7702(13).

91.     The electronic messages initiated by Defendants were "commercial" electronic messages because their primary purpose was the commercial advertisement or promotion of a commercial product or service (including content on an Internet website operated for a commercial purpose) as provided in 15 U.S.C. § 7702(2)(A).

92.     Defendants intentionally misled Facebook users by initiating the transmission of commercial electronic messages through Facebook's computers to Facebook users that contained header information that was materially false or misleading as to the true identity of the sender of the messages in violation of 15 U.S.C. § 7704(a)(3).

93.     Defendants initiated the transmission of commercial electronic messages, in a pattern or practice, through Facebook's computers to Facebook users, that did not contain a functioning return electronic mail address or other Internet-based opt-out mechanism in violation of 15 U.S.C. § 7704(a)(3).

94.     Defendants initiated the transmission of commercial electronic messages, in a pattern or practice, through Facebook's computers to Facebook users, that did not contain clear and conspicuous identification that the messages were advertisements or solicitations, clear and conspicuous notice of the opportunity to decline to receive further commercial emails from the sender, and a valid physical postal address of the sender in violation of 15 U.S.C. § 7704(a)(5).

95.     Defendants initiated the transmission of commercial electronic messages, in a pattern or practice, through Facebook's computers to Facebook users, that contained "from" lines that were misleading regarding the actual sender of the message and misleading regarding Facebook's connection to the messages in violation of 15 U.S.C. § 7704(a)(2).

96.     Facebook is informed and believes, and based thereon alleges, that Defendants initiated the transmission of the misleading commercial electronic messages with actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that the

- 16 -

1   messages' subject heading would be likely to mislead a recipient, acting reasonably under the

2   circumstances.

3       97.     Facebook is informed and believes, and based thereon alleges, that Defendants

4   initiated the transmission of commercial electronic messages, in a pattern or practice, through

5   Facebook's computers to Facebook users, that are misleading and unlawful under 15 U.S.C.

6   § 7704(a), as alleged above, or assisted in the origination of such messages through the

7   unauthorized relay or retransmission of the messages as defined in 15 U.S.C. § 7704(b)(3).

8       98.     Defendants have caused Facebook harm by deterring users and potential users

9   from using Facebook; by damaging Facebook's goodwill and reputation with its customers; and

10  by causing other injuries to Facebook.

11      99.     Facebook is entitled to an injunction prohibiting further violations of CAN-SPAM

12  by Defendant as provided by 15 U.S.C. § 7706(g)(1)(A), since it will continue to suffer

13  immediate and irreparable harm if Defendants' conduct is not enjoined.  Facebook has no

14  adequate remedy at law.

15      100.    Facebook is entitled to the greater of its actual monetary loss or statutory damages

16  as provided by 15 U.S.C. § 7706(g)(1)(B), in an amount to be proven at trial.

17      101.    Facebook is entitled to an award of aggravated damages in an amount equal to

18  three times the amount otherwise available pursuant to 15 U.S.C. § 7706(g)(3)(C) because

19  Defendants violated CAN-SPAM willfully and knowingly and because Defendants' unlawful

20  activity included one or more of the aggravated violations set forth in 15 U.S.C. § 7704(b).

21      102.    Facebook is entitled to reasonable costs, including reasonable attorneys' fees as

22  provided by 15 U.S.C. § 7706(g)(4).

23          **<u>SECOND CLAIM FOR RELIEF</u>**

24  **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *et seq.***

25      103.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth

26  herein, the allegations in all the preceding paragraphs.

27      104.    Facebook's computers are involved in interstate and foreign commerce and

28  communication, and are protected computers under 18 U.S.C. § 1030(e)(2).

- 17 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

1    105.    On information and belief, Defendants knowingly and intentionally accessed

2   Facebook's computers without authorization or in excess of authorization as defined by

3   Facebook's Terms of Use.

4    106.    On information and belief, after gaining unauthorized access to Facebook servers,

5   Defendants obtained and used valuable information from Facebook's protected computers in

6   transactions involving interstate or foreign communications.  This information included, among

7   other things, Facebook users' friend lists, and the means of sending messages to those friends.

8   The use included sending unauthorized messages from Facebook user accounts without

9   authorization and copying proprietary Facebook data and re-displaying it on Power.com's

10  website.

11   107.    Defendants knowingly, willfully, and with an intent to defraud accessed

12  Facebook's computers without authorization or in excess of authorization and obtained valuable

13  information from Facebook's computers that, on information and belief, Defendants used to

14  obtain something of value.

15   108.    Defendants knowingly, willfully, and with an intent to defraud trafficked in login

16  information through which computers were accessed without authorization, affecting interstate

17  commerce.

18   109.    Defendants' conduct has caused a loss to Facebook during a one-year period in

19  excess of $5,000.

20   110.    Facebook has been damaged by Defendants' actions, including being forced to

21  expend resources to investigate the unauthorized access and abuse of its computer network.

22  Facebook seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g) in an amount

23  to be proven at trial.

24   111.    Facebook has suffered irreparable and incalculable harm and injuries resulting

25  from Defendants' conduct, which harm will continue unless Defendants are enjoined from further

26  unauthorized use of Facebook's protected computers.  Facebook has no adequate remedy at law.

27

28

- 18 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

**THIRD CLAIM FOR RELIEF**
**CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS**
**AND FRAUD ACT, CALIFORNIA PENAL CODE § 502**

112.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations contained in all the preceding paragraphs.

113.    Defendants knowingly accessed and without permission used Facebook data, computers, computer systems and/or computer network in order to devise and/or execute a scheme to defraud and deceive in violation of California Penal Code § 502(c)(1).

114.    Defendants knowingly accessed and without permission took, copied, and/or used data from Facebook's computers, computer systems and/or computer network in violation of California Penal Code § 502(c)(2).

115.    Defendants knowingly and without permission used or caused to be used Facebook's computer services in violation of California Penal Code § 502(c)(3).

116.    Defendants knowingly and without permission accessed and added data to Facebook's computers, computer systems and/or computer network in violation of California Penal Code § 502(c)(4).

117.    Defendants knowingly and without permission accessed or caused to be accessed Facebook's computers, computer systems, and/or computer network in violation of California Penal Code § 502(c)(7).

118.    Facebook suffered and continues to suffer damage as a result of Defendants' violations of the California Penal Code § 502 identified above.

119.    Defendants' conduct also caused irreparable and incalculable harm and injuries to Facebook (including, but not limited to, Facebook's reputation and goodwill), and, unless enjoined, will cause further irreparable and incalculable injury, for which Facebook has no adequate remedy at law.

120.    Defendants willfully violated California Penal Code § 502 in disregard and derogation of Facebook's rights and the rights of legitimate Facebook users, and Defendants' actions as alleged above were carried out with oppression, fraud and malice.

- 19 -

SER376

121.    Pursuant to California Penal Code § 502(e), Facebook is entitled to injunctive relief, compensatory damages, punitive or exemplary damages, attorneys' fees, costs and other equitable relief.

### FOURTH CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT (DIRECT VICARIOUS AND CONTRIBUTORY)
### 17 U.S.C. § 101, *et seq.*

122.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in all the preceding paragraphs.

123.    Plaintiff Facebook owns and has registered copyrights in its website.

124.    Defendants had and have access to Facebook's website.

125.    Defendants have copied and/or created derivative works from Facebook's website and/or portions thereof, and continues to do so.

126.    Defendants' copies and/or derivative works are substantially similar to Facebook's original copyright-protected website.

127.    The copies and/or derivative works created by Defendants are unauthorized.

128.    At all times relevant, Defendants obtained direct financial benefit from the infringement and had the right and ability to control the infringing conduct, and/or intentionally induced, encouraged, caused or materially contributed to the infringement.

129.    The foregoing acts of Defendants constitute direct infringement, vicarious infringement, and/or contributory infringement of Facebook's exclusive rights in its copyrighted works under 17 U.S.C. § 106.

130.    Upon information and belief, Defendants' actions were and are intentional, willful, wanton and performed in disregard of Facebook's rights.

131.    Plaintiff Facebook has been and will continue to be damaged, and Defendants have been unjustly enriched by, Defendants' unlawful infringement.

132.    Defendants' conduct also has caused irreparable and incalculable harm and injuries to Facebook, and, unless enjoined, will cause further irreparable and incalculable injury, for which Facebook has no adequate remedy at law.

- 20 -

SER377

1    133.    Plaintiff Facebook is entitled to the relief provided by 17 U.S.C. §§ 502-505,

2    including but not limited to, injunctive relief, an order for the impounding and destruction of all

3    of Defendants' infringing copies and/or derivative works, compensatory damages (including, but

4    not limited to actual damages and/or Defendants' profits), statutory damages, punitive damages,

5    and Facebook's costs and attorneys' fees in amounts to be determined at trial.

6                          **FIFTH CLAIM FOR RELIEF**
     **VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA")**
7                        **17 U.S.C. § 1201, *et seq.***

8    134.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth

9    herein, the allegations in all the preceding paragraphs.

10   135.    Plaintiff Facebook has registered copyrights in its website.

11   136.    Plaintiff Facebook employs numerous technological measures, including

12   identification and blocking the IP addresses of known offenders.

13   137.    Defendants have circumvented and are circumventing technological measures that

14   effectively control access to Facebook's copyrighted website and portions thereof.

15   138.    On information and belief, Defendants manufacture, import, provide, offer to the

16   public, or otherwise traffics in technology, products, services, devices, components, or parts

17   thereof, that are primarily designed or produced for the purpose of circumventing technological

18   measures and/or protection afforded by technological measures that effectively control access to

19   Facebook's copyrighted website and/or portions thereof.

20   139.    On information and belief, Defendants' technology products, services, devices,

21   components or parts thereof, are primarily designed or produced for the purpose of circumventing

22   technological measures and/or protection afforded by technological measures that effectively

23   control access to Facebook's copyrighted website and/or portions thereof.

24   140.    On information and belief, Defendants' technology, products, services, devices,

25   components, or parts thereof have no or limited commercially significant purpose or use other

26   than to circumvent technological measures that effectively control access to the Facebook website

27   and/or portions thereof.

28

- 21 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

SER378

1    141.    On information and belief, Defendants and/or others acting in concert with

2    Defendants market such technology, products, services, devices, components, or parts thereof

3    with Defendants' knowledge for use in circumventing technological measures that effectively

4    control access to Facebook's website and/or portions thereof.

5    142.    Facebook has been and will continue to be damaged in an amount not presently

6    known with certainty, but which will be proven at trial.

7    143.    Defendants' conduct also has caused irreparable and incalculable harm and

8    injuries to Facebook, and, unless enjoined, will cause further irreparable and incalculable injury,

9    for which Facebook has no adequate remedy at law.

10    144.    Facebook is entitled to the range of relief provided by 17 U.S.C. §§ 1201-1203,

11    including, but not limited to, injunctive relief, compensatory damages or statutory damages,

12    punitive damages, and Facebook's costs and attorneys' fees in amounts to be proven at trial.

13
**SIXTH CLAIM FOR RELIEF**
14    **TRADEMARK INFRINGEMENT, 15 U.S.C. §§ 1114 and 1125(a)**

15    145.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth

16    herein, the allegations in all the preceding paragraphs.

17    146.    Plaintiff Facebook owns U.S. federal registrations 3041791, 3122052 for the

18    FACEBOOK mark.  These registrations are in full force and effect and are enforceable.

19    147.    At all times relevant, Defendants exercised ownership or control over online

20    advertising for its products, services and websites, and knowingly cooperated in and/or induced

21    encouraged, enabled or aided the infringement of Facebook's trademark rights in online

22    advertising for its products, services and website.

23    148.    Defendants' use of the FACEBOOK mark in interstate commerce is likely to cause

24    customer confusion or to cause mistake or to deceive as to the origin of the products and services

25    offered and sold by Defendants and as to their affiliation, connection, or association with and/or

26    endorsement or approval by Facebook.

27

28

- 22 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

149.    The foregoing acts of Defendants constitute false designation of association, affiliation, connection, endorsement and/or approval under 15 U.S.C. § 1125(a), and/or vicarious or contributory infringement of Facebook's rights under 15 U.S.C. § 1125(a).

150.    Defendants' actions also constitute the use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of a registered trademark of Facebook in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion or mistake, or to deceive, in violation of 15 U.S.C. § 1114.

151.    Upon information and belief, Defendants have engaged in such false designation of origin, association, affiliation, connection, endorsement and/or approval knowingly, willfully, deliberately, and in conscious disregard of Facebook's rights, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

152.    Facebook has been damaged and will continue to be damaged, and Defendants have been unjustly enriched, by such unlawful conduct in an amount to be proven at trial.

153.    In addition, Defendants' conduct described herein has caused and, if not enjoined, will continue to cause irreparable damage to Facebook's rights in its marks, and to the business, positive reputation and goodwill of Facebook, which cannot be adequately compensated solely by monetary damages.  Facebook therefore has no adequate remedy at law and seeks permanent injunctive relief pursuant to 15 U.S.C. § 1116.

**SEVENTH CLAIM FOR RELIEF**
**TRADEMARK INFRINGEMENT UNDER CALIFORNIA LAW**

154.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in all the preceding paragraphs.

155.    Plaintiff Facebook owns common law rights in the FACEBOOK mark that date back to 2004.

156.    The acts and conduct of Defendants as alleged in the Sixth Claim for Relief immediately above constitute trademark infringement under the common law of California

- 23 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

**EIGHTH CLAIM FOR RELIEF**
**UNLAWFUL, UNFAIR, AND FRAUDULENT COMPETITION UNDER**
**CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, et seq.**

157.    Plaintiff Facebook realleges and incorporates by reference, as is fully set forth herein, the allegations in all the preceding paragraphs.

158.    The acts and conduct of Defendants as alleged above in this Complaint constitute unlawful, unfair, and/or fraudulent business acts or practices as defined by Cal. Bus. & Prof. Code § 17200 et seq.

159.    Defendants' acts of unlawful, unfair, and fraudulent competition have caused harm to competition, to consumers, and to its competitors.  Defendants' acts of unlawful, unfair, and fraudulent competition have proximately caused Facebook to suffer injury in fact and loss of money and/or property (including as a result of expenses that Facebook has incurred, and continues to incur, in its efforts to prevent and deter Defendants from engaging in unlawful conduct) in an amount to be proven at trial.  Defendants' acts of unlawful, unfair, and fraudulent competition also have caused irreparable and incalculable injury to Facebook, to the FACEBOOK mark and trade name and to the business and goodwill represented thereby, and, unless enjoined, could cause further irreparable and incalculable injury, whereby Facebook has no adequate remedy at law.

**VII.    PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff Facebook prays for the following relief:

A.    For injunctive relief, as follows:  A permanent injunction enjoining and restraining Defendants, and all persons or entities acting in concert with them, during the pendency of this action and thereafter perpetually from:

1.    soliciting and/or storing Facebook login information;

2.    accessing or attempting to access Facebook's website and computer systems;

3.    initiating unsolicited commercial electronic mail messages to Facebook users;

- 24 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

1        4.    procuring unsolicited commercial electronic mail messages to Facebook

2        users;

3        5.    displaying Facebook's trademark anywhere on their websites;

4        6.    engaging in any activity that disrupts, diminishes the quality of, interferes

5        with the performance of, or impairs the functionality of Facebook's

6        website; and

7        7.    engaging in any activity that violates Facebook's Terms of Use.

8      B.    An award to Facebook of damages, including but not limited to, compensatory,

9  statutory, and punitive damages, as permitted by law and in such amounts to be proven at trial.

10     C.    An award to Facebook of reasonable costs, including reasonable attorneys' fees.

11     D.    For pre and post-judgment interest as allowed by law.

12     E.    For such other relief as the Court may deem just and proper.

13

14  DATED:  January 13, 2009          **PERKINS COIE LLP**

15                        By:/s/ _____

16                          David P. Chiappetta

17                    Attorneys for Plaintiff

18                    FACEBOOK, INC.

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable in this action.

DATED: January 13, 2009                    **PERKINS COIE** LLP

By:/s/ _____
            David P. Chiappetta

Attorneys for Plaintiff
FACEBOOK, INC.

- 26 -

FIRST AMENDED COMPLAINT
60406-0005.0036/LEGAL15115748.5

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 31, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*
Eric A. Shumsky
*Counsel for Plaintiff-Appellee*